**No. 24-7497**
**Consolidated with Nos. 21-70168, 21-70670**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

YUROK TRIBE, ALASKA COMMUNITY ACTION ON TOXICS, CENTER FOR ENVIRONMENTAL TRANSFORMATION, and CONSUMER FEDERATION OF AMERICA,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,

*Respondents*.

---

On Petitions for Review of Final Agency Actions of the United States Environmental Protection Agency
86 Fed. Reg. 880 (Jan. 6, 2021) and 89 Fed. Reg. 91,486 (Nov. 19, 2024)

---

# PETITIONERS' OPENING BRIEF

---

Katherine K. O'Brien
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

Kelly E. Lester
Earthjustice
48 Wall St., Floor 15
New York, NY 10005
(332) 251-0243
klester@earthjustice.org

Alana R. Reynolds
Earthjustice
1001 G St., Ste. 1000
Washington, DC 20001
(202) 797-4311
areynolds@earthjustice.org

*Counsel for Petitioners*

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Ninth Circuit Rule 26.1-1, Petitioner Yurok Tribe states that it is a sovereign nation and federally recognized Indian Tribe. Petitioners Alaska Community Action on Toxics, Center for Environmental Transformation, and Consumer Federation of America state that they are non-profit corporations, have no parent corporation, and no publicly held corporation owns 10% or more of their stock.

DATED: June 6, 2025

/s/Katherine K. O'Brien
Katherine K. O'Brien

# TABLE OF CONTENTS


RULE 26.1 DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ........................................................................v

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................3

ISSUES PRESENTED ..................................................................................4

STATUTES AND REGULATIONS ...............................................................5

STATEMENT OF THE CASE ......................................................................5

I. WIDESPREAD EXPOSURE TO DECABDE ENDANGERS HUMAN HEALTH AND THE ENVIRONMENT ..................................................5

A. DecaBDE's Uses ..............................................................................5

B. Exposures to DecaBDE ....................................................................7

1. DecaBDE exposure from articles ...............................................9

2. DecaBDE exposure from environmental releases .......................10

C. DecaBDE's Toxic Effects ................................................................13

II. TSCA REQUIRES EPA TO IMPOSE ALL PRACTICABLE MEASURES TO REDUCE DECABDE EXPOSURE ..................................................16

III. EXEMPTIONS AND LOOPHOLES IN EPA'S AMENDED RULE WILL PERPETUATE DECABDE EXPOSURE FOR YEARS TO COME .........18

A. The 2021 Rule ...............................................................................18

B. The 2024 Amendments ...................................................................20

SUMMARY OF ARGUMENT ....................................................................23

STANDARD OF REVIEW .........................................................................24

ARGUMENT ............................................................................................26

I. PETITIONERS HAVE STANDING .......................................................26

II. THE AMENDED RULE'S RECYCLING EXEMPTION IS UNLAWFUL .....................................................................................29

A. EPA Misinterpreted What Risk Management Measures Are "Practicable"—and Therefore Required—Under TSCA Section 6(h) ....30

B. EPA's Assertion That It Would Be Impracticable to Regulate Recycling of Plastics Containing DecaBDE Is Arbitrary and Unsupported ....36

C. EPA's Other Justifications for the Recycling Exclusion Are Unavailing ....40

III. THE AMENDED RULE'S DISPOSAL EXCLUSION IS UNLAWFUL....44

A. TSCA Requires EPA to Address Ongoing Exposures and Risks from DecaBDE Disposal....45

B. EPA's Failure to Regulate DecaBDE Disposal Is Unlawful ....47

1. EPA irrationally dismissed practicable measures for reducing decaBDE exposures from disposal....47

2. EPA's reliance on RCRA fails to justify the disposal exclusion..50

IV. THE AMENDED RULE FAILS TO ADDRESS DECABDE EXPOSURES AND RISKS FROM CONTAMINATED WASTEWATER AS TSCA REQUIRES ....56

A. DecaBDE Discharges Generate Ongoing Exposure to DecaBDE and Threaten Human Health and the Environment....58

B. The Amended Rule Fails to Restrict DecaBDE Discharges as TSCA Requires....59

V. THE AMENDED RULE FAILS TO REDUCE DECABDE EXPOSURES FROM CONTAMINATED SEWAGE SLUDGE AS TSCA REQUIRES ....62

A. Land-Application of Sewage Sludge Releases DecaBDE into the Environment ....63

B. The Amended Rule Unlawfully Fails to Address Exposures and Risks from DecaBDE-Contaminated Sewage Sludge ....65

VI. REMEDY ....68

CONCLUSION....70

CERTIFICATE OF COMPLIANCE....72

## TABLE OF AUTHORITIES

### Cases

*A Cmty. Voice v. EPA*,
997 F.3d 983 (9th Cir. 2021) .......... 42, 69

*Am. Farm Bureau Fed'n v. EPA*,
559 F.3d 512 (D.C. Cir. 2009) .......... 69

*Am. Textile Mfrs. Inst., Inc. v. Donovan*,
452 U.S. 490 (1981) .......... 32, 34, 51

*Am. Unites for Kids v. Rousseau*,
985 F.3d 1075 (9th Cir. 2021) .......... 26–27

*Ass'n of Irritated Residents v. EPA*,
10 F.4th 937 (9th Cir. 2021) .......... 27

*Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*,
159 F.3d 1178 (9th Cir. 1998) .......... 29

*Beno v. Shalala*,
30 F.3d 1057 (9th Cir. 1994) .......... 28

*Chem. Mfrs. Ass'n v. EPA*,
859 F.2d 977 (D.C. Cir. 1988) .......... 26, 37

*Covington v. Jefferson Cnty.*,
358 F.3d 626 (9th Cir. 2004) .......... 28

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
698 F.3d 1101 (9th Cir. 2012) .......... 51–52

*Ctr. for Biological Diversity v. Zinke*,
900 F.3d 1053 (9th Cir. 2018) .......... 40

*Ctr. for Food Safety v. Regan*,
56 F.4th 648 (9th Cir. 2022) .......... 70

*Earth Island Inst. v. Hogarth*,
494 F.3d 757 (9th Cir. 2007) .................................................................. 25, 59, 62

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ..........................................................................................27

*Hall v. Norton*,
266 F.3d 969 (9th Cir. 2001) ..............................................................................27

*Humane Soc'y of U.S. v. Locke*,
626 F.3d 1040 (9th Cir. 2010) ............................................................................44

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ..........................................................................................26

*In re Leite*,
112 F.4th 1246 (9th Cir. 2024) ...........................................................................33

*Lab. Council for Latin Am. Advancement v. EPA*,
12 F.4th 234 (2d Cir. 2021) ...............................................................................26

*Lanuza v. Love*,
899 F.3d 1019 (9th Cir. 2018) ............................................................................34

*League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060 (9th Cir. 2012) ........................................................... 42, 44

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..................................................................................... 26, 31

*Lopez v. Garland*,
116 F.4th 1032 (9th Cir. 2024) ...........................................................................26

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
463 U.S. 29 (1983) ....................................................................................... 25, 44

*Nat Res. Def. Council v. EPA*,
735 F.3d 873 (9th Cir. 2013) ..............................................................................27

*Nat. Res. Def. Council v. Pritzker*,
828 F.3d 1125 (9th Cir. 2016) ............................................................................67

*Nw. Coal. for Alternatives to Pesticides (NCAP) v. EPA*,
544 F.3d 1043 (9th Cir. 2008) .......... 67–68

*Nw. Env't Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) .......... 62

*Pollinator Stewardship Council v. EPA*,
806 F.3d 520 (9th Cir. 2015) .......... 69

*Rancheria v. Jewell*,
776 F.3d 706 (9th Cir. 2015) .......... 49

*Safer Chems., Healthy Fams. v. EPA*,
943 F.3d 397 (9th Cir. 2019) .......... 16

*Sierra Club v. EPA*,
167 F.3d 658 (D.C. Cir. 1999) .......... 52

*Sierra Club v. EPA*,
346 F.3d 955 (9th Cir. 2003) .......... 56

*Sierra Club v. EPA*,
671 F.3d 955 (9th Cir. 2012) .......... 37, 56

*United States v. Wenner*,
351 F.3d 969 (9th Cir. 2003) .......... 35–36

*Varity Corp. v. Howe*,
516 U.S. 489 (1996) .......... 36

*Vinyl Inst., Inc. v. EPA*,
106 F.4th 1118 (D.C. Cir. 2024) .......... 26, 40, 49, 52, 56

**Statutes**

5 U.S.C. § 706(2)(A) .......... 25

15 U.S.C. § 2605(a) .......... 17, 18, 34, 35, 66

15 U.S.C. § 2605(a)(6)(A) .......... 45

15 U.S.C. § 2605(c)(2) .......... 35

15 U.S.C. § 2605(c)(2)(A) ....................35

15 U.S.C. § 2605(c)(2)(B) ....................35

15 U.S.C. § 2605(g) ....................18

15 U.S.C. § 2605(h) .................... 1, 16, 23, 30

15 U.S.C. § 2605(h)(1).................... 16, 17, 69

15 U.S.C. § 2605(h)(3)....................69

15 U.S.C. § 2605(h)(4)....................

....................17, 23, 24, 30, 32–34, 35, 42, 44, 45, 47, 49, 51, 58, 62, 63, 65, 68

15 U.S.C. § 2605(i)(2) ....................3

15 U.S.C. § 2618(a)(1)(A) ....................3, 4

15 U.S.C. § 2618(c)(1)(B) .................... 24, 30, 37, 63, 68

15 U.S.C. § 2618(c)(1)(B)(i)(I).................... 25, 41

15 U.S.C. § 2625(h) ....................18

33 U.S.C. § 1345(d) ....................66

33 U.S.C. § 1345(d)(2)(A) ....................66

33 U.S.C. § 1345(d)(2)(C) ....................66

42 U.S.C. § 6949a(c)(5).................... 53, 54, 55

42 U.S.C. §§ 6924–6925 ....................52

**Regulations**

40 C.F.R. § 23.5 ....................3

40 C.F.R. § 240.100 ....................52

40 C.F.R. §§ 240.200–240.211-3 ....................52

40 C.F.R. pt. 257, subpt. A ....................................................................54

40 C.F.R. pt. 257, subpt. B .................................................................... 54–55

40 C.F.R. § 257.2 ....................................................................54

40 C.F.R. pt. 258, subpt. D .................................................................... 54–55

40 C.F.R. pt. 258, subpt. E ....................................................................54

40 C.F.R. § 258.1(f)(1)(i) .................................................................... 54–55

40 C.F.R. § 503.13 ....................................................................66

40 C.F.R. § 503.16 ....................................................................66

40 C.F.R. § 751.401 .................................................................... 2, 24

40 C.F.R. § 751.401(b)(2) ....................................................................44

40 C.F.R. § 751.403 .................................................................... 2, 9, 22, 57–58

40 C.F.R. § 751.405 .................................................................... 2, 24

40 C.F.R. § 751.405(a) ....................................................................18

40 C.F.R. § 751.405(a)(2) ....................................................................19

40 C.F.R. § 751.405(a)(2)(iii)–(iv) ....................................................................57

40 C.F.R. § 751.405(b) ....................................................................29

40 C.F.R. § 751.405(d) .................................................................... 22, 31

40 C.F.R. § 751.405(e) .................................................................... 22, 31

40 C.F.R. § 761.50(a)(3) ....................................................................61

**Legislative History**

162 Cong. Rec. 7984 (2016) .................................................................... 17, 33

H.R. Rep. No. 114-176 (2015) ....................................................................16

**Federal Register Notices**

Alaska: Tentative Determination and Final Determination of Full Program Adequacy of the State of Alaska's Municipal Solid Waste Landfill Permit Program, 65 Fed. Reg. 453 (Jan. 5, 2000) ............................................ 53, 55–56

Guidance Document on Hazardous Additive, Non-Polymeric Organohalogen Flame Retardants in Certain Consumer Products, 82 Fed. Reg. 45,268 (Sept. 28, 2017) ..................................................................14

**Other Authorities**

*Interim Strategy – Land Application of Biosolids Containing PFAS* (2024), Mich. Dept. of Env't, Great Lakes, and Energy, https://www.michigan.gov/egle/about/organization/water-resources/biosolids/pfas-related (last visited June 4, 2025) ......................... 66–67

Minn. Pollution Control Agency, *Minnesota Biosolids PFAS Strategy* (2025), https://www.pca.state.mn.us/sites/default/files/wq-wwprm2-113b.pdf...............66

N.Y. State Dept. of Env't Conservation, *DMM-7/ Biosolids Recycling in New York State – Interim Strategy for the Control of PFAS Compounds* (2023), https://extapps.dec.ny.gov/docs/materials_minerals_pdf/dmm7.pdf..................67

## INTRODUCTION

This case challenges regulations promulgated by the Environmental Protection Agency ("EPA") that exempt critical sources of exposure to the toxic flame retardant chemical decabromodiphenyl ether, or "decaBDE." DecaBDE has been used for decades in items ranging from car parts to curtains, despite evidence that it causes cancer, reproductive harm, damage to children's brain development, and other serious health harms.

When Congress amended the Toxic Substances Control Act ("TSCA") in 2016, it singled out a class of uniquely dangerous chemicals that includes decaBDE for strong and swift regulatory action: these chemicals are known as "PBTs" because they *persist* for long periods of time in the environment, *bioaccumulate* in living things, and are *toxic* even in small doses. Because EPA ranked decaBDE high for these dangerous characteristics, TSCA required EPA to promulgate expedited restrictions on the production, distribution, use, recycling, and disposal of decaBDE that will address the chemical's risks to human health and the environment and implement *all* practicable measures to reduce human and environmental exposures to decaBDE. 15 U.S.C. § 2605(h).

Contrary to that directive, in 2021 EPA issued regulations that left major sources of ongoing decaBDE exposure completely unregulated. 1-ER-0002–0016

(the "2021 Rule"). Although EPA subsequently reconsidered the 2021 Rule with the stated goal of further reducing exposures, the product of its years-long reconsideration was an amended rule that doubled down on the 2021 Rule's core deficiencies—failing to adopt any measures to reduce decaBDE exposures from recycling most plastics containing decaBDE and using that plastic in new consumer goods, from disposal of solid waste containing decaBDE, from ongoing discharges of decaBDE in wastewater, and from the use of decaBDE-contaminated sewage sludge as fertilizer. 1-ER-0017–0051 (the "2024 Amendments").

Petitioners are the Yurok Tribe and allied health and environmental advocacy organizations who seek to reduce their members' exposure to decaBDE in the air they breathe, the water they drink and fish in, the food they eat, and the products they use. Petitioners also seek to protect wildlife harmed by decaBDE—including endangered salmon populations integral to the culture and economy of Petitioner Yurok Tribe. Accordingly, Petitioners seek an order from this Court declaring unlawful EPA's 2021 Rule and 2024 Amendments (collectively, the "Amended Rule," *codified at* 40 C.F.R. §§ 751.401, 751.403, 751.405) and compelling EPA to eliminate the rule's unlawful loopholes.

## JURISDICTIONAL STATEMENT

The Courts of Appeals have exclusive jurisdiction to review rules issued under TSCA. 15 U.S.C. § 2618(a)(1)(A); *see also id.* § 2605(i)(2).

EPA promulgated the 2021 Rule on January 21, 2021. 1-ER-0002; *see also* 40 C.F.R. § 23.5 (authorizing EPA to specify promulgation date for judicial review purposes). Petitioner Alaska Community Action on Toxics timely petitioned this Court for review of the 2021 Rule on January 27, 2021. Petition for Review, No. 21-70168, Dkt. No. 1-4; *see* 15 U.S.C. § 2618(a)(1)(A) (providing that any person may petition for review of TSCA rule within 60 days of promulgation). Petitioners Yurok Tribe, Consumer Federation of America, and Center for Environmental Transformation timely petitioned this Court for review of the 2021 Rule on March 19, 2021. Petition for Review, No. 21-70670, Dkt. No. 1-3.

EPA promulgated the 2024 Amendments on December 3, 2024. *See* 1-ER-0017 (amendments published November 19, 2024); 40 C.F.R. § 23.5 (providing that rule is promulgated for judicial review purposes two weeks after publication unless otherwise specified). Petitioners Yurok Tribe, Alaska Community Action on Toxics, Center for Environmental Transformation, and Consumer Federation of America (collectively, "Petitioners") timely filed a petition for review in this Court on December 12, 2024, Petition for Review, No. 24-7497, Dkt. No. 1.1, which was

consolidated with the challenges to the 2021 Rule by this Court's order of January 24, 2025, Order, No. 24-7497, Dkt. No. 13.1.

Petitioner Yurok Tribe is a sovereign nation and federally recognized Indian tribe whose reservation and seat of government are located within this Circuit. 7-ER-1474–1475. Petitioner Alaska Community Action on Toxics' principal place of business is located within this Circuit. Pamela K. Miller Decl. ¶ 6. Accordingly, venue is proper in this Circuit. 15 U.S.C. § 2618(a)(1)(A).

## ISSUES PRESENTED

1. Whether the Amended Rule's exemption for recycling plastics containing decaBDE, and the use of such plastics in new articles, violates TSCA.

2. Whether the Amended Rule's exemption for disposal of decaBDE and materials containing decaBDE violates TSCA.

3. Whether EPA's failure in the Amended Rule to restrict decaBDE discharges in wastewater from facilities that manufacture, process, and dispose of articles containing decaBDE violates TSCA.

4. Whether EPA's failure in the Amended Rule to restrict the concentration of decaBDE in land-applied sewage sludge violates TSCA.

## STATUTES AND REGULATIONS

Pertinent statutes, regulations, and legislative history appear in the accompanying addendum.

## STATEMENT OF THE CASE

### I. WIDESPREAD EXPOSURE TO DECABDE ENDANGERS HUMAN HEALTH AND THE ENVIRONMENT

EPA recognizes that persistent, bioaccumulative, and toxic—or "PBT"—chemicals like decaBDE "are of particular concern with regard to human and environmental health" because they "remain in the environment for long periods of time, can accumulate up the food chain …, and have toxic attributes in small quantities." 2-ER-0168. Because of these characteristics, once decaBDE and other PBTs are released into the environment, "they can cause adverse health and ecological consequences for … years to decades or more[]." *Id.* In light of decaBDE's PBT characteristics, more than 180 nations and the European Union have committed to ban decaBDE under an international treaty known as the Stockholm Convention. 2-ER-0173; 3-ER-0486.

#### A. DecaBDE's Uses

DecaBDE has been used for decades as a flame retardant in numerous products, including electronics, appliances, car and airplane parts, wiring and other building materials, furniture, mattresses, apparel, curtains, and children's products.

1-ER-0006, 0012; 2-ER-0053, 0060. DecaBDE's primary use is in high-impact polystyrene plastic, from which enclosures for computers, televisions, and other electronics are made. 2-ER-0066. Because of its widespread use in plastics that are eventually recycled, decaBDE also is in consumer goods made from recycled plastics, including children's toys and kitchen utensils. 2-ER-0192; 5-ER-0977.

DecaBDE is part of a class of chemically related flame retardants called polybrominated diphenyl ethers, or "PBDEs." PBDEs are typically added to products in high volumes, constituting up to 25% of the product weight. 3-ER-0306.[1]

Though the major domestic manufacturers and importers of decaBDE committed to voluntarily phase out decaBDE by the end of 2013 due to its health and environmental risks, 3-ER-0313–0314, the record reflects that substantial decaBDE manufacturing and importing persisted in the U.S. years later. In its proposal for the 2021 Rule, EPA stated that 500,000 to 1,000,000 pounds of decaBDE were manufactured or imported in the U.S. in 2015 and asked "why some companies are still processing and using decaBDE despite phase-out initiatives and the availability of relatively inexpensive substitutes." 2-ER-0060;

---

[1] "Each individual PBDE variant … is referred to as a congener." 5-ER-0808. DecaBDE is a commercial mixture of PBDE congeners composed primarily of the congener "BDE-209." 2-ER-0168.

*see also* 5-ER-0847–0848 (EPA official reporting that decaBDE imports "*increased* since the domestic phase out" deadline and "as much as 530 tons were imported in 2016" (emphasis added)).

Further, EPA has acknowledged that environmental releases of decaBDE from ongoing use, recycling, and disposal of materials containing it "are likely to *increase* over time until the stock of available materials with decaBDE is depleted." 3-ER-0402 (emphasis added). Given the long service lives of many items containing decaBDE—such as airplanes and building materials—these releases may continue for decades. Yet, as discussed below, these are the very phases of the decaBDE lifecycle that EPA has left largely unregulated.

### B. Exposures to DecaBDE

DecaBDE is an "additive" flame retardant, meaning it is "mixed into plastics or foam without forming chemical bonds." 4-ER-0754 (Bramwell et al. 2016); *see also* 3-ER-0305–0306 (EPA assessment). Therefore, decaBDE can "readily migrate from products to the surrounding environment during manufacture, normal use, and disposal" of materials containing it. 3-ER-0305–0306 (EPA assessment); *see also* 4-ER-0681.

DecaBDE enters the bodies of exposed people and other organisms, 4-ER-0676 (Stockholm Convention report), and it can build up, or "bioaccumulate," in

living things over time, 1-ER-0007. DecaBDE has been detected in human blood, umbilical cord blood, placental tissue, fetal tissue, and breast milk, and in fish, amphibians, birds, mammals, and invertebrates. 3-ER-0353–0362, 0365–0381. DecaBDE can pass from a pregnant person's body into their developing fetus. 6-ER-1254 (Costa et al. 2008). And while decaBDE and other PBDEs have been detected "in individuals from all around the world," their levels in North Americans are "particularly alarming, as they are one to two orders of magnitude higher than those reported in Europe and Japan." *Id.*

DecaBDE has been detected in organisms, sediment, and soil worldwide. 4-ER-0690. Indeed, decaBDE has been detected even in remote regions far from identifiable point sources, demonstrating that it is capable of "long-range transport." 2-ER-0067. For example, through a process known as global distillation, significant volumes of decaBDE are transported via atmospheric currents to the Arctic, driving dangerously high exposures among people and wildlife there. 7-ER-1434–1435; Miller Decl. ¶¶ 13–21.

EPA determined that decaBDE exposure "is likely to the general population, consumers and commercial users, susceptible subpopulations (such as workers, subsistence fishers, and children), and the environment." 3-ER-0294. "Hundreds of studies show that DecaBDE has been detected in a wide variety of [environmental]

media"—including indoor dust, indoor air, ambient air, surface and groundwater, soil, sediment, wastewater, sewage sludge, landfill leachate, vegetation, food, incinerator waste, and sea water. 3-ER-0314 (EPA assessment).

As noted, once decaBDE is released into the environment, it "is very persistent." 4-ER-0676. When decaBDE does break down, it can generate even "more persistent, toxic and bioaccumulative" byproducts. *Id.*

### 1. DecaBDE exposure from articles

DecaBDE emissions from consumer goods, vehicle components, and building materials—denominated "articles" in EPA's rule, 40 C.F.R. § 751.403—are "substantial," 4-ER-0682 (Stockholm Convention report). As a result, decaBDE is "ubiquitous in indoor air and dust," 4-ER-0754, and contaminated dust is the primary way people are exposed to PBDEs like decaBDE. 3-ER-0405; 1-ER-0007; 4-ER-0795.

In addition to the many articles to which decaBDE is intentionally added, decaBDE is also "widely present in children's toys made of recycled plastic," 4-ER-0738 (DiGangi et al. 2017); *see also* 4-ER-0576–0577 (Norwegian Environment Agency report), and other recycled-content articles in which flame retardants are not intended, including food-contact materials, hair accessories, bedding, and clothing, 4-ER-0676; 5-ER-0977; 5-ER-1005–1006; 7-ER-1571. This

is because decaBDE "can persist through recycling processes for some time." 2-ER-0192. Indeed, "polystyrene [plastics] containing DecaBDE can withstand five cycles of regrind and molding" without the chemical breaking down. *Id.* DecaBDE's presence in recycled-content food-contact materials "is particularly concerning, since [flame retardants like decaBDE] may leach during use" and contaminate food. 7-ER-1571 (Liu et al. 2024). Studies also show that flame retardants in toys "can leach into children's saliva through mouthing of toys." *Id.*

As discussed below, infants and children are especially susceptible to harm from decaBDE—and they experience more exposure than adults. 4-ER-0676, 0693–0694 (Stockholm Convention report). Exposure to decaBDE that leaches from articles "is a particular concern" for children because of their tendency to put objects in their mouth and spend more time on the floor than adults, leading to more ingestion and inhalation of, and skin contact with, contaminated dust. 5-ER-0956. Children also are exposed to decaBDE in food, 4-ER-0692; 2-ER-0236, and breastfeeding babies are exposed through contaminated breast milk, 1-ER-0007; 6-ER-1254; 4-ER-0692.

**2. DecaBDE exposure from environmental releases**

DecaBDE releases into air, water, and soil also generate human and wildlife exposures.

Recycling plastics containing decaBDE is "an important source of environmental releases" of decaBDE, 4-ER-0682 (Stockholm Convention report), and "contributes to significant environmental pollution and health risks for local populations" near recycling facilities, 6-ER-1300 (Stockholm Convention report). EPA claimed without support that decaBDE releases from recycling facilities generally "are expected to be minimal," and worker exposures "[l]imited." 3-ER-0312. But studies in the record document substantially elevated decaBDE levels in the air inside and outside electronics recycling facilities and the air outside vehicle recycling facilities, 6-ER-1242, 1246, 1248–1249, as well as in the blood of people who work in or live near facilities where electronics are dismantled for recycling, 6-ER-1255; 4-ER-0701. Workers processing electronics and vehicles for recycling commonly work without personal protective equipment that could reduce their exposure to decaBDE. 7-ER-1426.

Disposal of articles containing decaBDE also generates environmental releases and exposures. *See* 3-ER-0311–0313 (EPA assessment); 4-ER-0536, 0586. DecaBDE is in multiple waste streams, including end-of-life vehicles and electronic, textile, household, and construction waste, 7-ER-1494, which may be disposed of by incineration or landfilling, *see* 6-ER-1203 (estimating that more than 1,000 metric tons of decaBDE were incinerated or landfilled in the U.S. in

2005). Landfilling and incineration of waste containing decaBDE can contaminate soil, 3-ER-0405–0406, and decaBDE has been found in wastewater, landfill leachate, incinerator waste, sludge from landfills and municipal solid waste incinerators, and air near municipal solid waste incinerators, *see* 3-ER-0314, 0327, 0339, 0346–0350; 6-ER-1201; 5-ER-0919; 7-ER-1542. Because decaBDE does not break down easily, contamination from disposal can persist in soil and sediment for years. 2-ER-0192; *see also* 7-ER-1553; 9-ER-2211.

DecaBDE also enters the environment through wastewater discharges. 3-ER-0314, 0332, 0347–0349; 7-ER-1652; 7-ER-1594–1595, tbl. 1; 7-ER-1540–1542, 1552–1553. A 2009 study concluded that decaBDE discharges "to aquatic systems and coastal oceans [are] increasing exponentially," and noted that "the widespread presence of [decaBDE] in household products ensures a continued delivery to the environment for years or decades even after production [of decaBDE] ceases." 7-ER-1659–1662. Studies in Washington, for example, have found that wastewater discharges contribute up to 38% of total PBDE pollution in Puget Sound. 7-ER-1682, 1691. These discharges generate exposures to wildlife and people, who may be exposed to decaBDE and other PBDEs through direct contact with contaminated waters and consumption of fish and shellfish. 7-ER-1487; 3-ER-0403.

To the extent that wastewater treatment removes decaBDE before it is discharged, that decaBDE concentrates in sewage sludge, a semi-solid byproduct of the wastewater treatment process. *See* 6-ER-1207 (EPA explaining that "sewage sludge is a major sink for [decaBDE]"). Each year in the U.S., approximately 3.8 million metric tons of sewage sludge, or "biosolids," are spread on soil as fertilizer. 6-ER-1206; 8-ER-1849. This practice disperses decaBDE in the environment, contaminating soil, crops, wild foods, and waterways. 3-ER-0314, 0403, 0405; 6-ER-1219.

Due to widespread environmental releases of decaBDE, the chemical is "widely present in food." 4-ER-0692. DecaBDE is found at particularly high levels in edible fish. 3-ER-0403. As a result, EPA determined that people who practice subsistence fishing or otherwise consume more "locally sourced" fish—as well as locally sourced game or produce—are likely to have "higher levels of exposure [to decaBDE] than the general population." *Id.*

### C. DecaBDE's Toxic Effects

This widespread exposure to decaBDE is alarming because of its serious toxic effects. DecaBDE damages the immune system, reproductive system, brain, thyroid, liver, and other organs. *See, e.g.*, 1-ER-0007, 0012; 3-ER-0427; 4-ER-0676, 0694, 0697–0698; 2-ER-0237, 0238. DecaBDE exposure is also linked to

cancer, 1-ER-0007, 0012; 2-ER-0169, endocrine disruption, 4-ER-0676–0677, 0700, and altered gene expression, 1-ER-0007, 0012; 4-ER-0697–0698.

In addition, a substantial body of evidence links decaBDE to serious and irreversible harm to brain development, making it especially dangerous to fetuses, infants, and children. 1-ER-0007, 0012; 4-ER-0697; 2-ER-0237; *see also* Guidance Document on Hazardous Additive, Non-Polymeric Organohalogen Flame Retardants in Certain Consumer Products, 82 Fed. Reg. 45,268, 45,269 (Sept. 28, 2017) (Consumer Product Safety Commission stressing that organohalogen flame retardants, which include PBDEs such as decaBDE, "have a disproportionately negative health effect on vulnerable populations, including children"). "Studies have shown that decaBDE exposure during development is linked to a range of adverse neurological effects, including impairments in learning," altered reflexes, behavioral changes, impaired memory, and reduced IQ. 2-ER-0237 (EPA analysis); 3-ER-0427; *see also* 5-ER-0945–0946 (Rice et al. 2007) ("[D]ecaBDE is a developmental neurotoxicant that can produce long-term behavioral changes following a discrete period of … exposure [during pregnancy]."); 4-ER-0699 (Stockholm Convention report explaining links between decaBDE exposure in infancy and "lower mental development scores in children 12–18 months of age" and evidence that "prenatal or postnatal exposure to [decaBDE] delays cognition").

Laboratory studies have demonstrated that decaBDE can harm the developing brain at real-world exposure levels experienced by pregnant people. 4-ER-0697.

As with people, decaBDE is toxic to fish, mammals, and invertebrates. 1-ER-0007. Studies show that existing levels of decaBDE in the environment are killing or harming birds, amphibians, and fish. 4-ER-0676–0677, 0691. Among other adverse effects on wildlife, PBDEs such as decaBDE are toxic to salmon, and researchers have concluded that PBDE contamination threatens the recovery of imperiled salmon populations that are integral to the ecosystems of the Pacific Northwest and to the culture and economy of Petitioner Yurok Tribe and other Tribal Nations. 7-ER-1488–1489.

Further, "there is concern that [decaBDE] and other PBDEs may act in combination" to harm brain development and cause other adverse health effects "in both humans and wildlife at environmentally relevant concentrations"—*i.e.*, real-world exposure levels. 4-ER-0676. This raises serious concerns because "wildlife and humans are typically not only exposed to [decaBDE] alone but rather to a complex mixture of multiple PBDEs" and other persistent toxic pollutants, and their combined effects "may be much larger than indicated by the sum of the effects of the individual [chemicals]." 4-ER-0699–0700.

## II. TSCA REQUIRES EPA TO IMPOSE ALL PRACTICABLE MEASURES TO REDUCE DECABDE EXPOSURE

When Congress amended TSCA in 2016, it recognized that PBT chemicals like decaBDE are uniquely dangerous pollutants that must be regulated aggressively to safeguard human health and the environment. *See* 15 U.S.C. § 2605(h); *Safer Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 406 (9th Cir. 2019) (explaining that Congress substantially amended TSCA in 2016 to address "persistent concerns about the pace of EPA's work" and "the ability of the Agency to use its existing authority" (quoting H.R. Rep. No. 114-176, at 12–13 (2015))).

Because of the unique risks PBTs pose, Congress mandated "expedited action" by EPA to minimize exposure to these chemicals. 15 U.S.C. § 2605(h)(1) (capitalization omitted). Specifically, TSCA section 6(h) requires EPA to promulgate, by December 22, 2020, risk management rules for chemicals listed in EPA's 2014 TSCA Work Plan for Chemical Assessments that EPA (1) reasonably determines to be toxic; (2) rates high for either persistence or bioaccumulation (and high or moderate for the other); and (3) determines are likely to generate exposure to the general population, higher-risk groups such as workers or children, or the environment. *Id*. EPA rated decaBDE "high" for hazard, exposure, persistence, and bioaccumulation. 1-ER-0007.

EPA's PBT rules may employ a wide range of risk management tools set forth in TSCA section 6(a): EPA may ban or restrict manufacturing (defined to include importing), processing (including recycling), distribution in commerce, commercial use, and/or disposal of the chemical and establish notification, labeling, and recordkeeping requirements. 15 U.S.C. § 2605(a), (h)(1), (h)(4).

Under section 6(h), EPA must select a set of risk management measures for regulated PBTs that "address the [chemical's] risks of injury to health or the environment" and reduce human and environmental exposure "to the extent practicable." *Id.* § 2605(h)(4). TSCA's legislative history affirms that Congress intended "to the extent practicable" in section 6(h)(4) to mean to the "*maximum* extent practicable." 162 Cong. Rec. 7984 (2016) (emphasis added). Thus, EPA has explained that section 6(h) rules must "prohibit all activities that it is practicable to prohibit" to reduce PBT chemical exposures. 2-ER-0132. This distinguishes EPA's section 6(h) rules for PBTs from EPA's section 6(a) rules for other TSCA-regulated

chemicals, which must eliminate risks to health or the environment that EPA finds "unreasonable." 15 U.S.C. § 2605(a).[2]

In promulgating risk management rules, EPA must apply the "best available science." *Id*. § 2625(h).

## III. EXEMPTIONS AND LOOPHOLES IN EPA'S AMENDED RULE WILL PERPETUATE DECABDE EXPOSURE FOR YEARS TO COME

### A. The 2021 Rule

On January 6, 2021, EPA promulgated a section 6(h) risk management rule for decaBDE.[3] 1-ER-0002. The 2021 Rule generally prohibits manufacturing, processing, and distribution of decaBDE and articles or products containing it, with delayed compliance dates for multiple industries. 40 C.F.R. § 751.405(a). The delayed compliance dates range from 18 months following promulgation for decaBDE use in "curtains in the hospitality industry" to 15 years for decaBDE in motor vehicle replacement parts and, for decaBDE in airplane parts, whenever

---

[2] TSCA allows EPA to grant time-limited exemptions from risk management rules for "a critical or essential use" of a chemical if EPA demonstrates that "no technically and economically feasible safer alternative is available" and immediate regulation would "significantly disrupt the national economy, national security, or critical infrastructure." 15 U.S.C. § 2605(g). However, EPA did not make any such determinations for decaBDE.

[3] The same day, EPA promulgated rules for four additional PBTs, which are not at issue here. 1-ER-0003.

planes in use before January 8, 2024, reach the end of their service life. *Id.* § 751.405(a)(2).

Despite acknowledging that people and the environment may be exposed to decaBDE "at all stages of [the chemical's] lifecycle (*i.e.*, manufacturing, processing, use (industrial, commercial, and consumer), distribution, and disposal)," 1-ER-0007, the 2021 Rule explicitly exempted or declined to regulate multiple activities that generate decaBDE exposures, *see* 1-ER-0008 (stating that "EPA is not regulating all activities or exposures to decaBDE, even though [EPA's] Exposure and Use Assessment identified potential for exposures under many conditions of use" (citation omitted)).

First, EPA exempted from regulation recycling of plastics containing decaBDE and the manufacturing of new articles from that plastic, so long as "no new decaBDE is added during the recycling or production processes." 1-ER-0016.

Second, despite finding that disposal of decaBDE and the vast quantities of articles containing it generates exposures, 1-ER-0007–0008, EPA exempted disposal from regulation, 1-ER-0008.

Third, EPA established no restrictions on environmental releases of decaBDE to air, water, or soil, *see* 1-ER-0009–0012, despite determining that such releases occur throughout the chemical's life cycle, 3-ER-0311–0314. Relatedly,

EPA established no limits on the concentration of decaBDE in land-applied sewage sludge, despite the practice resulting in decaBDE contamination of soil, water, and food. 3-ER-0314, 0403.

### B. The 2024 Amendments

Approximately two months after promulgating the 2021 Rule, EPA announced it was "review[ing], and consider[ing] revising," that rule "with an eye towards reducing exposure to the extent practicable, environmental justice, scientific integrity, and EPA's mission of protecting human health and the environment." 6-ER-1294. EPA solicited public comment on the 2021 Rule, "including whether there are further exposure reductions that could be achieved, including exposure reductions for potentially exposed or susceptible subpopulations and the environment." 6-ER-1293.[4] Petitioners submitted extensive comments explaining how the 2021 Rule violates TSCA's mandate to address decaBDE's risks and adopt all practicable exposure-reduction measures. 7-ER-1430–1473; 7-ER-1474–1480.

On March 15, 2022, EPA moved this Court for a voluntary remand of the 2021 Rule for purposes of reconsidering it. U.S. EPA's Mot. for a Voluntary

[4] EPA simultaneously solicited comment on potential revisions to its rule for the PBT chemical PIP(3:1), which, as noted, is not at issue here. 6-ER-1293.

Remand Without Vacatur, No. 21-70168, Dkt. No. 31-1. This Court granted EPA's motion on June 23, 2022, and placed Petitioners' challenge to the 2021 Rule in abeyance. Order, No. 21-70168, Dkt. No. 41.

EPA published proposed amendments to the 2021 Rule for public comment on November 24, 2023. 6-ER-1267. Petitioners submitted comments explaining that, instead of "fix[ing] the unlawful rule[] that it promulgated in 2021, EPA's Proposed Amendments largely double down on the errors in the 2021 Rule[] and ignore the extensive information and arguments that [Petitioners] ha[d] presented in the intervening years identifying practicable measures to further reduce exposure to decaBDE." 7-ER-1405. In addition, Petitioner Yurok Tribe engaged in government-to-government consultation with EPA concerning needed amendments to the 2021 Rule. 1-ER-0019. During that process, the Tribe submitted comments to EPA in January 2023 further substantiating the need for additional measures to reduce decaBDE exposures from recycling, disposal, wastewater discharges, and sludge spreading, and the practicability of those measures. 7-ER-1481–1497.

EPA published its final amendments to the 2021 Rule on November 19, 2024. 1-ER-0017. Despite taking more than three years to revise the rule with the stated purpose of further reducing decaBDE exposures, the 2024 Amendments leave the 2021 Rule's deficiencies substantively unaltered. The 2024 Amendments

impose virtually no restrictions on recycling plastics containing decaBDE or using that plastic to manufacture new articles. 1-ER-0026. "[T]he one exception" is a requirement that the single company that recycles plastic shipping pallets containing decaBDE post signs warning its workers of potential decaBDE exposure and require use of personal protective equipment. 1-ER-0026; *see* 1-ER-0026–0027; 40 C.F.R. § 751.405(d), (e). The 2024 Amendments also include no restrictions on disposal of decaBDE or materials containing it. 1-ER-0026. They include no limits on the concentration of decaBDE in land-applied sewage sludge. 1-ER-0028–0029. And although the 2024 Amendments include a new restriction on decaBDE discharges to water "during manufacture, processing, and distribution in commerce of decaBDE and decaBDE-containing *products*," EPA refused to extend that prohibition to facilities engaged in manufacturing, processing (including recycling), distribution, or disposal of decaBDE-containing *articles*. 1-ER-0029 (emphasis added).[5] EPA adopted this narrow restriction for facilities handling raw decaBDE or decaBDE-containing *products* despite finding that discharges from such facilities "are not occurring," 6-ER-1363, whereas the record

---

[5] The Amended Rule defines as an "article" any "manufactured item … formed to a specific shape or design during manufacture"—such as components for electronics, cars, planes, or appliances—while "products" include only raw decaBDE, "a mixture containing [decaBDE], or any object that contains [decaBDE] or mixture containing [decaBDE] that is not an article." 40 C.F.R. § 751.403.

shows that facilities handling decaBDE-containing *articles* discharge significant volumes of decaBDE, 7-ER-1414–1417.

## SUMMARY OF ARGUMENT

TSCA singles out for expedited and stringent EPA regulation certain chemicals that are uniquely dangerous because they persist for many years in the environment, build up in living things over time, and are toxic even in small quantities. 15 U.S.C. § 2605(h); 2-ER-0168. DecaBDE is one such persistent, bioaccumulative, and toxic chemical, and it is associated with life-threatening and life-altering health harms including cancer and impairment of children's brain development. Accordingly, TSCA section 6(h) requires EPA to promulgate a risk management rule for decaBDE that, in EPA's words, "prohibit[s] all activities that it is practicable to prohibit" to reduce human and environmental exposures to decaBDE. 2-ER-0132; *see* 15 U.S.C. § 2605(h)(4).

EPA's Amended Rule for decaBDE defies that mandate. Rather than impose all practicable measures to reduce exposures, it largely codifies the status quo, in which "[m]anufacture and use of decaBDE is generally on the decline," 2-ER-0165, but exposures from use of existing articles containing decaBDE and the recycling and disposal of those articles "are likely to increase" for years to come absent regulatory intervention, 3-ER-0402 (EPA assessment). Specifically, the

Amended Rule exempts or otherwise fails to regulate: (1) nearly all recycling of plastics containing decaBDE and use of that plastic to produce new articles; (2) disposal of decaBDE and materials containing it; (3) wastewater discharges of decaBDE from facilities that manufacture, process, and dispose of articles containing decaBDE; and (4) use of decaBDE-contaminated sewage sludge as fertilizer. *See* 40 C.F.R. §§ 751.401, 751.405. For each of these activities, EPA acknowledged that decaBDE exposures are occurring but took no steps to reduce them—let alone all practicable steps, as TSCA requires. 15 U.S.C. § 2605(h)(4). As a result of these unjustified exclusions and omissions, the Amended Rule is arbitrary, contrary to TSCA, and not supported by substantial evidence. *Id.* § 2618(c)(1)(B). To remedy these deficiencies in the Amended Rule and the serious health and environmental risks associated with ongoing decaBDE exposures, Petitioners seek an order from this Court declaring the Amended Rule unlawful and ordering EPA to expeditiously promulgate further amendments to bring the rule into compliance with TSCA.

## STANDARD OF REVIEW

TSCA generally incorporates the standards of review in the Administrative Procedure Act ("APA"), 15 U.S.C. § 2618(c)(1)(B), which directs reviewing courts to declare unlawful and set aside agency action that is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious when "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). Even when an agency with "technical expertise" is acting "within its area of competence," the Court should not defer to the agency's analysis "when the agency's decision is without substantial basis in fact," the agency "did not consider all the relevant factors," or "there is no rational connection between the facts found and the determination made." *Earth Island Inst. v. Hogarth*, 494 F.3d 757, 766 (9th Cir. 2007).

TSCA further directs that courts should set aside EPA's risk management rule "if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole." 15 U.S.C. § 2618(c)(1)(B)(i)(I). TSCA's substantial evidence standard is distinct from "the APA's arbitrary-and-capricious standard" and is "particularly demanding," requiring "that the reviewing court engage in a *searching review* of the Administrator's reasons and explanations for

the Administrator's conclusions." *Chem. Mfrs. Ass'n v. EPA*, 859 F.2d 977, 991–92 (D.C. Cir. 1988) (quotations omitted); *accord Lab. Council for Latin Am. Advancement v. EPA*, 12 F.4th 234, 245 (2d Cir. 2021). Under this "more searching and demanding" standard, EPA's action cannot be upheld where the "record lacks substantial evidence that the EPA *adequately* assessed available information." *Vinyl Inst., Inc. v. EPA*, 106 F.4th 1118, 1125, 1129 (D.C. Cir. 2024) (quotation omitted).

The Court "review[s] legal questions, including questions of statutory interpretation, *de novo*," *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024), and does not defer to the agency on such questions, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).

## ARGUMENT

### I. PETITIONERS HAVE STANDING

Petitioners have standing to challenge the Amended Rule. An organization has associational standing where (1) its members or supporters "would otherwise have standing to sue in their own right," (2) "the interests it seeks to protect are germane to the organization's purpose," and (3) "neither the claim[s] asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see Am. Unites for Kids v. Rousseau*, 985 F.3d 1075, 1096–97 (9th Cir. 2021)

(affirming that non-membership organizations with sufficient "indicia of membership" may establish associational standing). Petitioners' members, board and staff members, volunteers, and supporters (collectively, "members") "would otherwise have standing to sue" if they are harmed by the challenged action and a favorable decision is likely to redress their injuries. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

Here, Petitioners' members would have standing to sue in their own right because they are harmed by the exemptions and loopholes in the Amended Rule and that harm is likely to be redressed by a favorable decision from this Court. Petitioners' members face a "'credible threat' that [they] will be exposed" to decaBDE because of EPA's failure to regulate recycling and disposal of materials containing decaBDE, decaBDE discharges to water, and land application of decaBDE-contaminated sewage sludge as TSCA requires. *Nat Res. Def. Council v. EPA*, 735 F.3d 873, 879 (9th Cir. 2013); *see also Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021) (affirming that "a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of … cognizable interests that may confer standing" (quoting *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001)).

Petitioners' members live and work near the types of facilities identified in the record as ongoing sources of decaBDE exposure, including vehicle recyclers and solid waste incinerators. Kristin Marie Schrum Decl. ¶¶ 10–20; Jonathan Compton Decl. ¶¶ 2, 12–21. Petitioners' members practice subsistence fishing and hunting and they eat produce grown near vehicle recycling and waste incineration facilities, all of which are associated with heightened decaBDE exposure. Barry McCovey, Jr. Decl. ¶¶ 4, 6–9, 14; Viola Waghiyi Decl. ¶¶ 7–16; Miller Decl. ¶¶ 14–17, 21–25; Schrum Decl. ¶¶ 18–19. Petitioners' members and their children use articles that commonly contain and leach decaBDE, including kitchenware and toys made from recycled plastics. Lauren Hierl Decl. ¶¶ 9–11; Schrum Decl. ¶ 21; McCovey Decl. ¶¶ 12–13.

A favorable judicial decision is "likely" to redress this harm by compelling EPA to take action on remand to reduce decaBDE exposure among Petitioners' members, which satisfies the redressability requirement. *Covington v. Jefferson Cnty.*, 358 F.3d 626, 637 (9th Cir. 2004) (quotation omitted); *cf. Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir. 1994) (holding that redressability requirement was satisfied notwithstanding possibility that agency might reissue challenged decision on remand).

Further, Petitioners' lawsuit is germane to their purposes and does not require individual members' participation. The organizational Petitioners are dedicated to protecting their members from exposure to toxic chemicals like decaBDE. Compton Decl. ¶¶ 3, 8–10; Miller Decl. ¶¶ 6–7, 10–11; Paul Burns Decl. ¶¶ 2–3; Thomas Gremillion Decl. ¶¶ 2, 7–11. Petitioner Yurok Tribe has sovereign interests in protecting its members' health and stewarding Yurok lands, waters, and subsistence species. 7-ER-1474–1476. Finally, the participation of Petitioners' individual members is not required because Petitioners seek only declaratory and injunctive relief. *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178, 1181 (9th Cir. 1998).

## II. THE AMENDED RULE'S RECYCLING EXEMPTION IS UNLAWFUL

The Amended Rule's exemption permitting virtually unrestricted recycling of plastics containing decaBDE, and the use of that plastic to manufacture new articles, violates TSCA. *See* 40 C.F.R. § 751.405(b).[6] Continued introduction of decaBDE into recycling streams disperses the chemical into the environment and indoor spaces, "from which recovery is not technically or economically feasible."

---

[6] As discussed *supra* p. 22, the only exception to the Amended Rule's recycling exemption consists of worker-protection requirements for the single company recycling decaBDE-containing shipping pallets.

4-ER-0733 (DiGangi et al. 2017) (quoting Stockholm Convention report). And the record establishes that decaBDE poses serious health and environmental risks at real-world exposure levels. *E.g.*, 4-ER-0676–0677, 0691, 0694–0697, 0701–0703. EPA's conclusion that there are no practicable measures to reduce decaBDE exposures from recycling most plastics containing the chemical rests on a misinterpretation of the term "practicable" in TSCA section 6(h), 15 U.S.C. § 2605(h), and is arbitrary and unsupported by substantial evidence, *id.* § 2618(c)(1)(B).

### A. EPA Misinterpreted What Risk Management Measures Are "Practicable"—and Therefore Required—Under TSCA Section 6(h)

EPA's recycling exemption is contrary to TSCA, first, because it rests on an erroneous interpretation of the term "practicable" in section 6(h). 15 U.S.C. § 2605(h)(4). As EPA has acknowledged, section 6(h)(4) requires EPA to impose *all* "practicable" risk management measures to reduce exposure to PBT chemicals such as decaBDE. *Id.*; *see* 2-ER-0132 (EPA asserting that its rule "prohibit[s] all activities that it is practicable to prohibit" to reduce decaBDE exposure, based on "broad[]" mandate in section 6(h)(4)). In the challenged rule, however, EPA asserted that this mandate gives EPA discretion to reject risk management measures based on an open-ended set of factors "such … as achievability, feasibility,

workability, and reasonableness," as well as "the reasonably ascertainable economic consequences of the rule" and other considerations enumerated in TSCA section 6(c). 1-ER-0005; *see also* 1-ER-0022–0023. Based on that interpretation, EPA rejected any measures to reduce recycling-related exposures to decaBDE—save worker-protection requirements for a single company recycling shipping pallets, 40 C.F.R. § 751.405(d), (e); 1-ER-0026–0027—because it supposedly "would be difficult" to make general recycling restrictions "cost-effective," 1-ER-0011 (2021 Rule).[7]

Setting aside for the moment that EPA's cost claims lack any record support, *see infra* Point II.B, EPA's assertion that section 6(h)(4)'s practicability standard encompasses an open-ended set of discretionary factors such as reasonableness and cost-effectiveness is not the "best reading" of the statute. *Loper Bright*, 603 U.S. at 400.

The ordinary meaning of "practicable" is "feasible,"[8] "capable of being put into practice or of being done or accomplished,"[9] or "able to be done or put into

---

[7] Petitioners focus on EPA's rationales for the recycling exclusion in the 2021 Rule because EPA simply affirmed those rationales in the 2024 Amendments. 1-ER-0026.
[8] *Practicable*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/practicable (last visited June 1, 2025).
[9] *Id.*

action."[10] Consistent with these definitions, the Supreme Court has explained that "feasible," a synonym for "practicable," means "capable of being done, executed, or effected." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 508–09 (1981) (quotation omitted). Accordingly, the Court held that a statutory mandate to protect workers from harmful chemical exposures "to the extent feasible" is "limited only by the extent to which this is 'capable of being done,'" and prohibits the agency from rejecting regulatory measures that could be implemented based on cost-benefit judgments. *Id.* (quotation omitted). Instead, in directing the agency to adopt all feasible measures to protect workers' health, "Congress itself defined the basic relationship between costs and benefits, by placing the 'benefit' of the worker's health above all other considerations save those making attainment of this 'benefit' unachievable." *Id.* at 509.

Here too, in TSCA section 6(h)(4) Congress defined the cost-benefit relationship by directing EPA to adopt all exposure-reduction measures for decaBDE that are "practicable," *i.e.*, feasible or capable of being done. 15 U.S.C. § 2605(h)(4). In so doing, Congress prioritized exposure reduction over competing policy goals and deprived EPA of discretion to reject exposure-reduction measures

---

[10] *Practicable*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/practicable (last visited June 1, 2025).

that could be implemented based on EPA's judgments that they are not worth the costs or burdens they would impose.

TSCA's legislative history reinforces this interpretation. *See*, *e.g.*, *In re Leite*, 112 F.4th 1246, 1255–56 (9th Cir. 2024) (considering statute's text and legislative history to discern congressional intent). That history demonstrates that Congress intended "to the extent practicable" in section 6(h)(4) to mean to the "*maximum* extent practicable." 162 Cong. Rec. 7984 (2016) (emphasis added) (statement of lead Senate Democratic negotiators). Several sections of the enacted 2016 TSCA amendments bill "include[d] direction to EPA to take certain actions to 'the extent practicable,' in contrast to language in [the Senate bill requiring] … that actions be taken to 'the maximum extent practicable.'" *Id.* However, "[d]uring House-Senate negotiations on the bill, Senate negotiators were informed that House Legislative Counsel believed the terms 'extent practicable' and 'maximum extent practicable' are synonymous, and ultimately Congress agreed to include 'extent practicable' in the [enacted text] with the expectation that no change in meaning from [the bill] as reported by the Senate be inferred from that agreement." *Id.*

This history underscores that the Supreme Court's interpretation of the synonymous phrase "to the extent feasible" applies equally here: To satisfy TSCA's mandate to reduce decaBDE exposures "to the extent practicable," 15 U.S.C.

§ 2605(h)(4), EPA must adopt all exposure-reduction measures that are "capable of being done," *Am. Textile Mfrs.*, 452 U.S. at 509 (quotation omitted). While this does not preclude any consideration of costs, it limits that consideration to whether a measure's costs would make it *incapable* of being done—for example, by threatening an industry's viability. *See id.* at 535–36 (holding worker-protection standard was "*a fortiori* … 'economically feasible'" where regulated industry would not "as a whole … be seriously threatened" by compliance costs (quotation omitted)).

Thus, section 6(h)(4) deprives EPA of discretion to reject risk management measures based on EPA's judgment that it "would be difficult to make" the measure "cost-effective," as EPA did here. 6-ER-1276. Had Congress intended for EPA to impose only those risk management measures under section 6(h) that EPA deems reasonable or cost-effective, "it would have said so." *Lanuza v. Love*, 899 F.3d 1019, 1031 n.6 (9th Cir. 2018). For example, for section 6(a) rules for chemicals that are *not* subject to section 6(h)'s special provisions for persistent, bioaccumulative, and toxic chemicals, Congress directed EPA to impose risk management measures that are necessary to eliminate chemical risks that EPA deems "unreasonable." 15 U.S.C. § 2605(a).

Contrary to EPA's assertion, *see* 1-ER-0023; 1-ER-0005, TSCA section 6(c)(2), 15 U.S.C. § 2605(c)(2), does not alter this conclusion because that section applies only to standard section 6(a) risk management rules that must eliminate "unreasonable" risks. Section 6(a) states that, if EPA finds after a risk evaluation that a chemical presents unreasonable risk, it must "in accordance with subsection (c)(2)" select risk management requirements that will eliminate "such risk." *Id.* § 2605(a). Section 6(c)(2), in turn, requires EPA to "factor in, to the extent practicable," certain "considerations" when "selecting among prohibitions and other restrictions" to include in a section 6(a) rule, including "the reasonably ascertainable economic consequences of the rule." *Id.* § 2605(c)(2)(A), (B). But section 6(h) provides a directive distinct from the one in section 6(a) for selecting "prohibitions and other restrictions," *id.* § 2605(h)(4), to address the "particular concern" raised by PBT chemicals such as decaBDE, 2-ER-0168: For that specific subset of chemicals, instead of eliminating "unreasonable risk," 15 U.S.C. § 2605(a), EPA must select risk management measures that "address the risks" the PBT chemical poses and "reduce exposure … to the extent practicable," without regard to the section 6(c)(2) considerations or any other factors. 15 U.S.C. § 2605(h)(4); *see United States v. Wenner*, 351 F.3d 969, 975 (9th Cir. 2003) (affirming that, where two statutory provisions potentially apply to agency action,

"the specific trumps the general"); *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996) (warning against "applying a general provision when doing so would undermine limitations created by a more specific provision"). Interpreting section 6(c)(2) to give EPA discretion to consider factors beyond what exposure-reduction measures are practicable would undermine the specific mandate Congress established for PBT chemicals in section 6(h) and collapse the distinction it made between those PBTs and the much broader category of chemicals subject to regulation under section 6(a).

In sum, EPA's assertion that it may reject as not practicable restrictions on recycling plastics containing decaBDE because those restrictions purportedly are not cost-effective misapprehends the meaning of "practicable" in TSCA section 6(h) and is contrary to that provision.

### B. EPA's Assertion That It Would Be Impracticable to Regulate Recycling of Plastics Containing DecaBDE Is Arbitrary and Unsupported

Even assuming for the sake of argument that EPA had discretion to reject risk management measures for recycling based on judgments about their cost-effectiveness, which it does not, EPA's claim that such measures would be "difficult" to make "cost-effective" and "prohibitively expensive" is arbitrary and

not supported by substantial evidence. 1-ER-0011; 1-ER-0026; *see* 15 U.S.C. § 2618(c)(1)(B).

First, EPA hinged its general rejection of risk management measures for recycling on the purportedly "prohibitive[]" costs of identifying plastics containing decaBDE, but it cited *no* cost information to support that claim. 1-ER-0011 (2021 Rule asserting without support that it would be "prohibitively expensive" and "difficult to make plastic sorting for this purpose … cost-effective"); 1-ER-0026 (same in 2024 Amendments). EPA's failure "to provide an explanation for its choice rooted in the data presented was arbitrary and capricious," *Sierra Club v. EPA*, 671 F.3d 955, 968 (9th Cir. 2012), and falls short of TSCA's "particularly demanding" substantial evidence standard, *Chem. Mfrs.*, 859 F.2d at 992 (quotation omitted).

Indeed, EPA failed to address substantial evidence in the record that "[t]here are a variety of cheap, simple methods" for identifying plastics containing decaBDE and other PBDEs, 7-ER-1462 (quotation omitted); 4-ER-0743, which make separating such plastics from the recycling stream "possible at industrial scale," 4-ER-0581 (Norwegian Environment Agency report); *see also* 4-ER-0585 (explaining that "the [European Union] recycling industry is capable of separating plastics containing brominated flame retardants" such as decaBDE from other

recyclable material). These methods include "sink/float" systems that separate plastics with high bromine content (which reflects the addition of brominated flame retardants such as decaBDE), X-ray transmission scanning, and X-ray fluorescence scanning. 7-ER-1493; 9-ER-1975, 1980–1984, 1998–2003, 2009–2014.

Based on the availability of these technologies, the European Union has adopted regulations limiting the concentration of PBDEs, including decaBDE, in plastics accepted for standard recycling and in articles made from recycled plastic. 7-ER-1493–1494; 8-ER-1909–1911, 1919, 1927.[11] Those regulations were adopted after an in-depth assessment of the technological and economic feasibility of conducting the requisite plastics-sorting at industrial scale, 9-ER-1964–2084, which supported the conclusion that restricting concentrations of decaBDE and other PBDEs in recyclable plastics is compatible with ongoing recycling, including of electronics and vehicles, 7-ER-1493–1494; 9-ER-1984. Additionally, the Stockholm Convention's ban on decaBDE includes no recycling exemption. 3-ER-0486.

---

[11] The European Union regulations establish progressively more stringent limits on PBDE concentrations in waste accepted for standard recycling (and disposal), starting with a 500 parts-per-million ("ppm") limit and reducing to 350 ppm within three years and 200 ppm within five years. 7-ER-1493; 8-ER-1943, 1953–1955.

Based on this evidence, Petitioners argued in the rulemaking process that, at a minimum, it would be practicable for EPA to restrict decaBDE concentrations in recyclable material from specific waste streams—such as end-of-life vehicles, construction and demolition waste, and electronic waste—known to contain high levels of decaBDE. 7-ER-1493–1494. Alternatively, Petitioners urged EPA to reduce recycling-related exposures by limiting or prohibiting decaBDE releases to water from facilities that recycle electronics and/or end-of-life vehicles. 7-ER-1489. Both approaches would allow EPA to focus regulations on a discrete subset of recycling facilities while addressing most decaBDE in the recycling stream. *See* 7-ER-1494 (noting that, from 1970 to 2013, approximately 70% of decaBDE use in the U.S. was in electronics, wiring, and vehicle seating and that domestic e-waste contained approximately 2.7 million pounds of decaBDE in 2005 alone).

EPA offered no rational response to this evidence. It claimed that recycling restrictions are not practicable because "the only options to reduce exposure to decaBDE … in plastics that are being recycled would be to prohibit plastics recycling generally or to require testing of the incoming plastic stream to determine whether decaBDE … is present and prohibit recycling of those materials." 6-ER-1355. This assertion ignores the evidence in the record that identifying PBDE-containing plastics is feasible at industrial scale, the option of

restricting decaBDE in only high-priority recycling streams, and the option of restricting decaBDE discharges from specific recycling facilities, such as those processing vehicles or electronics. By "ignoring available data" demonstrating the practicability of reducing recycling-related exposures to decaBDE, EPA "acted in an arbitrary and capricious manner," *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018), and its conclusory assertions that regulating recycling of decaBDE-containing plastics in the U.S. would be impracticable does not provide "substantial evidence that the EPA *adequately* assessed available information," *Vinyl Inst.*, 106 F.4th at 1129.

### C. EPA's Other Justifications for the Recycling Exclusion Are Unavailing

The only other justifications EPA offered for its recycling exclusion — namely, EPA's desire to promote recycling and its claim that "low levels" of decaBDE typically appear in recycled-content articles, 1-ER-0011; 1-ER-0026— also fail because they are contrary to TSCA and not supported by substantial evidence.

To justify its recycling exemption, EPA invoked "the importance and impact of recycling, which contributes to American prosperity and the protection of our environment." 1-ER-0011; *see also* 1-ER-0026. This rationale fails at the outset because, as explained above, it ignores record evidence that it is feasible to restrict

decaBDE concentrations in recyclable plastics without compromising continued plastics recycling. EPA offered no evidence or analysis to rebut that conclusion. Moreover, EPA ignored evidence that permitting persistent, bioaccumulative, and toxic chemicals like decaBDE to proliferate in the environment and people's homes through recycling "will inevitably result in … the loss of the long-term credibility of recycling" and discourage consumers from purchasing recycled-content products because of well-founded concerns that such products are contaminated with toxic chemicals like decaBDE. 4-ER-0733 (DiGangi et al. 2017) (quotation omitted); *see* 7-ER-1464 (describing campaigns discouraging consumers from purchasing recycled plastic flooring due to evidence of contamination with toxic flame retardants and other chemicals). EPA never addressed this concern and provided no evidence—let alone the "substantial evidence" TSCA requires, 15 U.S.C. § 2618(c)(1)(B)(i)(I)—to support its conclusory assertion that allowing decaBDE to contaminate recycling streams and recycled-content articles will promote recycling.

Moreover, advancing "American prosperity" and the goal of generic environmental protection, 1-ER-0011—invoked by EPA in opposition to TSCA's mandate to adopt all practicable measures to reduce decaBDE exposure—are "factors Congress did not intend [EPA] to consider" in selecting risk management

measures under TSCA section 6(h). *League of Wilderness Defs.-Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1068 (9th Cir. 2012) (quotation omitted). Instead, Congress directed EPA to "select[] … prohibitions and other restrictions" for PBT chemicals such as decaBDE that will "address the [chemical's] risks of injury to health or the environment" and "reduce exposure to the substance"—including from recycling—"to the extent practicable." 15 U.S.C. § 2605(h)(4). It was unlawful for EPA to exempt recycling and recycled-content goods from its general restrictions on processing decaBDE based on policy preferences untethered from TSCA's mandate to reduce decaBDE exposures. *See A Cmty. Voice v. EPA*, 997 F.3d 983, 992 (9th Cir. 2021) (ordering EPA to reconsider TSCA regulation "because the EPA has looked to factors in addition to health," contrary to Congress's directive to consider health hazards alone).

Similarly, it was unlawful for EPA to reject risk management measures to reduce consumer exposure to decaBDE in recycled-content articles based on the unsubstantiated assertion that "decaBDE is typically present … at low levels" in such articles. 1-ER-0011; *see also* 1-ER-0026. As EPA acknowledged, PBT chemicals such as decaBDE "have toxic attributes in small quantities," 2-ER-0168, and build up in the body through repeat exposures over time, leading to a higher internal dose, 1-ER-0007. Further, studies have detected decaBDE in many

recycled-content articles, with the highest concentrations found in articles with significant exposure potential, including to children. *See*, *e.g.*, 5-ER-0969–0970 (Straková et al. 2018) (detecting decaBDE in 92% of sampled consumer goods identified as containing recycled plastic from electronic waste, with highest concentrations of measured PBDEs in toys, hair accessories, and kitchen utensils); 4-ER-0577; 7-ER-1571, 1573 (Liu et al. 2024) (detecting decaBDE in 70% of black plastic household products with elevated bromine levels, a proxy for recycled plastic content); 5-ER-0985 (summarizing research showing "considerable transfer" of PBDE flame retardants from kitchen utensils into cooking oil during food preparation).

EPA never addressed this evidence. The single source it cited to support its claim that decaBDE is present at low levels in recycled-content articles reported a broad range of decaBDE concentrations in such articles; while it characterized levels in recycled carpet padding and other foam materials as "low," it also reported decaBDE concentrations in toys that were tens of thousands of times higher. 4-ER-0576–0577 (cited in 2021 Rule, 1-ER-0011). Nor did EPA reconcile its position with TSCA section 6(h), which responds to the uniquely harmful properties of PBT chemicals by requiring EPA to reduce *all* exposures to the extent practicable and depriving EPA of discretion to leave exposures unaddressed

because the agency judges them to be "low level[]." 1-ER-0011; *see* 15 U.S.C. § 2605(h)(4); *League of Wilderness Defs.*, 689 F.3d at 1068. Moreover, even if it were correct, EPA's claim that consumers are likely to be exposed to only "low levels" of decaBDE from recycled plastic articles says nothing about the documented decaBDE exposures to workers, communities surrounding recycling facilities, and the environment from the recycling process itself. *See State Farm*, 463 U.S. at 43 (agency action is arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem").

In sum, EPA's conclusory assertion that decaBDE levels in recycled-content articles are sufficiently "low" to ignore them, without further explanation or evidence, falls short of EPA's duty to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Humane Soc'y of U.S. v. Locke*, 626 F.3d 1040, 1051 (9th Cir. 2010) (quoting *State Farm*, 463 U.S. at 43).

## III. THE AMENDED RULE'S DISPOSAL EXCLUSION IS UNLAWFUL

Despite identifying decaBDE exposures from disposal, in the Amended Rule EPA exempted from regulation the disposal of decaBDE and products and articles containing decaBDE. 40 C.F.R. § 751.401(b)(2). To support that exemption, EPA relied on conclusory assertions that general solid waste disposal requirements

under a different federal statute—the Resource Conservation and Recovery Act ("RCRA")— purportedly make regulation of decaBDE disposal under TSCA impracticable. EPA failed to rationally address evidence that disposal-related decaBDE exposures occur notwithstanding RCRA and other federal laws and that it is practicable to reduce those exposures using EPA's TSCA authority. EPA's refusal to regulate decaBDE disposal is contrary to TSCA, arbitrary, and unsupported by substantial evidence.

### A. TSCA Requires EPA to Address Ongoing Exposures and Risks from DecaBDE Disposal

As EPA recognized in promulgating its 2021 Rule, TSCA requires EPA to address risks presented by, and reduce exposure from, *any* activity involving decaBDE, including disposal. *See* 1-ER-0005 (explaining that TSCA requires EPA to "ensure[] that *any* activity involving a TSCA section 6(h) PBT chemical, past, present or future, is addressed by the regulatory approach taken" (emphasis added)). Indeed, TSCA expressly authorizes EPA to "prohibit[] or otherwise regulat[e] any manner or method" of disposal of decaBDE, or articles containing it, for commercial purposes. 15 U.S.C. § 2605(a)(6)(A); *see id.* § 2605(h)(4) (directing EPA to select risk management measures for PBTs from options set forth in section 6(a)). Yet EPA refused to use its authority to regulate disposal of decaBDE or materials containing it, even though EPA "identified potential for

exposures under … disposal," 1-ER-0008, and determined that environmental releases of decaBDE "associated with … disposal … are likely to *increase* over time" without regulatory intervention. 3-ER-0402 (emphasis added).

As discussed *supra*, pp. 11–12, decaBDE is released from solid waste incinerators and landfills. DecaBDE exposure also results from disposal practices common in tribal and rural communities—including the use of waste transfer stations, where solid waste can accumulate on the ground or in open containers, and open burning of solid waste. *See* 3-ER-0460–0462; 5-ER-1050–1051; 7-ER-1479. In Alaska, where members of Petitioner Alaska Community Action on Toxics live, there are more than 200 unlined municipal landfills serving approximately half the state's population, and they generate leachate that can drain to drinking water supplies and water bodies used for fishing. *See* 5-ER-1029; *see also* 5-ER-1050–1051; 3-ER-0460 (explaining that all rural landfills serving small communities in Alaska lack protective features like liners and leachate treatment). Alaska also permits waste burning at rural landfills in non-incinerator structures, which can release decaBDE and its toxic byproducts into the environment. *See* 7-ER-1451; 3-ER-0460; 4-ER-0613.

### B. EPA's Failure to Regulate DecaBDE Disposal Is Unlawful

Given the extensive evidence showing ongoing decaBDE exposures from disposal, EPA was required to adopt all practicable exposure-reduction measures. 15 U.S.C. § 2605(h)(4). EPA failed to do so—indeed, it did not meaningfully consider any options for reducing disposal-related exposures. Instead, EPA relied on the existence of RCRA to reject *any* risk management measures for disposal under TSCA, even though RCRA does not require all practicable measures to reduce decaBDE exposures and has failed to prevent disposal-related exposures to decaBDE.

#### 1. EPA irrationally dismissed practicable measures for reducing decaBDE exposures from disposal

EPA arbitrarily determined that it is impracticable to reduce decaBDE exposures from disposal.

As discussed *supra* Point II.B, multiple technologies are available to separate items containing PBDEs such as decaBDE from other waste "at industrial scale." 4-ER-0581 (Norwegian Environment Agency report); *see also* 7-ER-1512; 9-ER-2173–2177. Once identified, waste containing significant levels of decaBDE can be treated using multiple methods that reduce releases of decaBDE to the environment. For example, EPA could require solid waste incinerators handling such waste to employ widely available pollution-control technologies that would

reduce emissions of decaBDE and its toxic byproducts but are not uniformly required under existing law. *See* 7-ER-1510–1511 (comments from waste-combustion emissions expert identifying available technologies for reducing incinerator emissions of decaBDE); 7-ER-1496 (identifying widely used technology). EPA could also require disposal of materials containing high concentrations of decaBDE in "mono" landfills that hold only one type of waste—such as plastics—and mitigate conditions that promote leaching of decaBDE into the environment. *See* 7-ER-1513 (expert comments); 7-ER-1496. At a minimum, EPA could achieve significant exposure reductions by prioritizing for regulation specific waste streams known to contain higher levels of decaBDE, like auto shredder residue and electronic waste. 7-ER-1496.

Yet EPA did not adopt any of these requirements nor explain why they would be infeasible to implement, either economy-wide or for specific waste streams containing high levels of decaBDE. EPA also did not address record evidence showing that decaBDE disposal is more stringently regulated in many other nations, which further undermines EPA's conclusory assertion that it is impracticable to do so. The European Union, for example, limits the concentration of certain PBDEs, including decaBDE, in wastes accepted for standard disposal. *See* 7-ER-1493; 8-ER-1911–1912, 1927; 8-ER-1943. It established these

restrictions after analyzing whether there is sufficient capacity to treat waste containing elevated concentrations of decaBDE and other PBDEs in facilities with superior emissions controls and the technical and economic feasibility of doing so. 9-ER-1978, 1980–1984, 1998–2043. Similarly, the United Kingdom requires waste containing elevated concentrations of five PBDEs, including decaBDE, to be treated at disposal facilities "that can completely destroy … or irreversibly transform" the PBDE content, such as advanced incinerators. 9-ER-2088.

On this record, EPA's failure to adopt *any* measures to reduce decaBDE exposures from disposal violates TSCA's mandate to reduce all exposures to decaBDE to the extent practicable. 15 U.S.C. § 2605(h)(4). EPA's action is also arbitrary and unsupported by substantial evidence. EPA did not acknowledge, much less rationally address, any of the above record information in determining that it would be impracticable to regulate decaBDE disposal. *See* 2-ER-0121–0122 (2020 EPA Response to Comments) (absence); 6-ER-1356–1357 (2024 EPA Response to Comments) (absence). By "ignor[ing] important considerations [and] relevant evidence [i]n the record," EPA acted unlawfully. *Rancheria v. Jewell*, 776 F.3d 706, 714 (9th Cir. 2015); *see also Vinyl Inst.*, 106 F.4th at 1128 (EPA "must provide … an assessment of available information.").

### 2. EPA's reliance on RCRA fails to justify the disposal exclusion

EPA attempted to justify the disposal exclusion by pointing to general requirements for a limited set of waste disposal facilities under another federal statute, RCRA. In the 2021 Rule's preamble, EPA asserted that it would be "expensive and difficult" to regulate decaBDE disposal under TSCA given existing requirements in RCRA and other laws. 1-ER-0008. EPA repeated this justification in promulgating its 2024 Amendments, explaining that it "remain[ed] concerned" that adopting TSCA regulations for decaBDE disposal is "not practicable" because of existing RCRA requirements. 1-ER-0026. In reaching this conclusion, EPA unlawfully (1) failed to analyze whether exposure-reduction measures beyond the status quo are practicable, and (2) disregarded that RCRA allows for continued disposal-related exposures to decaBDE that EPA has the authority and obligation to eliminate under TSCA.

First, EPA impermissibly relied on RCRA to avoid analyzing whether additional measures to reduce decaBDE exposures are practicable. *See* 2-ER-0121–0122 (EPA disagreeing with commenters who argued EPA must analyze options for regulating decaBDE disposal under TSCA); *see also* 7-ER-1450–1451. Instead, EPA made only conclusory assertions that RCRA's existence makes any measures to reduce disposal-related exposures under TSCA "not practicable" and

asserted its "view" that it would be "expensive and difficult" to establish and administer any such requirements under TSCA. 1-ER-0008. Similarly, EPA rejected the suggestion that decaBDE, which is classified as a nonhazardous waste under RCRA, be classified as hazardous waste and therefore subject to more stringent RCRA disposal requirements because that purportedly would have undefined "impacts" on disposal capacity and be "very expensive" for industry and state and local governments. *Id.*

TSCA does not say that EPA need only impose measures to reduce decaBDE exposure that EPA finds cheap and easy; it requires EPA to impose all exposure-reduction measures that are practicable, *i.e.*, capable of being done. 15 U.S.C. § 2605(h)(4); *see supra* Point II.A. Accordingly, EPA was required to explain *why* it believes exposure-reduction measures under TSCA would be so expensive or difficult as to render them not "capable of being done." *Am. Textile Mfrs.*, 452 U.S. at 508–09 (quotation omitted); *see also supra* Point II.A. But nowhere in the record did EPA explain the nature or magnitude of the difficulty or expense it believes would arise from regulating decaBDE disposal under TSCA, nor articulate how EPA determined such measures could not be implemented. EPA therefore did not engage in the reasoned decision-making TSCA requires, which alone renders EPA's decision unlawful. *See Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,

698 F.3d 1101, 1124–25 (9th Cir. 2012) (affirming that agency must examine relevant data and explain its action in light of that data); *Sierra Club v. EPA*, 167 F.3d 658, 663–64 (D.C. Cir. 1999) (remanding agency action where agency "never adequately said *why* it believed" data justified its conclusion); *Vinyl Inst.*, 106 F.4th at 1127–28 (invalidating TSCA order where EPA failed to explain why available information supported its action). If it were adequate for EPA to avoid addressing ongoing exposures to persistent, bioaccumulative, and toxic chemicals like decaBDE simply by incanting that any such regulation would be expensive and difficult, section 6(h)'s mandate would be a dead letter.

Second, EPA's assertion that RCRA's "comprehensive, stringent" disposal scheme renders TSCA regulation impracticable is irrational because RCRA does not address many decaBDE exposures associated with disposal, including those affecting Petitioners' members. 1-ER-0008. For example, RCRA does not restrict decaBDE emissions from private or municipal solid waste incinerators processing "non-hazardous" wastes, which includes waste containing decaBDE. *Cf.* 42 U.S.C. §§ 6924–6925 (RCRA standards for hazardous waste facilities); *see also* 40 C.F.R. §§ 240.100, 240.200–240.211-3 (establishing RCRA guidelines for non-hazardous waste incineration that are mandatory only for federal agencies); 7-ER-1495

(explaining that RCRA permits incineration of wastes containing decaBDE in systems lacking practicable emissions controls); 7-ER-1451.

Further, RCRA allows waste burning to occur at rural Alaskan landfills in non-incinerator structures that lack any emissions controls, perpetuating exposures. *See* 42 U.S.C. § 6949a(c)(5) (providing for exemption from RCRA's landfill requirements for landfills serving Alaska Native villages and other small Alaskan communities); Alaska: Tentative Determination and Final Determination of Full Program Adequacy of the State of Alaska's Municipal Solid Waste Landfill Permit Program, 65 Fed. Reg. 453 (Jan. 5, 2000) (approving application of exemption); 5-ER-1029 (describing exposures); *see also* 3-ER-0461 (describing "federally compliant" burning of toxic waste without emissions controls in Alaska Native communities). RCRA also does not prevent decaBDE releases from solid waste transfer stations, where electronics, appliances, and other waste placed directly on the ground and exposed to the elements can release decaBDE to the environment. 3-ER-0462. Petitioners raised these concerns during the administrative process, but EPA never addressed this evidence; it simply repeated the inapposite assertion that RCRA provides criteria for landfills and ordinarily prohibits open dumping and burning of waste. *See* 6-ER-1356–1357; 2-ER-0121, 0145–0146.

EPA also disregarded that even RCRA's standards for landfills lack practicable requirements to reduce decaBDE exposures. For example, "[m]ore than 1,500 construction and demolition … landfills operate in the [U.S.], and U.S. federal regulations do not require containment features such as low-permeability liners and leachate collection systems for these facilities." 5-ER-1035 (National Tribal Toxics Council comments); *see also* 3-ER-0462; 40 C.F.R. § 257.2 (defining construction and demolition landfills and applicable requirements); 40 C.F.R. pt. 257, subpts. A, B (standards for construction and demolition landfills that do not mandate liners or leachate collection systems). EPA recognized that these landfills accept waste containing decaBDE but never addressed their lack of mandated mechanisms to reduce exposure. *See* 2-ER-0121 (acknowledging that "[w]astes containing [decaBDE] would be disposed of in … construction/demolition landfills" and listing federal criteria for such landfills that do not include liners or leachate collection systems).

RCRA also allows landfills serving Alaska Native villages and other small, rural communities to operate without protective features like liners, leachate collection systems, or groundwater monitoring. *See, e.g.*, 42 U.S.C. § 6949a(c)(5) (allowing certain Alaska landfills to avoid federal landfill requirements); 40 C.F.R. § 258.1(f)(1)(i) & subpts. D, E (exempting certain small landfills from, *inter alia*,

liner and leachate-collection requirements); 5-ER-1029; *see also* 3-ER-0460, 0463 (discussing exemptions' effect on tribal communities).[12] Contaminated leachate from these facilities can drain to waterways, exposing people and wildlife. 5-ER-1029; 3-ER-0461 (describing how "leachate-containing waters flow" from unlined landfills "to rivers and ponds, from which Alaska tribes obtain drinking water and foods").

In response to this evidence, EPA noted that RCRA exempts landfills serving Alaska Native villages and other remote Alaskan communities from RCRA requirements if Alaska's governor finds that those requirements are "infeasible," "not … cost-effective," or "otherwise inappropriate," 42 U.S.C. § 6949a(c)(5), saying that EPA also "presumes imposing regulatory standards for [these facilities] is not practicable," 2-ER-0122. In other words, EPA "presum[ed]" the impracticability of regulating decaBDE disposal in these Alaskan landfills based on a decades-old determination by a different entity that *RCRA* requirements—not any requirements EPA could adopt under TSCA—would be inappropriate. *Id.*; 65 Fed. Reg. at 455 (noting that Alaska Governor's certification invoking RCRA

[12] Further, even landfills that have these protective features can generate ongoing decaBDE exposure. DecaBDE is found in landfill leachate that is sent to wastewater treatment plants. *See* 7-ER-1524, 1540–1542. Given EPA's failure to adequately regulate decaBDE discharges from wastewater treatment plants, *see infra* Point IV, decaBDE in this leachate can end up in the environment.

exemption is from 1999). It is "unreasonable for EPA summarily to rely on the point of view taken under markedly different circumstances … without advancing an explanation for its action" based on the information presented in this rulemaking. *Sierra Club v. EPA*, 671 F.3d at 968.

In sum, "the record lacks substantial evidence that the EPA *adequately* assessed available information" showing substantial gaps in RCRA's regulation of decaBDE disposal that EPA is able and obligated to fill under TSCA, *Vinyl Inst.*, 106 F.4th at 1129, and EPA's assertion that existing federal disposal restrictions render TSCA regulation impracticable "runs counter to the evidence before the agency," *Sierra Club v. EPA*, 346 F.3d 955, 962 (9th Cir. 2003) (quotation omitted). Accordingly, the Amended Rule's disposal exemption cannot be upheld.

## IV. THE AMENDED RULE FAILS TO ADDRESS DECABDE EXPOSURES AND RISKS FROM CONTAMINATED WASTEWATER AS TSCA REQUIRES

EPA's failure to regulate decaBDE discharges in wastewater from facilities that manufacture, process, and dispose of articles containing decaBDE likewise violates TSCA.

EPA's 2021 Rule did not include any restrictions on decaBDE discharges to water, 1-ER-0016, despite substantial record evidence that such discharges generate exposures and risks to people and wildlife, along with evidence that those

discharges can be controlled through widely available wastewater treatment technologies. Accordingly, when EPA announced its intent to reconsider the 2021 Rule "with an eye towards reducing exposure to the extent practicable, environmental justice, scientific integrity, and EPA's mission of protecting human health and the environment," 6-ER-1294, Petitioners urged EPA to address this gap. Petitioners argued in public comments that EPA should, at minimum, establish discharge restrictions for facilities that are permitted to use decaBDE for many years under lengthy phase-out periods in EPA's rule, such as facilities manufacturing replacement parts for cars or planes, *see* 40 C.F.R. § 751.405(a)(2)(iii)–(iv), and other facilities known to be significant sources of decaBDE discharges, such as recyclers of electronic waste, vehicle recyclers, industrial laundries, shipbuilding facilities, metal finishers, landfills, and wastewater treatment plants. 7-ER-1487–1491; 7-ER-1414–1417; 7-ER-1540–1542.

In the 2024 Amendments, however, EPA adopted only a narrow restriction on decaBDE discharges "during the manufacturing, processing, and distribution in commerce of [raw] decaBDE and decaBDE-containing *products*." 1-ER-0028 (emphasis added). Because the rule defines materials such as electronics, vehicles, ship components, finished metal, and textiles as *articles*, not *products*, *see* 40

C.F.R. § 751.403; *see also supra* n.5, this restriction does nothing to address major sources of ongoing decaBDE discharges identified in the record. Indeed, EPA asserted that decaBDE discharges from the facilities it chose to regulate "are not occurring," 6-ER-1363; *see also* 1-ER-0028–0029, which indicates that the prohibition EPA imposed will not actually "*reduce* exposure" to decaBDE at all, 15 U.S.C. § 2605(h)(4) (emphasis added).

### A. DecaBDE Discharges Generate Ongoing Exposure to DecaBDE and Threaten Human Health and the Environment

This approach has significant consequences for human health and the environment. As discussed *supra* p. 12, wastewater discharges are a major pathway for environmental releases of PBDEs such as decaBDE. *See also* 7-ER-1499, 1501 (Canadian study explaining that "[t]he major route of PBDEs' introduction to the environment is via [wastewater treatment plant] effluents," with decaBDE congener the most prevalent). And studies show that exposure to PBDEs at levels found in the environment can harm both individual and population health in salmon, birds, and mammals. *E.g.*, 4-ER-0676–0677, 0691; 6-ER-1106–1114; 8-ER-1738, 1782, 1785–1791; 6-ER-1115–1125. Indeed, in Washington's Puget Sound, wastewater discharges are the primary driver of a PBDE "hotspot" that scientists warn "could affect the recovery of the [Endangered Species Act]-listed Chinook salmon" population and "thwart substantial [salmon] habitat remediation

efforts underway throughout the US Pacific Northwest." 8-ER-1709; *see also* 8-ER-1712–1719. PBDE discharges also harm endangered orcas, both because of their direct toxic effects on orcas and because they suppress salmon populations on which orcas depend for food. 8-ER-1785–1786; 7-ER-1691–1692.

DecaBDE discharges also pose significant risks to human health. Tribal populations—which include members of Petitioner Yurok Tribe and Alaska Native members of Petitioner Alaska Community Action on Toxics—face heightened risks from decaBDE water contamination because they tend to consume substantially greater amounts of locally sourced fish, shellfish, and/or marine mammals than the general population as part of their traditional diet. 3-ER-0403; 7-ER-1485; Miller Decl. ¶¶ 14–17.

### B. The Amended Rule Fails to Restrict DecaBDE Discharges as TSCA Requires

EPA's decision to leave decaBDE discharges from facilities that manufacture, process, or dispose of *articles* containing decaBDE "is not supportable" because EPA failed to articulate a "rational connection between the facts found and the determination made." *Earth Island Inst.*, 494 F.3d at 766. To justify its refusal to restrict discharges from any of these facilities, the 2024 Amendments assert without elaboration that "it would be extremely burdensome to

identify articles containing decaBDE to determine if a facility that recycles articles is subject to this final release to water prohibition." 1-ER-0029.

This rationale fails at the outset because it does not even purport to address the practicability of restricting decaBDE discharges from facilities other than recyclers. Evidence in the record identifies additional facility categories beyond recyclers—such as wastewater treatment plants, industrial laundries, and metal finishers—that contribute to high concentrations of PBDEs such as decaBDE in wastewater. 7-ER-1415. Nowhere did EPA explain why it would be impracticable to regulate these sources. Further, nowhere in the record did EPA substantiate its conclusory assertion that it would be "extremely burdensome" to identify recycling facilities to target for discharge restrictions. 1-ER-0029. Contrary to EPA's assertion, the record indicates that facilities recycling electronics and end-of-life vehicles are likely to process the greatest quantities of decaBDE-containing materials. *See*, *e.g.*, 3-ER-0306 (EPA stating that "electronic equipment" is among "[t]he three major product categories in which DecaBDE has been used as a flame retardant" and noting that "DecaBDE has also been used as a flame retardant for multiple applications in the aerospace and automotive industries, including replacement parts for cars and aircraft"); 4-ER-0733 (noting that decaBDE is "widely used in electrical equipment and [is a] primary toxic component[] of

electronic waste (e-waste)"); 6-ER-1201–1203 (EPA discussing large volumes of decaBDE in electronic waste); 9-ER-1993 (identifying vehicle and electronic wastes as "key waste streams for DecaBDE"). In short, it would not be difficult for EPA to identify categories of facilities for which discharge restrictions would be appropriate to curtail environmental releases of decaBDE.

EPA also disregarded evidence that widely available wastewater treatment technologies have proven effective in substantially reducing concentrations of decaBDE and other PBDEs in wastewater. 7-ER-1416; 7-ER-1498–1506. Moreover, EPA has long exercised its authority under TSCA to restrict discharges of polychlorinated biphenyls, or PCBs, to surface water, which provides a model for how the agency could practicably regulate decaBDE discharges. *See* 40 C.F.R. § 761.50(a)(3). EPA provided no explanation in the record for why such an approach would be impracticable.[13]

---

[13] In the 2021 Rule, EPA suggested that decaBDE discharges are regulated adequately under the Clean Water Act. *See* 1-ER-0008 (EPA asserting that it is not using its TSCA authority to regulate any form of decaBDE disposal and noting that EPA "generally presumes compliance with federal and state laws and regulations, including … the Clean Water Act"). EPA did not invoke this rationale in the 2024 Amendments, and it would be irrational to do so since, as Petitioners pointed out in public comments, EPA's compliance database indicates that decaBDE is not regulated under any Clean Water Act discharge permits anywhere in the U.S. 7-ER-1489.

Because EPA's decision "does not furnish a rationale for, or evidence to support, [EPA's] finding" that discharge restrictions for facilities that manufacture, recycle, or dispose of articles containing decaBDE are impracticable, its decision to leave those discharges unregulated is arbitrary and capricious. *Earth Island Inst.*, 494 F.3d at 767; *see also Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 689 (9th Cir. 2007) (holding agency action was arbitrary and capricious where "the record does not show the process, if there was one, that [the agency] used" to reach the challenged determination). Nor did EPA rationally demonstrate that the narrow restriction it adopted—which targets discharges that EPA itself asserts "are not occurring," 6-ER-1363—reduces exposures to decaBDE from wastewater discharges "to the extent practicable" as TSCA requires. 15 U.S.C. § 2605(h)(4).

## V. THE AMENDED RULE FAILS TO REDUCE DECABDE EXPOSURES FROM CONTAMINATED SEWAGE SLUDGE AS TSCA REQUIRES

EPA further violated TSCA by failing to address decaBDE exposures from land-applied sewage sludge. EPA's own analyses identify significant human and environmental exposure to decaBDE from spreading sewage sludge, or "biosolids," on agricultural land. Further, EPA failed to rationally address evidence in the record that restricting the allowable concentration of decaBDE in land-applied sewage sludge is practicable given EPA's existing regulatory program

restricting toxic contaminants in land-applied sludge, as well as state-level restrictions. EPA's rejection of regulations for land-application of decaBDE-contaminated sewage sludge fails to "address the risks of injury to health or the environment" presented by decaBDE and "reduce exposure to [decaBDE] to the extent practicable." 15 U.S.C. § 2605(h)(4). Further, EPA's failure to rationally explain its decision renders the Amended Rule arbitrary and unsupported by substantial evidence. *Id.* § 2618(c)(1)(B).

### A. Land-Application of Sewage Sludge Releases DecaBDE into the Environment

As noted, EPA identified sewage sludge as "a major sink for [decaBDE]." 6-ER-1207; *see also* 3-ER-0314 (EPA assessment stating that "[d]ecaBDE was detected at relatively higher concentrations in … sludge/biosolids" compared to other environmental media); 6-ER-1265 (summarizing study finding "high concentrations of … [P]BDES" in land-applied sludge in multiple states). EPA has found that decaBDE is the predominant PBDE in land-applied sludge, 6-ER-1207, with approximately 8.3 metric tons of decaBDE "applied to land in the United States" every year. 6-ER-1157.

As a result, EPA concluded that land-application of sewage sludge results in environmental releases of decaBDE. 3-ER-0403; *see also* 6-ER-1130 (peer-reviewed study explaining that the "[e]normous volumes of sewage sludge applied

to agricultural areas are clearly a major source of PBDEs to soils"); 6-ER-1323 (Stockholm Convention report explaining that "[c]ontamination of agricultural soil with [decaBDE] is a global problem partly linked to the use of sewage sludge as a fertilizer" and that "levels of [decaBDE] were 100-1000 fold higher at sites fertilized with sewage sludge compared to reference sites"). In addition to contaminating the soil to which it is applied, sludge containing decaBDE pollutes surrounding waterways through runoff and soil erosion. 6-ER-1219 (EPA assessment); 7-ER-1652 (Lucas et al. 2018).

These releases of decaBDE to agricultural soil and waterways in turn cause human and environmental exposure to decaBDE, including through contamination of food. EPA determined that land-application of contaminated sludge "result[s] in uptake [of decaBDE] to vegetation and other edible terrestrial food sources" and exposure to people consuming these foods. 3-ER-0403. People who practice subsistence fishing or hunting or eat high rates of locally sourced food "are likely to have higher dietary exposures [to decaBDE] than the general population." *Id.* In addition, EPA determined that wildlife are exposed to decaBDE through contact with sludge-contaminated soil. *Id.*; *see also* 6-ER-1323 (Stockholm Convention report concluding that when sludge is applied to soil, "[decaBDE] is transferred to biota, and can ultimately accumulate in organisms at the top of the food chain"); 7-

ER-1652 (describing bioaccumulation of flame retardants in organisms collected at sludge application sites). Further, once land-applied, decaBDE will persist in soil for years. *See* 4-ER-0684, 0702 (describing study finding that decaBDE concentrations in soil remained high years after last sludge application). "Accordingly, any measures to reduce the levels of [decaBDE] in sewage sludge and/or measures to better control the use of sewage sludge as a fertilizer, [are] likely to have a positive effect by reducing [decaBDE] levels in agricultural products over time." 6-ER-1323 (Stockholm Convention report).

Indeed, in a 2018 report, EPA's Office of the Inspector General criticized EPA's failure to use its authority to address flame retardants and additional contaminants in land-applied sludge. *See* 8-ER-1868. Among other issues, the Inspector General criticized EPA for "impl[ying] that, when used correctly, biosolids are safe," without "reveal[ing] that potentially harmful and unregulated pollutants are present in biosolids such as … flame retardants." *Id.*

### B. The Amended Rule Unlawfully Fails to Address Exposures and Risks from DecaBDE-Contaminated Sewage Sludge

Despite this evidence, the Amended Rule includes no measures to address decaBDE exposures and risks from land-application of sludge, 1-ER-0028–0029; 6-ER-1396, which violates TSCA's mandate to adopt all practicable measures to reduce decaBDE exposures and address associated risks, 15 U.S.C. § 2605(h)(4).

There is no dispute that EPA's expansive risk management authority under TSCA section 6 empowers it to restrict decaBDE levels in land-applied sewage sludge, *see id.* § 2605(a) (enumerating risk management options), and the record contains substantial evidence that it is practicable to do so. Indeed, under the Clean Water Act, EPA already limits the concentration of certain toxic contaminants in land-applied sludge and requires testing to ensure compliance with those restrictions. 33 U.S.C. § 1345(d); 40 C.F.R. §§ 503.13, 503.16; *see* 7-ER-1491. EPA is required to review these regulations every two years to determine whether "additional toxic pollutants" in sludge should be regulated to protect "public health or the environment." 33 U.S.C. § 1345(d)(2)(A), (C). And it is feasible to test for decaBDE in sludge—EPA has done so on a national scale as part of its National Sewage Sludge Survey. 6-ER-1207. Moreover, states also restrict toxic contaminants in sludge, further demonstrating that such restrictions are practicable.[14]

[14] *See*, *e.g.*, Minn. Pollution Control Agency, *Minnesota Biosolids PFAS Strategy* (2025), https://www.pca.state.mn.us/sites/default/files/wq-wwprm2-113b.pdf (requiring testing of sludge for certain perfluorinated chemicals and prohibiting land application if chemical concentrations exceed established threshold); *Interim Strategy – Land Application of Biosolids Containing PFAS* (2024), Mich. Dept. of

EPA failed to rationally address this evidence and explain why it would be impracticable to regulate decaBDE in land-applied sewage sludge in the Amended Rule. The 2024 Amendments' preamble includes no explanation of why regulating decaBDE in land-applied sludge is impracticable. *See* 1-ER-0028–0029. In its 2024 Response to Comments document, EPA simply states without any rationale that "EPA is not using its [TSCA] section 6 authority to regulate biosolids and, in particular, set a maximum level of contamination." 6-ER-1396.

This is insufficient to satisfy TSCA section 6(h)(4) and EPA's obligation to engage in reasoned decision-making. "In rulemaking, it is not enough to assert without meaningful discussion that more protective mitigation measures are impracticable." *Nat. Res. Def. Council v. Pritzker*, 828 F.3d 1125, 1139 n.12 (9th Cir. 2016); *see also Nw. Coal. for Alternatives to Pesticides (NCAP) v. EPA*, 544 F.3d 1043, 1052 (9th Cir. 2008) (holding that EPA decision establishing safety standards for children's exposure to certain pesticides was arbitrary where EPA did "not provide enough information to demonstrate a rational connection between the

---

Env't, Great Lakes, and Energy, https://www.michigan.gov/egle/about/organization/water-resources/biosolids/pfas-related (last visited June 4, 2025) (same); N.Y. State Dept. of Env't Conservation, *DMM-7/ Biosolids Recycling in New York State – Interim Strategy for the Control of PFAS Compounds* (2023), https://extapps.dec.ny.gov/docs/materials_minerals_pdf/dmm7.pdf (same).

factors that the EPA examined and the conclusions it reached”). EPA provided no explanation of *why* it decided not to “us[e] its section 6 authority to regulate biosolids and, in particular, set a maximum level of [decaBDE] contamination.” 6-ER-1396. Nor did EPA point to any evidence demonstrating that it would be impracticable to set such a restriction or contradicting the substantial record evidence that decaBDE exposures from sludge are occurring.

EPA has the authority and obligation under TSCA section 6(h) to reduce the continued contamination of soil, food, and water from land-application of decaBDE-contaminated sewage sludge, which exposes people and wildlife to decaBDE. EPA’s unexplained refusal to do so is contrary to that provision, arbitrary, and unsupported by substantial evidence. *See* 15 U.S.C. §§ 2605(h)(4), 2618(c)(1)(B).

## VI. REMEDY

To remedy EPA’s multiple TSCA violations, the Court should declare the Amended Rule unlawful and remand it to EPA with instructions to propose within 180 days, and finalize within one year, amendments that mandate all practicable measures to reduce exposures to decaBDE from recycling, solid waste disposal, wastewater discharges, and land-applied sewage sludge.

Because "[s]ome action is better than no action," this Court should "remand the [Amended] Rule without vacating it." *A Cmty. Voice*, 997 F.3d at 988 (remanding insufficiently protective TSCA rule without vacatur). Here, vacating the Amended Rule would risk health and environmental harm because it would eliminate the measures to reduce decaBDE exposure that the rule does require. *See Pollinator Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (explaining that this Court has "chosen to leave a[n EPA] rule in place when vacating would risk [environmental] harm"); *Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 528 (D.C. Cir. 2009) (remanding without vacatur and noting that "vacating a standard because it may be insufficiently protective would sacrifice such protection as it now provides, making the best an enemy of the good").

The Court should require EPA to propose amendments that satisfy TSCA section 6(h) within 180 days and finalize any amendments within one year. Congress prioritized PBT chemicals such as decaBDE for "expedited action" because of their unique dangers to human health and the environment. 15 U.S.C. § 2605(h)(1) (capitalization omitted). Yet more than four years after EPA was required to promulgate a rule that requires all practicable measures to reduce exposure to decaBDE, it still has not done so. *See id.* § 2605(h)(1), (3) (establishing December 2020 deadline for final PBT rules). EPA has already had

one opportunity to reconsider the rule and fix its shortcomings—and it took more than three years to adopt amendments that do virtually nothing to reduce exposure to this persistent, bioaccumulative, and toxic chemical. To avoid further delay in complying with Congress' directives, this Court should establish deadlines for EPA to expeditiously address the deficiencies in the rule. *See Ctr. for Food Safety v. Regan*, 56 F.4th 648, 669 (9th Cir. 2022) (remanding without vacatur and directing subsequent agency action within 180 days of mandate's issuance).

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court declare EPA's Amended Rule for decaBDE unlawful and remand it to EPA with instructions to propose within 180 days, and finalize within one year, amendments that mandate all practicable measures to reduce decaBDE exposures from recycling, solid waste disposal, wastewater discharges, and land-applied sewage sludge.

Respectfully submitted this 6th day of June, 2025.

/s/Katherine K. O'Brien
Katherine K. O'Brien
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

Kelly E. Lester
Earthjustice
48 Wall St., Floor 15
New York, NY 10005
(332) 251-0243
klester@earthjustice.org

Alana R. Reynolds
Earthjustice
1001 G St., Ste. 1000
Washington, DC 20001
(202) 797-4311
areynolds@earthjustice.org

*Counsel for Petitioners*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Ninth Circuit Rule 32-1 because it contains 13,999 words, excluding the items exempted by Federal Rule of Appellate Procedure 32(f).

I also certify that this brief complies with the type face and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced font using Microsoft Word Times New Roman 14-point font.

Dated: June 6, 2025

/s/Katherine K. O'Brien
Katherine K. O'Brien