**No. 24-7497**
**Consolidated with Nos. 21-70168, 21-70670**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

YUROK TRIBE, ALASKA COMMUNITY ACTION ON TOXICS, CENTER FOR ENVIRONMENTAL TRANSFORMATION, and CONSUMER FEDERATION OF AMERICA,

*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and LEE ZELDIN, in his official capacity as Administrator of the United States Environmental Protection Agency,

*Respondents*.

---

On Petitions for Review of Final Agency Actions of the United States Environmental Protection Agency
86 Fed. Reg. 880 (Jan. 6, 2021) and 89 Fed. Reg. 91,486 (Nov. 19, 2024)

---

# PETITIONERS' STATUTORY AND REGULATORY ADDENDUM

---

Katherine K. O'Brien
Earthjustice
P.O. Box 2297
South Portland, ME 04116
(212) 284-8036
kobrien@earthjustice.org

Kelly E. Lester
Earthjustice
48 Wall St., Floor 15
New York, NY 10005
(332) 251-0243
klester@earthjustice.org

Alana R. Reynolds
Earthjustice
1001 G St., Ste. 1000
Washington, DC 20001
(202) 797-4311
areynolds@earthjustice.org

*Counsel for Petitioners*

# TABLE OF CONTENTS

**Page**

**Federal Statutes**

5 U.S.C. § 706 .......... ADD001

15 U.S.C. § 2605 .......... ADD003

15 U.S.C. § 2618 .......... ADD018

15 U.S.C. § 2625 .......... ADD021

33 U.S.C. § 1345 .......... ADD032

42 U.S.C. § 6924 .......... ADD037

42 U.S.C. § 6925 .......... ADD053

42 U.S.C. § 6949a .......... ADD062

**Federal Regulations**

40 C.F.R. § 23.5 .......... ADD065

40 C.F.R. § 240.100 .......... ADD066

40 C.F.R. §§ 240.200-1–240.211-3 .......... ADD068

40 C.F.R. §§ 257.1–257.30 .......... ADD108

40 C.F.R. § 258.1 .......... ADD170

40 C.F.R. §§ 258.40–258.59 .......... ADD174

40 C.F.R. § 503.13 .......... ADD219

40 C.F.R. § 503.16 .......... ADD223

40 C.F.R. § 751.401 .......... ADD225

40 C.F.R. § 751.403 .......... ADD227

40 C.F.R. § 751.405 .......... ADD229

40 C.F.R. § 761.50 .......... ADD236

**Legislative History**

H.R. Rep. No. 114-176 (2015) (excerpt) .......... ADD241

162 Cong. Rec. 7984 (2016) (excerpt) .......... ADD244

United States Code Annotated
Title 5. Government Organization and Employees (Refs & Annos)
Part I. The Agencies Generally
Chapter 7. Judicial Review (Refs & Annos)

5 U.S.C.A. § 706

§ 706. Scope of review

Currentness

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

**(1)** compel agency action unlawfully withheld or unreasonably delayed; and

**(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

**(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

**(B)** contrary to constitutional right, power, privilege, or immunity;

**(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

**(D)** without observance of procedure required by law;

**(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

**(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**CREDIT(S)**

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

5 U.S.C.A. § 706, 5 USCA § 706

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Current through P.L. 119-12. Some statute sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 15. Commerce and Trade
Chapter 53. Toxic Substances Control (Refs & Annos)
Subchapter I. Control of Toxic Substances (Refs & Annos)

15 U.S.C.A. § 2605

§ 2605. Prioritization, risk evaluation, and regulation of chemical substances and mixtures

Currentness

**(a) Scope of regulation**

If the Administrator determines in accordance with subsection (b)(4)(A) that the manufacture, processing, distribution in commerce, use, or disposal of a chemical substance or mixture, or that any combination of such activities, presents an unreasonable risk of injury to health or the environment, the Administrator shall by rule and subject to section 2617 of this title, and in accordance with subsection (c)(2), apply one or more of the following requirements to such substance or mixture to the extent necessary so that the chemical substance or mixture no longer presents such risk:

**(1)** A requirement (A) prohibiting or otherwise restricting the manufacturing, processing, or distribution in commerce of such substance or mixture, or (B) limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce.

**(2)** A requirement--

**(A)** prohibiting or otherwise restricting the manufacture, processing, or distribution in commerce of such substance or mixture for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement, or

**(B)** limiting the amount of such substance or mixture which may be manufactured, processed, or distributed in commerce for (i) a particular use or (ii) a particular use in a concentration in excess of a level specified by the Administrator in the rule imposing the requirement.

**(3)** A requirement that such substance or mixture or any article containing such substance or mixture be marked with or accompanied by clear and adequate minimum warnings and instructions with respect to its use, distribution in commerce, or disposal or with respect to any combination of such activities. The form and content of such minimum warnings and instructions shall be prescribed by the Administrator.

**(4)** A requirement that manufacturers and processors of such substance or mixture make and retain records of the processes used to manufacture or process such substance or mixture or monitor or conduct tests which are reasonable and necessary to assure compliance with the requirements of any rule applicable under this subsection.

**(5)** A requirement prohibiting or otherwise regulating any manner or method of commercial use of such substance or mixture.

**(6)(A)** A requirement prohibiting or otherwise regulating any manner or method of disposal of such substance or mixture, or of any article containing such substance or mixture, by its manufacturer or processor or by any other person who uses, or disposes of, it for commercial purposes.

**(B)** A requirement under subparagraph (A) may not require any person to take any action which would be in violation of any law or requirement of, or in effect for, a State or political subdivision, and shall require each person subject to it to notify each State and political subdivision in which a required disposal may occur of such disposal.

**(7)** A requirement directing manufacturers or processors of such substance or mixture (A) to give notice of such determination to distributors in commerce of such substance or mixture and, to the extent reasonably ascertainable, to other persons in possession of such substance or mixture or exposed to such substance or mixture, (B) to give public notice of such determination, and (C) to replace or repurchase such substance or mixture as elected by the person to which the requirement is directed.

Any requirement (or combination of requirements) imposed under this subsection may be limited in application to specified geographic areas.

**(b) Risk evaluations**

**(1) Prioritization for risk evaluations**

**(A) Establishment of process**

Not later than 1 year after June 22, 2016, the Administrator shall establish, by rule, a risk-based screening process, including criteria for designating chemical substances as high-priority substances for risk evaluations or low-priority substances for which risk evaluations are not warranted at the time. The process to designate the priority of chemical substances shall include a consideration of the hazard and exposure potential of a chemical substance or a category of chemical substances (including consideration of persistence and bioaccumulation, potentially exposed or susceptible subpopulations and storage near significant sources of drinking water), the conditions of use or significant changes in the conditions of use of the chemical substance, and the volume or significant changes in the volume of the chemical substance manufactured or processed.

**(B) Identification of priorities for risk evaluation**

**(i) High-priority substances**

The Administrator shall designate as a high-priority substance a chemical substance that the Administrator concludes, without consideration of costs or other nonrisk factors, may present an unreasonable risk of injury to health or the environment because of a potential hazard and a potential route of exposure under the conditions of use, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(ii) Low-priority substances**

The Administrator shall designate a chemical substance as a low-priority substance if the Administrator concludes, based on information sufficient to establish, without consideration of costs or other nonrisk factors, that such substance does not meet the standard identified in clause (i) for designating a chemical substance a high-priority substance.

**(C) Information request and review and proposed and final prioritization designation**

The rulemaking required in subparagraph (A) shall ensure that the time required to make a priority designation of a chemical substance be no shorter than nine months and no longer than 1 year, and that the process for such designations includes--

**(i)** a requirement that the Administrator request interested persons to submit relevant information on a chemical substance that the Administrator has initiated the prioritization process on, before proposing a priority designation for the chemical substance, and provide 90 days for such information to be provided;

**(ii)** a requirement that the Administrator publish each proposed designation of a chemical substance as a high- or low-priority substance, along with an identification of the information, analysis, and basis used to make the proposed designations, and provide 90 days for public comment on each such proposed designation; and

**(iii)** a process by which the Administrator may extend the deadline in clause (i) for up to three months in order to receive or evaluate information required to be submitted in accordance with section 2603(a)(2)(B) of this title, subject to the limitation that if the information available to the Administrator at the end of such an extension remains insufficient to enable the designation of the chemical substance as a low-priority substance, the Administrator shall designate the chemical substance as a high-priority substance.

**(2) Initial risk evaluations and subsequent designations of high- and low-priority substances**

**(A) Initial risk evaluations**

Not later than 180 days after June 22, 2016, the Administrator shall ensure that risk evaluations are being conducted on 10 chemical substances drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments and shall publish the list of such chemical substances during the 180 day period.

**(B) Additional risk evaluations**

Not later than three and one half years after June 22, 2016, the Administrator shall ensure that risk evaluations are being conducted on at least 20 high-priority substances and that at least 20 chemical substances have been designated as low-priority substances, subject to the limitation that at least 50 percent of all chemical substances on which risk evaluations are being conducted by the Administrator are drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments.

**(C) Continuing designations and risk evaluations**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

The Administrator shall continue to designate priority substances and conduct risk evaluations in accordance with this subsection at a pace consistent with the ability of the Administrator to complete risk evaluations in accordance with the deadlines under paragraph (4)(G).

**(D) Preference**

In designating high-priority substances, the Administrator shall give preference to--

**(i)** chemical substances that are listed in the 2014 update of the TSCA Work Plan for Chemical Assessments as having a Persistence and Bioaccumulation Score of 3; and

**(ii)** chemical substances that are listed in the 2014 update of the TSCA Work Plan for Chemical Assessments that are known human carcinogens and have high acute and chronic toxicity.

**(E) Metals and metal compounds**

In identifying priorities for risk evaluation and conducting risk evaluations of metals and metal compounds, the Administrator shall use the Framework for Metals Risk Assessment of the Office of the Science Advisor, Risk Assessment Forum, and dated March 2007, or a successor document that addresses metals risk assessment and is peer reviewed by the Science Advisory Board.

**(3) Initiation of risk evaluations; designations**

**(A) Risk evaluation initiation**

Upon designating a chemical substance as a high-priority substance, the Administrator shall initiate a risk evaluation on the substance.

**(B) Revision**

The Administrator may revise the designation of a low-priority substance based on information made available to the Administrator.

**(C) Ongoing designations**

The Administrator shall designate at least one high-priority substance upon the completion of each risk evaluation (other than risk evaluations for chemical substances designated under paragraph (4)(C)(ii)).

**(4) Risk evaluation process and deadlines**

**(A) In general**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

The Administrator shall conduct risk evaluations pursuant to this paragraph to determine whether a chemical substance presents an unreasonable risk of injury to health or the environment, without consideration of costs or other nonrisk factors, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant to the risk evaluation by the Administrator, under the conditions of use.

**(B) Establishment of process**

Not later than 1 year after June 22, 2016, the Administrator shall establish, by rule, a process to conduct risk evaluations in accordance with subparagraph (A).

**(C) Requirement**

The Administrator shall conduct and publish risk evaluations, in accordance with the rule promulgated under subparagraph (B), for a chemical substance--

**(i)** that has been identified under paragraph (2)(A) or designated under paragraph (1)(B)(i); and

**(ii)** subject to subparagraph (E), that a manufacturer of the chemical substance has requested, in a form and manner and using the criteria prescribed by the Administrator in the rule promulgated under subparagraph (B), be subjected to a risk evaluation.

**(D) Scope**

The Administrator shall, not later than 6 months after the initiation of a risk evaluation, publish the scope of the risk evaluation to be conducted, including the hazards, exposures, conditions of use, and the potentially exposed or susceptible subpopulations the Administrator expects to consider, and, for each designation of a high-priority substance, ensure not less than 12 months between the initiation of the prioritization process for the chemical substance and the publication of the scope of the risk evaluation for the chemical substance, and for risk evaluations conducted on chemical substances that have been identified under paragraph (2)(A) or selected under subparagraph (E)(iv)(II) of this paragraph, ensure not less than 3 months before the Administrator publishes the scope of the risk evaluation.

**(E) Limitation and criteria**

**(i) Percentage requirements**

The Administrator shall ensure that, of the number of chemical substances that undergo a risk evaluation under clause (i) of subparagraph (C), the number of chemical substances undergoing a risk evaluation under clause (ii) of subparagraph (C) is--

**(I)** not less than 25 percent, if sufficient requests are made under clause (ii) of subparagraph (C); and

**(II)** not more than 50 percent.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(ii) Requested risk evaluations**

Requests for risk evaluations under subparagraph (C)(ii) shall be subject to the payment of fees pursuant to section 2625(b) of this title, and the Administrator shall not expedite or otherwise provide special treatment to such risk evaluations.

**(iii) Preference**

In deciding whether to grant requests under subparagraph (C)(ii), the Administrator shall give preference to requests for risk evaluations on chemical substances for which the Administrator determines that restrictions imposed by 1 or more States have the potential to have a significant impact on interstate commerce or health or the environment.

**(iv) Exceptions**

**(I)** Chemical substances for which requests have been granted under subparagraph (C)(ii) shall not be subject to section 2617(b) of this title.

**(II)** Requests for risk evaluations on chemical substances which are made under subparagraph (C)(ii) and that are drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments shall be granted at the discretion of the Administrator and not be subject to clause (i)(II).

**(F) Requirements**

In conducting a risk evaluation under this subsection, the Administrator shall--

**(i)** integrate and assess available information on hazards and exposures for the conditions of use of the chemical substance, including information that is relevant to specific risks of injury to health or the environment and information on potentially exposed or susceptible subpopulations identified as relevant by the Administrator;

**(ii)** describe whether aggregate or sentinel exposures to a chemical substance under the conditions of use were considered, and the basis for that consideration;

**(iii)** not consider costs or other nonrisk factors;

**(iv)** take into account, where relevant, the likely duration, intensity, frequency, and number of exposures under the conditions of use of the chemical substance; and

**(v)** describe the weight of the scientific evidence for the identified hazard and exposure.

**(G) Deadlines**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

The Administrator--

**(i)** shall complete a risk evaluation for a chemical substance as soon as practicable, but not later than 3 years after the date on which the Administrator initiates the risk evaluation under subparagraph (C); and

**(ii)** may extend the deadline for a risk evaluation for not more than 6 months.

**(H) Notice and comment**

The Administrator shall provide no less than 30 days public notice and an opportunity for comment on a draft risk evaluation prior to publishing a final risk evaluation.

**(c) Promulgation of subsection (a) rules**

**(1) Deadlines**

If the Administrator determines that a chemical substance presents an unreasonable risk of injury to health or the environment in accordance with subsection (b)(4)(A), the Administrator--

**(A)** shall propose in the Federal Register a rule under subsection (a) for the chemical substance not later than 1 year after the date on which the final risk evaluation regarding the chemical substance is published;

**(B)** shall publish in the Federal Register a final rule not later than 2 years after the date on which the final risk evaluation regarding the chemical substance is published; and

**(C)** may extend the deadlines under this paragraph for not more than 2 years, subject to the condition that the aggregate length of extensions under this subparagraph and subsection (b)(4)(G)(ii) does not exceed 2 years, and subject to the limitation that the Administrator may not extend a deadline for the publication of a proposed or final rule regarding a chemical substance drawn from the 2014 update of the TSCA Work Plan for Chemical Assessments or a chemical substance that, with respect to persistence and bioaccumulation, scores high for 1 and either high or moderate for the other, pursuant to the TSCA Work Plan Chemicals Methods Document published by the Administrator in February 2012 (or a successor scoring system), without adequate public justification that demonstrates, following a review of the information reasonably available to the Administrator, that the Administrator cannot complete the proposed or final rule without additional information regarding the chemical substance.

**(2) Requirements for rule**

**(A) Statement of effects**

In proposing and promulgating a rule under subsection (a) with respect to a chemical substance or mixture, the Administrator shall consider and publish a statement based on reasonably available information with respect to--

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(i)** the effects of the chemical substance or mixture on health and the magnitude of the exposure of human beings to the chemical substance or mixture;

**(ii)** the effects of the chemical substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture;

**(iii)** the benefits of the chemical substance or mixture for various uses; and

**(iv)** the reasonably ascertainable economic consequences of the rule, including consideration of--

**(I)** the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health;

**(II)** the costs and benefits of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator; and

**(III)** the cost effectiveness of the proposed regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator.

**(B) Selecting requirements**

In selecting among prohibitions and other restrictions, the Administrator shall factor in, to the extent practicable, the considerations under subparagraph (A) in accordance with subsection (a).

**(C) Consideration of alternatives**

Based on the information published under subparagraph (A), in deciding whether to prohibit or restrict in a manner that substantially prevents a specific condition of use of a chemical substance or mixture, and in setting an appropriate transition period for such action, the Administrator shall consider, to the extent practicable, whether technically and economically feasible alternatives that benefit health or the environment, compared to the use so proposed to be prohibited or restricted, will be reasonably available as a substitute when the proposed prohibition or other restriction takes effect.

**(D) Replacement parts**

**(i) In general**

The Administrator shall exempt replacement parts for complex durable goods and complex consumer goods that are designed prior to the date of publication in the Federal Register of the rule under subsection (a), unless the Administrator finds that such replacement parts contribute significantly to the risk, identified in a risk evaluation conducted under subsection (b)(4)(A), to the general population or to an identified potentially exposed or susceptible subpopulation.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(ii) Definitions**

In this subparagraph--

**(I)** the term "complex consumer goods" means electronic or mechanical devices composed of multiple manufactured components, with an intended useful life of 3 or more years, where the product is typically not consumed, destroyed, or discarded after a single use, and the components of which would be impracticable to redesign or replace; and

**(II)** the term "complex durable goods" means manufactured goods composed of 100 or more manufactured components, with an intended useful life of 5 or more years, where the product is typically not consumed, destroyed, or discarded after a single use.

**(E) Articles**

In selecting among prohibitions and other restrictions, the Administrator shall apply such prohibitions or other restrictions to an article or category of articles containing the chemical substance or mixture only to the extent necessary to address the identified risks from exposure to the chemical substance or mixture from the article or category of articles so that the substance or mixture does not present an unreasonable risk of injury to health or the environment identified in the risk evaluation conducted in accordance with subsection (b)(4)(A).

**(3) Procedures**

When prescribing a rule under subsection (a) the Administrator shall proceed in accordance with section 553 of Title 5 (without regard to any reference in such section to sections 556 and 557 of such title), and shall also--

**(A)** publish a notice of proposed rulemaking stating with particularity the reason for the proposed rule;

**(B)** allow interested persons to submit written data, views, and arguments, and make all such submissions publicly available;

**(C)** promulgate a final rule based on the matter in the rulemaking record; and

**(D)** make and publish with the rule the determination described in subsection (a).

**(d) Effective date**

**(1) In general**

In any rule under subsection (a), the Administrator shall--

**(A)** specify the date on which it shall take effect, which date shall be as soon as practicable;

**(B)** except as provided in subparagraphs (C) and (D), specify mandatory compliance dates for all of the requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in a case of a use exempted under subsection (g);

**(C)** specify mandatory compliance dates for the start of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable, but not later than 5 years after the date of promulgation of the rule, except in the case of a use exempted under subsection (g);

**(D)** specify mandatory compliance dates for full implementation of ban or phase-out requirements under a rule under subsection (a), which shall be as soon as practicable; and

**(E)** provide for a reasonable transition period.

**(2) Variability**

As determined by the Administrator, the compliance dates established under paragraph (1) may vary for different affected persons.

**(3)(A)** The Administrator may declare a proposed rule under subsection (a) to be effective, and compliance with the proposed requirements to be mandatory, upon publication in the Federal Register of the proposed rule and until the compliance dates applicable to such requirements in a final rule promulgated under section 2605(a) of this title or until the Administrator revokes such proposed rule, in accordance with subparagraph (B), if--

**(i)** the Administrator determines that--

**(I)** the manufacture, processing, distribution in commerce, use, or disposal of the chemical substance or mixture subject to such proposed rule or any combination of such activities is likely to result in an unreasonable risk of serious or widespread injury to health or the environment before such effective date without consideration of costs or other non-risk factors; and

**(II)** making such proposed rule so effective is necessary to protect the public interest; and

**(ii)** in the case of a proposed rule to prohibit the manufacture, processing, or distribution of a chemical substance or mixture because of the risk determined under clause (i)(I), a court has in an action under section 2606 of this title granted relief with respect to such risk associated with such substance or mixture.

Such a proposed rule which is made so effective shall not, for purposes of judicial review, be considered final agency action.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(B)** If the Administrator makes a proposed rule effective upon its publication in the Federal Register, the Administrator shall, as expeditiously as possible, give interested persons prompt notice of such action in accordance with subsection (c), and either promulgate such rule (as proposed or with modifications) or revoke it.

**(e) Polychlorinated biphenyls**

**(1)** Within six months after January 1, 1977, the Administrator shall promulgate rules to--

**(A)** prescribe methods for the disposal of polychlorinated biphenyls, and

**(B)** require polychlorinated biphenyls to be marked with clear and adequate warnings, and instructions with respect to their processing, distribution in commerce, use, or disposal or with respect to any combination of such activities.

Requirements prescribed by rules under this paragraph shall be consistent with the requirements of paragraphs (2) and (3).

**(2)(A)** Except as provided under subparagraph (B), effective one year after January 1, 1977, no person may manufacture, process, or distribute in commerce or use any polychlorinated biphenyl in any manner other than in a totally enclosed manner.

**(B)** The Administrator may by rule authorize the manufacture, processing, distribution in commerce or use (or any combination of such activities) of any polychlorinated biphenyl in a manner other than in a totally enclosed manner if the Administrator finds that such manufacture, processing, distribution in commerce, or use (or combination of such activities) will not present an unreasonable risk of injury to health or the environment.

**(C)** For the purposes of this paragraph, the term "totally enclosed manner" means any manner which will ensure that any exposure of human beings or the environment to a polychlorinated biphenyl will be insignificant as determined by the Administrator by rule.

**(3)(A)** Except as provided in subparagraphs (B) and (C)--

**(i)** no person may manufacture any polychlorinated biphenyl after two years after January 1, 1977, and

**(ii)** no person may process or distribute in commerce any polychlorinated biphenyl after two and one-half years after such date.

**(B)** Any person may petition the Administrator for an exemption from the requirements of subparagraph (A), and the Administrator may grant by rule such an exemption if the Administrator finds that--

**(i)** an unreasonable risk of injury to health or environment would not result, and

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(ii)** good faith efforts have been made to develop a chemical substance which does not present an unreasonable risk of injury to health or the environment and which may be substituted for such polychlorinated biphenyl.

An exemption granted under this subparagraph shall be subject to such terms and conditions as the Administrator may prescribe and shall be in effect for such period (but not more than one year from the date it is granted) as the Administrator may prescribe.

**(C)** Subparagraph (A) shall not apply to the distribution in commerce of any polychlorinated biphenyl if such polychlorinated biphenyl was sold for purposes other than resale before two and one half years after October 11, 1976.

**(4)** Any rule under paragraph (1), (2)(B), or (3)(B) shall be promulgated in accordance with paragraph (3) of subsection (c).

**(5)** This subsection does not limit the authority of the Administrator, under any other provision of this chapter or any other Federal law, to take action respecting any polychlorinated biphenyl.

**(f) Mercury**

**(1) Prohibition on sale, distribution, or transfer of elemental mercury by Federal agencies**

Except as provided in paragraph (2), effective beginning on October 14, 2008, no Federal agency shall convey, sell, or distribute to any other Federal agency, any State or local government agency, or any private individual or entity any elemental mercury under the control or jurisdiction of the Federal agency.

**(2) Exceptions**

Paragraph (1) shall not apply to--

**(A)** a transfer between Federal agencies of elemental mercury for the sole purpose of facilitating storage of mercury to carry out this chapter; or

**(B)** a conveyance, sale, distribution, or transfer of coal.

**(3) Leases of Federal coal**

Nothing in this subsection prohibits the leasing of coal.

**(g) Exemptions**

**(1) Criteria for exemption**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

The Administrator may, as part of a rule promulgated under subsection (a), or in a separate rule, grant an exemption from a requirement of a subsection (a) rule for a specific condition of use of a chemical substance or mixture, if the Administrator finds that--

**(A)** the specific condition of use is a critical or essential use for which no technically and economically feasible safer alternative is available, taking into consideration hazard and exposure;

**(B)** compliance with the requirement, as applied with respect to the specific condition of use, would significantly disrupt the national economy, national security, or critical infrastructure; or

**(C)** the specific condition of use of the chemical substance or mixture, as compared to reasonably available alternatives, provides a substantial benefit to health, the environment, or public safety.

**(2) Exemption analysis and statement**

In proposing an exemption under this subsection, the Administrator shall analyze the need for the exemption, and shall make public the analysis and a statement describing how the analysis was taken into account.

**(3) Period of exemption**

The Administrator shall establish, as part of a rule under this subsection, a time limit on any exemption for a time to be determined by the Administrator as reasonable on a case-by-case basis, and, by rule, may extend, modify, or eliminate an exemption if the Administrator determines, on the basis of reasonably available information and after adequate public justification, the exemption warrants extension or modification or is no longer necessary.

**(4) Conditions**

As part of a rule promulgated under this subsection, the Administrator shall include conditions, including reasonable recordkeeping, monitoring, and reporting requirements, to the extent that the Administrator determines the conditions are necessary to protect health and the environment while achieving the purposes of the exemption.

**(h) Chemicals that are persistent, bioaccumulative, and toxic**

**(1) Expedited action**

Not later than 3 years after June 22, 2016, the Administrator shall propose rules under subsection (a) with respect to chemical substances identified in the 2014 update of the TSCA Work Plan for Chemical Assessments--

**(A)** that the Administrator has a reasonable basis to conclude are toxic and that with respect to persistence and bioaccumulation score high for one and either high or moderate for the other, pursuant to the TSCA Work Plan Chemicals Methods Document published by the Administrator in February 2012 (or a successor scoring system), and are not a metal or a metal compound, and for which the Administrator has not completed a Work Plan Problem Formulation, initiated a

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

review under section 2604 of this title, or entered into a consent agreement under section 2603 of this title, prior to June 22, 2016; and

**(B)** exposure to which under the conditions of use is likely to the general population or to a potentially exposed or susceptible subpopulation identified by the Administrator, or the environment, on the basis of an exposure and use assessment conducted by the Administrator.

**(2) No risk evaluation required**

The Administrator shall not be required to conduct risk evaluations on chemical substances that are subject to paragraph (1).

**(3) Final rule**

Not later than 18 months after proposing a rule pursuant to paragraph (1), the Administrator shall promulgate a final rule under subsection (a).

**(4) Selecting restrictions**

In selecting among prohibitions and other restrictions promulgated in a rule under subsection (a) pursuant to paragraph (1), the Administrator shall address the risks of injury to health or the environment that the Administrator determines are presented by the chemical substance and shall reduce exposure to the substance to the extent practicable.

**(5) Relationship to subsection (b)**

If, at any time prior to the date that is 90 days after June 22, 2016, the Administrator makes a designation under subsection (b)(1)(B)(i), or receives a request under subsection (b)(4)(C)(ii), such chemical substance shall not be subject to this subsection, except that in selecting among prohibitions and other restrictions promulgated in a rule pursuant to subsection (a), the Administrator shall both ensure that the chemical substance meets the rulemaking standard under subsection (a) and reduce exposure to the substance to the extent practicable.

**(i) Final agency action**

Under this section and subject to section 2617 of this title--

**(1)** a determination by the Administrator under subsection (b)(4)(A) that a chemical substance does not present an unreasonable risk of injury to health or the environment shall be issued by order and considered to be a final agency action, effective beginning on the date of issuance of the order; and

**(2)** a final rule promulgated under subsection (a), including the associated determination by the Administrator under subsection (b)(4)(A) that a chemical substance presents an unreasonable risk of injury to health or the environment, shall be considered to be a final agency action, effective beginning on the date of promulgation of the final rule.

**(j) Definition**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

For the purposes of this chapter, the term "requirement" as used in this section shall not displace statutory or common law.

**CREDIT(S)**

(Pub.L. 94-469, Title I, § 6, Oct. 11, 1976, 90 Stat. 2020; renumbered Title I, Pub.L. 99-519, § 3(c)(1), Oct. 22, 1986, 100 Stat. 2989; amended Pub.L. 109-364, Div. A, Title III, § 317(a), Oct. 17, 2006, 120 Stat. 2142; Pub.L. 110-414, § 3, Oct. 14, 2008, 122 Stat. 4342; Pub.L. 114-182, Title I, § 6, June 22, 2016, 130 Stat. 460.)

15 U.S.C.A. § 2605, 15 USCA § 2605
Current through P.L. 119-12. Some statute sections may be more current, see credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 15. Commerce and Trade
Chapter 53. Toxic Substances Control (Refs & Annos)
Subchapter I. Control of Toxic Substances (Refs & Annos)

15 U.S.C.A. § 2618

§ 2618. Judicial review

Currentness

**(a) In general**

**(1)(A)** Except as otherwise provided in this subchapter, not later than 60 days after the date on which a rule is promulgated under this subchapter, subchapter II, or subchapter IV, or the date on which an order is issued under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title,, [1] any person may file a petition for judicial review of such rule or order with the United States Court of Appeals for the District of Columbia Circuit or for the circuit in which such person resides or in which such person's principal place of business is located. Courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of such a rule or order if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

**(B)** Except as otherwise provided in this subchapter, courts of appeals of the United States shall have exclusive jurisdiction of any action to obtain judicial review (other than in an enforcement proceeding) of an order issued under this subchapter, other than an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, if any district court of the United States would have had jurisdiction of such action but for this subparagraph.

**(C)(i)** Not later than 60 days after the publication of a designation under section 2605(b)(1)(B)(ii) of this title, any person may commence a civil action to challenge the designation.

**(ii)** The United States Court of Appeals for the District of Columbia Circuit shall have exclusive jurisdiction over a civil action filed under this subparagraph.

**(2)** Copies of any petition filed under paragraph (1)(A) shall be transmitted forthwith to the Administrator and to the Attorney General by the clerk of the court with which such petition was filed. The provisions of section 2112 of Title 28 shall apply to the filing of the record of proceedings on which the Administrator based the rule or order being reviewed under this section and to the transfer of proceedings between United States courts of appeals.

**(b) Additional submissions and presentations; modifications**

If in an action under this section to review a rule, or an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, the petitioner or the Administrator applies to the court for leave to make additional oral submissions or written presentations respecting such rule or order and shows to the satisfaction of the court that such submissions and presentations would be material and that there were reasonable grounds for the submissions and failure to make such submissions and presentations in the

proceeding before the Administrator, the court may order the Administrator to provide additional opportunity to make such submissions and presentations. The Administrator may modify or set aside the rule or order being reviewed or make a new rule or order by reason of the additional submissions and presentations and shall file such modified or new rule or order with the return of such submissions and presentations. The court shall thereafter review such new or modified rule or order.

**(c) Standard of review**

**(1)(A)** Upon the filing of a petition under subsection (a)(1) for judicial review of a rule or order, the court shall have jurisdiction (i) to grant appropriate relief, including interim relief, as provided in chapter 7 of Title 5, and (ii) except as otherwise provided in subparagraph (B), to review such rule or order in accordance with chapter 7 of Title 5.

**(B)** Section 706 of Title 5 shall apply to review of a rule or order under this section, except that--

**(i)** in the case of review of--

**(I)** a rule under section 2603(a), 2604(b)(4), 2605(a) (including review of the associated determination under section 2605(b)(4)(A)), or 2605(e) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such rule if the court finds that the rule is not supported by substantial evidence in the rulemaking record taken as a whole; and

**(II)** an order under section 2603, 2604(e), 2604(f), or 2605(i)(1) of this title, the standard for review prescribed by paragraph (2)(E) of such section 706 shall not apply and the court shall hold unlawful and set aside such order if the court finds that the order is not supported by substantial evidence in the record taken as a whole; and

**(ii)** the court may not review the contents and adequacy of any statement of basis and purpose required by section 553(c) of Title 5 to be incorporated in the rule or order, except as part of the record, taken as a whole.

**(2)** The judgment of the court affirming or setting aside, in whole or in part, any rule or order reviewed in accordance with this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of Title 28.

**(d) Fees and costs**

The decision of the court in an action commenced under subsection (a), or of the Supreme Court of the United States on review of such a decision, may include an award of costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate.

**(e) Other remedies**

The remedies as provided in this section shall be in addition to and not in lieu of any other remedies provided by law.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**CREDIT(S)**

(Pub.L. 94-469, Title I, § 19, Oct. 11, 1976, 90 Stat. 2039; renumbered Title I and amended Pub.L. 99-519, § 3(b)(2), (c)(1), Oct. 22, 1986, 100 Stat. 2989; Pub.L. 102-550, Title X, § 1021(b)(8), Oct. 28, 1992, 106 Stat. 3923; Pub.L. 114-182, Title I, §§ 14, 19(m), June 22, 2016, 130 Stat. 498, 508.)

## Footnotes

1 So in original.

15 U.S.C.A. § 2618, 15 USCA § 2618
Current through P.L. 119-12. Some statute sections may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 15. Commerce and Trade
Chapter 53. Toxic Substances Control (Refs & Annos)
Subchapter I. Control of Toxic Substances (Refs & Annos)

15 U.S.C.A. § 2625

§ 2625. Administration

Currentness

**(a) Cooperation of Federal agencies**

Upon request by the Administrator, each Federal department and agency is authorized--

**(1)** to make its services, personnel, and facilities available (with or without reimbursement) to the Administrator to assist the Administrator in the administration of this chapter; and

**(2)** to furnish to the Administrator such information, data, estimates, and statistics, and to allow the Administrator access to all information in its possession as the Administrator may reasonably determine to be necessary for the administration of this chapter.

**(b) Fees**

**(1)** The Administrator may, by rule, require the payment from any person required to submit information under section 2603 of this title or a notice or other information to be reviewed by the Administrator under section 2604 of this title, or who manufactures or processes a chemical substance that is the subject of a risk evaluation under section 2605(b) of this title, of a fee that is sufficient and not more than reasonably necessary to defray the cost related to such chemical substance of administering sections 2603, 2604, and 2605 of this title, and collecting, processing, reviewing, and providing access to and protecting from disclosure as appropriate under section 2613 of this title information on chemical substances under this subchapter, including contractor costs incurred by the Administrator. In setting a fee under this paragraph, the Administrator shall take into account the ability to pay of the person required to pay such fee and the cost to the Administrator of carrying out the activities described in this paragraph. Such rules may provide for sharing such a fee in any case in which the expenses of testing are shared under section 2603 or 2604 of this title.

**(2)** The Administrator, after consultation with the Administrator of the Small Business Administration, shall by rule prescribe standards for determining the persons which qualify as small business concerns for purposes of paragraph (4).

**(3) Fund**

**(A) Establishment**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

There is established in the Treasury of the United States a fund, to be known as the TSCA Service Fee Fund (in this paragraph referred to as the "Fund"), consisting of such amounts as are deposited in the Fund under this paragraph.

**(B) Collection and deposit of fees**

Subject to the conditions of subparagraph (C), the Administrator shall collect the fees described in this subsection and deposit those fees in the Fund.

**(C) Use of funds by Administrator**

Fees authorized under this section shall be collected and available for obligation only to the extent and in the amount provided in advance in appropriations Acts, and shall be available without fiscal year limitation for use in defraying the costs of the activities described in paragraph (1).

**(D) Accounting and auditing**

**(i) Accounting**

The Administrator shall biennially prepare and submit to the Committee on Environment and Public Works of the Senate and the Committee on Energy and Commerce of the House of Representatives a report that includes an accounting of the fees paid to the Administrator under this paragraph and amounts disbursed from the Fund for the period covered by the report, as reflected by financial statements provided in accordance with sections 3515 and 3521 of Title 31.

**(ii) Auditing**

**(I) In general**

For the purpose of section 3515(c) of Title 31, the Fund shall be considered a component of a covered executive agency.

**(II) Components of audit**

The annual audit required in accordance with sections 3515 and 3521 of Title 31 of the financial statements of activities carried out using amounts from the Fund shall include an analysis of--

**(aa)** the fees collected and amounts disbursed under this subsection;

**(bb)** the reasonableness of the fees in place as of the date of the audit to meet current and projected costs of administering the provisions of this subchapter for which the fees may be used; and

**(cc)** the number of requests for a risk evaluation made by manufacturers under section 2605(b)(4)(C)(ii) of this title.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(III) Federal responsibility**

The Inspector General of the Environmental Protection Agency shall conduct the annual audit described in subclause (II) and submit to the Administrator a report that describes the findings and any recommendations of the Inspector General resulting from the audit.

**(4) Amount and adjustment of fees; refunds**

In setting fees under this section, the Administrator shall--

**(A)** prescribe lower fees for small business concerns, after consultation with the Administrator of the Small Business Administration;

**(B)** set the fees established under paragraph (1) at levels such that the fees will, in aggregate, provide a sustainable source of funds to annually defray--

**(i)** the lower of--

**(I)** 25 percent of the costs to the Administrator of carrying out sections 2603, 2604, and 2605 of this title, and of collecting, processing, reviewing, and providing access to and protecting from disclosure as appropriate under section 2613 of this title information on chemical substances under this subchapter, other than the costs to conduct and complete risk evaluations under section 2605(b) of this title; or

**(II)** $25,000,000 (subject to adjustment pursuant to subparagraph (F)); and

**(ii)** the costs of risk evaluations specified in subparagraph (D);

**(C)** reflect an appropriate balance in the assessment of fees between manufacturers and processors, and allow the payment of fees by consortia of manufacturers or processors;

**(D)** notwithstanding subparagraph (B)--

**(i)** except as provided in clause (ii), for chemical substances for which the Administrator has granted a request from a manufacturer pursuant to section 2605(b)(4)(C)(ii) of this title, establish the fee at a level sufficient to defray the full costs to the Administrator of conducting the risk evaluation under section 2605(b) of this title;

**(ii)** for chemical substances for which the Administrator has granted a request from a manufacturer pursuant to section 2605(b)(4)(C)(ii) of this title, and which are included in the 2014 update of the TSCA Work Plan for Chemical Assessments, establish the fee at a level sufficient to defray 50 percent of the costs to the Administrator of conducting the risk evaluation under section 2605(b) of this title; and

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(iii)** apply fees collected pursuant to clauses (i) and (ii) only to defray the costs described in those clauses;

**(E)** prior to the establishment or amendment of any fees under paragraph (1), consult and meet with parties potentially subject to the fees or their representatives, subject to the condition that no obligation under chapter 10 of Title 5 or subchapter II of chapter 5 of Title 5 is applicable with respect to such meetings;

**(F)** beginning with the fiscal year that is 3 years after June 22, 2016, and every 3 years thereafter, after consultation with parties potentially subject to the fees and their representatives pursuant to subparagraph (E), increase or decrease the fees established under paragraph (1) as necessary to adjust for inflation and to ensure that funds deposited in the Fund are sufficient to defray--

**(i)** approximately but not more than 25 percent of the costs to the Administrator of carrying out sections 2603, 2604, and 2605 of this title, and of collecting, processing, reviewing, and providing access to and protecting from disclosure as appropriate under section 2613 of this title information on chemical substances under this subchapter, other than the costs to conduct and complete risk evaluations requested under section 2605(b)(4)(C)(ii) of this title; and

**(ii)** the costs of risk evaluations specified in subparagraph (D); and

**(G)** if a notice submitted under section 2604 of this title is not reviewed or such a notice is withdrawn, refund the fee or a portion of the fee if no substantial work was performed on the notice.

**(5) Minimum amount of appropriations**

Fees may not be assessed for a fiscal year under this section unless the amount of appropriations for the Chemical Risk Review and Reduction program project of the Environmental Protection Agency for the fiscal year (excluding the amount of any fees appropriated for the fiscal year) are equal to or greater than the amount of appropriations for that program project for fiscal year 2014.

**(6) Termination**

The authority provided by this subsection shall terminate at the conclusion of the fiscal year that is 10 years after June 22, 2016, unless otherwise reauthorized or modified by Congress.

**(c) Action with respect to categories**

**(1)** Any action authorized or required to be taken by the Administrator under any provision of this chapter with respect to a chemical substance or mixture may be taken by the Administrator in accordance with that provision with respect to a category of chemical substances or mixtures. Whenever the Administrator takes action under a provision of this chapter with respect to a category of chemical substances or mixtures, any reference in this chapter to a chemical substance or mixture (insofar as it relates to such action) shall be deemed to be a reference to each chemical substance or mixture in such category.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(2)** For purposes of paragraph (1):

**(A)** The term "category of chemical substances" means a group of chemical substances the members of which are similar in molecular structure, in physical, chemical, or biological properties, in use, or in mode of entrance into the human body or into the environment, or the members of which are in some other way suitable for classification as such for purposes of this chapter, except that such term does not mean a group of chemical substances which are grouped together solely on the basis of their being new chemical substances.

**(B)** The term "category of mixtures" means a group of mixtures the members of which are similar in molecular structure, in physical, chemical, or biological properties, in use, or in the mode of entrance into the human body or into the environment, or the members of which are in some other way suitable for classification as such for purposes of this chapter.

**(d) Assistance office**

The Administrator shall establish in the Environmental Protection Agency an identifiable office to provide technical and other nonfinancial assistance to manufacturers and processors of chemical substances and mixtures respecting the requirements of this chapter applicable to such manufacturers and processors, the policy of the Agency respecting the application of such requirements to such manufacturers and processors, and the means and methods by which such manufacturers and processors may comply with such requirements.

**(e) Financial disclosures**

**(1)** Except as provided under paragraph (3), each officer or employee of the Environmental Protection Agency and the Department of Health and Human Services who--

**(A)** performs any function or duty under this chapter, and

**(B)** has any known financial interest (i) in any person subject to this chapter or any rule or order in effect under this chapter, or (ii) in any person who applies for or receives any grant or contract under this chapter,

shall, on February 1, 1978, and on February 1 of each year thereafter, file with the Administrator or the Secretary of Health and Human Services (hereinafter in this subsection referred to as the "Secretary"), as appropriate, a written statement concerning all such interests held by such officer or employee during the preceding calendar year. Such statement shall be made available to the public.

**(2)** The Administrator and the Secretary shall--

**(A)** act within 90 days of January 1, 1977--

**(i)** to define the term "known financial interests" for purposes of paragraph (1), and

**(ii)** to establish the methods by which the requirement to file written statements specified in paragraph (1) will be monitored and enforced, including appropriate provisions for review by the Administrator and the Secretary of such statements; and

**(B)** report to the Congress on June 1, 1978, and on June 1 of each year thereafter with respect to such statements and the actions taken in regard thereto during the preceding calendar year.

**(3)** The Administrator may by rule identify specific positions with the Environmental Protection Agency, and the Secretary may by rule identify specific positions with the Department of Health and Human Services, which are of a nonregulatory or nonpolicymaking nature, and the Administrator and the Secretary may by rule provide that officers or employees occupying such positions shall be exempt from the requirements of paragraph (1).

**(4)** This subsection does not supersede any requirement of chapter 11 of Title 18.

**(5)** Any officer or employee who is subject to, and knowingly violates, this subsection or any rule issued thereunder, shall be fined not more than $2,500 or imprisoned not more than one year, or both.

**(f) Statement of basis and purpose**

Any final order issued under this chapter shall be accompanied by a statement of its basis and purpose. The contents and adequacy of any such statement shall not be subject to judicial review in any respect.

**(g) Assistant Administrator**

**(1)** The President, by and with the advice and consent of the Senate, shall appoint an Assistant Administrator for Toxic Substances of the Environmental Protection Agency. Such Assistant Administrator shall be a qualified individual who is, by reason of background and experience, especially qualified to direct a program concerning the effects of chemicals on human health and the environment. Such Assistant Administrator shall be responsible for (A) the collection of information, (B) the preparation of studies, (C) the making of recommendations to the Administrator for regulatory and other actions to carry out the purposes and to facilitate the administration of this chapter, and (D) such other functions as the Administrator may assign or delegate.

**(2)** The Assistant Administrator to be appointed under paragraph (1) shall be in addition to the Assistant Administrators of the Environmental Protection Agency authorized by section 1(d) of Reorganization Plan No. 3 of 1970.

**(h) Scientific standards**

In carrying out sections 2603, 2604, and 2605 of this title, to the extent that the Administrator makes a decision based on science, the Administrator shall use scientific information, technical procedures, measures, methods, protocols, methodologies, or models, employed in a manner consistent with the best available science, and shall consider as applicable--

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(1)** the extent to which the scientific information, technical procedures, measures, methods, protocols, methodologies, or models employed to generate the information are reasonable for and consistent with the intended use of the information;

**(2)** the extent to which the information is relevant for the Administrator's use in making a decision about a chemical substance or mixture;

**(3)** the degree of clarity and completeness with which the data, assumptions, methods, quality assurance, and analyses employed to generate the information are documented;

**(4)** the extent to which the variability and uncertainty in the information, or in the procedures, measures, methods, protocols, methodologies, or models, are evaluated and characterized; and

**(5)** the extent of independent verification or peer review of the information or of the procedures, measures, methods, protocols, methodologies, or models.

**(i) Weight of scientific evidence**

The Administrator shall make decisions under sections 2603, 2604, and 2605 of this title based on the weight of the scientific evidence.

**(j) Availability of information**

Subject to section 2613 of this title, the Administrator shall make available to the public--

**(1)** all notices, determinations, findings, rules, consent agreements, and orders of the Administrator under this subchapter;

**(2)** any information required to be provided to the Administrator under section 2603 of this title;

**(3)** a nontechnical summary of each risk evaluation conducted under section 2605(b) of this title;

**(4)** a list of the studies considered by the Administrator in carrying out each such risk evaluation, along with the results of those studies; and

**(5)** each designation of a chemical substance under section 2605(b) of this title, along with an identification of the information, analysis, and basis used to make the designations.

**(k) Reasonably available information**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

In carrying out sections 2603, 2604, and 2605 of this title, the Administrator shall take into consideration information relating to a chemical substance or mixture, including hazard and exposure information, under the conditions of use, that is reasonably available to the Administrator.

**(l) Policies, procedures, and guidance**

**(1) Development**

Not later than 2 years after June 22, 2016, the Administrator shall develop any policies, procedures, and guidance the Administrator determines are necessary to carry out the amendments to this chapter made by the Frank R. Lautenberg Chemical Safety for the 21st Century Act.

**(2) Review**

Not later than 5 years after June 22, 2016, and not less frequently than once every 5 years thereafter, the Administrator shall--

**(A)** review the adequacy of the policies, procedures, and guidance developed under paragraph (1), including with respect to animal, nonanimal, and epidemiological test methods and procedures for assessing and determining risk under this subchapter; and

**(B)** revise such policies, procedures, and guidance as the Administrator determines necessary to reflect new scientific developments or understandings.

**(3) Testing of chemical substances and mixtures**

The policies, procedures, and guidance developed under paragraph (1) applicable to testing chemical substances and mixtures shall--

**(A)** address how and when the exposure level or exposure potential of a chemical substance or mixture would factor into decisions to require new testing, subject to the condition that the Administrator shall not interpret the lack of exposure information as a lack of exposure or exposure potential; and

**(B)** describe the manner in which the Administrator will determine that additional information is necessary to carry out this subchapter, including information relating to potentially exposed or susceptible populations.

**(4) Chemical substances with completed risk assessments**

With respect to a chemical substance listed in the 2014 update to the TSCA Work Plan for Chemical Assessments for which the Administrator has published a completed risk assessment prior to June 22, 2016, the Administrator may publish proposed and final rules under section 2605(a) of this title that are consistent with the scope of the completed risk assessment for the chemical substance and consistent with other applicable requirements of section 2605 of this title.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(5) Guidance**

Not later than 1 year after June 22, 2016, the Administrator shall develop guidance to assist interested persons in developing and submitting draft risk evaluations which shall be considered by the Administrator. The guidance shall, at a minimum, address the quality of the information submitted and the process to be followed in developing draft risk evaluations for consideration by the Administrator.

**(m) Report to Congress**

**(1) Initial report**

Not later than 6 months after June 22, 2016, the Administrator shall submit to the Committees on Energy and Commerce and Appropriations of the House of Representatives and the Committees on Environment and Public Works and Appropriations of the Senate a report containing an estimation of--

**(A)** the capacity of the Environmental Protection Agency to conduct and publish risk evaluations under section 2605(b)(4)(C)(i) of this title, and the resources necessary to conduct the minimum number of risk evaluations required under section 2605(b)(2) of this title;

**(B)** the capacity of the Environmental Protection Agency to conduct and publish risk evaluations under section 2605(b)(4)(C)(ii) of this title, the likely demand for such risk evaluations, and the anticipated schedule for accommodating that demand;

**(C)** the capacity of the Environmental Protection Agency to promulgate rules under section 2605(a) of this title as required based on risk evaluations conducted and published under section 2605(b) of this title; and

**(D)** the actual and anticipated efforts of the Environmental Protection Agency to increase the Agency's capacity to conduct and publish risk evaluations under section 2605(b) of this title.

**(2) Subsequent reports**

The Administrator shall update and resubmit the report described in paragraph (1) not less frequently than once every 5 years.

**(n) Annual plan**

**(1) In general**

The Administrator shall inform the public regarding the schedule and the resources necessary for the completion of each risk evaluation as soon as practicable after initiating the risk evaluation.

**(2) Publication of plan**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

At the beginning of each calendar year, the Administrator shall publish an annual plan that--

**(A)** identifies the chemical substances for which risk evaluations are expected to be initiated or completed that year and the resources necessary for their completion;

**(B)** describes the status of each risk evaluation that has been initiated but not yet completed; and

**(C)** if the schedule for completion of a risk evaluation has changed, includes an updated schedule for that risk evaluation.

**(o) Consultation with Science Advisory Committee on Chemicals**

**(1) Establishment**

Not later than 1 year after June 22, 2016, the Administrator shall establish an advisory committee, to be known as the Science Advisory Committee on Chemicals (referred to in this subsection as the "Committee").

**(2) Purpose**

The purpose of the Committee shall be to provide independent advice and expert consultation, at the request of the Administrator, with respect to the scientific and technical aspects of issues relating to the implementation of this subchapter.

**(3) Composition**

The Committee shall be composed of representatives of such science, government, labor, public health, public interest, animal protection, industry, and other groups as the Administrator determines to be advisable, including representatives that have specific scientific expertise in the relationship of chemical exposures to women, children, and other potentially exposed or susceptible subpopulations.

**(4) Schedule**

The Administrator shall convene the Committee in accordance with such schedule as the Administrator determines to be appropriate, but not less frequently than once every 2 years.

**(p) Prior actions**

**(1) Rules, orders, and exemptions**

Nothing in the Frank R. Lautenberg Chemical Safety for the 21st Century Act eliminates, modifies, or withdraws any rule promulgated, order issued, or exemption established pursuant to this chapter before June 22, 2016.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(2) Prior-initiated evaluations**

Nothing in this chapter prevents the Administrator from initiating a risk evaluation regarding a chemical substance, or from continuing or completing such risk evaluation, prior to the effective date of the policies, procedures, and guidance required to be developed by the Administrator pursuant to the amendments made by the Frank R. Lautenberg Chemical Safety for the 21st Century Act.

**(3) Actions completed prior to completion of policies, procedures, and guidance**

Nothing in this chapter requires the Administrator to revise or withdraw a completed risk evaluation, determination, or rule under this chapter solely because the action was completed prior to the development of a policy, procedure, or guidance pursuant to the amendments made by the Frank R. Lautenberg Chemical Safety for the 21st Century Act.

**CREDIT(S)**

(Pub.L. 94-469, Title I, § 26, Oct. 11, 1976, 90 Stat. 2046; Pub.L. 98-80, § 2(c)(2)(A), Aug. 23, 1983, 97 Stat. 485; renumbered Title I, Pub.L. 99-519, § 3(c)(1), Oct. 22, 1986, 100 Stat. 2989; amended Pub.L. 114-182, Title I, §§ 17, 19(q), June 22, 2016, 130 Stat. 499, 510; Pub.L. 117-286, § 4(a)(69), Dec. 27, 2022, 136 Stat. 4313.)

15 U.S.C.A. § 2625, 15 USCA § 2625
Current through P.L. 119-12. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

United States Code Annotated
Title 33. Navigation and Navigable Waters (Refs & Annos)
Chapter 26. Water Pollution Prevention and Control (Refs & Annos)
Subchapter IV. Permits and Licenses (Refs & Annos)

33 U.S.C.A. § 1345

§ 1345. Disposal or use of sewage sludge

Currentness

**(a) Permit**

Notwithstanding any other provision of this chapter or of any other law, in any case where the disposal of sewage sludge resulting from the operation of a treatment works as defined in section 1292 of this title (including the removal of in-place sewage sludge from one location and its deposit at another location) would result in any pollutant from such sewage sludge entering the navigable waters, such disposal is prohibited except in accordance with a permit issued by the Administrator under section 1342 of this title.

**(b) Issuance of permit; regulations**

The Administrator shall issue regulations governing the issuance of permits for the disposal of sewage sludge subject to subsection (a) of this section and section 1342 of this title. Such regulations shall require the application to such disposal of each criterion, factor, procedure, and requirement applicable to a permit issued under section 1342 of this title.

**(c) State permit program**

Each State desiring to administer its own permit program for disposal of sewage sludge subject to subsection (a) of this section within its jurisdiction may do so in accordance with section 1342 of this title.

**(d) Regulations**

**(1) Regulations**

The Administrator, after consultation with appropriate Federal and State agencies and other interested persons, shall develop and publish, within one year after December 27, 1977, and from time to time thereafter, regulations providing guidelines for the disposal of sludge and the utilization of sludge for various purposes. Such regulations shall--

**(A)** identify uses for sludge, including disposal;

**(B)** specify factors to be taken into account in determining the measures and practices applicable to each such use or disposal (including publication of information on costs);

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(C)** identify concentrations of pollutants which interfere with each such use or disposal.

The Administrator is authorized to revise any regulation issued under this subsection.

**(2) Identification and regulation of toxic pollutants**

**(A) On basis of available information**

**(i) Proposed regulations**

Not later than November 30, 1986,[1] the Administrator shall identify those toxic pollutants which, on the basis of available information on their toxicity, persistence, concentration, mobility, or potential for exposure, may be present in sewage sludge in concentrations which may adversely affect public health or the environment, and propose regulations specifying acceptable management practices for sewage sludge containing each such toxic pollutant and establishing numerical limitations for each such pollutant for each use identified under paragraph (1)(A).

**(ii) Final regulations**

Not later than August 31, 1987, and after opportunity for public hearing, the Administrator shall promulgate the regulations required by subparagraph (A)(i).

**(B) Others**

**(i) Proposed regulations**

Not later than July 31, 1987, the Administrator shall identify those toxic pollutants not identified under subparagraph (A)(i) which may be present in sewage sludge in concentrations which may adversely affect public health or the environment, and propose regulations specifying acceptable management practices for sewage sludge containing each such toxic pollutant and establishing numerical limitations for each pollutant for each such use identified under paragraph (1)(A).

**(ii) Final regulations**

Not later than June 15, 1988, the Administrator shall promulgate the regulations required by subparagraph (B)(i).

**(C) Review**

From time to time, but not less often than every 2 years, the Administrator shall review the regulations promulgated under this paragraph for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants consistent with the requirements of this paragraph.

**(D) Minimum standards; compliance date**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

The management practices and numerical criteria established under subparagraphs (A), (B), and (C) shall be adequate to protect public health and the environment from any reasonably anticipated adverse effects of each pollutant. Such regulations shall require compliance as expeditiously as practicable but in no case later than 12 months after their publication, unless such regulations require the construction of new pollution control facilities, in which case the regulations shall require compliance as expeditiously as practicable but in no case later than two years from the date of their publication.

**(3) Alternative standards**

For purposes of this subsection, if, in the judgment of the Administrator, it is not feasible to prescribe or enforce a numerical limitation for a pollutant identified under paragraph (2), the Administrator may instead promulgate a design, equipment, management practice, or operational standard, or combination thereof, which in the Administrator's judgment is adequate to protect public health and the environment from any reasonably anticipated adverse effects of such pollutant. In the event the Administrator promulgates a design or equipment standard under this subsection, the Administrator shall include as part of such standard such requirements as will assure the proper operation and maintenance of any such element of design or equipment.

**(4) Conditions on permits**

Prior to the promulgation of the regulations required by paragraph (2), the Administrator shall impose conditions in permits issued to publicly owned treatment works under section 1342 of this title or take such other measures as the Administrator deems appropriate to protect public health and the environment from any adverse effects which may occur from toxic pollutants in sewage sludge.

**(5) Limitation on statutory construction**

Nothing in this section is intended to waive more stringent requirements established by this chapter or any other law.

**(e) Manner of sludge disposal**

The determination of the manner of disposal or use of sludge is a local determination, except that it shall be unlawful for any person to dispose of sludge from a publicly owned treatment works or any other treatment works treating domestic sewage for any use for which regulations have been established pursuant to subsection (d) of this section, except in accordance with such regulations.

**(f) Implementation of regulations**

**(1) Through section 1342 permits**

Any permit issued under section 1342 of this title to a publicly owned treatment works or any other treatment works treating domestic sewage shall include requirements for the use and disposal of sludge that implement the regulations established pursuant to subsection (d) of this section, unless such requirements have been included in a permit issued under the appropriate provisions of subtitle C of the Solid Waste Disposal Act, part C of the Safe Drinking Water Act, the Marine Protection, Research, and Sanctuaries Act of 1972, or the Clean Air Act, or under State permit programs approved by the Administrator, where the Administrator determines that such programs assure compliance with any applicable requirements of this section.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Not later than December 15, 1986,[2] the Administrator shall promulgate procedures for approval of State programs pursuant to this paragraph.

**(2) Through other permits**

In the case of a treatment works described in paragraph (1) that is not subject to section 1342 of this title and to which none of the other above listed permit programs nor approved State permit authority apply, the Administrator may issue a permit to such treatment works solely to impose requirements for the use and disposal of sludge that implement the regulations established pursuant to subsection (d) of this section. The Administrator shall include in the permit appropriate requirements to assure compliance with the regulations established pursuant to subsection (d) of this section. The Administrator shall establish procedures for issuing permits pursuant to this paragraph.

**(g) Studies and projects**

**(1) Grant program; information gathering**

The Administrator is authorized to conduct or initiate scientific studies, demonstration projects, and public information and education projects which are designed to promote the safe and beneficial management or use of sewage sludge for such purposes as aiding the restoration of abandoned mine sites, conditioning soil for parks and recreation areas, agricultural and horticultural uses, and other beneficial purposes. For the purposes of carrying out this subsection, the Administrator may make grants to State water pollution control agencies, other public or nonprofit agencies, institutions, organizations, and individuals. In cooperation with other Federal departments and agencies, other public and private agencies, institutions, and organizations, the Administrator is authorized to collect and disseminate information pertaining to the safe and beneficial use of sewage sludge.

**(2) Authorization of appropriations**

For the purposes of carrying out the scientific studies, demonstration projects, and public information and education projects authorized in this section, there is authorized to be appropriated for fiscal years beginning after September 30, 1986, not to exceed $5,000,000.

**CREDIT(S)**

(June 30, 1948, c. 758, Title IV, § 405, as added Pub.L. 92-500, § 2, Oct. 18, 1972, 86 Stat. 884; amended Pub.L. 95-217, §§ 54(d), 68, Dec. 27, 1977, 91 Stat. 1591, 1606; Pub.L. 100-4, Title IV, § 406(a)-(c), (f), Feb. 4, 1987, 101 Stat. 71, 72, 74.)

**Footnotes**

1 So in original. Subsec. (d)(2) was enacted by Pub.L. 100-4, which was approved Feb. 4, 1987.

2 So in original. Subsec. (f) was enacted by Pub.L. 100-4, which was approved Feb. 4, 1987.

33 U.S.C.A. § 1345, 33 USCA § 1345
Current through P.L. 119-12. Some statute sections may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 82. Solid Waste Disposal (Refs & Annos)
Subchapter III. Hazardous Waste Management (Refs & Annos)

42 U.S.C.A. § 6924

§ 6924. Standards applicable to owners and operators of hazardous waste treatment, storage, and disposal facilities

Currentness

**(a) In general**

Not later than eighteen months after October 21, 1976, and after opportunity for public hearings and after consultation with appropriate Federal and State agencies, the Administrator shall promulgate regulations establishing such performance standards, applicable to owners and operators of facilities for the treatment, storage, or disposal of hazardous waste identified or listed under this subchapter, as may be necessary to protect human health and the environment. In establishing such standards the Administrator shall, where appropriate, distinguish in such standards between requirements appropriate for new facilities and for facilities in existence on the date of promulgation of such regulations. Such standards shall include, but need not be limited to, requirements respecting--

**(1)** maintaining records of all hazardous wastes identified or listed under this chapter which is treated, stored, or disposed of, as the case may be, and the manner in which such wastes were treated, stored, or disposed of;

**(2)** satisfactory reporting, monitoring, and inspection and compliance with the manifest system referred to in section 6922(5) of this title;

**(3)** treatment, storage, or disposal of all such waste received by the facility pursuant to such operating methods, techniques, and practices as may be satisfactory to the Administrator;

**(4)** the location, design, and construction of such hazardous waste treatment, disposal, or storage facilities;

**(5)** contingency plans for effective action to minimize unanticipated damage from any treatment, storage, or disposal of any such hazardous waste;

**(6)** the maintenance of operation of such facilities and requiring such additional qualifications as to ownership, continuity of operation, training for personnel, and financial responsibility (including financial responsibility for corrective action) as may be necessary or desirable; and

**(7)** compliance with the requirements of section 6925 of this title respecting permits for treatment, storage, or disposal.

No private entity shall be precluded by reason of criteria established under paragraph (6) from the ownership or operation of facilities providing hazardous waste treatment, storage, or disposal services where such entity can provide assurances of financial responsibility and continuity of operation consistent with the degree and duration of risks associated with the treatment, storage, or disposal of specified hazardous waste.

**(b) Salt dome formations, salt bed formations, underground mines and caves**

**(1)** Effective on November 8, 1984, the placement of any noncontainerized or bulk liquid hazardous waste in any salt dome formation, salt bed formation, underground mine, or cave is prohibited until such time as--

**(A)** the Administrator has determined, after notice and opportunity for hearings on the record in the affected areas, that such placement is protective of human health and the environment;

**(B)** the Administrator has promulgated performance and permitting standards for such facilities under this subchapter, and;

**(C)** a permit has been issued under section 6925(c) of this title for the facility concerned.

**(2)** Effective on November 8, 1984, the placement of any hazardous waste other than a hazardous waste referred to in paragraph (1) in a salt dome formation, salt bed formation, underground mine, or cave is prohibited until such time as a permit has been issued under section 6925(c) of this title for the facility concerned.

**(3)** No determination made by the Administrator under subsection (d), (e), or (g) of this section regarding any hazardous waste to which such subsection (d), (e), or (g) applies shall affect the prohibition contained in paragraph (1) or (2) of this subsection.

**(4)** Nothing in this subsection shall apply to the Department of Energy Waste Isolation Pilot Project in New Mexico.

**(c) Liquids in landfills**

**(1)** Effective 6 months after November 8, 1984, the placement of bulk or noncontainerized liquid hazardous waste or free liquids contained in hazardous waste (whether or not absorbents have been added) in any landfill is prohibited. Prior to such date the requirements (as in effect on April 30, 1983) promulgated under this section by the Administrator regarding liquid hazardous waste shall remain in force and effect to the extent such requirements are applicable to the placement of bulk or noncontainerized liquid hazardous waste, or free liquids contained in hazardous waste, in landfills.

**(2)** Not later than fifteen months after November 8, 1984, the Administrator shall promulgate final regulations which--

**(A)** minimize the disposal of containerized liquid hazardous waste in landfills, and

**(B)** minimize the presence of free liquids in containerized hazardous waste to be disposed of in landfills.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Such regulations shall also prohibit the disposal in landfills of liquids that have been absorbed in materials that biodegrade or that release liquids when compressed as might occur during routine landfill operations. Prior to the date on which such final regulations take effect, the requirements (as in effect on April 30, 1983) promulgated under this section by the Administrator shall remain in force and effect to the extent such requirements are applicable to the disposal of containerized liquid hazardous waste, or free liquids contained in hazardous waste, in landfills.

**(3)** Effective twelve months after November 8, 1984, the placement of any liquid which is not a hazardous waste in a landfill for which a permit is required under section 6925(c) of this title or which is operating pursuant to interim status granted under section 6925(e) of this title is prohibited unless the owner or operator of such landfill demonstrates to the Administrator, or the Administrator determines, that--

**(A)** the only reasonably available alternative to the placement in such landfill is placement in a landfill or unlined surface impoundment, whether or not permitted under section 6925(c) of this title or operating pursuant to interim status under section 6925(e) of this title, which contains, or may reasonably be anticipated to contain, hazardous waste; and

**(B)** placement in such owner or operator's landfill will not present a risk of contamination of any underground source of drinking water.

As used in subparagraph (B), the term "underground source of drinking water" has the same meaning as provided in regulations under the Safe Drinking Water Act (title XIV of the Public Health Service Act).

**(4)** No determination made by the Administrator under subsection (d), (e), or (g) of this section regarding any hazardous waste to which such subsection (d), (e), or (g) applies shall affect the prohibition contained in paragraph (1) of this subsection.

**(d) Prohibitions on land disposal of specified wastes**

**(1)** Effective 32 months after November 8, 1984 (except as provided in subsection (f) with respect to underground injection into deep injection wells), the land disposal of the hazardous wastes referred to in paragraph (2) is prohibited unless the Administrator determines the prohibition on one or more methods of land disposal of such waste is not required in order to protect human health and the environment for as long as the waste remains hazardous, taking into account--

**(A)** the long-term uncertainties associated with land disposal,

**(B)** the goal of managing hazardous waste in an appropriate manner in the first instance, and

**(C)** the persistence, toxicity, mobility, and propensity to bioaccumulate of such hazardous wastes and their hazardous constituents.

For the purposes of this paragraph, a method of land disposal may not be determined to be protective of human health and the environment for a hazardous waste referred to in paragraph (2) (other than a hazardous waste which has complied with the pretreatment regulations promulgated under subsection (m)), unless, upon application by an interested person, it has been demonstrated to the Administrator, to a reasonable degree of certainty, that there will be no migration of hazardous constituents from the disposal unit or injection zone for as long as the wastes remain hazardous.

**(2)** Paragraph (1) applies to the following hazardous wastes listed or identified under section 6921 of this title:

**(A)** Liquid hazardous wastes, including free liquids associated with any solid or sludge, containing free cyanides at concentrations greater than or equal to 1,000 mg/l.

**(B)** Liquid hazardous wastes, including free liquids associated with any solid or sludge, containing the following metals (or elements) or compounds of these metals (or elements) at concentrations greater than or equal to those specified below:

**(i)** arsenic and/or compounds (as As) 500 mg/l;

**(ii)** cadmium and/or compounds (as Cd) 100 mg/l;

**(iii)** chromium (VI and/or compounds (as Cr VI)) 500 mg/l;

**(iv)** lead and/or compounds (as Pb) 500 mg/l;

**(v)** mercury and/or compounds (as Hg) 20 mg/l;

**(vi)** nickel and/or compounds (as Ni) 134 mg/l;

**(vii)** selenium and/or compounds (as Se) 100 mg/l; and

**(viii)** thallium and/or compounds (as Th) 130 mg/l.

**(C)** Liquid hazardous waste having a pH less than or equal to two (2.0).

**(D)** Liquid hazardous wastes containing polychlorinated biphenyls at concentrations greater than or equal to 50 ppm.

**(E)** Hazardous wastes containing halogenated organic compounds in total concentration greater than or equal to 1,000 mg/kg.

When necessary to protect human health and the environment, the Administrator shall substitute more stringent concentration levels than the levels specified in subparagraphs (A) through (E).

**(3)** During the period ending forty-eight months after November 8, 1984, this subsection shall not apply to any disposal of contaminated soil or debris resulting from a response action taken under section 9604 or 9606 of this title or a corrective action required under this subchapter.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(e) Solvents and dioxins**

**(1)** Effective twenty-four months after November 8, 1984 (except as provided in subsection (f) with respect to underground injection into deep injection wells), the land disposal of the hazardous wastes referred to in paragraph (2) is prohibited unless the Administrator determines the prohibition of one or more methods of land disposal of such waste is not required in order to protect human health and the environment for as long as the waste remains hazardous, taking into account the factors referred to in subparagraph (A) through (C) of subsection (d)(1). For the purposes of this paragraph, a method of land disposal may not be determined to be protective of human health and the environment for a hazardous waste referred to in paragraph (2) (other than a hazardous waste which has complied with the pretreatment regulations promulgated under subsection (m)), unless upon application by an interested person it has been demonstrated to the Administrator, to a reasonable degree of certainty, that there will be no migration of hazardous constituents from the disposal unit or injection zone for as long as the wastes remain hazardous.

**(2)** The hazardous wastes to which the prohibition under paragraph (1) applies are as follows--

**(A)** dioxin-containing hazardous wastes numbered F020, F021, F022, and F023 (as referred to in the proposed rule published by the Administrator in the Federal Register for April 4, 1983), and

**(B)** those hazardous wastes numbered F001, F002, F003, F004, and F005 in regulations promulgated by the Administrator under section 6921 of this title (40 C.F.R. 261.31 (July 1, 1983)), as those regulations are in effect on July 1, 1983.

**(3)** During the period ending forty-eight months after November 8, 1984, this subsection shall not apply to any disposal of contaminated soil or debris resulting from a response action taken under section 9604 or 9606 of this title or a corrective action required under this subchapter.

**(f) Disposal into deep injection wells; specified subsection (d) wastes; solvents and dioxins**

**(1)** Not later than forty-five months after November 8, 1984, the Administrator shall complete a review of the disposal of all hazardous wastes referred to in paragraph (2) of subsection (d) and in paragraph (2) of subsection (e) by underground injection into deep injection wells.

**(2)** Within forty-five months after November 8, 1984, the Administrator shall make a determination regarding the disposal by underground injection into deep injection wells of the hazardous wastes referred to in paragraph (2) of subsection (d) and the hazardous wastes referred to in paragraph (2) of subsection (e). The Administrator shall promulgate final regulations prohibiting the disposal of such wastes into such wells if it may reasonably be determined that such disposal may not be protective of human health and the environment for as long as the waste remains hazardous, taking into account the factors referred to in subparagraphs (A) through (C) of subsection (d)(1). In promulgating such regulations, the Administrator shall consider each hazardous waste referred to in paragraph (2) of subsection (d) or in paragraph (2) of subsection (e) which is prohibited from disposal into such wells by any State.

**(3)** If the Administrator fails to make a determination under paragraph (2) for any hazardous waste referred to in paragraph (2) of subsection (d) or in paragraph (2) of subsection (e) within forty-five months after November 8, 1984, such hazardous waste shall be prohibited from disposal into any deep injection well.

**(4)** As used in this subsection, the term "deep injection well" means a well used for the underground injection of hazardous waste other than a well to which section 6979a(a) of this title applies.

**(g) Additional land disposal prohibition determinations**

**(1)** Not later than twenty-four months after November 8, 1984, the Administrator shall submit a schedule to Congress for--

**(A)** reviewing all hazardous wastes listed (as of November 8, 1984) under section 6921 of this title other than those wastes which are referred to in subsection (d) or (e); and

**(B)** taking action under paragraph (5) of this subsection with respect to each such hazardous waste.

**(2)** The Administrator shall base the schedule on a ranking of such listed wastes considering their intrinsic hazard and their volume such that decisions regarding the land disposal of high volume hazardous wastes with high intrinsic hazard shall, to the maximum extent possible, be made by the date forty-five months after November 8, 1984. Decisions regarding low volume hazardous wastes with lower intrinsic hazard shall be made by the date sixty-six months after November 8, 1984.

**(3)** The preparation and submission of the schedule under this subsection shall not be subject to the Paperwork Reduction Act of 1980. No hearing on the record shall be required for purposes of preparation or submission of the schedule. The schedule shall not be subject to judicial review.

**(4)** The schedule under this subsection shall require that the Administrator shall promulgate regulations in accordance with paragraph (5) or make a determination under paragraph (5)--

**(A)** for at least one-third of all hazardous wastes referred to in paragraph (1) by the date forty-five months after November 8, 1984;

**(B)** for at least two-thirds of all such listed wastes by the date fifty-five months after November 8, 1984; and

**(C)** for all such listed wastes and for all hazardous wastes identified under section 6921 of this title by the date sixty-six months after November 8, 1984.

In the case of any hazardous waste identified or listed under section 6921 of this title after November 8, 1984, the Administrator shall determine whether such waste shall be prohibited from one or more methods of land disposal in accordance with paragraph (5) within six months after the date of such identification or listing.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(5)** Not later than the date specified in the schedule published under this subsection, the Administrator shall promulgate final regulations prohibiting one or more methods of land disposal of the hazardous wastes listed on such schedule except for methods of land disposal which the Administrator determines will be protective of human health and the environment for as long as the waste remains hazardous, taking into account the factors referred to in subparagraphs (A) through (C) of subsection (d)(1). For the purposes of this paragraph, a method of land disposal may not be determined to be protective of human health and the environment (except with respect to a hazardous waste which has complied with the pretreatment regulations promulgated under subsection (m)) unless, upon application by an interested person, it has been demonstrated to the Administrator, to a reasonable degree of certainty, that there will be no migration of hazardous constituents from the disposal unit or injection zone for as long as the wastes remain hazardous.

**(6)(A)** If the Administrator fails (by the date forty-five months after November 8, 1984) to promulgate regulations or make a determination under paragraph (5) for any hazardous waste which is included in the first one-third of the schedule published under this subsection, such hazardous waste may be disposed of in a landfill or surface impoundment only if--

**(i)** such facility is in compliance with the requirements of subsection (o) which are applicable to new facilities (relating to minimum technological requirements); and

**(ii)** prior to such disposal, the generator has certified to the Administrator that such generator has investigated the availability of treatment capacity and has determined that the use of such landfill or surface impoundment is the only practical alternative to treatment currently available to the generator.

The prohibition contained in this subparagraph shall continue to apply until the Administrator promulgates regulations or makes a determination under paragraph (5) for the waste concerned.

**(B)** If the Administrator fails (by the date 55 months after November 8, 1984) to promulgate regulations or make a determination under paragraph (5) for any hazardous waste which is included in the first two-thirds of the schedule published under this subsection, such hazardous waste may be disposed of in a landfill or surface impoundment only if--

**(i)** such facility is in compliance with the requirements of subsection (o) which are applicable to new facilities (relating to minimum technological requirements); and

**(ii)** prior to such disposal, the generator has certified to the Administrator that such generator has investigated the availability of treatment capacity and has determined that the use of such landfill or surface impoundment is the only practical alternative to treatment currently available to the generator.

The prohibition contained in this subparagraph shall continue to apply until the Administrator promulgates regulations or makes a determination under paragraph (5) for the waste concerned.

**(C)** If the Administrator fails to promulgate regulations, or make a determination under paragraph (5) for any hazardous waste referred to in paragraph (1) within 66 months after November 8, 1984, such hazardous waste shall be prohibited from land disposal.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(7)** Solid waste identified as hazardous based solely on one or more characteristics shall not be subject to this subsection, any prohibitions under subsection (d), (e), or (f), or any requirement promulgated under subsection (m) (other than any applicable specific methods of treatment, as provided in paragraph (8)) if the waste--

**(A)** is treated in a treatment system that subsequently discharges to waters of the United States pursuant to a permit issued under section 1342 of Title 33, treated for the purposes of the pretreatment requirements of section 1317 of Title 33, or treated in a zero discharge system that, prior to any permanent land disposal, engages in treatment that is equivalent to treatment required under section 1342 of Title 33 for discharges to waters of the United States, as determined by the Administrator; and

**(B)** no longer exhibits a hazardous characteristic prior to management in any land-based solid waste management unit.

**(8)** Solid waste that otherwise qualifies under paragraph (7) shall nevertheless be required to meet any applicable specific methods of treatment specified for such waste by the Administrator under subsection (m), including those specified in the rule promulgated by the Administrator June 1, 1990, prior to management in a land-based unit as part of a treatment system specified in paragraph (7)(A). No solid waste may qualify under paragraph (7) that would generate toxic gases, vapors, or fumes due to the presence of cyanide when exposed to pH conditions between 2.0 and 12.5.

**(9)** Solid waste identified as hazardous based on one or more characteristics alone shall not be subject to this subsection, any prohibitions under subsection (d), (e), or (f), or any requirement promulgated under subsection (m) if the waste no longer exhibits a hazardous characteristic at the point of injection in any Class I injection well permitted under section 300h-1 of this title.

**(10)** Not later than five years after March 26, 1996, the Administrator shall complete a study of hazardous waste managed pursuant to paragraph (7) or (9) to characterize the risks to human health or the environment associated with such management. In conducting this study, the Administrator shall evaluate the extent to which risks are adequately addressed under existing State or Federal programs and whether unaddressed risks could be better addressed under such laws or programs. Upon receipt of additional information or upon completion of such study and as necessary to protect human health and the environment, the Administrator may impose additional requirements under existing Federal laws, including subsection (m)(1), or rely on other State or Federal programs or authorities to address such risks. In promulgating any treatment standards pursuant to subsection (m)(1) under the previous sentence, the Administrator shall take into account the extent to which treatment is occurring in land-based units as part of a treatment system specified in paragraph (7)(A).

**(11)** Nothing in paragraph (7) or (9) shall be interpreted or applied to restrict any inspection or enforcement authority under the provisions of this chapter.

**(h) Variance from land disposal prohibitions**

**(1)** A prohibition in regulations under subsection (d), (e), (f), or (g) shall be effective immediately upon promulgation.

**(2)** The Administrator may establish an effective date different from the effective date which would otherwise apply under subsection (d), (e), (f), or (g) with respect to a specific hazardous waste which is subject to a prohibition under subsection (d), (e), (f), or (g) or under regulations under subsection (d), (e), (f), or (g) of this section. Any such other effective date shall be established on the basis of the earliest date on which adequate alternative treatment, recovery, or disposal capacity which

protects human health and the environment will be available. Any such other effective date shall in no event be later than 2 years after the effective date of the prohibition which would otherwise apply under subsection (d), (e), (f), or (g).

**(3)** The Administrator, after notice and opportunity for comment and after consultation with appropriate State agencies in all affected States, may on a case-by-case basis grant an extension of the effective date which would otherwise apply under subsection (d), (e), (f), or (g) or under paragraph (2) for up to one year, where the applicant demonstrates that there is a binding contractual commitment to construct or otherwise provide such alternative capacity but due to circumstances beyond the control of such applicant such alternative capacity cannot reasonably be made available by such effective date. Such extension shall be renewable once for no more than one additional year.

**(4)** Whenever another effective date (hereinafter referred to as a "variance") is established under paragraph (2), or an extension is granted under paragraph (3), with respect to any hazardous waste, during the period for which such variance or extension is in effect, such hazardous waste may be disposed of in a landfill or surface impoundment only if such facility is in compliance with the requirements of subsection (o).

**(i) Publication of determination**

If the Administrator determines that a method of land disposal will be protective of human health and the environment, he shall promptly publish in the Federal Register notice of such determination, together with an explanation of the basis for such determination.

**(j) Storage of hazardous waste prohibited from land disposal**

In the case of any hazardous waste which is prohibited from one or more methods of land disposal under this section (or under regulations promulgated by the Administrator under any provision of this section) the storage of such hazardous waste is prohibited unless such storage is solely for the purpose of the accumulation of such quantities of hazardous waste as are necessary to facilitate proper recovery, treatment or disposal.

(k) "Land disposal" defined

For the purposes of this section, the term "land disposal", when used with respect to a specified hazardous waste, shall be deemed to include, but not be limited to, any placement of such hazardous waste in a landfill, surface impoundment, waste pile, injection well, land treatment facility, salt dome formation, salt bed formation, or underground mine or cave.

**(l) Ban on dust suppression**

The use of waste or used oil or other material, which is contaminated or mixed with dioxin or any other hazardous waste identified or listed under section 6921 of this title (other than a waste identified solely on the basis of ignitability), for dust suppression or road treatment is prohibited.

**(m) Treatment standards for wastes subject to land disposal prohibition**

**(1)** Simultaneously with the promulgation of regulations under subsection (d), (e), (f), or (g) prohibiting one or more methods of land disposal of a particular hazardous waste, and as appropriate thereafter, the Administrator shall, after notice and an opportunity for hearings and after consultation with appropriate Federal and State agencies, promulgate regulations specifying those levels or methods of treatment, if any, which substantially diminish the toxicity of the waste or substantially reduce the likelihood of migration of hazardous constituents from the waste so that short-term and long-term threats to human health and the environment are minimized.

**(2)** If such hazardous waste has been treated to the level or by a method specified in regulations promulgated under this subsection, such waste or residue thereof shall not be subject to any prohibition promulgated under subsection (d), (e), (f), or (g) and may be disposed of in a land disposal facility which meets the requirements of this subchapter. Any regulation promulgated under this subsection for a particular hazardous waste shall become effective on the same date as any applicable prohibition promulgated under subsection (d), (e), (f), or (g).

**(n) Air emissions**

Not later than thirty months after November 8, 1984, the Administrator shall promulgate such regulations for the monitoring and control of air emissions at hazardous waste treatment, storage, and disposal facilities, including but not limited to open tanks, surface impoundments, and landfills, as may be necessary to protect human health and the environment.

**(o) Minimum technological requirements**

**(1)** The regulations under subsection (a) of this section shall be revised from time to time to take into account improvements in the technology of control and measurement. At a minimum, such regulations shall require, and a permit issued pursuant to section 6925(c) of this title after November 8, 1984, by the Administrator or a State shall require--

**(A)** for each new landfill or surface impoundment, each new landfill or surface impoundment unit at an existing facility, each replacement of an existing landfill or surface impoundment unit, and each lateral expansion of an existing landfill or surface impoundment unit, for which an application for a final determination regarding issuance of a permit under section 6925(c) of this title is received after November 8, 1984--

**(i)** the installation of two or more liners and a leachate collection system above (in the case of a landfill) and between such liners; and

**(ii)** ground water monitoring; and

**(B)** for each incinerator which receives a permit under section 6925(c) of this title after November 8, 1984, the attainment of the minimum destruction and removal efficiency required by regulations in effect on June 24, 1982.

The requirements of this paragraph shall apply with respect to all waste received after the issuance of the permit.

**(2)** Paragraph (1)(A)(i) shall not apply if the owner or operator demonstrates to the Administrator, and the Administrator finds for such landfill or surface impoundment, that alternative design and operating practices, together with location characteristics,

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

will prevent the migration of any hazardous constituents into the ground water or surface water at least as effectively as such liners and leachate collection systems.

**(3)** The double-liner requirement set forth in paragraph (1)(A)(i) may be waived by the Administrator for any monofill, if--

**(A)** such monofill contains only hazardous wastes from foundry furnace emission controls or metal casting molding sand,

**(B)** such wastes do not contain constituents which would render the wastes hazardous for reasons other than the Extraction Procedure ("EP") toxicity characteristics set forth in regulations under this subchapter, and

**(C)** such monofill meets the same requirements as are applicable in the case of a waiver under section 6925(j)(2) or (4) of this title.

**(4)(A)** Not later than thirty months after November 8, 1984, the Administrator shall promulgate standards requiring that new landfill units, surface impoundment units, waste piles, underground tanks and land treatment units for the storage, treatment, or disposal of hazardous waste identified or listed under section 6921 of this title shall be required to utilize approved leak detection systems.

**(B)** For the purposes of subparagraph (A)--

**(i)** the term "approved leak detection system" means a system or technology which the Administrator determines to be capable of detecting leaks of hazardous constituents at the earliest practicable time; and

**(ii)** the term "new units" means units on which construction commences after the date of promulgation of regulations under this paragraph.

**(5)(A)** The Administrator shall promulgate regulations or issue guidance documents implementing the requirements of paragraph (1)(A) within two years after November 8, 1984.

**(B)** Until the effective date of such regulations or guidance documents, the requirement for the installation of two or more liners may be satisfied by the installation of a top liner designed, operated, and constructed of materials to prevent the migration of any constituent into such liner during the period such facility remains in operation (including any post-closure monitoring period), and a lower liner designed, operated [1] and constructed to prevent the migration of any constituent through such liner during such period. For the purpose of the preceding sentence, a lower liner shall be deemed to satisfy such requirement if it is constructed of at least a 3-foot thick layer of recompacted clay or other natural material with a permeability of no more than $1 \times 10^{-7}$ centimeter per second.

**(6)** Any permit under section 6925 of this title which is issued for a landfill located within the State of Alabama shall require the installation of two or more liners and a leachate collection system above and between such liners, notwithstanding any other provision of this chapter.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(7)** In addition to the requirements set forth in this subsection, the regulations referred to in paragraph (1) shall specify criteria for the acceptable location of new and existing treatment, storage, or disposal facilities as necessary to protect human health and the environment. Within 18 months after November 8, 1984, the Administrator shall publish guidance criteria identifying areas of vulnerable hydrogeology.

**(p) Ground water monitoring**

The standards under this section concerning ground water monitoring which are applicable to surface impoundments, waste piles, land treatment units, and landfills shall apply to such a facility whether or not--

**(1)** the facility is located above the seasonal high water table;

**(2)** two liners and a leachate collection system have been installed at the facility; or

**(3)** the owner or operator inspects the liner (or liners) which has been installed at the facility.

This subsection shall not be construed to affect other exemptions or waivers from such standards provided in regulations in effect on November 8, 1984, or as may be provided in revisions to those regulations, to the extent consistent with this subsection. The Administrator is authorized on a case-by-case basis to exempt from ground water monitoring requirements under this section (including subsection (o)) any engineered structure which the Administrator finds does not receive or contain liquid waste (nor waste containing free liquids), is designed and operated to exclude liquid from precipitation or other runoff, utilizes multiple leak detection systems within the outer layer of containment, and provides for continuing operation and maintenance of these leak detection systems during the operating period, closure, and the period required for post-closure monitoring and for which the Administrator concludes on the basis of such findings that there is a reasonable certainty hazardous constituents will not migrate beyond the outer layer of containment prior to the end of the period required for post-closure monitoring.

**(q) Hazardous waste used as fuel**

**(1)** Not later than two years after November 8, 1984, and after notice and opportunity for public hearing, the Administrator shall promulgate regulations establishing such--

**(A)** standards applicable to the owners and operators of facilities which produce a fuel--

**(i)** from any hazardous waste identified or listed under section 6921 of this title, or

**(ii)** from any hazardous waste identified or listed under section 6921 of this title and any other material;

**(B)** standards applicable to the owners and operators of facilities which burn, for purposes of energy recovery, any fuel produced as provided in subparagraph (A) or any fuel which otherwise contains any hazardous waste identified or listed under section 6921 of this title; and

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(C)** standards applicable to any person who distributes or markets any fuel which is produced as provided in subparagraph (A) or any fuel which otherwise contains any hazardous waste identified or listed under section 6921 of this title;

as may be necessary to protect human health and the environment. Such standards may include any of the requirements set forth in paragraphs (1) through (7) of subsection (a) as may be appropriate. Nothing in this subsection shall be construed to affect or impair the provisions of section 6921(b)(3) of this title. For purposes of this subsection, the term "hazardous waste listed under section 6921 of this title" includes any commercial chemical product which is listed under section 6921 of this title and which, in lieu of its original intended use, is (i) produced for use as (or as a component of) a fuel, (ii) distributed for use as a fuel, or (iii) burned as a fuel.

**(2)(A)** This subsection, subsection (r), and subsection (s) shall not apply to petroleum refinery wastes containing oil which are converted into petroleum coke at the same facility at which such wastes were generated, unless the resulting coke product would exceed one or more characteristics by which a substance would be identified as a hazardous waste under section 6921 of this title.

**(B)** The Administrator may exempt from the requirements of this subsection, subsection (r), or subsection (s) facilities which burn de minimis quantities of hazardous waste as fuel, as defined by the Administrator, if the wastes are burned at the same facility at which such wastes are generated; the waste is burned to recover useful energy, as determined by the Administrator on the basis of the design and operating characteristics of the facility and the heating value and other characteristics of the waste; and the waste is burned in a type of device determined by the Administrator to be designed and operated at a destruction and removal efficiency sufficient such that protection of human health and environment is assured.

**(C)(i)** After November 8, 1984, and until standards are promulgated and in effect under paragraph (2) of this subsection, no fuel which contains any hazardous waste may be burned in any cement kiln which is located within the boundaries of any incorporated municipality with a population greater than five hundred thousand (based on the most recent census statistics) unless such kiln fully complies with regulations (as in effect on November 8, 1984) under this subchapter which are applicable to incinerators.

**(ii)** Any person who knowingly violates the prohibition contained in clause (i) shall be deemed to have violated section 6928(d)(2) of this title.

**(r) Labeling**

**(1)** Notwithstanding any other provision of law, until such time as the Administrator promulgates standards under subsection (q) specifically superceding this requirement, it shall be unlawful for any person who is required to file a notification in accordance with paragraph (1) or (3) of section 6930 of this title to distribute or market any fuel which is produced from any hazardous waste identified or listed under section 6921 of this title, or any fuel which otherwise contains any hazardous waste identified or listed under section 6921 of this title if the invoice or the bill of sale fails--

**(A)** to bear the following statement: "WARNING: THIS FUEL CONTAINS HAZARDOUS WASTES", and

**(B)** to list the hazardous wastes contained therein.

Beginning ninety days after November 8, 1984, such statement shall be located in a conspicuous place on every such invoice or bill of sale and shall appear in conspicuous and legible type in contrast by typography, layouts, or color with other printed matter on the invoice or bill of sale.

**(2)** Unless the Administrator determines otherwise as may be necessary to protect human health and the environment, this subsection shall not apply to fuels produced from petroleum refining waste containing oil if--

**(A)** such materials are generated and reinserted onsite into the refining process;

**(B)** contaminants are removed; and

**(C)** such refining waste containing oil is converted along with normal process streams into petroleum-derived fuel products at a facility at which crude oil is refined into petroleum products and which is classified as a number SIC 2911 facility under the Office of Management and Budget Standard Industrial Classification Manual.

**(3)** Unless the Administrator determines otherwise as may be necessary to protect human health and the environment, this subsection shall not apply to fuels produced from oily materials, resulting from normal petroleum refining, production and transportation practices, if (A) contaminants are removed; and (B) such oily materials are converted along with normal process streams into petroleum-derived fuel products at a facility at which crude oil is refined into petroleum products and which is classified as a number SIC 2911 facility under the Office of Management and Budget Standard Industrial Classification Manual.

**(s) Recordkeeping**

Not later than fifteen months after November 8, 1984, the Administrator shall promulgate regulations requiring that any person who is required to file a notification in accordance with subparagraph (1), (2), or (3), of section 6930(a) of this title shall maintain such records regarding fuel blending, distribution, or use as may be necessary to protect human health and the environment.

**(t) Financial responsibility provisions**

**(1)** Financial responsibility required by subsection (a) of this section may be established in accordance with regulations promulgated by the Administrator by any one, or any combination, of the following: insurance, guarantee, surety bond, letter of credit, or qualification as a self-insurer. In promulgating requirements under this section, the Administrator is authorized to specify policy or other contractual terms, conditions, or defenses which are necessary or are unacceptable in establishing such evidence of financial responsibility in order to effectuate the purposes of this chapter.

**(2)** In any case where the owner or operator is in bankruptcy, reorganization, or arrangement pursuant to the Federal Bankruptcy Code or where (with reasonable diligence) jurisdiction in any State court or any Federal Court cannot be obtained over an owner or operator likely to be solvent at the time of judgment, any claim arising from conduct for which evidence of financial responsibility must be provided under this section may be asserted directly against the guarantor providing such evidence of financial responsibility. In the case of any action pursuant to this subsection, such guarantor shall be entitled to invoke all rights and defenses which would have been available to the owner or operator if any action had been brought against the owner or operator by the claimant and which would have been available to the guarantor if an action had been brought against the guarantor by the owner or operator.

**(3)** The total liability of any guarantor shall be limited to the aggregate amount which the guarantor has provided as evidence of financial responsibility to the owner or operator under this chapter. Nothing in this subsection shall be construed to limit any other State or Federal statutory, contractual or common law liability of a guarantor to its owner or operator including, but not limited to, the liability of such guarantor for bad faith either in negotiating or in failing to negotiate the settlement of any claim. Nothing in this subsection shall be construed to diminish the liability of any person under section 9607 or 9611 of this title or other applicable law.

**(4)** For the purpose of this subsection, the term "guarantor" means any person, other than the owner or operator, who provides evidence of financial responsibility for an owner or operator under this section.

**(u) Continuing releases at permitted facilities**

Standards promulgated under this section shall require, and a permit issued after November 8, 1984, by the Administrator or a State shall require, corrective action for all releases of hazardous waste or constituents from any solid waste management unit at a treatment, storage, or disposal facility seeking a permit under this subchapter, regardless of the time at which waste was placed in such unit. Permits issued under section 6925 of this title shall contain schedules of compliance for such corrective action (where such corrective action cannot be completed prior to issuance of the permit) and assurances of financial responsibility for completing such corrective action.

**(v) Corrective action beyond facility boundary**

As promptly as practicable after November 8, 1984, the Administrator shall amend the standards under this section regarding corrective action required at facilities for the treatment, storage, or disposal, of hazardous waste listed or identified under section 6921 of this title to require that corrective action be taken beyond the facility boundary where necessary to protect human health and the environment unless the owner or operator of the facility concerned demonstrates to the satisfaction of the Administrator that, despite the owner or operator's best efforts, the owner or operator was unable to obtain the necessary permission to undertake such action. Such regulations shall take effect immediately upon promulgation, notwithstanding section 6930(b) of this title, and shall apply to--

**(1)** all facilities operating under permits issued under subsection (c), and

**(2)** all landfills, surface impoundments, and waste pile units (including any new units, replacements of existing units, or lateral expansions of existing units) which receive hazardous waste after July 26, 1982.

Pending promulgation of such regulations, the Administrator shall issue corrective action orders for facilities referred to in paragraphs (1) and (2), on a case-by-case basis, consistent with the purposes of this subsection.

**(w) Underground tanks**

Not later than March 1, 1985, the Administrator shall promulgate final permitting standards under this section for underground tanks that cannot be entered for inspection. Within forty-eight months after November 8, 1984, such standards shall be modified, if necessary, to cover at a minimum all requirements and standards described in section 6991b of this title.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(x) Mining and other special wastes**

If (1) solid waste from the extraction, beneficiation or processing of ores and minerals, including phosphate rock and overburden from the mining of uranium, (2) fly ash waste, bottom ash waste, slag waste, and flue gas emission control waste generated primarily from the combustion of coal or other fossil fuels, or (3) cement kiln dust waste, is subject to regulation under this subchapter, the Administrator is authorized to modify the requirements of subsections (c), (d), (e), (f), (g), (o), and (u) and section 6925(j) of this title, in the case of landfills or surface impoundments receiving such solid waste, to take into account the special characteristics of such wastes, the practical difficulties associated with implementation of such requirements, and site-specific characteristics, including but not limited to the climate, geology, hydrology and soil chemistry at the site, so long as such modified requirements assure protection of human health and the environment.

**(y) Munitions**

**(1)** Not later than 6 months after October 6, 1992, the Administrator shall propose, after consulting with the Secretary of Defense and appropriate State officials, regulations identifying when military munitions become hazardous waste for purposes of this subchapter and providing for the safe transportation and storage of such waste. Not later than 24 months after October 6, 1992, and after notice and opportunity for comment, the Administrator shall promulgate such regulations. Any such regulations shall assure protection of human health and the environment.

**(2)** For purposes of this subsection, the term “military munitions” includes chemical and conventional munitions.

**CREDIT(S)**

(Pub.L. 89-272, Title II, § 3004, as added Pub.L. 94-580, § 2, Oct. 21, 1976, 90 Stat. 2807; amended Pub.L. 96-482, § 9, Oct. 21, 1980, 94 Stat. 2338; Pub.L. 98-616, Title II, §§ 201(a), 202(a), 203, 204(b)(1), 205 to 209, Nov. 8, 1984, 98 Stat. 3226, 3233, 3234, 3236, 3238 to 3240; Pub.L. 102-386, Title I, § 107, Oct. 6, 1992, 106 Stat. 1513; Pub.L. 104-119, §§ 2, 4(2) to (5), Mar. 26, 1996, 110 Stat. 830, 833.)

**Footnotes**

1 So in original. Probably should be followed by a comma.

42 U.S.C.A. § 6924, 42 USCA § 6924
Current through P.L. 119-12. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 82. Solid Waste Disposal (Refs & Annos)
Subchapter III. Hazardous Waste Management (Refs & Annos)

42 U.S.C.A. § 6925

§ 6925. Permits for treatment, storage, or disposal of hazardous waste

Currentness

**(a) Permit requirements**

Not later than eighteen months after October 21, 1976, the Administrator shall promulgate regulations requiring each person owning or operating an existing facility or planning to construct a new facility for the treatment, storage, or disposal of hazardous waste identified or listed under this subchapter to have a permit issued pursuant to this section. Such regulations shall take effect on the date provided in section 6930 of this title and upon and after such date the treatment, storage, or disposal of any such hazardous waste and the construction of any new facility for the treatment, storage, or disposal of any such hazardous waste is prohibited except in accordance with such a permit. No permit shall be required under this section in order to construct a facility if such facility is constructed pursuant to an approval issued by the Administrator under section 2605(e) of Title 15 for the incineration of polychlorinated biphenyls and any person owning or operating such a facility may, at any time after operation or construction of such facility has begun, file an application for a permit pursuant to this section authorizing such facility to incinerate hazardous waste identified or listed under this subchapter.

**(b) Requirements of permit application**

Each application for a permit under this section shall contain such information as may be required under regulations promulgated by the Administrator, including information respecting--

**(1)** estimates with respect to the composition, quantities, and concentrations of any hazardous waste identified or listed under this subchapter, or combinations of any such hazardous waste and any other solid waste, proposed to be disposed of, treated, transported, or stored, and the time, frequency, or rate of which such waste is proposed to be disposed of, treated, transported, or stored; and

**(2)** the site at which such hazardous waste or the products of treatment of such hazardous waste will be disposed of, treated, transported to, or stored.

**(c) Permit issuance**

**(1)** Upon a determination by the Administrator (or a State, if applicable), of compliance by a facility for which a permit is applied for under this section with the requirements of this section and section 6924 of this title, the Administrator (or the State) shall issue a permit for such facilities. In the event permit applicants propose modification of their facilities, or in the event the Administrator (or the State) determines that modifications are necessary to conform to the requirements under this section and section 6924 of this title, the permit shall specify the time allowed to complete the modifications.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(2)(A)(i)** Not later than the date four years after November 8, 1984, in the case of each application under this subsection for a permit for a land disposal facility which was submitted before such date, the Administrator shall issue a final permit pursuant to such application or issue a final denial of such application.

**(ii)** Not later than the date five years after November 8, 1984, in the case of each application for a permit under this subsection for an incinerator facility which was submitted before such date, the Administrator shall issue a final permit pursuant to such application or issue a final denial of such application.

**(B)** Not later than the date eight years after November 8, 1984, in the case of each application for a permit under this subsection for any facility (other than a facility referred to in subparagraph (A)) which was submitted before such date, the Administrator shall issue a final permit pursuant to such application or issue a final denial of such application.

**(C)** The time periods specified in this paragraph shall also apply in the case of any State which is administering an authorized hazardous waste program under section 6926 of this title. Interim status under subsection (e) shall terminate for each facility referred to in subparagraph (A)(ii) or (B) on the expiration of the five- or eight-year period referred to in subparagraph (A) or (B), whichever is applicable, unless the owner or operator of the facility applies for a final determination regarding the issuance of a permit under this subsection within--

**(i)** two years after November 8, 1984 (in the case of a facility referred to in subparagraph (A)(ii)), or

**(ii)** four years after November 8, 1984 (in the case of a facility referred to in subparagraph (B)).

**(3)** Any permit under this section shall be for a fixed term, not to exceed 10 years in the case of any land disposal facility, storage facility, or incinerator or other treatment facility. Each permit for a land disposal facility shall be reviewed five years after date of issuance or reissuance and shall be modified as necessary to assure that the facility continues to comply with the currently applicable requirements of this section and section 6924 of this title. Nothing in this subsection shall preclude the Administrator from reviewing and modifying a permit at any time during its term. Review of any application for a permit renewal shall consider improvements in the state of control and measurement technology as well as changes in applicable regulations. Each permit issued under this section shall contain such terms and conditions as the Administrator (or the State) determines necessary to protect human health and the environment.

**(d) Permit revocation**

Upon a determination by the Administrator (or by a State, in the case of a State having an authorized hazardous waste program under section 6926 of this title) of noncompliance by a facility having a permit under this chapter with the requirements of this section or section 6924 of this title, the Administrator (or State, in the case of a State having an authorized hazardous waste program under section 6926 of this title) shall revoke such permit.

**(e) Interim status**

**(1)** Any person who--

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(A)** owns or operates a facility required to have a permit under this section which facility--

**(i)** was in existence on November 19, 1980, or

**(ii)** is in existence on the effective date of statutory or regulatory changes under this chapter that render the facility subject to the requirement to have a permit under this section,

**(B)** has complied with the requirements of section 6930(a) of this title, and

**(C)** has made an application for a permit under this section,

shall be treated as having been issued such permit until such time as final administrative disposition of such application is made, unless the Administrator or other plaintiff proves that final administrative disposition of such application has not been made because of the failure of the applicant to furnish information reasonably required or requested in order to process the application. This paragraph shall not apply to any facility which has been previously denied a permit under this section or if authority to operate the facility under this section has been previously terminated.

**(2)** In the case of each land disposal facility which has been granted interim status under this subsection before November 8, 1984, interim status shall terminate on the date twelve months after November 8, 1984, unless the owner or operator of such facility--

**(A)** applies for a final determination regarding the issuance of a permit under subsection (c) for such facility before the date twelve months after November 8, 1984; and

**(B)** certifies that such facility is in compliance with all applicable groundwater monitoring and financial responsibility requirements.

**(3)** In the case of each land disposal facility which is in existence on the effective date of statutory or regulatory changes under this chapter that render the facility subject to the requirement to have a permit under this section and which is granted interim status under this subsection, interim status shall terminate on the date twelve months after the date on which the facility first becomes subject to such permit requirement unless the owner or operator of such facility--

**(A)** applies for a final determination regarding the issuance of a permit under subsection (c) for such facility before the date twelve months after the date on which the facility first becomes subject to such permit requirement; and

**(B)** certifies that such facility is in compliance with all applicable groundwater monitoring and financial responsibility requirements.

**(f) Coal mining wastes and reclamation permits**

Notwithstanding subsection (a) through (e) of this section, any surface coal mining and reclamation permit covering any coal mining wastes or overburden which has been issued or approved under the Surface Mining Control and Reclamation Act of 1977 shall be deemed to be a permit issued pursuant to this section with respect to the treatment, storage, or disposal of such wastes or overburden. Regulations promulgated by the Administrator under this subchapter shall not be applicable to treatment, storage, or disposal of coal mining wastes and overburden which are covered by such a permit.

**(g) Research, development, and demonstration permits**

**(1)** The Administrator may issue a research, development, and demonstration permit for any hazardous waste treatment facility which proposes to utilize an innovative and experimental hazardous waste treatment technology or process for which permit standards for such experimental activity have not been promulgated under this subchapter. Any such permit shall include such terms and conditions as will assure protection of human health and the environment. Such permits--

**(A)** shall provide for the construction of such facilities, as necessary, and for operation of the facility for not longer than one year (unless renewed as provided in paragraph (4)), and

**(B)** shall provide for the receipt and treatment by the facility of only those types and quantities of hazardous waste which the Administrator deems necessary for purposes of determining the efficacy and performance capabilities of the technology or process and the effects of such technology or process on human health and the environment, and

**(C)** shall include such requirements as the Administrator deems necessary to protect human health and the environment (including, but not limited to, requirements regarding monitoring, operation, insurance or bonding, financial reponsibility, [1] closure, and remedial action), and such requirements as the Administrator deems necessary regarding testing and providing of information to the Administrator with respect to the operation of the facility.

The Administrator may apply the criteria set forth in this paragraph in establishing the conditions of each permit without separate establishment of regulations implementing such criteria.

**(2)** For the purpose of expediting review and issuance of permits under this subsection, the Administrator may, consistent with the protection of human health and the environment, modify or waive permit application and permit issuance requirements established in the Administrator's general permit regulations except that there may be no modification or waiver of regulations regarding financial responsibility (including insurance) or of procedures established under section 6974(b)(2) of this title regarding public participation.

**(3)** The Administrator may order an immediate termination of all operations at the facility at any time he determines that termination is necessary to protect human health and the environment.

**(4)** Any permit issued under this subsection may be renewed not more than three times. Each such renewal shall be for a period of not more than 1 year.

**(h) Waste minimization**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Effective September 1, 1985, it shall be a condition of any permit issued under this section for the treatment, storage, or disposal of hazardous waste on the premises where such waste was generated that the permittee certify, no less often than annually, that--

**(1)** the generator of the hazardous waste has a program in place to reduce the volume or quantity and toxicity of such waste to the degree determined by the generator to be economically practicable; and

**(2)** the proposed method of treatment, storage, or disposal is that practicable method currently available to the generator which minimizes the present and future threat to human health and the environment.

**(i) Interim status facilities receiving wastes after July 26, 1982**

The standards concerning ground water monitoring, unsaturated zone monitoring, and corrective action, which are applicable under section 6924 of this title to new landfills, surface impoundments, land treatment units, and waste-pile units required to be permitted under subsection (c) shall also apply to any landfill, surface impoundment, land treatment unit, or waste-pile unit qualifying for the authorization to operate under subsection (e) which receives hazardous waste after July 26, 1982.

**(j) Interim status surface impoundments**

**(1)** Except as provided in paragraph (2), (3), or (4), each surface impoundment in existence on November 8, 1984, and qualifying for the authorization to operate under subsection (e) of this section shall not receive, store, or treat hazardous waste after the date four years after November 8, 1984, unless such surface impoundment is in compliance with the requirements of section 6924(o)(1)(A) of this title which would apply to such impoundment if it were new.

**(2)** Paragraph (1) of this subsection shall not apply to any surface impoundment which (A) has at least one liner, for which there is no evidence that such liner is leaking; (B) is located more than one-quarter mile from an underground source of drinking water; and (C) is in compliance with generally applicable ground water monitoring requirements for facilities with permits under subsection (c) of this section.

**(3)** Paragraph (1) of this subsection shall not apply to any surface impoundment which (A) contains treated waste water during the secondary or subsequent phases of an aggressive biological treatment facility subject to a permit issued under section 1342 of Title 33 (or which holds such treated waste water after treatment and prior to discharge); (B) is in compliance with generally applicable ground water monitoring requirements for facilities with permits under subsection (c) of this section; and (C)(i) is part of a facility in compliance with section 1311(b)(2) of Title 33, or (ii) in the case of a facility for which no effluent guidelines required under section 1314(b)(2) of Title 33 are in effect and no permit under section 1342(a)(1) of Title 33 implementing section 1311(b)(2) of Title 33 has been issued, is part of a facility in compliance with a permit under section 1342 of Title 33, which is achieving significant degradation of toxic pollutants and hazardous constituents contained in the untreated waste stream and which has identified those toxic pollutants and hazardous constituents in the untreated waste stream to the appropriate permitting authority.

**(4)** The Administrator (or the State, in the case of a State with an authorized program), after notice and opportunity for comment, may modify the requirements of paragraph (1) for any surface impoundment if the owner or operator demonstrates that such surface impoundment is located, designed and operated so as to assure that there will be no migration of any hazardous

constitutent[2] into ground water or surface water at any future time. The Administrator or the State shall take into account locational criteria established under section 6924(o)(7) of this title.

**(5)** The owner or operator of any surface impoundment potentially subject to paragraph (1) who has reason to believe that on the basis of paragraph (2), (3), or (4) such surface impoundment is not required to comply with the requirements of paragraph (1), shall apply to the Administrator (or the State, in the case of a State with an authorized program) not later than twenty-four months after November 8, 1984, for a determination of the applicability of paragraph (1) (in the case of paragraph (2) or (3)) or for a modification of the requirements of paragraph (1) (in the case of paragraph (4)), with respect to such surface impoundment. Such owner or operator shall provide, with such application, evidence pertinent to such decision, including:

**(A)** an application for a final determination regarding the issuance of a permit under subsection (c) of this section for such facility, if not previously submitted;

**(B)** evidence as to compliance with all applicable ground water monitoring requirements and the information and analysis from such monitoring;

**(C)** all reasonably ascertainable evidence as to whether such surface impoundment is leaking; and

**(D)** in the case of applications under paragraph (2) or (3), a certification by a registered professional engineer with academic training and experience in ground water hydrology that--

**(i)** under paragraph (2), the liner of such surface impoundment is designed, constructed, and operated in accordance with applicable requirements, such surface impoundment is more than one-quarter mile from an underground source of drinking water and there is no evidence such liner is leaking; or

**(ii)** under paragraph (3), based on analysis of those toxic pollutants and hazardous constituents that are likely to be present in the untreated waste stream, such impoundment satisfies the conditions of paragraph (3).

In the case of any surface impoundment for which the owner or operator fails to apply under this paragraph within the time provided by this paragraph or paragraph (6), such surface impoundment shall comply with paragraph (1) notwithstanding paragraph (2), (3), or (4). Within twelve months after receipt of such application and evidence and not later than thirty-six months after November 8, 1984, and after notice and opportunity to comment, the Administrator (or, if appropriate, the State) shall advise such owner or operator on the applicability of paragraph (1) to such surface impoundment or as to whether and how the requirements of paragraph (1) shall be modified and applied to such surface impoundment.

**(6)(A)** In any case in which a surface impoundment becomes subject to paragraph (1) after November 8, 1984, due to the promulgation of additional listings or characteristics for the identification of hazardous waste under section 6921 of this title, the period for compliance in paragraph (1) shall be four years after the date of such promulgation, the period for demonstrations under paragraph (4) and for submission of evidence under paragraph (5) shall be not later than twenty-four months after the date of such promulgation, and the period for the Administrator (or if appropriate, the State) to advise such owners or operators under paragraph (5) shall be not later than thirty-six months after the date of promulgation.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(B)** In any case in which a surface impoundment is initially determined to be excluded from the requirements of paragraph (1) but due to a change in condition (including the existence of a leak) no longer satisfies the provisions of paragraph (2), (3), or (4) and therefore becomes subject to paragraph (1), the period for compliance in paragraph (1) shall be two years after the date of discovery of such change of condition, or in the case of a surface impoundment excluded under paragraph (3) three years after such date of discovery.

**(7)(A)** The Administrator shall study and report to the Congress on the number, range of size, construction, likelihood of hazardous constituents migrating into ground water, and potential threat to human health and the environment of existing surface impoundments excluded by paragraph (3) from the requirements of paragraph (1). Such report shall address the need, feasibility, and estimated costs of subjecting such existing surface impoundments to the requirements of paragraph (1).

**(B)** In the case of any existing surface impoundment or class of surface impoundments from which the Administrator (or the State, in the case of a State with an authorized program) determines hazardous constituents are likely to migrate into ground water, the Administrator (or if appropriate, the State) is authorized to impose such requirements as may be necessary to protect human health and the environment, including the requirements of section 6924(o) of this title which would apply to such impoundments if they were new.

**(C)** In the case of any surface impoundment excluded by paragraph (3) from the requirements of paragraph (1) which is subsequently determined to be leaking, the Administrator (or, if appropriate, the State) shall require compliance with paragraph (1), unless the Administrator (or, if appropriate, the State) determines that such compliance is not necessary to protect human health and the environment.

**(8)** In the case of any surface impoundment in which the liners and leak detection system have been installed pursuant to the requirements of paragraph (1) and in good faith compliance with section 6924(o) of this title and the Administrator's regulations and guidance documents governing liners and leak detection systems, no liner or leak detection system which is different from that which was so installed pursuant to paragraph (1) shall be required for such unit by the Administrator when issuing the first permit under this section to such facility. Nothing in this paragraph shall preclude the Administrator from requiring installation of a new liner when the Administrator has reason to believe that any liner installed pursuant to the requirements of this subsection is leaking.

**(9)** In the case of any surface impoundment which has been excluded by paragraph (2) on the basis of a liner meeting the definition under paragraph (12)(A)(ii), at the closure of such impoundment the Administrator shall require the owner or operator of such impoundment to remove or decontaminate all waste residues, all contaminated liner material, and contaminated soil to the extent practicable. If all contaminated soil is not removed or decontaminated, the owner or operator of such impoundment shall be required to comply with appropriate post-closure requirements, including but not limited to ground water monitoring and corrective action.

**(10)** Any incremental cost attributable to the requirements of this subsection or section 6924(o) of this title shall not be considered by the Administrator (or the State, in the case of a State with an authorized program under section 1342 of Title 33)--

**(A)** in establishing effluent limitations and standards under section 1311, 1314, 1316, 1317, or 1342 of Title 33 based on effluent limitations guidelines and standards promulgated any time before twelve months after November 8, 1984; or

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(B)** in establishing any other effluent limitations to carry out the provisions of section 1311, 1317, or 1342 of Title 33 on or before October 1, 1986.

**(11)(A)** If the Administrator allows a hazardous waste which is prohibited from one or more methods of land disposal under subsection (d), (e), or (g) of section 6924 of this title (or under regulations promulgated by the Administrator under such subsections) to be placed in a surface impoundment (which is operating pursuant to interim status) for storage or treatment, such impoundment shall meet the requirements that are applicable to new surface impoundments under section 6924(o)(1) of this title, unless such impoundment meets the requirements of paragraph (2) or (4).

**(B)** In the case of any hazardous waste which is prohibited from one or more methods of land disposal under subsection (d), (e), or (g) of section 6924 of this title (or under regulations promulgated by the Administrator under such subsection) the placement or maintenance of such hazardous waste in a surface impoundment for treatment is prohibited as of the effective date of such prohibition unless the treatment residues which are hazardous are, at a minimum, removed for subsequent management within one year of the entry of the waste into the surface impoundment.

**(12)(A)** For the purposes of paragraph (2)(A) of this subsection, the term "liner" means--

**(i)** a liner designed, constructed, installed, and operated to prevent hazardous waste from passing into the liner at any time during the active life of the facility; or

**(ii)** a liner designed, constructed, installed, and operated to prevent hazardous waste from migrating beyond the liner to adjacent subsurface soil, ground water, or surface water at any time during the active life of the facility.

**(B)** For the purposes of this subsection, the term "aggressive biological treatment facility" means a system of surface impoundments in which the initial impoundment of the secondary treatment segment of the facility utilizes intense mechanical aeration to enhance biological activity to degrade waste water pollutants and

**(i)** the hydraulic retention time in such initial impoundment is no longer than 5 days under normal operating conditions, on an annual average basis;

**(ii)** the hydraulic retention time in such initial impoundment is no longer than thirty days under normal operating conditions, on an annual average basis: *Provided,* That the sludge in such impoundment does not constitute a hazardous waste as identified by the extraction procedure toxicity characteristic in effect on November 8, 1984; or

**(iii)** such system utilizes activated sludge treatment in the first portion of secondary treatment.

**(C)** For the purposes of this subsection, the term "underground source or [3] drinking water" has the same meaning as provided in regulations under the Safe Drinking Water Act (title XIV of the Public Health Service Act).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(13)** The Administrator may modify the requirements of paragraph (1) in the case of a surface impoundment for which the owner or operator, prior to October 1, 1984, has entered into, and is in compliance with, a consent order, decree, or agreement with the Administrator or a State with an authorized program mandating corrective action with respect to such surface impoundment that provides a degree of protection of human health and the environment which is at a minimum equivalent to that provided by paragraph (1).

**CREDIT(S)**

(Pub.L. 89-272, Title II, § 3005, as added Pub.L. 94-580, § 2, Oct. 21, 1976, 90 Stat. 2808; amended Pub.L. 95-609, § 7(h), Nov. 8, 1978, 92 Stat. 3082; Pub.L. 96-482, §§ 10, 11, Oct. 21, 1980, 94 Stat. 2338; Pub.L. 98-616, Title II, §§ 211 to 213(a), (c), 214(a), 215, 224(b), 243(c), Nov. 8, 1984, 98 Stat. 3240 to 3243, 3253, 3261; Pub.L. 104-119, § 4(6), (7), Mar. 26, 1996, 110 Stat. 833.)

**Footnotes**

1 So in original. Probably should be “responsibility”.

2 So in original. Probably should be “constituent”.

3 So in original. Probably should be “of”.

42 U.S.C.A. § 6925, 42 USCA § 6925
Current through P.L. 119-12. Some statute sections may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
Title 42. The Public Health and Welfare
Chapter 82. Solid Waste Disposal (Refs & Annos)
Subchapter IV. State or Regional Solid Waste Plans

42 U.S.C.A. § 6949a

§ 6949a. Adequacy of certain guidelines and criteria

Currentness

**(a) Study**

The Administrator shall conduct a study of the extent to which the guidelines and criteria under this chapter (other than guidelines and criteria for facilities to which subchapter III applies) which are applicable to solid waste management and disposal facilities, including, but not limited to landfills and surface impoundments, are adequate to protect human health and the environment from ground water contamination. Such study shall include a detailed assessment of the degree to which the criteria under section 6907(a) of this title and the criteria under section 6944 of this title regarding monitoring, prevention of contamination, and remedial action are adequate to protect ground water and shall also include recommendation with respect to any additional enforcement authorities which the Administrator, in consultation with the Attorney General, deems necessary for such purposes.

**(b) Report**

Not later than thirty-six months after November 8, 1984, the Administrator shall submit a report to the Congress setting forth the results of the study required under this section, together with any recommendations made by the Administrator on the basis of such study.

**(c) Revisions of guidelines and criteria**

**(1) In general**

Not later than March 31, 1988, the Administrator shall promulgate revisions of the criteria promulgated under paragraph (1) of section 6944(a) of this title and under section 6907(a)(3) of this title for facilities that may receive hazardous household wastes or hazardous wastes from small quantity generators under section 6921(d) of this title. The criteria shall be those necessary to protect human health and the environment and may take into account the practicable capability of such facilities. At a minimum such revisions for facilities potentially receiving such wastes should require ground water monitoring as necessary to detect contamination, establish criteria for the acceptable location of new or existing facilities, and provide for corrective action as appropriate.

**(2) Additional revisions**

Subject to paragraph (3), the requirements of the criteria described in paragraph (1) relating to ground water monitoring shall not apply to an owner or operator of a new municipal solid waste landfill unit, an existing municipal solid waste landfill unit,

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

or a lateral expansion of a municipal solid waste landfill unit, that disposes of less than 20 tons of municipal solid waste daily, based on an annual average, if--

**(A)** there is no evidence of ground water contamination from the municipal solid waste landfill unit or expansion; and

**(B)** the municipal solid waste landfill unit or expansion serves--

**(i)** a community that experiences an annual interruption of at least 3 consecutive months of surface transportation that prevents access to a regional waste management facility; or

**(ii)** a community that has no practicable waste management alternative and the landfill unit is located in an area that annually receives less than or equal to 25 inches of precipitation.

**(3) Protection of ground water resources**

**(A) Monitoring requirement**

A State may require ground water monitoring of a solid waste landfill unit that would otherwise be exempt under paragraph (2) if necessary to protect ground water resources and ensure compliance with a State ground water protection plan, where applicable.

**(B) Methods**

If a State requires ground water monitoring of a solid waste landfill unit under subparagraph (A), the State may allow the use of a method other than the use of ground water monitoring wells to detect a release of contamination from the unit.

**(C) Corrective action**

If a State finds a release from a solid waste landfill unit, the State shall require corrective action as appropriate.

**(4) No-migration exemption**

**(A) In general**

Ground water monitoring requirements may be suspended by the Director of an approved State for a landfill operator if the operator demonstrates that there is no potential for migration of hazardous constituents from the unit to the uppermost aquifer during the active life of the unit and the post-closure care period.

**(B) Certification**

A demonstration under subparagraph (A) shall be certified by a qualified ground-water scientist and approved by the Director of an approved State.

**(C) Guidance**

Not later than 6 months after March 26, 1996, the Administrator shall issue a guidance document to facilitate small community use of the no migration [1] exemption under this paragraph.

**(5) Alaska Native villages**

Upon certification by the Governor of the State of Alaska that application of the requirements described in paragraph (1) to a solid waste landfill unit of a Native village (as defined in section 1602 of Title 43) or unit that is located in or near a small, remote Alaska village would be infeasible, or would not be cost-effective, or is otherwise inappropriate because of the remote location of the unit, the State may exempt the unit from some or all of those requirements. This paragraph shall apply only to solid waste landfill units that dispose of less than 20 tons of municipal solid waste daily, based on an annual average.

**(6) Further revisions of guidelines and criteria**

Recognizing the unique circumstances of small communities, the Administrator shall, not later than two years after March 26, 1996, promulgate revisions to the guidelines and criteria promulgated under this subchapter to provide additional flexibility to approved States to allow landfills that receive 20 tons or less of municipal solid waste per day, based on an annual average, to use alternative frequencies of daily cover application, frequencies of methane gas monitoring, infiltration layers for final cover, and means for demonstrating financial assurance: Provided, That such alternative requirements take into account climatic and hydrogeologic conditions and are protective of human health and environment.

**CREDIT(S)**

(Pub.L. 89-272, Title II, § 4010, as added Pub.L. 98-616, Title III, § 302(a)(1), Nov. 8, 1984, 98 Stat. 3267; amended Pub.L. 104-119, § 3(a), Mar. 26, 1996, 110 Stat. 831.)

## Footnotes

1 So in original. Probably should be "no-migration".

42 U.S.C.A. § 6949a, 42 USCA § 6949a
Current through P.L. 119-12. Some statute sections may be more current, see credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter A. General
Part 23. Judicial Review Under EPA—Administered Statutes (Refs & Annos)

40 C.F.R. § 23.5

§ 23.5 Timing of Administrator's action under Toxic Substances Control Act.

Currentness

Unless the Administrator otherwise explicitly provides in promulgating a particular rule or issuing a particular order, the time and date of the Administrator's promulgation or issuance for purposes of section 19(a)(1) shall be at 1:00 p.m. eastern time (standard or daylight, as appropriate) on the date that is (a) for a Federal Register document, two weeks after the date when the document is published in the Federal Register, or (b) for any other document, two weeks after it is signed.

SOURCE: 50 FR 7270, Feb. 21, 1985; 53 FR 29322, Aug. 3, 1988; 70 FR 33359, June 8, 2005, unless otherwise noted.

AUTHORITY: Clean Water Act, 33 U.S.C. 1361(a), 1369(b); Clean Air Act, 42 U.S.C. 7601(a)(1), 7607(b); Resource, Conservation and Recovery Act, 42 U.S.C. 6912(a), 6976; Toxic Substances Control Act, 15 U.S.C. 2618; Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. 136n(b), 136w(a); Safe Drinking Water Act, 42 U.S.C. 300j–7(a)(2), 300j–9(a); Atomic Energy Act, 42 U.S.C. 2201, 2239; Federal Food, Drug, and Cosmetic Act, 21 U.S.C. 371(a), 346a, 28 U.S.C. 2112(a), 2343, 2344.

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart A. General Provisions

40 C.F.R. § 240.100

§ 240.100 Scope.

Currentness

(a) The prescribed guidelines are applicable to thermal processing facilities designed to process or which are processing 50 tons or more per day of municipal-type solid wastes. The application of this capacity criterion will be interpreted to mean any facility designed to process or actually processing 50/24 tons or more per hour. However, the guidelines do not apply to hazardous, agricultural, and mining wastes because of the lack of sufficient information upon which to base recommended procedures.

(b) The requirement sections contained herein delineate minimum levels of performance required of any solid waste thermal processing operation. The recommended procedures sections are presented to suggest preferred methods by which the objectives of the requirements can be realized. The recommended procedures are based on the practice of incineration at large facilities (50 tons per day or more) processing municipal solid waste. If techniques other than the recommended procedures are used or wastes other than municipal wastes are processed, it is the obligation of the facility's owner and operator to demonstrate to the responsible agency in advance by means of engineering calculations, pilot plant data, etc., that the techniques employed will satisfy the requirements.

(c) Thermal processing residue must be disposed of in an environmentally acceptable manner. Where a land disposal facility is employed, it must be in accordance with the Environmental Protection Agency's Guidelines for the Land Disposal of Solid Wastes for both residues from the thermal processing operation and those non-hazardous wastes which cannot be thermally processed for reasons of health, safety, or technological limitation.

(d) Pursuant to section 211 of the Solid Waste Disposal Act, as amended, these guidelines are mandatory for Federal agencies. In addition, they are recommended to State, interstate, regional, and local government agencies for use in their activities.

(e) The guidelines are intended to apply equally to all solid waste generated by Federal agencies, regardless of whether processed or disposed of on or off Federal property; and solid waste generated by non-Federal entities, but processed or disposed of on Federal property. However, in the case of many Federal facilities such as Post Offices, military recruiting stations, and other offices, local community solid waste processing and disposal facilities are utilized, and processing and disposal is not within the management control of the Federal agency. Thus, implementation of the guidelines can be expected only in those situations where the Federal agency is able to exercise direct management control over the processing and disposal operations. However, every effort must be made by the responsible agency, where offsite facilities are utilized, to attain processing and disposal facilities that are in compliance with the guidelines. Where non-Federal generated solid waste is processed and disposed of on Federal land and/or facilities, those facilities and/or sites must be in compliance with these guidelines. Determination of

compliance to meet the requirements of the guidelines rests with the responsible agency, and they have the authority to determine how such compliance may occur.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.200. Solid Wastes Accepted.

40 C.F.R. § 240.200–1

§ 240.200–1 Requirement.

Currentness

In consultation with the responsible agencies, the owner/operator shall determine what wastes shall be accepted and shall identify any special handling required. In general, only wastes for which the facility has been specifically designed shall be accepted; however, other wastes may be accepted if it has been demonstrated to the responsible agency that they can be satisfactorily processed within the design capability of the facility or after appropriate facility modifications.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.200. Solid Wastes Accepted.

40 C.F.R. § 240.200–2

§ 240.200–2 Recommended procedures: Design.

Currentness

(a) In addition to the residential and commercial wastes normally processed at municipal-scale incinerators, certain special wastes might be considered for processing. These include: Certain bulky wastes (e.g., combustible demolition and construction debris, tree stumps, large timbers, furniture, and major appliances), digested and dewatered sludges from waste water treatment facilities, raw sewage sludges, and septic tank pumpings.

(b) If the facility is designed to handle special wastes, special areas should be provided where appropriate for storage while they await processing.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.200. Solid Wastes Accepted.

40 C.F.R. § 240.200–3

# § 240.200–3 Recommended procedures: Operations.

Currentness

(a) Storage areas for special wastes should be clearly marked.

(b) Facility personnel should be thoroughly trained in any unusual handling required by acceptance of Special Wastes.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.201. Solid Wastes Excluded.

40 C.F.R. § 240.201–1

§ 240.201–1 Requirement.

Currentness

Using information provided to them by the waste generator/owner, the responsible agency and the facility owner/operator shall jointly determine specific wastes to be excluded and shall identify them in the plans. The generator/owner of excluded wastes shall consult with the responsible agency in determining an alternative method of disposal for excluded wastes. The criteria used in considering whether a waste is unacceptable shall include the facility's capabilities, alternative methods available, the chemical and biological characteristics of the waste, environmental and health effects, and the safety of personnel. Disposal of pesticides and pesticide containers shall be consistent with the Federal Environmental Pesticides Control Act of 1972 (Pub.L. 92–516) and recommended procedures promulgated thereunder.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.201. Solid Wastes Excluded.

40 C.F.R. § 240.201–2

§ 240.201–2 Recommended procedures: Design.

Currentness

(a) Provision for storing, handling, and removing hazardous or excluded wastes inadvertently left at the facility should be considered in design.

(b) Examples of wastes which should be considered for exclusion from the facility include: Hazardous wastes, very large carcasses, automobile bodies, dewatered sludges from water treatment plants, and industrial process wastes.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.201. Solid Wastes Excluded.

40 C.F.R. § 240.201–3

§ 240.201–3 Recommended procedures: Operations.

Currentness

(a) Regular users of the facility should be given a list of excluded materials. The list should also be displayed prominently at the facility entrance. If a regular user persists in making unacceptable deliveries, he should be barred from the installation and reported to the responsible agency.

(b) The operating plan should specify the procedures and precautions to be taken if unacceptable wastes are delivered to the facility or are improperly left there. Operating personnel should be thoroughly trained in such procedures.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.202. Site Selection.

40 C.F.R. § 240.202–1

§ 240.202–1 Requirement.

Currentness

Site selection and utilization shall be consistent with public health and welfare, and air and water quality standards and adaptable to appropriate land-use plans.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.202. Site Selection.

40 C.F.R. § 240.202–2

§ 240.202–2 Recommended procedures: Design.

Currentness

(a) Whenever possible, thermal processing facilities should be located in areas zoned for industrial use and having adequate utilities to serve the facility.

(b) The site should be accessible by permanent roads leading from the public road system.

(c) Environmental factors, climatological conditions, and socioeconomic factors should be given full consideration as selection criteria.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.


© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.202. Site Selection.

40 C.F.R. § 240.202–3

§ 240.202–3 Recommended procedures: Operations.

Currentness

Not applicable.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.203. General Design.

40 C.F.R. § 240.203–1

§ 240.203–1 Requirement.

Currentness

A plan for the design of new facilities or modifications to existing facilities shall be prepared or approved by a professional engineer. A list of major considerations and the rationale for the decision on each consideration shall be approved by the responsible agency prior to authorization for construction. This information shall remain available for review.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.203. General Design.

40 C.F.R. § 240.203–2

§ 240.203–2 Recommended procedures: Design.

Currentness

(a) The types, amounts (by weight and volume), and characteristics of all solid wastes expected to be processed should be determined by survey and analysis. The gross calorific value of the solid wastes to be processed should be determined to serve as a basis for design.

(b) Resource recovery in the form of heat utilization or direct recovery of materials should be considered in the design.

(c) The facility should be designed to be compatible with the surrounding area, easy to maintain, and consistent with the land use of the area.

(d) Employee convenience facilities and plant maintenance facilities should be provided. Adequate lighting should be provided throughout the facility.

(e) The corrosive and erosive action of once-through and recirculated process waters should be controlled either by treating them or by using materials capable of withstanding the adverse effects of the waters.

(f) Facility design capacity should consider such items as waste quantity and characteristics, variations in waste generation, equipment downtime, and availability of alternate storage, processing, or disposal capability.

(g) Facility systems and subsystems should be designed to assure standby capability in the event of breakdown. Provision for standby water and power should also be considered.

(h) Instrumentation should be provided to determine such factors as: The weight of incoming and outgoing materials (the same scale system may be used for both); total combustion airflow rates; underfire and overfire airflows and the quantitative distribution of each; selected temperatures and pressures in the furnace, along gas passages, in the particulate collection device, and in the stack; electrical power and water consumption of critical units; and rate of operation. The smoke density, the concentration of carbon monoxide, or the concentration of hydrocarbons in the stack gases should be monitored. Measurement of the pH should be considered for effluent waters. Continuously recording instrumentation should be used as much as possible.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(i) Audible signals should be provided to alert operating personnel of critical operating unit malfunctions.

(j) Sampling capability should be designed into the facility so that each process stream can be sampled, and the utilities required to do so should be close at hand. The sampling sites should be so designed that personnel can sample safely without interfering with normal plant operations.

(k) A laboratory should be included in the design, or provision should be made for laboratory analyses to be performed by an outside source acceptable to the responsible agency.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.203. General Design.

40 C.F.R. § 240.203–3

§ 240.203–3 Recommended procedures: Operations.

Currentness

Not applicable.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.204. Water Quality.

40 C.F.R. § 240.204–1

§ 240.204–1 Requirement.

Currentness

All waters discharged from the facility shall be sufficiently treated to meet the most stringent of applicable water quality standards, established in accordance with or effective under the provisions of the Federal Water Pollution Control Act, as amended.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.204. Water Quality.

40 C.F.R. § 240.204–2

§ 240.204–2 Recommended procedures: Design.

Currentness

(a) Effluent waters should not be discharged indiscriminately. Consideration should be given to onsite treatment of process and waste waters before discharge.

(b) Recirculation of process waters should be considered.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.204. Water Quality.

40 C.F.R. § 240.204–3

§ 240.204–3 Recommended procedures: Operations.

Currentness

(a) When monitoring instrumentation indicates excessive discharge contamination, appropriate adjustments should be made to lower the concentrations to acceptable levels.

(b) In the event of an accidental spill, the local regulatory agency should be notified immediately.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.205. Air Quality.

40 C.F.R. § 240.205–1

§ 240.205–1 Requirement.

Currentness

Emissions shall not exceed applicable existing emission standards established by the U.S. Environmental Protection Agency (as published in parts 52, 60, 61 and 76 [1] of this chapter) under the authority of the Clean Air Act, as amended, or State or local emission standards effective under that Act, if the latter are more stringent.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

## Footnotes

1 Editorial Note: Part 76 was removed at 40 FR 13216, Mar. 25, 1975.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.205. Air Quality.

40 C.F.R. § 240.205–2

§ 240.205–2 Recommended procedures: Design.

Currentness

(a) These requirements should be met by using appropriate air pollution control technology.

(b) All emissions, including dust from vents, should be controlled.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.205. Air Quality.

40 C.F.R. § 240.205–3

§ 240.205–3 Recommended procedures: Operations.

Currentness

When monitoring instrumentation indicates excessive emissions, appropriate adjustments should be made to lower the emission to acceptable levels.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.206. Vectors.

40 C.F.R. § 240.206–1

§ 240.206–1 Requirement.

Currentness

Conditions shall be maintained that are unfavorable for the harboring, feeding, and breeding of vectors.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.206. Vectors.

40 C.F.R. § 240.206–2

§ 240.206–2 Recommended procedures: Design.

Currentness

Thermal processing facilities should be designed for ease of cleaning. Areas favorable for breeding of vectors should be avoided.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.206. Vectors.

40 C.F.R. § 240.206–3

§ 240.206–3 Recommended procedures: Operations.

Currentness

(a) A housekeeping schedule should be established and maintained. As a minimum the schedule should provide for cleaning the tipping and residue areas as spillages occur, emptying the solid waste storage area at least weekly, and routinely cleaning the remainder of the facility.

(b) Solid waste and residue should not be allowed to accumulate at the facility for more than one week.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.207. Aesthetics.

40 C.F.R. § 240.207–1

§ 240.207–1 Requirement.

Currentness

The incinerator facility shall be designed and operated at all times in an aesthetically acceptable manner.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.207. Aesthetics.

40 C.F.R. § 240.207–2

§ 240.207–2 Recommended procedures: Design.

Currentness

The facility should be designed so that it is physically attractive. The tipping, residue discharge, and waste salvage areas should be screened from public view, and the grounds should be landscaped.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.207. Aesthetics.

40 C.F.R. § 240.207–3

§ 240.207–3 Recommended procedures: Operations.

Currentness

(a) A routine housekeeping and litter removal schedule should be established and implemented so that the facility regularly presents a neat and clean appearance.

(b) Solid wastes that cannot be processed by the facility should be removed from the facility at least weekly. Open burning or open dumping of this material should be prohibited.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.208. Residue.

40 C.F.R. § 240.208–1

§ 240.208–1 Requirement.

Currentness

Residue and other solid waste products resulting from a thermal process shall be disposed of in an environmentally acceptable manner. Where land disposal is employed, practices must be in conformance with the U.S. Environmental Protection Agency's Guidelines for the Land Disposal of Solid Wastes. Unwanted residue materials remaining after the recovery operation shall be disposed of in a manner which protects the environment. Where land disposal is employed, practices must be in conformance with the U.S. Environmental Protection Agency's Guidelines for the Land Disposal of Solid Wastes.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.208. Residue.

40 C.F.R. § 240.208–2

# § 240.208–2 Recommended procedures: Design.

Currentness

Thermal processing facilities should be so designed as to allow for removal from the site of residue or other solids in a manner that protects the environment.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.208. Residue.

40 C.F.R. § 240.208–3

§ 240.208–3 Recommended procedures: Operations.

Currentness

(a) The furnace operator should visually observe the quality of the bottom ash at least twice per shift and record in the operating log the estimated percentage of unburned combustibles.

(b) If residue or fly ash is collected in a wet condition, it should be drained of free moisture. Transportation of residue and fly ash should be by means that prevent the loads from shifting, falling, leaking, or blowing from the container.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.209. Safety.

40 C.F.R. § 240.209–1

§ 240.209–1 Requirement.

Currentness

Incinerators shall be designed, operated, and maintained in a manner to protect the health and safety of personnel associated with the operation of the facility. Pertinent provisions of the Occupational Safety and Health Act of 1970 (Pub.L. 91–596) and regulations promulgated thereunder shall apply.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.209. Safety.

40 C.F.R. § 240.209–2

§ 240.209–2 Recommended procedures: Design.

Currentness

(a) Attention should be given to the safety of operators and vehicles through the provision of safety devices.

(b) Fire control equipment should be provided.

(c) Methods and/or equipment for removal of an injured person from the storage pit should be available.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.209. Safety.

40 C.F.R. § 240.209–3

§ 240.209–3 Recommended procedures: Operations.

Currentness

(a) Detailed procedures should be developed for operation during such emergency situations as power failure, air or water supply failure, equipment breakdowns, and fire. These procedures should be posted in prominent locations, implemented by the staff as required, and upgraded and revised periodically.

(b) Approved respirators or self-contained breathing apparatus should be available at convenient locations. Their use should be reviewed periodically with facility personnel. Information on this type equipment can be obtained from the Appalachian Laboratory for Occupational Respiratory Disease, National Institute for Occupational Safety and Health, Morgantown, W. Va.

(c) Training in first aid practices and emergency procedures should be given all personnel.

(d) Personal safety devices such as hard hats, gloves, safety glasses, and footwear should be provided for facility employees.

(e) If a regular user or employee persistently poses a safety hazard he should be barred from the facility and reported to the responsible agency.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.210. General Operations.

40 C.F.R. § 240.210–1

# § 240.210–1 Requirement.

Currentness

The thermal processing facility shall be operated and maintained in a manner that assures it will meet the design requirements. An operations manual describing the various tasks to be performed, operating procedures, and safety precautions for various areas of the facility shall be developed and shall be readily available for reference by plant personnel.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.210. General Operations.

40 C.F.R. § 240.210–2

§ 240.210–2 Recommended procedures: Design.

Currentness

Not applicable.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.210. General Operations.

40 C.F.R. § 240.210–3

§ 240.210–3 Recommended procedures: Operations.

Currentness

(a) The facility supervisor should be experienced in the operation of the type of facility designed or, in the case of an innovated design, be adequately trained by responsible personnel in the operation of the facility.

(b) Alternate and standby disposal and operating procedures should be established for implementation during emergencies, air pollution episodes, and shutdown periods.

(c) Upon completion of facility construction, provision should be made for instruction of the staff in proper operation and maintenance procedures.

(d) A routine maintenance schedule should be established and followed.

(e) As-built engineering drawings of the facility should be provided at the conclusion of construction of the facility. These should be updated to show modifications by the owner as changes are made and should be readily available. A schematic showing the relationships of the various subsystems should also be available.

(f) Key operational procedures should be prominently posted.

(g) Equipment manuals, catalogs, spare parts lists, and spare parts should be readily available at the facility.

(h) Training opportunities for facility operating personnel should be provided.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.211. Records.

40 C.F.R. § 240.211–1

§ 240.211–1 Requirement.

Currentness

The owner/operator of the thermal processing facility shall provide records and monitoring data as required by the responsible agency.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.211. Records.

40 C.F.R. § 240.211–2

§ 240.211–2 Recommended procedures: Design.

Currentness

Continuously recording instrumentation should be used as much as possible.

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 240. Guidelines for the Thermal Processing of Solid Wastes (Refs & Annos)
Subpart B. Requirements and Recommended Procedures
§ 240.211. Records.

40 C.F.R. § 240.211–3

§ 240.211–3 Recommended procedures: Operations.

Currentness

(a) Extensive monitoring and recordkeeping should be practiced during the first 12 to 18 months of operation of a new or renovated facility, during periods of high air pollution, and during periods of upset conditions at the facility.

(b) During other periods of more normal operation of the facility, less extensive monitoring and record keeping may be practiced if approved by the responsible agency.

(c) Operating records should be kept in a daily log and should include as a minimum:

(1) The total weight and volume (truck capacities may be used for volume determination) of solid waste received during each shift, including the number of loads received, the ownership or specific identity of delivery vehicles, the source and nature of the solid wastes accepted.

(2) Furnace and combustion chamber temperatures recorded at least every 60 minutes and as changes are made, including explanations for prolonged, abnormally high and low temperatures.

(3) Rate of operation, such as grate speed.

(4) Overfire and underfire air volumes and pressure and distribution recorded at least every 60 minutes and as changes are made.

(5) Weights of bottom ash, grate siftings, and fly ash, individually or combined, recorded at intervals appropriate to normal facility operation.

(6) Estimated percentages of unburned material in the bottom ash.

(7) Water used on each shift for bottom ash quenching and scrubber operation. Representative samples of process waters should be collected and analyzed as recommended by the responsible agency.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(8) Power produced and utilized each shift. If steam is produced, quality, production totals and consumption rates should be recorded.

(9) Auxiliary fuel used each shift.

(10) Gross calorific value of daily representative samples of bottom ash, grate siftings, and fly ash. (Sampling time should be varied so that all shifts are monitored on a weekly basis.)

(11) Emission measurements and laboratory analyses required by the responsible agency.

(12) Complete records of monitoring instruments.

(13) Problems encountered and methods of solution.

(d) An annual report should be prepared which includes at least the following information:

(1) Minimum, average, and maximum daily volume and weight of waste received and processed, summarized on a monthly basis.

(2) A summary of the laboratory analyses including at least monthly averages.

(3) Number and qualifications of personnel in each job category; total manhours per week; number of State certified or licensed personnel; staffing deficiencies; and serious injuries, their cause and preventive measures instituted.

(4) An identification and brief discussion of major operational problems and solutions.

(5) Adequacy of operation and performance with regard to environmental requirements, the general level of housekeeping and maintenance, testing and reporting proficiency, and recommendations for corrective actions.

(6) A copy of all significant correspondence, reports, inspection reports, and any other communications from enforcement agencies.

(e) Methodology for evaluating the facility's performance should be developed. Evaluation procedures recommended by the U.S. Environmental Protection Agency should be used whenever possible (see bibliography).

SOURCE: 39 FR 29329, Aug. 14, 1974, unless otherwise noted.

AUTHORITY: Sec. 209(a), Solid Waste Disposal Act of 1965 (Pub.L. 89–272); as amended by the Resource Recovery Act of 1970 (Pub.L. 91–512).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.1

§ 257.1 Scope and purpose.

Currentness

(a) Unless otherwise provided, the criteria in §§ 257.1 through 257.4 are adopted for determining which solid waste disposal facilities and practices pose a reasonable probability of adverse effects on health or the environment under sections 1008(a)(3) and 4004(a) of the Resource Conservation and Recovery Act (The Act). Unless otherwise provided, the criteria in §§ 257.5 through 257.30 are adopted for purposes of ensuring that non-municipal non-hazardous waste disposal units that receive very small quantity generator (VSQG) waste do not present risks to human health and the environment taking into account the practicable capability of such units in accordance with section 4010(c) of the Act. Unless otherwise provided, the criteria in §§ 257.50 through 257.107 are adopted for determining which CCR landfills and CCR surface impoundments pose a reasonable probability of adverse effects on health or the environment under sections 1008(a)(3) and 4004(a) of the Act.

(1) Facilities failing to satisfy any of the criteria in §§ 257.1 through 257.4 or §§ 257.5 through 257.30 or §§ 257.50 through 257.107 are considered open dumps, which are prohibited under section 4005 of the Act.

(2) Practices failing to satisfy any of the criteria in §§ 257.1 through 257.4 or §§ 257.5 through 257.30 or §§ 257.50 through 257.107 constitute open dumping, which is prohibited under section 4005 of the Act.

(b) These criteria also provide guidelines for the disposal of sewage sludge on the land when the sewage sludge is not used or disposed through a practice regulated in 40 CFR part 503.

(c) These criteria apply to all solid waste disposal facilities and practices with the following exceptions:

(1) The criteria do not apply to agricultural wastes, including manures and crop residues, returned to the soil as fertilizers or soil conditioners.

(2) The criteria do not apply to overburden resulting from mining operations intended for return to the mine site.

(3) The criteria do not apply to the land application of domestic sewage or treated domestic sewage.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(4) The criteria do not apply to the location and operation of septic tanks. The criteria do, however, apply to the disposal of septic tank pumpings.

(5) The criteria do not apply to solid or dissolved materials in irrigation return flows.

(6) The criteria do not apply to industrial discharges which are point sources subject to permits under section 402 of the Clean Water Act, as amended.

(7) The criteria do not apply to source, special nuclear or byproduct material as defined by the Atomic Energy Act, as amended (68 Stat. 923).

(8) The criteria do not apply to hazardous waste disposal facilities which are subject to regulation under subtitle C of the Act.

(9) The criteria do not apply to disposal of solid waste by underground well injection subject to the regulations (40 CFR part 146) for the Underground Injection Control Program (UICP) under the Safe Drinking Water Act, as amended, 42 U.S.C. 3007 et seq.

(10) The criteria of this part do not apply to municipal solid waste landfill units, which are subject to the revised criteria contained in part 258 of this chapter.

(11) The criteria do not apply to the use or disposal sewage sludge on the land when the sewage sludge is used or disposed in accordance with 40 CFR part 503.

(12) Except as otherwise specifically provided in subpart D of this part, the criteria in subpart A of this part do not apply to CCR units, as that term is defined in subpart D of this part. CCR units are instead subject to subpart D of this part.

**Credits**

[44 FR 53460, Sept. 13, 1979, as amended at 46 FR 47052, Sept. 23, 1981; 56 FR 51016, Oct. 9, 1991; 58 FR 9385, Feb. 19, 1993; 61 FR 34269, July 1, 1996; 80 FR 21467, April 17, 2015; 80 FR 37989, July 2, 2015; 81 FR 85804, Nov. 28, 2016; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (24)


© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.2

§ 257.2 Definitions.

Currentness

The definitions set forth in section 1004 of the Act apply to this part. Special definitions of general concern to this part are provided below, and definitions especially pertinent to particular sections of this part are provided in those sections.

CCR landfill means an area of land or an excavation that receives CCR and which is not a surface impoundment, an underground injection well, a salt dome formation, a salt bed formation, an underground or surface coal mine, or a cave. For purposes of this subpart, a CCR landfill also includes sand and gravel pits and quarries that receive CCR, CCR piles, and any practice that does not meet the definition of a beneficial use of CCR.

CCR surface impoundment means a natural topographic depression, man-made excavation, or diked area, which is designed to hold an accumulation of CCR and liquids, and the unit treats, stores, or disposes of CCR.

Construction and demolition (C & D) landfill means a solid waste disposal facility subject to the requirements of subparts A or B of this part that receives construction and demolition waste and does not receive hazardous waste (defined in § 261.3 of this chapter) or industrial solid waste (defined in § 258.2 of this chapter). Only a C & D landfill that meets the requirements of subpart B of this part may receive very small quantity generator waste (defined in § 260.10 of this chapter). A C & D landfill typically receives any one or more of the following types of solid wastes: Roadwork material, excavated material, demolition waste, construction/renovation waste, and site clearance waste.

Disposal means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

Domestic septage is either liquid or solid material removed from a septic tank, cesspool, portable toilet, Type III marine sanitation device, or similar treatment works that receives only domestic sewage. Domestic septage does not include liquid or solid material removed from a septic tank, cesspool, or similar treatment works that receives either commercial wastewater or industrial wastewater and does not include grease removed from a grease trap at a restaurant.

Facility means all contiguous land and structures, other appurtenances, and improvements on the land used for the disposal of solid waste.

Land application unit means an area where wastes are applied onto or incorporated into the soil surface (excluding manure spreading operations) for agricultural purposes or for treatment and disposal.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Landfill means an area of land or an excavation in which wastes are placed for permanent disposal, and that is not a land application unit, surface impoundment, injection well, or waste pile.

Leachate means liquid that has passed through or emerged from solid waste and contains soluble, suspended or miscible materials removed from such wastes.

Municipal solid waste landfill (MSWLF) unit means a discrete area of land or an excavation that receives household waste, and that is not a land application unit, surface impoundment, injection well, or waste pile, as those terms are defined in this section. A MSWLF unit also may receive other types of RCRA Subtitle D wastes, such as commercial solid waste, nonhazardous sludge, and industrial solid waste. Such a landfill may be publicly or privately owned. A MSWLF unit may be a new MSWLF unit, an existing MSWLF unit or a lateral expansion. A construction and demolition landfill that receives residential lead-based paint waste and does not receive any other household waste is not a MSWLF unit.

Open dump means a facility for the disposal of solid waste which does not comply with this part.

Practice means the act of disposal of solid waste.

Residential lead-based paint waste means waste containing lead-based paint, which is generated as a result of activities such as abatement, rehabilitation, renovation and remodeling in homes and other residences. The term residential lead-based paint waste includes, but is not limited to, lead-based paint debris, chips, dust, and sludges.

Sanitary landfill means a facility for the disposal of solid waste which complies with this part.

Sewage sludge means solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in a treatment works. Sewage sludge includes, but is not limited to, domestic septage; scum or solids removed in primary, secondary, or advanced wastewater treatment processes; and a material derived from sewage sludge. Sewage sludge does not include ash generated during the firing of sewage sludge in a sewage sludge incinerator or grit and screenings generated during preliminary treatment of domestic sewage in a treatment works.

Sludge means any solid, semisolid, or liquid waste generated from a municipal, commercial, or industrial wastewater treatment plant, water supply treatment plant, or air pollution control facility or any other such waste having similar characteristics and effect.

Solid waste means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, but does not include solid or dissolved materials in domestic sewage, or solid or dissolved material in irrigation return flows or industrial discharges which are point sources subject to permits under section 402 of the Federal Water Pollution Control Act, as amended (86 Stat. 880), or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923).

State means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

Surface impoundment or impoundment means a facility or part of a facility that is a natural topographic depression, human-made excavation, or diked area formed primarily of earthen materials (although it may be lined with human-made materials), that is designed to hold an accumulation of liquid wastes or wastes containing free liquids and that is not an injection well. Examples of surface impoundments are holding storage, settling, and aeration pits, ponds, and lagoons.

Waste pile or pile means any noncontainerized accumulation of solid, nonflowing waste that is used for treatment or storage.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**Credits**
[44 FR 53460, Sept. 13, 1979; 44 FR 58910, Oct. 12, 1979; 56 FR 51016, Oct. 9, 1991; 58 FR 9385, Feb. 19, 1993; 66 FR 53542, Oct. 23, 2001; 66 FR 67108, Dec. 28, 2001; 68 FR 36495, June 18, 2003; 80 FR 21468, April 17, 2015; 80 FR 37989, July 2, 2015; 81 FR 85804, Nov. 28, 2016]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (22)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.3

§ 257.3 Criteria for classification of solid waste disposal facilities and practices.

Currentness

Solid waste disposal facilities or practices which violate any of the following criteria pose a reasonable probability of adverse effects on health or the environment:

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (3)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.3–1

§ 257.3–1 Floodplains.

Currentness

(a) Facilities or practices in floodplains shall not restrict the flow of the base flood, reduce the temporary water storage capacity of the floodplain, or result in washout of solid waste, so as to pose a hazard to human life, wildlife, or land or water resources.

(b) As used in this section:

(1) Based flood means a flood that has a 1 percent or greater chance of recurring in any year or a flood of a magnitude equalled or exceeded once in 100 years on the average over a significantly long period.

(2) Floodplain means the lowland and relatively flat areas adjoining inland and coastal waters, including flood-prone areas of offshore islands, which are inundated by the base flood.

(3) Washout means the carrying away of solid waste by waters of the base flood.

**Credits**
[44 FR 53460, Sept. 13, 1979; 44 FR 54708, Sept. 21, 1979]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (2)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.3–2

§ 257.3–2 Endangered species.

Currentness

(a) Facilities or practices shall not cause or contribute to the taking of any endangered or threatened species of plants, fish, or wildlife.

(b) The facility or practice shall not result in the destruction or adverse modification of the critical habitat of endangered or threatened species as identified in 50 CFR part 17.

(c) As used in this section:

(1) Endangered or threatened species means any species listed as such pursuant to section 4 of the Endangered Species Act.

(2) Destruction or adverse modification means a direct or indirect alteration of critical habitat which appreciably diminishes the likelihood of the survival and recovery of threatened or endangered species using that habitat.

(3) Taking means harassing, harming, pursuing, hunting, wounding, killing, trapping, capturing, or collecting or attempting to engage in such conduct.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.3–3

§ 257.3–3 Surface water.

Currentness

(a) For purposes of section 4004(a) of the Act, a facility shall not cause a discharge of pollutants into waters of the United States that is in violation of the requirements of the National Pollutant Discharge Elimination System (NPDES) under section 402 of the Clean Water Act, as amended.

(b) For purposes of section 4004(a) of the Act, a facility shall not cause a discharge of dredged material or fill material to waters of the United States that is in violation of the requirements under section 404 of the Clean Water Act, as amended.

(c) A facility or practice shall not cause non-point source pollution of waters of the United States that violates applicable legal requirements implementing an areawide or Statewide water quality management plan that has been approved by the Administrator under section 208 of the Clean Water Act, as amended.

(d) Definitions of the terms Discharge of dredged material, Point source, Pollutant, Waters of the United States, and Wetlands can be found in the Clean Water Act, as amended, 33 U.S.C. 1251 et seq., and implementing regulations, specifically 33 CFR part 323 (42 FR 37122, July 19, 1977).

**Credits**
[44 FR 53460, Sept. 13, 1979; 44 FR 54708, Sept. 21, 1979; as amended at 46 FR 47052, Sept. 23, 1981]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (29)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.3–4

§ 257.3–4 Ground water.

Currentness

(a) A facility or practice shall not contaminate an underground drinking water source beyond the solid waste boundary or beyond an alternative boundary specified in accordance with paragraph (b) of this section.

(b)(1) For purposes of section 1008(a)(3) of the Act or section 405(d) of the CWA, a party charged with open dumping or a violation of section 405(e) with respect to sewage sludge that is not used or disposed through a practice regulated in 40 CFR part 503 may demonstrate that compliance should be determined at an alternative boundary in lieu of the solid waste boundary. The court shall establish an alternative boundary only if it finds that such a change would not result in contamination of ground water which may be needed or used for human consumption. This finding shall be based on analysis and consideration of all of the following factors that are relevant:

(i) The hydrogeological characteristics of the facility and surrounding land, including any natural attenuation and dilution characteristics of the aquifer;

(ii) The volume and physical and chemical characteristics of the leachate;

(iii) The quantity, quality, and direction of flow of ground water underlying the facility;

(iv) The proximity and withdrawal rates of ground-water users;

(v) The availability of alternative drinking water supplies;

(vi) The existing quality of the ground water, including other sources of contamination and their cumulative impacts on the ground water;

(vii) Public health, safety, and welfare effects.

(2) For purposes of sections 4004(a) and 1008(a) (3), the State may establish an alternative boundary for a facility to be used in lieu of the solid waste boundary only if it finds that such a change would not result in the contamination of ground

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

water which may be needed or used for human consumption. Such a finding shall be based on an analysis and consideration of all of the factors identified in paragraph (b) (1) of this section that are relevant.

(c) As used in this section:

(1) Aquifer means a geologic formation, group of formations, or portion of a formation capable of yielding usable quantities of ground water to wells or springs.

(2) Contaminate means introduce a substance that would cause:

(i) The concentration of that substance in the ground water to exceed the maximum contaminant level specified in appendix I, or

(ii) An increase in the concentration of that substance in the ground water where the existing concentration of that substance exceeds the maximum contaminant level specified in appendix I.

(3) Ground water means water below the land surface in the zone of saturation.

(4) Underground drinking water source means:

(i) An aquifer supplying drinking water for human consumption, or

(ii) An aquifer in which the ground water contains less than 10,000 mg/1 total dissolved solids.

(5) Solid waste boundary means the outermost perimeter of the solid waste (projected in the horizontal plane) as it would exist at completion of the disposal activity.

**Credits**
[44 FR 53460, Sept. 13, 1979, as amended at 46 FR 47052, Sept. 23, 1981; 58 FR 9386, Feb. 19, 1993]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (30)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.3–5

§ 257.3–5 Application to land used for the production of food-chain crops (interim final).

Currentness

(a) Cadmium. A facility or practice concerning application of solid waste to within one meter (three feet) of the surface of land used for the production of food-chain crops shall not exist or occur, unless in compliance with all requirements of paragraphs (a)(1)(i) through (iii) of this section or all requirements of paragraphs (a)(2)(i) through (iv) of this section.

(1)(i) The pH of the solid waste and soil mixture is 6.5 or greater at the time of each solid waste application, except for solid waste containing cadmium at concentrations of 2 mg/kg (dry weight) or less.

(ii) The annual application of cadmium from solid waste does not exceed 0.5 kilograms per hectare (kg/ha) on land used for production of tobacco, leafy vegetables or root crops grown for human consumption. For other food-chain crops, the annual cadmium application rate does not exceed:

| Time period | Annual Cd application rate (kg/ha) |
| --- | --- |
| Present to June 30, 1984.......................................................... | 2.0 |
| July 1, 1984 to December 31, 1986.......................................... | 1.25 |
| Beginning January 1, 1987...................................................... | 0.5 |

(iii) The cumulative application of cadmium from solid waste does not exceed the levels in either paragraph (a)(1)(iii)(A) or (B) of this section.

(A)

| Soil cation exchange capacity (meq/100g) | Maximum cumulative application (kg/ha) | |
| --- | --- | --- |
| | Background soil pH less than 6.5 | Background soil pH more than 6.5 |
| Less than 5............................................... | 5 | 5 |
| 5 to 15...................................................... | 5 | 10 |

| | | |
|---|---|---|
| More than 15 | 5 | 20 |

(B) For soils with a background pH of less than 6.5, the cumulative cadmium application rate does not exceed the levels below: *Provided*, That the pH of the solid waste and soil mixture is adjusted to and maintained at 6.5 or greater whenever food-chain crops are grown.

| Soil cation exchange capacity (meq/100g) | Maximum cumulative application (kg/ha) |
|---|---|
| Less than 5 | 5 |
| 5 to 15 | 10 |
| More than 15 | 20 |

(2)(i) The only food-chain crop produced is animal feed.

(ii) The pH of the solid waste and soil mixture is 6.5 or greater at the time of solid waste application or at the time the crop is planted, whichever occurs later, and this pH level is maintained whenever food-chain crops are grown.

(iii) There is a facility operating plan which demonstrates how the animal feed will be distributed to preclude ingestion by humans. The facility operating plan describes the measures to be taken to safeguard against possible health hazards from cadmium entering the food chain, which may result from alternative land uses.

(iv) Future property owners are notified by a stipulation in the land record or property deed which states that the property has received solid waste at high cadmium application rates and that food-chain crops should not be grown, due to a possible health hazard.

(b) Polychlorinated Biphenyls (PCBs). Solid waste containing concentrations of PCBs equal to or greater than 10 mg/kg (dry weight) is incorporated into the soil when applied to land used for producing animal feed, including pasture crops for animals raised for milk. Incorporation of the solid waste into the soil is not required if it is assured that the PCB content is less than 0.2 mg/kg (actual weight) in animal feed or less than 1.5 mg/kg (fat basis) in milk.

(c) As used in this section:

(1) Animal feed means any crop grown for consumption by animals, such as pasture crops, forage, and grain.

(2) Background soil pH means the pH of the soil prior to the addition of substances that alter the hydrogen ion concentration.

(3) Cation exchange capacity means the sum of exchangeable cations a soil can absorb expressed in milli-equivalents per 100 grams of soil as determined by sampling the soil to the depth of cultivation or solid waste placement, whichever is greater, and analyzing by the summation method for distinctly acid soils or the sodium acetate method for neutral,

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

calcareous or saline soils (“Methods of Soil Analysis, Agronomy Monograph No. 9.” C. A. Black, ed., American Society of Agronomy, Madison, Wisconsin. pp 891–901, 1965).

(4) Food-chain crops means tobacco, crops grown for human consumption, and animal feed for animals whose products are consumed by humans.

(5) Incorporated into the soil means the injection of solid waste beneath the surface of the soil or the mixing of solid waste with the surface soil.

(6) Pasture crops means crops such as legumes, grasses, grain stubble and stover which are consumed by animals while grazing.

(7) pH means the logarithm of the reciprocal of hydrogen ion concentration.

(8) Root crops means plants whose edible parts are grown below the surface of the soil.

(9) Soil pH is the value obtained by sampling the soil to the depth of cultivation or solid waste placement, whichever is greater, and analyzing by the electrometric method. (“Methods of Soil Analysis, Agronomy Monograph No. 9,” C.A. Black, ed., American Society of Agronomy, Madison, Wisconsin, pp. 914–926, 1965.)

**Credits**
[44 FR 53460, Sept. 13, 1979; 44 FR 54708, Sept. 21, 1979]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.3–6

§ 257.3–6 Disease.

Currentness

(a) Disease Vectors. The facility or practice shall not exist or occur unless the on-site population of disease vectors is minimized through the periodic application of cover material or other techniques as appropriate so as to protect public health.

(b) Sewage sludge and septic tank pumpings (Interim Final). A facility or practice involving disposal of sewage sludge or septic tank pumpings shall not exist or occur unless in compliance with paragraphs (b)(1), (2) or (3) of this section.

(1) Sewage sludge that is applied to the land surface or is incorporated into the soil is treated by a Process to Significantly Reduce Pathogens prior to application or incorporation. Public access to the facility is controlled for at least 12 months, and grazing by animals whose products are consumed by humans is prevented for at least one month. Processes to Significantly Reduce Pathogens are listed in appendix II, section A. (These provisions do not apply to sewage sludge disposed of by a trenching or burial operation.)

(2) Septic tank pumpings that are applied to the land surface or incorporated into the soil are treated by a Process to Significantly Reduce Pathogens (as listed in appendix II, section A), prior to application or incorporation, unless public access to the facility is controlled for at least 12 months and unless grazing by animals whose products are consumed by humans is prevented for at least one month. (These provisions do not apply to septic tank pumpings disposed of by a trenching or burial operation.)

(3) Sewage sludge or septic tank pumpings that are applied to the land surface or are incorporated into the soil are treated by a Process to Further Reduce Pathogens, prior to application or incorporation, if crops for direct human consumption are grown within 18 months subsequent to application or incorporation. Such treatment is not required if there is no contact between the solid waste and the edible portion of the crop; however, in this case the solid waste is treated by a Process to Significantly Reduce Pathogens, prior to application; public access to the facility is controlled for at least 12 months; and grazing by animals whose products are consumed by humans is prevented for at least one month. If crops for direct human consumption are not grown within 18 months of application or incorporation, the requirements of paragraphs (b)(1) and (2) of this section apply. Processes to Further Reduce Pathogens are listed in appendix II, section B.

(c) As used in this section:

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(1) Crops for direct human consumption means crops that are consumed by humans without processing to minimize pathogens prior to distribution to the consumer.

(2) Disease vector means rodents, flies, and mosquitoes capable of transmitting disease to humans.

(3) Incorporated into the soil means the injection of solid waste beneath the surface of the soil or the mixing of solid waste with the surface soil.

(4) Periodic application of cover material means the application and compaction of soil or other suitable material over disposed solid waste at the end of each operating day or at such frequencies and in such a manner as to reduce the risk of fire and to impede vectors access to the waste.

(5) Trenching or burial operation means the placement of sewage sludge or septic tank pumpings in a trench or other natural or man-made depression and the covering with soil or other suitable material at the end of each operating day such that the wastes do not migrate to the surface.

**Credits**
[44 FR 53460, Sept. 13, 1979; 44 FR 54708, Sept. 21, 1979]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (12)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.3–7

§ 257.3–7 Air.

Currentness

(a) The facility or practice shall not engage in open burning of residential, commercial, institutional or industrial solid waste. This requirement does not apply to infrequent burning of agricultural wastes in the field, silvicultural wastes for forest management purposes, land-clearing debris, diseased trees, debris from emergency clean-up operations, and ordnance.

(b) For purposes of section 4004(a) of the Act, the facility shall not violate applicable requirements developed under a State Implementation Plan (SIP) approved or promulgated by the Administrator pursuant to section 110 of the Clean Air Act, as amended.

(c) As used in this section "open burning" means the combustion of solid waste without (1) control of combustion air to maintain adequate temperature for efficient combustion, (2) containment of the combustion reaction in an enclosed device to provide sufficient residence time and mixing for complete combustion, and (3) control of the emission of the combustion products.

**Credits**
[44 FR 53460, Sept. 13, 1979; 44 FR 54708, Sept. 21, 1979; as amended at 46 FR 47052, Sept. 23, 1981]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (7)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.3–8

§ 257.3–8 Safety.

Currentness

(a) Explosive gases. The concentration of explosive gases generated by the facility or practice shall not exceed:

(1) Twenty-five percent (25%) of the lower explosive limit for the gases in facility structures (excluding gas control or recovery system components); and

(2) The lower explosive limit for the gases at the property boundary.

(b) Fires. A facility or practice shall not pose a hazard to the safety of persons or property from fires. This may be accomplished through compliance with § 257.3–7 and through the periodic application of cover material or other techniques as appropriate.

(c) Bird hazards to aircraft. A facility or practice disposing of putrescible wastes that may attract birds and which occurs within 10,000 feet (3,048 meters) of any airport runway used by turbojet aircraft or within 5,000 feet (1,524 meters) of any airport runway used by only piston-type aircraft shall not pose a bird hazard to aircraft.

(d) Access. A facility or practice shall not allow uncontrolled public access so as to expose the public to potential health and safety hazards at the disposal site.

(e) As used in this section:

(1) Airport means public-use airport open to the public without prior permission and without restrictions within the physical capacities of available facilities.

(2) Bird hazard means an increase in the likelihood of bird/aircraft collisions that may cause damage to the aircraft or injury to its occupants.

(3) Explosive gas means methane ($CH_4$).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(4) Facility structures means any buildings and sheds or utility or drainage lines on the facility.

(5) Lower explosive limit means the lowest percent by volume of a mixture of explosive gases which will propagate a flame in air at 25°C and atmospheric pressure.

(6) Periodic application of cover material means the application and compaction of soil or other suitable material over disposed solid waste at the end of each operating day or at such frequencies and in such a manner as to reduce the risk of fire and to impede disease vectors' access to the waste.

(7) Putrescible wastes means solid waste which contains organic matter capable of being decomposed by microorganisms and of such a character and proportion as to be capable of attracting or providing food for birds.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (7)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart A. Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)

40 C.F.R. § 257.4

# § 257.4 Effective date.

Currentness

These criteria become effective October 15, 1979.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Notes of Decisions (1)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units

C.F.R. T. 40, Ch. I, Subch. I, Pt. 257, Subpt. B, Refs & Annos
Currentness

**Credits**

Source: 61 FR 34269, July 1, 1996; 81 FR 85804, Nov. 28, 2016, unless otherwise noted.

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)

40 C.F.R. § 257.5

# § 257.5 Disposal standards for owners/operators of non-municipal non-hazardous waste disposal units that receive Very Small Quantity Generator (VSQG) waste.

Currentness

(a) Applicability.

(1) The requirements in this section apply to owners/operators of any non-municipal non-hazardous waste disposal unit that receives VSQG hazardous waste, as defined in 40 CFR 260.10. Non-municipal non-hazardous waste disposal units that meet the requirements of this section may receive VSQG wastes. Any owner/operator of a non-municipal non-hazardous waste disposal unit that receives VSQG hazardous waste continues to be subject to the requirements in §§ 257.3–2, 257.3–3, 257.3–5, 257.3–6, 257.3–7, and 257.3–8(a), (b), and (d).

(2) Any non-municipal non-hazardous waste disposal unit that is receiving VSQG hazardous waste as of January 1, 1998, must be in compliance with the requirements in §§ 257.7 through 257.13 and § 257.30 by January 1, 1998, and the requirements in §§ 257.21 through 257.28 by July 1, 1998.

(3) Any non-municipal non-hazardous waste disposal unit that does not meet the requirements in this section may not receive VSQG wastes.

(4) Any non-municipal non-hazardous waste disposal unit that is not receiving VSQG Hazardous waste as of January 1, 1998, continues to be subject to the requirements in §§ 257.1 through 257.4.

(5) Any non-municipal non-hazardous waste disposal unit that first receives VSQG hazardous waste after January 1, 1998, must be in compliance with §§ 257.7 through 257.30 prior to the receipt of VSQG hazardous waste.

(b) Definitions.

Active life means the period of operation beginning with the initial receipt of solid waste and ending at the final receipt of solid waste.

Existing unit means any non-municipal non-hazardous waste disposal unit that is receiving VSQG hazardous waste as of January 1, 1998.

Facility means all contiguous land and structures, other appurtenances, and improvements on the land used for the disposal of non-municipal non-hazardous waste.

Lateral expansion means a horizontal expansion of the waste boundaries of an existing non-municipal non-hazardous waste disposal unit.

New unit means any non-municipal non-hazardous waste disposal unit that has not received VSQG hazardous waste prior to January 1, 1998.

State means any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands.

State Director means the chief administrative officer of the lead state agency responsible for implementing the state permit program for 40 CFR part 257, subpart B and 40 CFR part 258 regulated facilities.

Uppermost aquifer means the geologic formation nearest the natural ground surface that is an aquifer, as well as, lower aquifers that are hydraulically interconnected with this aquifer within the facility's property boundary.

Waste management unit boundary means a vertical surface located at the hydraulically downgradient limit of the unit. This vertical surface extends down into the uppermost aquifer.

**Credits**

[63 FR 57044, Oct. 23, 1998; 81 FR 85804, Nov. 28, 2016]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Location Restrictions

40 C.F.R. § 257.7

§ 257.7 [Reserved]

Currentness

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Location Restrictions

40 C.F.R. § 257.8

§ 257.8 Floodplains.

Currentness

(a) Owners or operators of new units, existing units, and lateral expansions located in 100–year floodplains must demonstrate that the unit will not restrict the flow of the 100–year flood, reduce the temporary water storage capacity of the floodplain, or result in washout of solid waste so as to pose a hazard to human health and the environment. The owner or operator must place the demonstration in the operating record and notify the State Director that it has been placed in the operating record.

(b) For purposes of this section:

(1) Floodplain means the lowland and relatively flat areas adjoining inland and coastal waters, including flood-prone areas of offshore islands, that are inundated by the 100–year flood.

(2) 100–year flood means a flood that has a 1–percent or greater chance of recurring in any given year or a flood of a magnitude equalled or exceeded once in 100 years on the average over a significantly long period.

(3) Washout means the carrying away of solid waste by waters of the base flood.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Location Restrictions

40 C.F.R. § 257.9

§ 257.9 Wetlands.

Currentness

(a) Owners or operators of new units and lateral expansions shall not locate such units in wetlands, unless the owner or operator can make the following demonstrations to the Director of an approved State:

(1) Where applicable under section 404 of the Clean Water Act or applicable State wetlands laws, the presumption that a practicable alternative to the proposed landfill is available which does not involved wetlands is clearly rebutted:

(2) The construction and operation of the unit will not:

(i) Cause or contribute to violations of any applicable State water quality standard;

(ii) Violate any applicable toxic effluent standard or prohibition under Section 307 of the Clean Water Act;

(iii) Jeopardize the continued existence of endangered or threatened species or result in the destruction or adverse modification of a critical habitat, protected under the Endangered Species Act of 1973; and

(iv) Violate any requirement under the Marine Protection, Research, and Sanctuaries Act of 1972 for the protection of a marine sanctuary;

(3) The unit will not cause or contribute to significant degradation of wetlands. The owner/operator must demonstrate the integrity of the unit and its ability to protect ecological resources by addressing the following factors:

(i) Erosion, stability, and migration potential of native wetland soils, muds and deposits used to support the unit;

(ii) Erosion, stability, and migration potential of dredged and fill materials used to support the unit;

(iii) The volume and chemical nature of the waste managed in the unit;

(iv) Impacts on fish, wildlife, and other aquatic resources and their habitat from release of the waste;

(v) The potential effects of catastrophic release of waste to the wetland and the resulting impacts on the environment; and

(vi) Any additional factors, as necessary, to demonstrate that ecological resources in the wetland are sufficiently protected.

(4) To the extent required under section 404 of the Clean Water Act or applicable State wetlands laws, steps have been taken to attempt to achieve no net loss of wetlands (as defined by acreage and function) by first avoiding impacts to wetlands to the maximum extent practicable as required by paragraph (a)(1) of this section, then minimizing unavoidable impacts to the maximum extent practicable, and finally offsetting remaining unavoidable wetland impacts through all appropriate and practicable compensatory mitigation actions (e.g., restoration of existing degraded wetlands or creation of man-made wetlands); and

(5) Sufficient information is available to make a reasonable determination with respect to these demonstrations.

(b) For purposes of this section, wetlands means those areas that are defined in 40 CFR 232.2(r).

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Location Restrictions

40 C.F.R. § 257.10

§ 257.10 [Reserved]

Currentness

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Location Restrictions

40 C.F.R. § 257.11

§ 257.11 [Reserved]

Currentness

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Location Restrictions

40 C.F.R. § 257.12

§ 257.12 [Reserved]

Currentness

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Location Restrictions

40 C.F.R. § 257.13

§ 257.13 Deadline for making demonstrations.

Currentness

Existing units that cannot make the demonstration specified in § 257.8(a) pertaining to floodplains by January 1, 1998, must not accept VSQG hazardous waste for disposal.

**Credits**
[81 FR 85805, Nov. 28, 2016]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Ground-Water Monitoring and Corrective Action

40 C.F.R. § 257.21

§ 257.21 Applicability.

Currentness

(a) The requirements in this section apply to units identified in § 257.5(a), except as provided in paragraph (b) of this section.

(b) Ground-water monitoring requirements under §§ 257.22 through 257.25 may be suspended by the Director of an approved State for a unit identified in § 257.5(a) if the owner or operator can demonstrate that there is no potential for migration of hazardous constituents from that unit to the uppermost aquifer during the active life of the unit plus 30 years. This demonstration must be certified by a qualified ground-water scientist and approved by the Director of an approved State, and must be based upon:

(1) Site-specific field collected measurements, sampling, and analysis of physical, chemical, and biological processes affecting contaminant fate and transport; and

(2) Contaminant fate and transport predictions that maximize contaminant migration and consider impacts on human health and environment.

(c) Owners and operators of facilities identified in § 257.5(a) must comply with the ground-water monitoring requirements of this section according to the following schedule unless an alternative schedule is specified under paragraph (d) of this section:

(1) Existing units and lateral expansions must be in compliance with the ground-water monitoring requirements specified in §§ 257.22 through 257.25 by July 1, 1998.

(2) New units identified in § 257.5(a) must be in compliance with the ground-water monitoring requirements specified in §§ 257.22 through 257.25 before waste can be placed in the unit.

(d) The Director of an approved State may specify an alternative schedule for the owners or operators of existing units and lateral expansions to comply with the ground-water monitoring requirements specified in §§ 257.22 through 257.25. This schedule must ensure that 50 percent of all existing units are in compliance by July 1, 1998, and all existing units are in compliance by


© 2025 Thomson Reuters. No claim to original U.S. Government Works.

July 1, 1999. In setting the compliance schedule, the Director of an approved State must consider potential risks posed by the unit to human health and the environment. The following factors should be considered in determining potential risk:

(1) Proximity of human and environmental receptors;

(2) Design of the unit;

(3) Age of the unit;

(4) The size of the unit; and

(5) Resource value of the underlying aquifer, including:

(i) Current and future uses;

(ii) Proximity and withdrawal rate of users; and

(iii) Ground-water quality and quantity.

(e) Once established at a unit, ground-water monitoring shall be conducted throughout the active life plus 30 years. The Director of an approved State may decrease the 30 year period if the owner/operator demonstrates that a shorter period of time is adequate to protect human health and the environment and the Director approves the demonstration.

(f) For the purposes of this section, a qualified ground-water scientist is a scientist or engineer who has received a baccalaureate or post-graduate degree in the natural sciences or engineering and has sufficient training and experience in ground-water hydrology and related fields as may be demonstrated by State registration, professional Certifications, or completion of accredited university programs that enable that individual to make sound professional judgments regarding ground-water monitoring, contaminant fate and transport, and corrective-action.

(g) The Director of an approved State may establish alternative schedules for demonstrating compliance with § 257.22(d)(2), pertaining to notification of placement of certification in operating record; § 257.24(c)(1), pertaining to notification that statistically significant increase (SSI) notice is in operating record; § 257.24(c)(2) and (3), pertaining to an assessment monitoring program; § 257.25(b), pertaining to sampling and analyzing appendix II of part 258 constituents; § 257.25(d)(1), pertaining to placement of notice (appendix II of 40 CFR part 258 constituents detected) in record and notification of notice in record; § 257.25(d)(2), pertaining to sampling for appendix I and II of 40 CFR part 258; § 257.25(g), pertaining to notification (and placement of notice in record) of SSI above ground-water protection standard; §§ 257.25(g)(1)(iv) and 257.26(a), pertaining to assessment of corrective measures; § 257.27(a), pertaining to selection of remedy and notification of placement in record; § 257.28(c)(4), pertaining to notification of placement in record (alternative corrective action measures); and § 257.28(f), pertaining to notification of placement in record (certification of remedy completed).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(h) Directors of approved States can use the flexibility in paragraph (i) of this section for any non-municipal non-hazardous waste disposal unit that receives VSQG waste, if the non-municipal non-hazardous waste disposal unit:

(1) Disposes of less than 20 tons of non-municipal waste daily, based on an annual average; and

(2) Has no evidence of ground-water contamination; and either

(3) Serves a community that experiences an annual interruption of at least three consecutive months of surface transportation that prevents access to a regional waste management facility; or

(4) Serves a community that has no practicable waste management alternative and the non-municipal solid waste disposal facility is located in an area that annually receives less than or equal to 25 inches of precipitation.

(5) Owners/operators of any non-municipal non-hazardous waste disposal unit that meets the criteria in paragraph (h) of this section must place in the operating record information demonstrating this.

(i) Directors of approved States may allow any non-municipal non-hazardous waste disposal unit meeting the criteria in paragraph (h) of this section to:

(1) Use alternatives to the ground-water monitoring system prescribed in §§ 257.22 through 257.25 so long as the alternatives will detect and, if necessary, assess the nature or extent of contamination from the non-municipal non-hazardous waste disposal unit on a site-specific basis; or establish and use, on a site-specific basis, an alternative list of indicator parameters for some or all of the constituents listed in appendix I (Appendix I of 40 CFR part 258). Alternative indicator parameters approved by the Director of an approved State under this section must ensure detection of contamination from the non-municipal non-hazardous waste disposal unit.

(2) If contamination is detected through the use of any alternative to the ground-water monitoring system prescribed in §§ 257.22 through 257.25, the non-municipal non-hazardous waste disposal unit owner or operator must perform expanded monitoring to determine whether the detected contamination is an actual release from the non-municipal solid waste disposal unit and, if so, to determine the nature and extent of the contamination. The Director of the approved State shall establish a schedule for the non-municipal non-hazardous waste disposal unit owner or operator to submit results from expanded monitoring in a manner that ensures protection of human health and the environment.

(i) If expanded monitoring indicates that contamination from the non-municipal non-hazardous waste disposal unit has reached the saturated zone, the owner or operator must install ground-water monitoring wells and sample these wells in accordance with §§ 257.22 through 257.25.

(ii) If expanded monitoring indicates that contamination from the non-municipal non-hazardous waste disposal unit is present in the unsaturated zone or on the surface, the Director of an approved State shall establish a schedule for the owner or operator to submit a description of any necessary corrective measures. The schedule shall ensure corrective measures, where necessary, are undertaken in a timely manner that protects human health and the environment. The

proposed corrective measures are subject to revision and approval by the Director of the approved State. The owner or operator must implement the corrective measures according to a schedule established by the Director of the approved State.

(3) When considering whether to allow alternatives to a ground-water monitoring system prescribed in §§ 257.22 through 257.25, including alternative indicator parameters, the Director of an approved State shall consider at least the following factors:

(i) The geological and hydrogeological characteristics of the site;

(ii) The impact of manmade and natural features on the effectiveness of an alternative technology;

(iii) Climatic factors that may influence the selection, use, and reliability of alternative ground-water monitoring procedures; and

(iv) The effectiveness of indicator parameters in detecting a release.

(4) The Director of an approved State can require an owner or operator to comply with the requirements of §§ 257.22 through 257.25, where it is determined by the Director that using alternatives to ground-water monitoring approved under this paragraph are inadequate to detect contamination and, if necessary, to assess the nature and extent of contamination.

**Credits**
[81 FR 85805, Nov. 28, 2016]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Ground-Water Monitoring and Corrective Action

40 C.F.R. § 257.22

# § 257.22 Ground-water monitoring systems.

Currentness

(a) A ground-water monitoring system must be installed that consists of a sufficient number of wells, installed at appropriate locations and depths, to yield ground-water samples from the uppermost aquifer (as defined in § 257.5(b)) that:

(1) Represent the quality of background ground water that has not been affected by leakage from a unit. A determination of background quality may include sampling of wells that are not hydraulically upgradient of the waste management area where:

(i) Hydrogeologic conditions do not allow the owner or operator to determine what wells are hydraulically upgradient; or

(ii) Sampling at other wells will provide an indication of background ground-water quality that is as representative or more representative than that provided by the upgradient wells; and

(2) Represent the quality of ground water passing the relevant point of compliance specified by the Director of an approved State or at the waste management unit boundary in an unapproved State. The downgradient monitoring system must be installed at the relevant point of compliance specified by the Director of an approved State or at the waste management unit boundary in an unapproved State that ensures detection of ground-water contamination in the uppermost aquifer. The relevant point of compliance specified by the Director of an approved State shall be no more than 150 meters from the waste management unit boundary and shall be located on land owned by the owner of the facility. In determining the relevant point of compliance the State Director shall consider at least the following factors: the hydrogeologic characteristics of the unit and surrounding land, the volume and physical and chemical characteristics of the leachate, the quantity, quality and direction of flow of ground water, the proximity and withdrawal rate of the ground-water users, the availability of alternative drinking water supplies, the existing quality of the ground water, including other sources of contamination and their cumulative impacts on the ground water, and whether the ground water is currently used or reasonably expected to be used for drinking water, public health, safety, and welfare effects, and practicable capability of the owner or operator. When physical obstacles preclude installation of ground-water monitoring wells at the relevant point of compliance at existing units, the down-gradient monitoring system may be installed at the closest practicable distance hydraulically down-gradient from the relevant point of compliance specified by the Director of an approved State that ensures detection of groundwater contamination in the uppermost aquifer.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(b) The Director of an approved State may approve a multi-unit ground-water monitoring system instead of separate ground-water monitoring systems for each unit when the facility has several units, provided the multi-unit ground-water monitoring system meets the requirement of § 257.22(a) and will be as protective of human health and the environment as individual monitoring systems for each unit, based on the following factors:

(1) Number, spacing, and orientation of the units;

(2) Hydrogeologic setting;

(3) Site history;

(4) Engineering design of the units; and

(5) Type of waste accepted at the units.

(c) Monitoring wells must be cased in a manner that maintains the integrity of the monitoring well bore hole. This casing must be screened or perforated and packed with gravel or sand, where necessary, to enable collection of ground-water samples. The annular space (i.e., the space between the bore hole and well casing) above the sampling depth must be sealed to prevent contamination of samples and the ground water.

(1) The owner or operator must notify the State Director that the design, installation, development, and decommission of any monitoring wells, piezometers and other measurement, sampling, and analytical devices documentation has been placed in the operating record; and

(2) The monitoring wells, piezometers, and other measurement, sampling, and analytical devices must be operated and maintained so that they perform to design specifications throughout the life of the monitoring program.

(d) The number, spacing, and depths of monitoring systems shall be:

(1) Determined based upon site-specific technical information that must include thorough characterization of:

(i) Aquifer thickness, ground-water flow rate, ground-water flow direction including seasonal and temporal fluctuations in ground-water flow; and

(ii) Saturated and unsaturated geologic units and fill materials overlying the uppermost aquifer, materials comprising the uppermost aquifer, and materials comprising the confining unit defining the lower boundary of the uppermost aquifer; including, but not limited to: thicknesses, stratigraphy, lithology, hydraulic conductivities, porosities and effective porosities.

(2) Certified by a qualified ground-water scientist or approved by the Director of an approved State. Within 14 days of this certification, the owner or operator must notify the State Director that the certification has been placed in the operating record.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Ground-Water Monitoring and Corrective Action

40 C.F.R. § 257.23

§ 257.23 Ground-water sampling and analysis requirements.

Currentness

(a) The ground-water monitoring program must include consistent sampling and analysis procedures that are designed to ensure monitoring results that provide an accurate representation of ground-water quality at the background and downgradient wells installed in compliance with § 257.22(a). The owner or operator must notify the State Director that the sampling and analysis program documentation has been placed in the operating record and the program must include procedures and techniques for:

(1) Sample collection;

(2) Sample preservation and shipment;

(3) Analytical procedures;

(4) Chain of custody control; and

(5) Quality assurance and quality control.

(b) The ground-water monitoring program must include sampling and analytical methods that are appropriate for ground-water sampling and that accurately measure hazardous constituents and other monitoring parameters in ground-water samples. Ground-water samples shall not be field-filtered prior to laboratory analysis.

(c) The sampling procedures and frequency must be protective of human health and the environment.

(d) Ground-water elevations must be measured in each well immediately prior to purging, each time ground water is sampled. The owner or operator must determine the rate and direction of ground-water flow each time ground water is sampled. Ground-water elevations in wells which monitor the same waste management area must be measured within a period of time short enough to avoid temporal variations in ground-water flow which could preclude accurate determination of ground-water flow rate and direction.

(e) The owner or operator must establish background ground-water quality in a hydraulically upgradient or background well(s) for each of the monitoring parameters or constituents required in the particular ground-water monitoring program that applies to the unit, as determined under § 257.24(a), or § 257.25(a). Background ground-water quality may be established at wells that are not located hydraulically upgradient from the unit if it meets the requirements of § 257.22(a)(1).

(f) The number of samples collected to establish ground-water quality data must be consistent with the appropriate statistical procedures determined pursuant to paragraph (g) of this section. The sampling procedures shall be those specified under § 257.24(b) for detection monitoring, § 257.25(b) and (d) for assessment monitoring, and § 257.26(b) for corrective action.

(g) The owner or operator must specify in the operating record one of the following statistical methods to be used in evaluating ground-water monitoring data for each hazardous constituent. The statistical test chosen shall be conducted separately for each hazardous constituent in each well.

(1) A parametric analysis of variance (ANOVA) followed by multiple comparisons procedures to identify statistically significant evidence of contamination. The method must include estimation and testing of the contrasts between each compliance well's mean and the background mean levels for each constituent.

(2) An analysis of variance (ANOVA) based on ranks followed by multiple comparisons procedures to identify statistically significant evidence of contamination. The method must include estimation and testing of the contrasts between each compliance well's median and the background median levels for each constituent.

(3) A tolerance or prediction interval procedure in which an interval for each constituent is established from the distribution of the background data, and the level of each constituent in each compliance well is compared to the upper tolerance or prediction limit.

(4) A control chart approach that gives control limits for each constituent.

(5) Another statistical test method that meets the performance standards of paragraph (h) of this section. The owner or operator must place a justification for this alternative in the operating record and notify the State Director of the use of this alternative test. The justification must demonstrate that the alternative method meets the performance standards of paragraph (h) of this section.

(h) Any statistical method chosen under paragraph (g) of this section shall comply with the following performance standards, as appropriate:

(1) The statistical method used to evaluate ground-water monitoring data shall be appropriate for the distribution of chemical parameters or hazardous constituents. If the distribution of the chemical parameters or hazardous constituents is shown by the owner or operator to be inappropriate for a normal theory test, then the data should be transformed or a distribution-free theory test should be used. If the distributions for the constituents differ, more than one statistical method may be needed.

(2) If an individual well comparison procedure is used to compare an individual compliance well constituent concentration with background constituent concentrations or a ground-water protection standard, the test shall be done at a Type I error level no less than 0.01 for each testing period. If a multiple comparisons procedure is used, the Type I experiment wise error rate for each testing period shall be no less than 0.05; however, the Type I error of no less than 0.01 for individual well comparisons must be maintained. This performance standard does not apply to tolerance intervals, prediction intervals, or control charts.

(3) If a control chart approach is used to evaluate ground-water monitoring data, the specific type of control chart and its associated parameter values shall be protective of human health and the environment. The parameters shall be determined after considering the number of samples in the background data base, the data distribution, and the range of the concentration values for each constituent of concern.

(4) If a tolerance interval or a predictional interval is used to evaluate ground-water monitoring data, the levels of confidence and, for tolerance intervals, the percentage of the population that the interval must contain, shall be protective of human health and the environment. These parameters shall be determined after considering the number of samples in the background data base, the data distribution, and the range of the concentration values for each constituent of concern.

(5) The statistical method shall account for data below the limit of detection with one or more statistical procedures that are protective of human health and the environment. Any practical quantitation limit (pql) that is used in the statistical method shall be the lowest concentration level that can be reliably achieved within specified limits of precision and accuracy during routine laboratory operating conditions that are available to the facility.

(6) If necessary, the statistical method shall include procedures to control or correct for seasonal and spatial variability as well as temporal correlation in the data.

(i) The owner or operator must determine whether or not there is a statistically significant increase over background values for each parameter or constituent required in the particular ground-water monitoring program that applies to the unit, as determined under §§ 257.24(a) or 257.25(a).

(1) In determining whether a statistically significant increase has occurred, the owner or operator must compare the ground-water quality of each parameter or constituent at each monitoring well designated pursuant to § 257.22(a)(2) to the background value of that constituent, according to the statistical procedures and performance standards specified under paragraphs (g) and (h) of this section.

(2) Within a reasonable period of time after completing sampling and analysis, the owner or operator must determine whether there has been a statistically significant increase over background at each monitoring well.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Ground-Water Monitoring and Corrective Action

40 C.F.R. § 257.24

§ 257.24 Detection monitoring program.

Currentness

(a) Detection monitoring is required at facilities identified in § 257.5(a) at all ground-water monitoring wells defined under § 257.22(a)(1) and (a)(2). At a minimum, a detection monitoring program must include the monitoring for the constituents listed in appendix I of 40 CFR part 258.

(1) The Director of an approved State may delete any of the appendix I (Appendix I of 40 CFR part 258) monitoring parameters for a unit if it can be shown that the removed constituents are not reasonably expected to be contained in or derived from the waste contained in the unit.

(2) The Director of an approved State may establish an alternative list of indicator parameters for a unit, in lieu of some or all of the constituents in appendix I to 40 CFR part 258, if the alternative parameters provide a reliable indication of releases from the unit to the ground water. In determining alternative parameters, the Director shall consider the following factors:

(i) The types, quantities, and concentrations of constituents in waste managed at the unit;

(ii) The mobility, stability, and persistence of waste constituents or their reaction products in the unsaturated zone beneath the unit;

(iii) The detectability of indicator parameters, waste constituents, and reaction products in the ground water; and

(iv) The concentration or values and coefficients of variation of monitoring parameters or constituents in the groundwater background.

(b) The monitoring frequency for all constituents listed in appendix I to 40 CFR part 258, or in the alternative list approved in accordance with paragraph (a)(2) of this section, shall be at least semiannual during the active life of the unit plus 30 years. A minimum of four independent samples from each well (background and downgradient) must be collected and analyzed for the appendix I (Appendix I of 40 CFR part 258) constituents, or the alternative list approved in accordance with paragraph (a)(2) of this section, during the first semiannual sampling event. At least one sample from each well (background and downgradient)

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

must be collected and analyzed during subsequent semiannual sampling events. The Director of an approved State may specify an appropriate alternative frequency for repeated sampling and analysis for appendix I (Appendix I of 40 CFR part 258) constituents, or the alternative list approved in accordance with paragraph (a)(2) of this section, during the active life plus 30 years. The alternative frequency during the active life shall be no less than annual. The alternative frequency shall be based on consideration of the following factors:

(1) Lithology of the aquifer and unsaturated zone;

(2) Hydraulic conductivity of the aquifer and unsaturated zone;

(3) Ground-water flow rates;

(4) Minimum distance between upgradient edge of the unit and downgradient monitoring well screen (minimum distance of travel); and

(5) Resource value of the aquifer.

(c) If the owner or operator determines, pursuant to § 257.23(g), that there is a statistically significant increase over background for one or more of the constituents listed in appendix I to 40 CFR part 258, or in the alternative list approved in accordance with paragraph (a)(2) of this section, at any monitoring well at the boundary specified under § 257.22(a)(2), the owner or operator:

(1) Must, within 14 days of this finding, place a notice in the operating record indicating which constituents have shown statistically significant changes from background levels, and notify the State Director that this notice was placed in the operating record; and

(2) Must establish an assessment monitoring program meeting the requirements of § 257.25 within 90 days except as provided for in paragraph (c)(3) of this section.

(3) The owner/operator may demonstrate that a source other than the unit caused the contamination or that the statistically significant increase resulted from error in sampling, analysis, statistical evaluation, or natural variation in ground-water quality. A report documenting this demonstration must be certified by a qualified ground-water scientist or approved by the Director of an approved State and be placed in the operating record. If a successful demonstration is made and documented, the owner or operator may continue detection monitoring as specified in this section. If, after 90 days, a successful demonstration is not made, the owner or operator must initiate an assessment monitoring program as required in § 257.25.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Ground-Water Monitoring and Corrective Action

40 C.F.R. § 257.25

# § 257.25 Assessment monitoring program.

Currentness

(a) Assessment monitoring is required whenever a statistically significant increase over background has been detected for one or more of the constituents listed in appendix I of 40 CFR part 258 or in the alternative list approved in accordance with § 257.24(a)(2).

(b) Within 90 days of triggering an assessment monitoring program, and annually thereafter, the owner or operator must sample and analyze the ground water for all constituents identified in appendix II of 40 CFR part 258. A minimum of one sample from each downgradient well must be collected and analyzed during each sampling event. For any constituent detected in the downgradient wells as the result of the complete appendix II (Appendix II of 40 CFR part 258) analysis, a minimum of four independent samples from each well (background and downgradient) must be collected and analyzed to establish background for the new constituents. The Director of an approved State may specify an appropriate subset of wells to be sampled and analyzed for appendix II (Appendix II of 40 CFR part 258) constituents during assessment monitoring. The Director of an approved State may delete any of the appendix II (Appendix II of 40 CFR part 258) monitoring parameters for a unit if it can be shown that the removed constituents are not reasonably expected to be in or derived from the waste contained in the unit.

(c) The Director of an approved State may specify an appropriate alternate frequency for repeated sampling and analysis for the full set of appendix II (Appendix II of 40 CFR part 258) constituents, or the alternative list approved in accordance with paragraph (b) of this section, during the active life plus 30 years considering the following factors:

(1) Lithology of the aquifer and unsaturated zone;

(2) Hydraulic conductivity of the aquifer and unsaturated zone;

(3) Ground-water flow rates;

(4) Minimum distance between upgradient edge of the unit and downgradient monitoring well screen (minimum distance of travel);

(5) Resource value of the aquifer; and

(6) Nature (fate and transport) of any constituents detected in response to this section.

(d) After obtaining the results from the initial or subsequent sampling events required in paragraph (b) of this section, the owner or operator must:

(1) Within 14 days, place a notice in the operating record identifying the appendix II (appendix II of 40 CFR part 258) constituents that have been detected and notify the State Director that this notice has been placed in the operating record;

(2) Within 90 days, and on at least a semiannual basis thereafter, resample all wells specified by § 257.22(a) to this section, conduct analyses for all constituents in appendix I (Appendix I of 40 CFR part 258) to this part or in the alternative list approved in accordance with § 257.24(a)(2), and for those constituents in appendix II to 40 CFR part 258 that are detected in response to paragraph (b) of this section, and record their concentrations in the facility operating record. At least one sample from each well (background and downgradient) must be collected and analyzed during these sampling events. The Director of an approved State may specify an alternative monitoring frequency during the active life plus 30 years for the constituents referred to in this paragraph. The alternative frequency for appendix I (appendix I of 40 CFR part 258) constituents, or the alternative list approved in accordance with § 257.24(a)(2), during the active life shall be no less than annual. The alternative frequency shall be based on consideration of the factors specified in paragraph (c) of this section;

(3) Establish background concentrations for any constituents detected pursuant to paragraphs (b) or (d)(2) of this section; and

(4) Establish ground-water protection standards for all constituents detected pursuant to paragraph (b) or (d) of this section. The ground-water protection standards shall be established in accordance with paragraphs (h) or (i) of this section.

(e) If the concentrations of all appendix II (appendix II of 40 CFR part 258) constituents are shown to be at or below background values, using the statistical procedures in § 257.23(g), for two consecutive sampling events, the owner or operator must notify the State Director of this finding and may return to detection monitoring.

(f) If the concentrations of any appendix II (appendix II of part 258) constituents are above background values, but all concentrations are below the ground-water protection standard established under paragraphs (h) or (i) of this section, using the statistical procedures in § 257.23(g), the owner or operator must continue assessment monitoring in accordance with this section.

(g) If one or more appendix II (appendix II of CFR part 258) constituents are detected at statistically significant levels above the ground-water protection standard established under paragraphs (h) or (i) of this section in any sampling event, the owner or operator must, within 14 days of this finding, place a notice in the operating record identifying the appendix II (appendix II of 40 CFR part 258) constituents that have exceeded the ground-water protection standard and notify the State Director and all appropriate local government officials that the notice has been placed in the operating record. The owner or operator also:

(1)(i) Must characterize the nature and extent of the release by installing additional monitoring wells as necessary;

(ii) Must install at least one additional monitoring well at the facility boundary in the direction of contaminant migration and sample this well in accordance with paragraph (d)(2) of this section;

(iii) Must notify all persons who own the land or reside on the land that directly overlies any part of the plume of contamination if contaminants have migrated off-site if indicated by sampling of wells in accordance paragraph (g)(1) of this section; and

(iv) Must initiate an assessment of corrective measures as required by § 257.26 within 90 days; or

(2) May demonstrate that a source other than the non-municipal non-hazardous waste disposal unit caused the contamination, or that the statistically significant increase resulted from error in sampling, analysis, statistical evaluation, or natural variation in ground-water quality. A report documenting this demonstration must be certified by a qualified ground-water scientist or approved by the Director of an approved State and placed in the operating record. If a successful demonstration is made the owner or operator must continue monitoring in accordance with the assessment monitoring program pursuant to this § 257.25, and may return to detection monitoring if the appendix II (appendix II of 40 CFR part 258) constituents are at or below background as specified in paragraph (e) of this section. Until a successful demonstration is made, the owner or operator must comply with § 257.25(g) including initiating an assessment of corrective measures.

(h) The owner or operator must establish a ground-water protection standard for each appendix II (appendix II of 40 CFR part 258) constituent detected in the ground-water. The ground-water protection standard shall be:

(1) For constituents for which a maximum contaminant level (MCL) has been promulgated under section 1412 of the Safe Drinking Water Act (codified) under 40 CFR part 141, the MCL for that constituent;

(2) For constituents for which MCLs have not been promulgated, the background concentration for the constituent established from wells in accordance with § 257.22(a)(1); or

(3) For constituents for which the background level is higher than the MCL identified under subparagraph (h)(1) of this section or health based levels identified under paragraph (i)(1) of this section, the background concentration.

(i) The Director of an approved State may establish an alternative ground-water protection standard for constituents for which MCLs have not been established. These ground-water protection standards shall be appropriate health based levels that satisfy the following criteria:

(1) The level is derived in a manner consistent with Agency guidelines for assessing the health risks of environmental pollutants (51 FR 33992, 34006, 34014, 34028, September 24, 1986);

(2) The level is based on scientifically valid studies conducted in accordance with the Toxic Substances Control Act Good Laboratory Practice Standards (40 CFR part 792) or equivalent;

(3) For carcinogens, the level represents a concentration associated with an excess lifetime cancer risk level (due to continuous lifetime exposure) within the $1 \times 10^{-4}$ to $1 \times 10^{-6}$ range; and

(4) For systemic toxicants, the level represents a concentration to which the human population (including sensitive subgroups) could be exposed to on a daily basis that is likely to be without appreciable risk of deleterious effects during a lifetime. For purposes of this subpart, systemic toxicants include toxic chemicals that cause effects other than cancer or mutation.

(j) In establishing ground-water protection standards under paragraph (i) of this section, the Director of an approved State may consider the following:

(1) Multiple contaminants in the ground water;

(2) Exposure threats to sensitive environmental receptors; and

(3) Other site-specific exposure or potential exposure to ground water.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Ground-Water Monitoring and Corrective Action

40 C.F.R. § 257.26

§ 257.26 Assessment of corrective measures.

Currentness

(a) Within 90 days of finding that any of the constituents listed in appendix II (appendix II of 40 CFR Part 258) have been detected at a statistically significant level exceeding the ground-water protection standards defined under § 257.25(h) or (i), the owner or operator must initiate an assessment of corrective measures. Such an assessment must be completed within a reasonable period of time.

(b) The owner or operator must continue to monitor in accordance with the assessment monitoring program as specified in § 257.25.

(c) The assessment shall include an analysis of the effectiveness of potential corrective measures in meeting all of the requirements and objectives of the remedy as described under § 257.27, addressing at least the following:

(1) The performance, reliability, ease of implementation, and potential impacts of appropriate potential remedies, including safety impacts, cross-media impacts, and control of exposure to any residual contamination;

(2) The time required to begin and complete the remedy;

(3) The costs of remedy implementation; and

(4) The institutional requirements such as State or local permit requirements or other environmental or public health requirements that may substantially affect implementation of the remedy(s).

(d) The owner or operator must discuss the results of the corrective measures assessment, prior to the selection of remedy, in a public meeting with interested and affected parties.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Ground-Water Monitoring and Corrective Action

40 C.F.R. § 257.27

§ 257.27 Selection of remedy.

Currentness

(a) Based on the results of the corrective measures assessment conducted under § 257.26, the owner or operator must select a remedy that, at a minimum, meets the standards listed in paragraph (b) of this section. The owner or operator must notify the State Director, within 14 days of selecting a remedy, that a report describing the selected remedy has been placed in the operating record and how it meets the standards in paragraph (b) of this section.

(b) Remedies must:

(1) Be protective of human health and the environment;

(2) Attain the ground-water protection standard as specified pursuant to § 257.25(h) or (i);

(3) Control the source(s) of releases so as to reduce or eliminate, to the maximum extent practicable, further releases of appendix II (appendix II of 40 CFR part 258) constituents into the environment that may pose a threat to human health or the environment; and

(4) Comply with standards for management of wastes as specified in § 257.28(d).

(c) In selecting a remedy that meets the standards of § 257.27(b), the owner or operator shall consider the following evaluation factors:

(1) The long- and short-term effectiveness and protectiveness of the potential remedy(s), along with the degree of certainty that the remedy will prove successful based on consideration of the following:

(i) Magnitude of reduction of existing risks;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) Magnitude of residual risks in terms of likelihood of further releases due to waste remaining following implementation of a remedy;

(iii) The type and degree of long-term management required, including monitoring, operation, and maintenance;

(iv) Short-term risks that might be posed to the community, workers, or the environment during implementation of such a remedy, including potential threats to human health and the environment associated with excavation, transportation, and re-disposal or containment;

(v) Time until full protection is achieved;

(vi) Potential for exposure of humans and environmental receptors to remaining wastes, considering the potential threat to human health and the environment associated with excavation, transportation, re-disposal, or containment;

(vii) Long-term reliability of the engineering and institutional controls; and

(viii) Potential need for replacement of the remedy.

(2) The effectiveness of the remedy in controlling the source to reduce further releases based on consideration of the following factors:

(i) The extent to which containment practices will reduce further releases;

(ii) The extent to which treatment technologies may be used.

(3) The ease or difficulty of implementing a potential remedy(s) based on consideration of the following types of factors:

(i) Degree of difficulty associated with constructing the technology;

(ii) Expected operational reliability of the technologies;

(iii) Need to coordinate with and obtain necessary approvals and permits from other agencies;

(iv) Availability of necessary equipment and specialists; and

(v) Available capacity and location of needed treatment, storage, and disposal services.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(4) Practicable capability of the owner or operator, including a consideration of the technical and economic capability.

(5) The degree to which community concerns are addressed by a potential remedy(s).

(d) The owner or operator shall specify as part of the selected remedy a schedule(s) for initiating and completing remedial activities. Such a schedule must require the initiation of remedial activities within a reasonable period of time taking into consideration the factors set forth in paragraphs (d)(1) through (d)(8) of this section. The owner or operator must consider the following factors in determining the schedule of remedial activities:

(1) Extent and nature of contamination;

(2) Practical capabilities of remedial technologies in achieving compliance with ground-water protection standards established under § 257.25(g) or (h) and other objectives of the remedy;

(3) Availability of treatment or disposal capacity for wastes managed during implementation of the remedy;

(4) Desirability of utilizing technologies that are not currently available, but which may offer significant advantages over already available technologies in terms of effectiveness, reliability, safety, or ability to achieve remedial objectives;

(5) Potential risks to human health and the environment from exposure to contamination prior to completion of the remedy;

(6) Resource value of the aquifer including:

(i) Current and future uses;

(ii) Proximity and withdrawal rate of users;

(iii) Ground-water quantity and quality;

(iv) The potential damage to wildlife, crops, vegetation, and physical structures caused by exposure to waste constituent;

(v) The hydrogeologic characteristic of the unit and surrounding land;

(vi) Ground-water removal and treatment costs; and

(vii) The cost and availability of alternative water supplies.

(7) Practicable capability of the owner or operator.

(8) Other relevant factors.

(e) The Director of an approved State may determine that remediation of a release of an appendix II (appendix II of 40 CFR part 258) constituent from the unit is not necessary if the owner or operator demonstrates to the Director of the approved state that:

(1) The ground-water is additionally contaminated by substances that have originated from a source other than the unit and those substances are present in concentrations such that cleanup of the release from the unit would provide no significant reduction in risk to actual or potential receptors; or

(2) The constituent(s) is present in ground water that:

(i) Is not currently or reasonably expected to be a source of drinking water; and

(ii) Is not hydraulically connected with waters to which the hazardous constituents are migrating or are likely to migrate in a concentration(s) that would exceed the ground-water protection standards established under § 257.25(h) or (i); or

(3) Remediation of the release(s) is technically impracticable; or

(4) Remediation results in unacceptable cross-media impacts.

(f) A determination by the Director of an approved State pursuant to paragraph (e) of this section shall not affect the authority of the State to require the owner or operator to undertake source control measures or other measures that may be necessary to eliminate or minimize further releases to the ground-water, to prevent exposure to the ground-water, or to remediate the ground-water to concentrations that are technically practicable and significantly reduce threats to human health or the environment.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Ground-Water Monitoring and Corrective Action

40 C.F.R. § 257.28

# § 257.28 Implementation of the corrective action program.

Currentness

(a) Based on the schedule established under § 257.27(d) for initiation and completion of remedial activities the owner/operator must:

(1) Establish and implement a corrective action ground-water monitoring program that:

(i) At a minimum, meets the requirements of an assessment monitoring program under § 257.25;

(ii) Indicates the effectiveness of the corrective action remedy; and

(iii) Demonstrates compliance with ground-water protection standard pursuant to paragraph (e) of this section.

(2) Implement the corrective action remedy selected under § 257.27; and

(3) Take any interim measures necessary to ensure the protection of human health and the environment. Interim measures should, to the greatest extent practicable, be consistent with the objectives of and contribute to the performance of any remedy that may be required pursuant to § 257.27. The following factors must be considered by an owner or operator in determining whether interim measures are necessary:

(i) Time required to develop and implement a final remedy;

(ii) Actual or potential exposure of nearby populations or environmental receptors to hazardous constituents;

(iii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iv) Further degradation of the ground-water that may occur if remedial action is not initiated expeditiously;

(v) Weather conditions that may cause hazardous constituents to migrate or be released;

(vi) Risks of fire or explosion, or potential for exposure to hazardous constituents as a result of an accident or failure of a container or handling system; and

(vii) Other situations that may pose threats to human health and the environment.

(b) An owner or operator may determine, based on information developed after implementation of the remedy has begun or other information, that compliance with requirements of § 257.27(b) are not being achieved through the remedy selected. In such cases, the owner or operator must implement other methods or techniques that could practicably achieve compliance with the requirements, unless the owner or operator makes the determination under § 257.28(c).

(c) If the owner or operator determines that compliance with requirements under § 257.27(b) cannot be practically achieved with any currently available methods, the owner or operator must:

(1) Obtain certification of a qualified ground-water scientist or approval by the Director of an approved State that compliance with requirements under § 257.27(b) cannot be practically achieved with any currently available methods;

(2) Implement alternate measures to control exposure of humans or the environment to residual contamination, as necessary to protect human health and the environment; and

(3) Implement alternate measures for control of the sources of contamination, or for removal or decontamination of equipment, units, devices, or structures that are:

(i) Technically practicable; and

(ii) Consistent with the overall objective of the remedy.

(4) Notify the State Director within 14 days that a report justifying the alternative measures prior to implementing the alternative measures has been placed in the operating record.

(d) All solid wastes that are managed pursuant to a remedy required under § 257.27, or an interim measure required under § 257.28(a)(3), shall be managed in a manner:

(1) That is protective of human health and the environment; and

(2) That complies with applicable RCRA requirements.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(e) Remedies selected pursuant to § 257.27 shall be considered complete when:

(1) The owner or operator complies with the ground-water protection standards established under § 257.25(h) or (i) at all points within the plume of contamination that lie beyond the ground-water monitoring well system established under § 257.22(a).

(2) Compliance with the ground-water protection standards established under § 257.25(h) or (i) has been achieved by demonstrating that concentrations of appendix II (appendix II of Part 258) constituents have not exceeded the ground-water protection standard(s) for a period of three consecutive years using the statistical procedures and performance standards in § 257.23(g) and (h). The Director of an approved State may specify an alternative length of time during which the owner or operator must demonstrate that concentrations of appendix II (appendix II of 40 CFR part 258) constituents have not exceeded the ground-water protection standard(s) taking into consideration:

(i) Extent and concentration of the release(s);

(ii) Behavior characteristics of the hazardous constituents in the ground-water;

(iii) Accuracy of monitoring or modeling techniques, including any seasonal, meteorological, or other environmental variabilities that may affect the accuracy; and

(iv) Characteristics of the ground-water.

(3) All actions required to complete the remedy have been satisfied.

(f) Upon completion of the remedy, the owner or operator must notify the State Director within 14 days that a certification that the remedy has been completed in compliance with the requirements of § 257.28(e) has been placed in the operating record. The certification must be signed by the owner or operator and by a qualified ground-water scientist or approved by the Director of an approved State.

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 257. Criteria for Classification of Solid Waste Disposal Facilities and Practices (Refs & Annos)
Subpart B. Disposal Standards for the Receipt of Very Small Quantity Generator (Vsqg) Wastes at Non–Municipal Non–Hazardous Waste Disposal Units (Refs & Annos)
Recordkeeping Requirements

40 C.F.R. § 257.30

§ 257.30 Recordkeeping requirements.

Currentness

(a) The owner/operator of a non-municipal non-hazardous waste disposal unit must record and retain near the facility in an operating record or in an alternative location approved by the Director of an approved State the following information as it becomes available:

(1) Any location restriction demonstration required under §§ 257.7 through 257.12; and

(2) Any demonstration, certification, finding, monitoring, testing, or analytical data required in §§ 257.21 through 257.28.

(b) The owner/operator must notify the State Director when the documents from paragraph (a) of this section have been placed or added to the operating record, and all information contained in the operating record must be furnished upon request to the State Director or be made available at all reasonable times for inspection by the State Director.

(c) The Director of an approved State can set alternative schedules for recordkeeping and notification requirements as specified in paragraphs (a) and (b) of this section, except for the notification requirements in § 257.25(g)(1)(iii).

(d) The Director of an approved state program may receive electronic documents only if the state program includes the requirements of 40 CFR Part 3—(Electronic reporting).

**Credits**
[70 FR 59888, Oct. 13, 2005]

SOURCE: 44 FR 53460, Sept. 13, 1979; 56 FR 51016, Oct. 9, 1991; 61 FR 34269, July 1, 1996; 66 FR 53542, Oct. 23, 2001; 68 FR 36495, June 18, 2003; 81 FR 85804, Nov. 28, 2016; 83 FR 36451, July 30, 2018; 85 FR 53561, Aug. 28, 2020; 89 FR 39099, May 8, 2024; 89 FR 88652, Nov. 8, 2024, unless otherwise noted.

AUTHORITY: 42 U.S.C. 6907(a)(3), 6912(a)(1), 6927, 6944, 6945(a) and (d); 33 U.S.C. 1345(d) and (e).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart A. General

40 C.F.R. § 258.1

§ 258.1 Purpose, scope, and applicability.

Currentness

(a) The purpose of this part is to establish minimum national criteria under the Resource Conservation and Recovery Act (RCRA or the Act), as amended, for all municipal solid waste landfill (MSWLF) units and under the Clean Water Act, as amended, for municipal solid waste landfills that are used to dispose of sewage sludge. These minimum national criteria ensure the protection of human health and the environment.

(b) These Criteria apply to owners and operators of new MSWLF units, existing MSWLF units, and lateral expansions, except as otherwise specifically provided in this part; all other solid waste disposal facilities and practices that are not regulated under subtitle C of RCRA are subject to the criteria contained in part 257 of this chapter.

(c) These Criteria do not apply to municipal solid waste landfill units that do not receive waste after October 9, 1991.

(d)(1) MSWLF units that meet the conditions of § 258.1(e)(2) and receive waste after October 9, 1991 but stop receiving waste before April 9, 1994, are exempt from all the requirements of this part 258, except the final cover requirement specified in § 258.60(a). The final cover must be installed by October 9, 1994. Owners or operators of MSWLF units described in this paragraph that fail to complete cover installation by October 9, 1994 will be subject to all the requirements of this part 258, unless otherwise specified.

(2) MSWLF units that meet the conditions of § 258.1(e)(3) and receive waste after October 9, 1991 but stop receiving waste before the date designated by the state pursuant to § 258.1(e)(3), are exempt from all the requirements of this part 258, except the final cover requirement specified in § 258.60(a). The final cover must be installed within one year after the date designated by the state pursuant to § 258.1(e)(3). Owners or operators of MSWLF units described in this paragraph that fail to complete cover installation within one year after the date designated by the state pursuant to § 258.1(e)(3) will be subject to all the requirements of this part 258, unless otherwise specified.

(3) MSWLF units that meet the conditions of paragraph (f)(1) of this section and receive waste after October 9, 1991 but stop receiving waste before October 9, 1997, are exempt from all the requirements of this part 258, except the final cover requirement specified in § 258.60(a). The final cover must be installed by October 9, 1998. Owners or operators of MSWLF units described in this paragraph that fail to complete cover installation by October 9, 1998 will be subject to all the requirements of this part 258, unless otherwise specified.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(4) MSWLF units that do not meet the conditions of § 258.1 (e)(2), (e)(3), or (f) and receive waste after October 9, 1991 but stop receiving waste before October 9, 1993, are exempt from all the requirements this part 258, except the final cover requirement specified in § 258.60(a). The final cover must be installed by October 9, 1994. Owners or operators of MSWLF units described in this paragraph that fail to complete cover installation by October 9, 1994 will be subject to all the requirements of this part 258, unless otherwise specified.

(e)(1) The compliance date for all requirements of this part 258, unless otherwise specified, is October 9, 1993 for all MSWLF units that receive waste on or after October 9, 1993, except those units that qualify for an extension under (e)(2), (3), or (4) of this section.

(2) The compliance date for all requirements of this part 258, unless otherwise specified, is April 9, 1994 for an existing MSWLF unit or a lateral expansion of an existing MSWLF unit that meets the following conditions:

(i) The MSWLF unit disposed of 100 tons per day or less of solid waste during a representative period prior to October 9, 1993;

(ii) The unit does not dispose of more than an average of 100 TPD of solid waste each month between October 9, 1993 and April 9, 1994;

(iii) The MSWLF unit is located in a state that has submitted an application for permit program approval to EPA by October 9, 1993, is located in the state of Iowa, or is located on Indian Lands or Indian Country; and

(iv) The MSWLF unit is not on the National Priorities List (NPL) as found in appendix B to 40 CFR part 300.

(3) The compliance date for all requirements of this part 258, unless otherwise specified, for an existing MSWLF unit or lateral expansion of an existing MSWLF unit receiving flood-related waste from federally-designated areas within the major disasters declared for the states of Iowa, Illinois, Minnesota, Wisconsin, Missouri, Nebraska, Kansas, North Dakota, and South Dakota by the President during the summer of 1993 pursuant to 42 U.S.C. 5121 et seq., shall be designated by the state in which the MSWLF unit is located in accordance with the following:

(i) The MSWLF unit may continue to accept waste up to April 9, 1994 without being subject to part 258, if the state in which the MSWLF unit is located determines that the MSWLF unit is needed to receive flood-related waste from a federally-designated disaster area as specified in (e)(3) of this section.

(ii) The MSWLF unit that receives an extension under paragraph (e)(3)(i) of this section may continue to accept waste up to an additional six months beyond April 9, 1994 without being subject to part 258, if the state in which the MSWLF unit is located determines that the MSWLF unit is needed to receive flood-related waste from a federally-designated disaster area specified in (e)(3) of this section.

(iii) In no case shall a MSWLF unit receiving an extension under paragraph (e)(3) (i) or (ii) of this section accept waste beyond October 9, 1994 without being subject to part 258.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(4) For a MSWLF unit that meets the conditions for the exemption in paragraph (f)(1) of this section, the compliance date for all applicable requirements of part 258, unless otherwise specified, is October 9, 1997.

(f)(1) Owners or operators of new MSWLF units, existing MSWLF units, and lateral expansions that dispose of less than twenty (20) tons of municipal solid waste daily, based on an annual average, are exempt from subparts D and E of this part, so long as there is no evidence of ground-water contamination from the MSWLF unit, and the MSWLF unit serves:

(i) A community that experiences an annual interruption of at least three consecutive months of surface transportation that prevents access to a regional waste management facility, or

(ii) A community that has no practicable waste management alternative and the landfill unit is located in an area that annually receives less than or equal to 25 inches of precipitation.

(2) Owners or operators of new MSWLF units, existing MSWLF units, and lateral expansions that meet the criteria in paragraph (f)(1)(i) or (f)(1)(ii) of this section must place in the operating record information demonstrating this.

(3) If the owner or operator of a new MSWLF unit, existing MSWLF unit, or lateral expansion has knowledge of ground-water contamination resulting from the unit that has asserted the exemption in paragraph (f)(1)(i) or (f)(1)(ii) of this section, the owner or operator must notify the state Director of such contamination and, thereafter, comply with subparts D and E of this part.

(g) Municipal solid waste landfill units failing to satisfy these criteria are considered open dumps for purposes of State solid waste management planning under RCRA.

(h) Municipal solid waste landfill units failing to satisfy these criteria constitute open dumps, which are prohibited under section 4005 of RCRA.

(i) Municipal solid waste landfill units containing sewage sludge and failing to satisfy these Criteria violate sections 309 and 405(e) of the Clean Water Act.

(j) Subpart G of this part is effective April 9, 1995, except for MSWLF units meeting the requirements of paragraph (f)(1) of this section, in which case the effective date of subpart G is October 9, 1995.

**Credits**
[58 FR 51546, Oct. 1, 1993; 60 FR 52342, Oct. 6, 1995; 61 FR 50413, Sept. 25, 1996]

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Notes of Decisions (43)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart D. Design Criteria

40 C.F.R. § 258.40

§ 258.40 Design criteria.

Currentness

(a) New MSWLF units and lateral expansions shall be constructed:

(1) In accordance with a design approved by the Director of an approved State or as specified in § 258.40(e) for unapproved States. The design must ensure that the concentration values listed in Table 1 of this section will not be exceeded in the uppermost aquifer at the relevant point of compliance, as specified by the Director of an approved State under paragraph (d) of this section, or

(2) With a composite liner, as defined in paragraph (b) of this section and a leachate collection system that is designed and constructed to maintain less than a 30–cm depth of leachate over the liner.

(b) For purposes of this section, composite liner means a system consisting of two components; the upper component must consist of a minimum 30–mil flexible membrane liner (FML), and the lower component must consist of at least a two-foot layer of compacted soil with a hydraulic conductivity of no more than $1 \text{ x} 10^{-7}$ cm/sec. FML components consisting of high density polyethylene (HDPE) shall be at least 60–mil thick. The FML component must be installed in direct and uniform contact with the compacted soil component.

(c) When approving a design that complies with paragraph (a)(1) of this section, the Director of an approved State shall consider at least the following factors:

(1) The hydrogeologic characteristics of the facility and surrounding land;

(2) The climatic factors of the area; and

(3) The volume and physical and chemical characteristics of the leachate.

(d) The relevant point of compliance specified by the Director of an approved State shall be no more than 150 meters from the waste management unit boundary and shall be located on land owned by the owner of the MSWLF unit. In determining the relevant point of compliance State Director shall consider at least the following factors:

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(1) The hydrogeologic characteristics of the facility and surrounding land;

(2) The volume and physical and chemical characteristics of the leachate;

(3) The quantity, quality, and direction, of flow of ground water;

(4) The proximity and withdrawal rate of the ground-water users;

(5) The availability of alternative drinking water supplies;

(6) The existing quality of the ground water, including other sources of contamination and their cumulative impacts on the ground water, and whether the ground water is currently used or reasonably expected to be used for drinking water;

(7) Public health, safety, and welfare effects; and

(8) Practicable capability of the owner or operator.

(e) If EPA does not promulgate a rule establishing the procedures and requirements for State compliance with RCRA section 4005(c)(1)(B) by October 9, 1993, owners and operators in unapproved States may utilize a design meeting the performance standard in § 258.40(a)(1) if the following conditions are met:

(1) The State determines the design meets the performance standard in § 258.40(a)(1);

(2) The State petitions EPA to review its determination; and

(3) EPA approves the State determination or does not disapprove the determination within 30 days.

Note to subpart D: 40 CFR part 239 is reserved to establish the procedures and requirements for State compliance with RCRA section 4005(c)(1)(B).

**Table 1**

| Chemical | MCL (mg/l) |
|---|---|
| Arsenic | 0.05 |
| Barium | 1.0 |
| Benzene | 0.005 |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | |
|---|---|
| Cadmium | 0.01 |
| Carbon tetrachloride | 0.005 |
| Chromium (hexavalent) | 0.05 |
| 2,4-Dichlorophenoxy acetic acid | 0.1 |
| 1,4-Dichlorobenzene | 0.075 |
| 1,2-Dichloroethane | 0.005 |
| 1,1-Dichloroethylene | 0.007 |
| Endrin | 0.0002 |
| Fluoride | 4 |
| Lindane | 0.004 |
| Lead | 0.05 |
| Mercury | 0.002 |
| Methoxychlor | 0.1 |
| Nitrate | 10 |
| Selenium | 0.01 |
| Silver | 0.05 |
| Toxaphene | 0.005 |
| 1,1,1-Trichloromethane | 0.2 |
| Trichloroethylene | 0.005 |
| 2,4,5-Trichlorophenoxy acetic acid | 0.01 |
| Vinyl Chloride | 0.002 |

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Notes of Decisions (9)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart D. Design Criteria

40 C.F.R. § 258.41

§ 258.41 Project XL Bioreactor Landfill Projects.

Currentness

(a) Buncombe County, North Carolina Project XL Bioreactor Landfill Requirements. Paragraph (a) of this section applies to Cells 1, 2, 3, 4, and 5 of the Buncombe County Solid Waste Management Facility located in the County of Buncombe, North Carolina, owned and operated by the Buncombe County Solid Waste Authority, or its successors. This paragraph (a) will also apply to Cells 6, 7, 8, 9, and 10, provided that the EPA Regional Administrator for Region 4 and the State Director determine that the pilot project in Cells 3, 4, and 5 is performing as expected and that the pilot project has not exhibited detrimental environmental results.

(1) The Buncombe County Solid Waste Authority is allowed to place liquid waste in the Buncombe County Solid Waste Management Facility, provided that the provisions of paragraphs (a)(2) through (9) of this section are met.

(2) The only liquid waste allowed under this section is leachate or gas condensate derived from the MSWLF, which may be supplemented with water from the French Broad River. The owner or operator shall control any liquids to the landfill to assure that the average moisture content of the landfill does not exceed 50% by weight. Liquid addition and recirculation is allowed only to the extent that the integrity of the landfill including its liner system is maintained, as determined by the State Director.

(3) The MSWLF unit shall be designed and constructed with a liner and leachate collection system as described in § 258.40(a)(2) or paragraphs (a)(4) and (5) of this section. The owner or operator must place documentation of the landfill design in the operating record and notify the State Director that it has been placed in operating record;

(4) Cells 3–10 shall be constructed with a liner system consisting of the components described in paragraphs (a)(4)(i) through (v) of this section, or an equivalent or superior liner system as determined by the State Director:

(i) A lower component consisting of at least 18 inches of compacted soil with a hydraulic conductivity of no more than $1 \times 10^{-5}$ cm/sec., and

(ii) An upper component consisting of a minimum 30–millimeter (“mil”) flexible membrane liner (FML) or 60–mil if High Density Polyethylene (“HDPE”) is used, and

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(iii) A geosynthetic clay liner (GCL) overlaying and in direct contact with the 18 inches of compacted soil in paragraph (a)(4) of this section and having the following properties:

(A) The GCL shall be formulated and manufactured from polypropylene geotextiles and high swelling containment resistant sodium bentonite. The bentonite-geotextile liner shall be manufactured using a minimum of one pound per square foot as determined using the Standard Test Method for Measuring Mass per Unit Area of Geotextiles, ASTM D–5261–92 (reapproved in 1996). The high swelling sodium montmorillonite clay shall be at 12% moisture content as determined by the Standard Test Method for Laboratory Determination of Water (Moisture) Content of Soil and Rock by Mass, ASTM D2216–98. The Director of the Federal Register approves this incorporation by reference with 5 U.S.C. 552(a) and 1 CFR part 51. These methods are available from The American Society for Testing and Materials, 100 Barr Harbor Drive, West Conshohocken, PA 19428–2959. These methods may be inspected at EPA's docket office located at Crystal Gateway, 1235 Jefferson Davis Highway, First Floor, Arlington, Virginia, or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

(B) The encapsulating geotextile shall be polypropylene and shall have a minimum weight of 6 oz./square yard.

(iv) The upper component shall be installed in direct and uniform contact with an overlaying soil cushioning component.

(v) Underlying the above liner system, there shall also be installed a leak detection system consisting of a 60–mil HDPE liner placed on a prepared subgrade.

(A) A 4 inch capped pipe will drain liquid collected in the sump out beyond the footprint of the landfill cell.

(B) Water collected on the leak detection liner shall be monitored at least semi-annually as directed by the State Director to determine whether any leachate escaped the liner system.

(5) Cells 3–10 shall be designed and constructed with a leachate collection system to maintain less than 30 centimeters depth of leachate is present at the sump location. The leachate collection system shall include a continuous monitoring system to monitor depth of leachate.

(6) The owner/operator shall keep the Federally Enforceable State Operating Permit (FESOP) issued by the Western North Carolina Air Quality Agency for the Buncombe County Solid Waste Management Facility in effect, and shall comply with the provisions of the FESOP, during the entire period of leachate recirculation and the post closure period. The FESOP was issued on November 13, 2000 and contains the air quality requirements for the Buncombe County Landfill XL project.

(7) Monitoring and reporting requirements. The owner or operator of the Buncombe County Solid Waste Management Facility shall monitor for the parameters listed in paragraphs (a)(7)(i) through (xiii) of this section and submit an annual report on the XL project to the EPA Regional Administrator for Region 4 and the State Director. The first report is due coincident with the October 2001 report to the state. The report should state what progress has been made toward the superior environmental performance and other commitments as stated in the Final Project Agreement. The report shall include, at a minimum, the following data:

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(i) Amount of landfill gas generated;

(ii) Percent capture of landfill gas, if known;

(iii) Quality of the landfill gas, amount and type of liquids applied to the landfill;

(iv) Method of liquids application to the landfill;

(v) Quantity of waste placed in the landfill;

(vi) Quantity and quality of leachate collected;

(vii) Quantity of leachate recirculated back into the landfill;

(viii) Information on the pretreatment of waste applied to the landfill;

(ix) Data collected on landfill temperature and moisture content;

(x) Data on the leachate pressure (head) on the liner;

(xi) Observations, information, and studies made on the physical stability of the MSWLF units that are developed during the project term, if any.

(xii) The above data may be summarized, and, at a minimum shall contain, the minimum, maximum, median, and average data points as well as the frequency of monitoring as applicable.

(xiii) The method and frequency of monitoring shall be specified by the State Director.

(8) Termination and Withdrawal.

(i) Paragraph (a) of this section will terminate August 22, 2026, unless a subsequent rulemaking is issued or terminated earlier pursuant to paragraph (a)(8)(ii) of this section.

(ii) In the event of noncompliance with paragraph (a) of this section, EPA may terminate the authority under paragraph (a) of this section and the authority to add liquid wastes to all or part of cells 3–10 under § 258.28(a)(3). The EPA Regional Administrator will provide written notice of intent to terminate to the Buncombe County Solid Waste Authority with a copy to the State Director. The notice will state EPA's intent to terminate under the rules and will include a brief statement

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

of EPA's reasons for its action. The termination will take effect 60 days from the date of the notice, unless the EPA Regional Administrator for Region 4 issues a written notice rescinding the termination.

(9) Compliance requirements in the event of termination or withdrawal. The Buncombe County Solid Waste Management Facility will be subject to all regulatory provisions applicable to MSWLFs upon termination of authority under this section. In the event of early termination of this section, the EPA Regional Administrator for Region 4 may provide an interim period of compliance to allow Buncombe County a reasonable period of time for transition following cessation of liquids addition.

(b) This section applies solely to Module D of the Yolo County Central Landfill owned and operated by the County of Yolo, California, or its successors. It allows the Yolo County Central Landfill to add bulk or noncontainerized liquid wastes to Module D under the following conditions:

(1) Module D shall be designed and constructed with a composite liner as defined in § 258.40(b) and a leachate collection system that functions and continuously monitors to ensure that less than 30 centimeters depth of leachate is maintained over the liner.

(2) The owner or operator of the Yolo County Central Landfill must ensure that the concentration values listed in Table 1 of § 258.40 are not exceeded in the uppermost aquifer at the relevant point of compliance for the landfill as specified by the State Director under § 258.40(d).

(3) The owner or operator of the Yolo County Central Landfill shall demonstrate that the addition of any liquids to Module D does not result in an increased leakage rate, and does not result in liner slippage, or otherwise compromise the integrity of the landfill and its liner system, as determined by the State Director.

(4) The owner or operator of the Yolo County Central Landfill must ensure that Module D is operated in such a manner so as to prevent any landfill fires from occurring.

(5) The owner or operator of the Yolo County Central Landfill shall submit an annual report to the EPA Regional Administrator and the State Director. The first report is due within 18 months after August 13, 2001. The report shall state what progress the Project is making towards the superior environmental performance as stated in the Final Project Agreement. The data in paragraphs (b)(5)(i) through (xvi) of this section may be summarized, but, at a minimum, shall contain the minimum, maximum, median, and average data points as well as the frequency of monitoring, as applicable. These reporting provisions shall remain in effect for as long as the owner or operator of the Yolo County Central Landfill continues to add liquid waste to Module D. Additional monitoring, record keeping and reporting requirements related to landfill gas will be contained in a permit executed by the local air quality management district pursuant to the Clean Air Act, 42 U.S.C. 7401 et seq. Application of this site-specific rule to the Yolo County Central Landfill is conditioned upon the issuance of such permit. The annual report will include, at a minimum, the following data:

(i) Amount of landfill gas generated;

(ii) Percent capture of landfill gas;

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(iii) Quality of the landfill gas;

(iv) Amount and type of liquids applied to the landfill;

(v) Method of liquids application to the landfill;

(vi) Quantity of waste placed in the landfill;

(vii) Quantity and quality of leachate collected, including at least the following parameters, monitored, at a minimum, on an annual basis:

(A) pH;

(B) Conductivity;

(C) Dissolved oxygen;

(D) Dissolved solids;

(E) Biochemical oxygen demand;

(F) Chemical oxygen demand;

(G) Organic carbon;

(H) Nutrients, (including ammonia [“$NH_3$”], total kjeldahl nitrogen [“TKN”], and total phosphorus [“TP”] );

(I) Common ions;

(J) Heavy metals;

(K) Organic priority pollutants; and

(L) Flow rate;

(viii) Quantity of leachate recirculated back into the landfill;

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(ix) Information on the pretreatment of solid and liquid waste applied to the landfill;

(x) Landfill temperature;

(xi) Landfill moisture content;

(xii) Data on the leachate pressure (head) on the liner;

(xiii) The amount of aeration of the waste;

(xiv) Data on landfill settlement;

(xv) Any information on the performance of the landfill cover; and

(xvi) Observations, information, or studies made on the physical stability of the landfill.

(6) This section will remain in effect until August 13, 2006. By August 13, 2006, Yolo County Central Landfill shall return to compliance with the regulatory requirements which would have been in effect absent the flexibility provided through this Project XL site-specific rule. This section applies to Phase I of Module D. This section also will apply to any phase of Module D beyond Phase I only if a second Final Project Agreement that describes the additional phase has been signed by representatives of EPA Region 9, Yolo County, and the State of California. Phase I of Module D is defined as the operation of twelve acres of the twenty acre Module D.

(c) Virginia Landfills XL Project Requirements. Paragraph (c) of this section applies solely to two Virginia landfills operated by the Waste Management, Inc. or its successors: The Maplewood Recycling and Waste Disposal Facility, located in Amelia County, Virginia ("Maplewood Landfill"); and the King George County Landfill and Recycling Facility, located in King George County, Virginia ("King George Landfill") collectively hereinafter, "the VA Project XL Landfills or landfill." The VA Project XL Landfills are allowed to add non-hazardous bulk or non-containerized liquids including, leachate, storm water and truck wash water, hereinafter, "liquid or liquids", to Cell 3 of the King George Landfill (hereinafter "Cell 3") and Phases 1 and 2 of the Maplewood Landfill (hereinafter "Phases 1 and 2") under the following conditions:

(1) The operator of the landfill shall maintain the liners underlying Cell 3 and Phases 1 and 2, which were designed and constructed with an alternative liner as defined in § 258.40(a)(1) in accord with their current installed design in order to maintain the integrity of the liner system and keep it and the leachate collection system in good operating order. The operator of the landfill shall ensure that the addition of any liquids does not result in an increased leakage rate, and does not result in liner slippage, or otherwise compromise the integrity of the landfill and its liner system, as determined by the State Director. In addition, the leachate collection system shall be operated, monitored and maintained to ensure that less than 30 cm depth of leachate is maintained over the liner.

(2) The operator of the landfill shall ensure that the concentration values listed in Table 1 of § 258.40 are not exceeded in the uppermost aquifer at the relevant point of compliance for the landfill, as specified by the State Director, under § 258.40(d).

(3) The operator of the landfill shall monitor and report whether surface seeps are occurring and determine whether they are attributable to operation of the liquid application system. EPA and VADEQ shall be notified in the semi-annual report of the occurrence of any seeps.

(4) The operator of the landfill shall determine on a monthly basis the leachate quality in test and control areas with and without liquid addition. The operator of the landfill shall collect monthly samples of the landfill leachate and analyze them for the following parameters: pH, Conductivity, Dissolved Oxygen, Dissolved Solids, Biochemical Oxygen Demand, Chemical Oxygen Demand, Organic Carbon, Nutrients (ammonia, total kjeldahl nitrogen, total phosphorus), Common Ions, Heavy Metals and Organic Priority Pollutants.

(5) The operator of the landfill shall determine on a semi-annual basis the total quantity of leachate collected in test and control areas; the total quantity of liquids applied in the test areas and determination of any changes in this quantity over time; the total quantity of leachate in on-site storage structures and any leachate taken for offsite disposal.

(6) Prior to the addition of any liquid to the landfill, the operator of the landfill shall perform an initial characterization of the liquid and notify EPA and VADEQ of the liquid proposed to be added. The parameters for the initial characterization of liquids shall be the same as the monthly parameters for the landfill leachate specified in paragraph (c)(4) of this section. The operator shall annually test all liquids added to the landfill and compare these results to the initial characterization.

(7) The operator of the landfill shall ensure that Cell 3 and Phases 1 and 2 are operated in such a manner so as to prevent any landfill fires from occurring. The operator of the landfill shall monitor the gas temperature at well heads, at a minimum, on a monthly basis.

(8) The operator of the landfill shall perform an annual surface topographic survey to determine the rate of the settlement of the waste in the test and control areas.

(9) The operator of the landfill shall monitor and record the frequency of odor complaints during and after liquid application events. EPA and VADEQ shall be notified of the occurrence of any odor complaints in the semi-annual report.

(10) The operator of the landfill shall collect representative samples of the landfill waste in the test areas on an annual basis and analyze the samples for the following solid waste stabilization and decomposition parameters: Moisture Content, Biochemical Methane Potential, Cellulose, Lignin, Hemi-cellulose, Volatile Solids and pH.

(11) The operator of the landfill shall report to the EPA Regional Administrator and the State Director on the information described in paragraphs (c)(1) through (10) of this section on a semi-annual basis. The first report is due within 6 months after the effective date of this section. These reporting provisions shall remain in effect for the duration of the project term.

(12) Additional monitoring, record keeping and reporting requirements related to landfill gas will be contained in a Federally Enforceable State Operating Permit ("FESOP") for the VA Project XL Landfills issued pursuant to the Clean Air Act, 42 U.S.C. 7401 et seq. Application of this site-specific rule to the VA Project XL Landfills is conditioned upon the issuance of such a FESOP.

(13) This section applies until July 18, 2012. By July 18, 2012, the VA Project XL Landfills must return to compliance with the regulatory requirements which would have been in effect absent the flexibility provided through this section. If EPA Region 3's Regional Administrator, the Commonwealth of Virginia and Waste Management agree to an amendment of the project term, the parties must enter into an amended or new Final Project Agreement for any such amendment.

(14) The authority provided by this section may be terminated before the end of the 10 year period in the event of noncompliance with the requirements of paragraph (c) of this section, the determination by the EPA Region 3's Regional Administrator that the project has failed to achieve the expected level of environmental performance, or the promulgation of generally applicable requirements that would apply to all landfills that meet or exceed the performance standard set forth in § 258.40(a)(1). In the event of early termination EPA in consultation with the Commonwealth of Virginia will determine an interim compliance period to provide sufficient time for the operator to return the landfills to compliance with the regulatory requirements which would have been in effect absent the authority provided by this section. The interim compliance period shall not exceed six months.

**Credits**
[66 FR 42449, Aug. 13, 2001; 66 FR 44069, Aug. 22, 2001; 67 FR 47319, July 18, 2002; 69 FR 18803, April 9, 2004]

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart D. Design Criteria

40 C.F.R. § 258.42

§ 258.42 Approval of site-specific flexibility requests in Indian country.

Currentness

(a) Salt River Pima–Maricopa Indian Community (SRPMIC), Salt River Landfill Research, Development, and Demonstration Project Requirements. Paragraph (a) of this section applies to the Salt River Landfill, a municipal solid waste landfill owned and operated by the SPRMIC on the SRPMIC's reservation in Arizona, which includes waste disposal areas identified as "Phases I–VI." The application submitted by SRPMIC, "Research, Development, and Demonstration Permit Application Salt River Landfill," dated September 24, 2007 and amended on April 8, 2008 is hereby incorporated by reference. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may inspect or obtain a copy at the Environmental Protection Agency Region IX, 75 Hawthorne Street, San Francisco, CA, or by calling the Docket Facility at (415) 947–4406, or go to http://www.regulations.gov, Docket ID No. EPA–R09–RCRA–2008–0354. You may also inspect a copy at the National Archives and Records Administration (NARA). For information on the availability at NARA, call (202) 741–6030 or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html. The facility owner and/or operator may operate the facility in accordance with this application, including the following activities more generally described as follows:

(1) The owner and/or operator may install a geosynthetic clay liner as an alternative bottom liner system in Phase VI.

(2) The owner and/or operator may operate Phase VI as a bioreactor by recirculating leachate and landfill gas condensate, and by adding storm water and groundwater, to the below grade portions of Phase VI.

(3) The owner and/or operator may increase the moisture content of the waste mass in Phases IIIB and IVA by recirculating leachate and landfill gas condensate, and by adding storm water and groundwater, to the below grade portions of Phases IIIB and IVA.

(4) The owner and/or operator shall maintain less than a 30–cm depth of leachate on the liner.

(5) The owner and/or operator shall submit reports to the Director of the Land, Chemicals and Redevelopment Division at EPA Region 9 as specified in "Research, Development, and Demonstration Permit Application Salt River Landfill," dated September 24, 2007 and amended on April 8, 2008, including an annual report showing whether and to what extent the site is progressing in attaining project goals. The annual report will also include a summary of all monitoring and testing results, as specified in the application.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(6) The owner and/or operator may not operate the facility pursuant to the authority granted by this section if there is any deviation from the terms, conditions, and requirements of this section unless the operation of the facility will continue to conform to the standards set forth in § 258.4 and the owner and/or operator has obtained the prior written approval of the Director of the Land, Chemicals and Redevelopment Division at EPA Region 9 or the Director's designee to implement corrective measures or otherwise operate the facility subject to such deviation. The Director of the Land, Chemicals and Redevelopment Division or designee shall provide an opportunity for the public to comment on any significant deviation prior to providing written approval of the deviation.

(7) Paragraphs (a)(2), (3), (5), (6), and (9) of this section will terminate on March 19, 2024, unless the Director of the Land, Chemicals and Redevelopment Division at EPA Region 9 or the Director's designee renews this authority in writing. Any such renewal may extend the authority granted under paragraphs (a)(2), (3), (5), (6), and (9) of this section for up to an additional three years, and multiple renewals (up to a total of 21 years from March 19, 2009) may be provided. The Director of the Land, Chemicals and Redevelopment Division or designee shall provide an opportunity for the public to comment on any renewal request prior to providing written approval or disapproval of such request.

(8) In no event will the provisions of paragraph (a)(2), (3), (5), (6), or (9) of this section remain in effect after March 19, 2030, 21 years after the March 19, 2009 date of publication of the site-specific rule in this section. Upon termination of paragraphs (a)(2), (3), (5), (6), and (9) of this section, and except with respect to paragraphs (a)(1) and (4) of this section, the owner and/or operator shall return to compliance with the regulatory requirements which would have been in effect absent the flexibility provided through the site-specific rule in this section.

(9) In seeking any renewal of the authority granted under or other requirements of paragraphs (a)(2), (3), (5), and (6) of this section, the owner and/or operator shall provide a detailed assessment of the project showing the status with respect to achieving project goals, a list of problems and status with respect to problem resolutions, and any other requirements that the Director of the Land, Chemicals and Redevelopment Division at EPA Region 9 or the Director's designee has determined are necessary for the approval of any renewal and has communicated in writing to the owner and operator.

(10) The owner and/or operator's authority to operate the landfill in accordance with paragraphs (a)(2), (3), (5), (6), and (9) of this section shall terminate if the Director of the Land, Chemicals and Redevelopment Division at EPA Region 9 or the Director's designee determines that the overall goals of the project are not being attained, including protection of human health or the environment. Any such determination shall be communicated in writing to the owner and operator.

(b) [Reserved]

**Credits**
[74 FR 11680, March 19, 2009; 86 FR 18188, April 8, 2021]

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart D. Design Criteria

40 C.F.R. § 258.43

§§ 258.43 to 258.49 [Reserved]

Currentness

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart D. Design Criteria

40 C.F.R. § 258.49

§§ 258.43 to 258.49 [Reserved]

Currentness

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.50

§ 258.50 Applicability.

Currentness

(a) The requirements in this part apply to MSWLF units, except as provided in paragraph (b) of this section.

(b) Ground-water monitoring requirements under § 258.51 through § 258.55 of this part may be suspended by the Director of an approved State for a MSWLF unit if the owner or operator can demonstrate that there is no potential for migration of hazardous constituents from that MSWLF unit to the uppermost aquifer (as defined in § 258.2) during the active life of the unit and the post-closure care period. This demonstration must be certified by a qualified ground-water scientist and approved by the Director of an approved State, and must be based upon:

(1) Site-specific field collected measurements, sampling, and analysis of physical, chemical, and biological processes affecting contaminant fate and transport, and

(2) Contaminant fate and transport predictions that maximize contaminant migration and consider impacts on human health and environment.

(c) Owners and operators of MSWLF units, except those meeting the conditions of § 258.1(f), must comply with the ground-water monitoring requirements of this part according to the following schedule unless an alternative schedule is specified under paragraph (d) of this section:

(1) Existing MSWLF units and lateral expansions less than one mile from a drinking water intake (surface or subsurface) must be in compliance with the ground-water monitoring requirements specified in §§ 258.51–258.55 by October 9, 1994;

(2) Existing MSWLF units and lateral expansions greater than one mile but less than two miles from a drinking water intake (surface or subsurface) must be in compliance with the ground-water monitoring requirements specified in §§ 258.51–258.55 by October 9, 1995;

(3) Existing MSWLF units and lateral expansions greater than two miles from a drinking water intake (surface or subsurface) must be in compliance with the ground-water monitoring requirements specified in §§ 258.51–258.55 by October 9, 1996.

(4) New MSWLF units must be in compliance with the ground-water monitoring requirements specified in §§ 258.51–258.55 before waste can be placed in the unit.

(d) The Director of an approved State may specify an alternative schedule for the owners or operators of existing MSWLF units and lateral expansions to comply with the ground-water monitoring requirements specified in §§ 258.51–258.55. This schedule must ensure that 50 percent of all existing MSWLF units are in compliance by October 9, 1994 and all existing MSWLF units are in compliance by October 9, 1996. In setting the compliance schedule, the Director of an approved State must consider potential risks posed by the unit to human health and the environment. The following factors should be considered in determining potential risk:

(1) Proximity of human and environmental receptors;

(2) Design of the MSWLF unit;

(3) Age of the MSWLF unit;

(4) The size of the MSWLF unit; and

(5) Types and quantities of wastes disposed including sewage sludge; and

(6) Resource value of the underlying aquifer, including:

(i) Current and future uses;

(ii) Proximity and withdrawal rate of users; and

(iii) Ground-water quality and quantity.

(e) Owners and operators of all MSWLF units that meet the conditions of § 258.1(f)(1) must comply with all applicable ground-water monitoring requirements of this part by October 9, 1997.

(f) Once established at a MSWLF unit, ground-water monitoring shall be conducted throughout the active life and post-closure care period of that MSWLF unit as specified in § 258.61.

(g) For the purposes of this subpart, a qualified ground-water scientist is a scientist or engineer who has received a baccalaureate or post-graduate degree in the natural sciences or engineering and has sufficient training and experience in groundwater hydrology and related fields as may be demonstrated by State registration, professional Certifications, or completion of accredited university programs that enable that individual to make sound professional judgements regarding ground-water monitoring, contaminant fate and transport, and corrective-action.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(h) The Director of an approved State may establish alternative schedules for demonstrating compliance with § 258.51(d)(2), pertaining to notification of placement of certification in operating record; § 258.54(c)(1), pertaining to notification that statistically significant increase (SSI) notice is in operating record; § 258.54(c) (2) and (3), pertaining to an assessment monitoring program; § 258.55(b), pertaining to sampling and analyzing appendix II constituents; § 258.55(d)(1), pertaining to placement of notice (appendix II constituents detected) in record and notification of notice in record; § 258.55(d)(2), pertaining to sampling for appendix I and II to this part; § 258.55(g), pertaining to notification (and placement of notice in record) of SSI above ground-water protection standard; §§ 258.55(g)(1)(iv) and 258.56(a), pertaining to assessment of corrective measures; § 258.57(a), pertaining to selection of remedy and notification of placement in record; § 258.58(c)(4), pertaining to notification of placement in record (alternative corrective action measures); and § 258.58(f), pertaining to notification of placement in record (certification of remedy completed).

**Credits**
[57 FR 28628, June 26, 1992; 58 FR 51547, Oct. 1, 1993; 60 FR 52342, Oct. 6, 1995]

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Notes of Decisions (3)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.51

§ 258.51 Ground-water monitoring systems.

Currentness

(a) A ground-water monitoring system must be installed that consists of a sufficient number of wells, installed at appropriate locations and depths, to yield ground-water samples from the uppermost aquifer (as defined in § 258.2) that:

(1) Represent the quality of background ground water that has not been affected by leakage from a unit. A determination of background quality may include sampling of wells that are not hydraulically upgradient of the waste management area where:

(i) Hydrogeologic conditions do not allow the owner or operator to determine what wells are hydraulically upgradient; or

(ii) Sampling at other wells will provide an indication of background ground-water quality that is as representative or more representative than that provided by the upgradient wells; and

(2) Represent the quality of ground water passing the relevant point of compliance specified by Director of an approved State under § 258.40(d) or at the waste management unit boundary in unapproved States. The downgradient monitoring system must be installed at the relevant point of compliance specified by the Director of an approved State under § 258.40(d) or at the waste management unit boundary in unapproved States that ensures detection of ground-water contamination in the uppermost aquifer. When physical obstacles preclude installation of ground-water monitoring wells at the relevant point of compliance at existing units, the down-gradient monitoring system may be installed at the closest practicable distance hydraulically down-gradient from the relevant point of compliance specified by the Director of an approved State under § 258.40 that ensure detection of groundwater contamination in the uppermost aquifer.

(b) The Director of an approved State may approve a multiunit ground-water monitoring system instead of separate ground-water monitoring systems for each MSWLF unit when the facility has several units, provided the multi-unit ground-water monitoring system meets the requirement of § 258.51(a) and will be as protective of human health and the environment as individual monitoring systems for each MSWLF unit, based on the following factors:

(1) Number, spacing, and orientation of the MSWLF units;

(2) Hydrogeologic setting;

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(3) Site history;

(4) Engineering design of the MSWLF units, and

(5) Type of waste accepted at the MSWLF units.

(c) Monitoring wells must be cased in a manner that maintains the integrity of the monitoring well bore hole. This casing must be screened or perforated and packed with gravel or sand, where necessary, to enable collection of ground-water samples. The annular space (i.e., the space between the bore hole and well casing) above the sampling depth must be sealed to prevent contamination of samples and the ground water.

(1) The owner or operator must notify the State Director that the design, installation, development, and decommission of any monitoring wells, piezometers and other measurement, sampling, and analytical devices documentation has been placed in the operating record; and

(2) The monitoring wells, piezometers, and other measurement, sampling, and analytical devices must be operated and maintained so that they perform to design specifications throughout the life of the monitoring program.

(d) The number, spacing, and depths of monitoring systems shall be:

(1) Determined based upon site-specific technical information that must include thorough characterization of:

(i) Aquifer thickness, ground-water flow rate, ground-water flow direction including seasonal and temporal fluctuations in ground-water flow; and

(ii) Saturated and unsaturated geologic units and fill materials overlying the uppermost aquifer, materials comprising the uppermost aquifer, and materials comprising the confining unit defining the lower boundary of the uppermost aquifer; including, but not limited to: Thicknesses, stratigraphy, lithology, hydraulic conductivities, porosities and effective porosities.

(2) Certified by a qualified ground-water scientist or approved by the Director of an approved State. Within 14 days of this certification, the owner or operator must notify the State Director that the certification has been placed in the operating record.

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.52

§ 258.52 [Reserved]

Currentness

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.53

§ 258.53 Ground-water sampling and analysis requirements.

Currentness

(a) The ground-water monitoring program must include consistent sampling and analysis procedures that are designed to ensure monitoring results that provide an accurate representation of ground-water quality at the background and downgradient wells installed in compliance with § 258.51(a) of this part. The owner or operator must notify the State Director that the sampling and analysis program documentation has been placed in the operating record and the program must include procedures and techniques for:

(1) Sample collection;

(2) Sample preservation and shipment;

(3) Analytical procedures;

(4) Chain of custody control; and

(5) Quality assurance and quality control.

(b) The ground-water monitoring program must include sampling and analytical methods that are appropriate for ground-water sampling and that accurately measure hazardous constituents and other monitoring parameters in ground-water samples. Ground-water samples shall not be field-filtered prior to laboratory analysis.

(c) The sampling procedures and frequency must be protective of human health and the environment.

(d) Ground-water elevations must be measured in each well immediately prior to purging, each time ground water is sampled. The owner or operator must determine the rate and direction of ground-water flow each time ground water is sampled. Ground-water elevations in wells which monitor the same waste management area must be measured within a period of time short enough to avoid temporal variations in ground-water flow which could preclude accurate determination of ground-water flow rate and direction.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(e) The owner or operator must establish background ground-water quality in a hydraulically upgradient or background well(s) for each of the monitoring parameters or constituents required in the particular ground-water monitoring program that applies to the MSWLF unit, as determined under § 258.54(a) or § 258.55(a) of this part. Background ground-water quality may be established at wells that are not located hydraulically upgradient from the MSWLF unit if it meets the requirements of § 258.51(a)(1).

(f) The number of samples collected to establish ground-water quality data must be consistent with the appropriate statistical procedures determined pursuant to paragraph (g) of this section. The sampling procedures shall be those specified under § 258.54(b) for detection monitoring, § 258.55 (b) and (d) for assessment monitoring, and § 258.56(b) of corrective action.

(g) The owner or operator must specify in the operating record one of the following statistical methods to be used in evaluating ground-water monitoring data for each hazardous constituent. The statistical test chosen shall be conducted separately for each hazardous constituent in each well.

(1) A parametric analysis of variance (ANOVA) followed by multiple comparisons procedures to identify statistically significant evidence of contamination. The method must include estimation and testing of the contrasts between each compliance well's mean and the background mean levels for each constituent.

(2) An analysis of variance (ANOVA) based on ranks followed by multiple comparisons procedures to identify statistically significant evidence of contamination. The method must include estimation and testing of the contrasts between each compliance well's median and the background median levels for each constituent.

(3) A tolerance or prediction interval procedure in which an interval for each constituent is established from the distribution of the background data, and the level of each constituent in each compliance well is compared to the upper tolerance or prediction limit.

(4) A control chart approach that gives control limits for each constituent.

(5) Another statistical test method that meets the performance standards of § 258.53(h). The owner or operator must place a justification for this alternative in the operating record and notify the State Director of the use of this alternative test. The justification must demonstrate that the alternative method meets the performance standards of § 258.53(h).

(h) Any statistical method chosen under § 258.53(g) shall comply with the following performance standards, as appropriate:

(1) The statistical method used to evaluate ground-water monitoring data shall be appropriate for the distribution of chemical parameters or hazardous constituents. If the distribution of the chemical parameters or hazardous constituents is shown by the owner or operator to be inappropriate for a normal theory test, then the data should be transformed or a distribution-free theory test should be used. If the distributions for the constituents differ, more than one statistical method may be needed.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(2) If an individual well comparison procedure is used to compare an individual compliance well constituent concentration with background constituent concentrations or a ground-water protection standard, the test shall be done at a Type I error level no less than 0.01 for each testing period. If a multiple comparisons procedure is used, the Type I experiment wise error rate for each testing period shall be no less than 0.05; however, the Type I error of no less than 0.01 for individual well comparisons must be maintained. This performance standard does not apply to tolerance intervals, prediction intervals, or control charts.

(3) If a control chart approach is used to evaluate ground-water monitoring data, the specific type of control chart and its associated parameter values shall be protective of human health and the environment. The parameters shall be determined after considering the number of samples in the background data base, the data distribution, and the range of the concentration values for each constituent of concern.

(4) If a tolerance interval or a predictional interval is used to evaluate ground-water monitoring data, the levels of confidence and, for tolerance intervals, the percentage of the population that the interval must contain, shall be protective of human health and the environment. These parameters shall be determined after considering the number of samples in the background data base, the data distribution, and the range of the concentration values for each constituent of concern.

(5) The statistical method shall account for data below the limit of detection with one or more statistical procedures that are protective of human health and the environment. Any practical quantitation limit (pql) that is used in the statistical method shall be the lowest concentration level that can be reliably achieved within specified limits of precision and accuracy during routine laboratory operating conditions that are available to the facility.

(6) If necessary, the statistical method shall include procedures to control or correct for seasonal and spatial variability as well as temporal correlation in the data.

(i) The owner or operator must determine whether or not there is a statistically significant increase over background values for each parameter or constituent required in the particular ground-water monitoring program that applies to the MSWLF unit, as determined under §§ 258.54(a) or 258.55(a) of this part.

(1) In determining whether a statistically significant increase has occurred, the owner or operator must compare the ground-water quality of each parameter or constituent at each monitoring well designated pursuant to § 258.51(a)(2) to the background value of that constituent, according to the statistical procedures and performance standards specified under paragraphs (g) and (h) of this section.

(2) Within a reasonable period of time after completing sampling and analysis, the owner or operator must determine whether there has been a statistically significant increase over background at each monitoring well.

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.54

§ 258.54 Detection monitoring program.

Currentness

(a) Detection monitoring is required at MSWLF units at all ground-water monitoring wells defined under §§ 258.51 (a)(1) and (a)(2) of this part. At a minimum, a detection monitoring program must include the monitoring for the constituents listed in appendix I to this part.

(1) The Director of an approved State may delete any of the appendix I monitoring parameters for a MSWLF unit if it can be shown that the removed constituents are not reasonably expected to be in or derived from the waste contained in the unit.

(2) The Director of an approved State may establish an alternative list of inorganic indicator parameters for a MSWLF unit, in lieu of some or all of the heavy metals (constituents 1–15 in appendix I to this part), if the alternative parameters provide a reliable indication of inorganic releases from the MSWLF unit to the ground water. In determining alternative parameters, the Director shall consider the following factors:

(i) The types, quantities, and concentrations of constituents in wastes managed at the MSWLF unit;

(ii) The mobility, stability, and persistence of waste constituents or their reaction products in the unsaturated zone beneath the MSWLF unit;

(iii) The detectability of indicator parameters, waste constituents, and reaction products in the ground water; and

(iv) The concentration or values and coefficients of variation of monitoring parameters or constituents in the groundwater background.

(b) The monitoring frequency for all constituents listed in appendix I to this part, or in the alternative list approved in accordance with paragraph (a)(2) of this section, shall be at least semiannual during the active life of the facility (including closure) and the post-closure period. A minimum of four independent samples from each well (background and downgradient) must be collected and analyzed for the appendix I constituents, or the alternative list approved in accordance with paragraph (a)(2) of this section, during the first semiannual sampling event. At least one sample from each well (background and downgradient) must be collected and analyzed during subsequent semiannual sampling events. The Director of an approved State may specify an appropriate alternative frequency for repeated sampling and analysis for appendix I constituents, or the alternative list approved

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

in accordance with paragraph (a)(2) of this section, during the active life (including closure) and the post-closure care period. The alternative frequency during the active life (including closure) shall be no less than annual. The alternative frequency shall be based on consideration of the following factors:

(1) Lithology of the aquifer and unsaturated zone;

(2) Hydraulic conductivity of the aquifer and unsaturated zone;

(3) Ground-water flow rates;

(4) Minimum distance between upgradient edge of the MSWLF unit and downgradient monitoring well screen (minimum distance of travel); and

(5) Resource value of the aquifer.

(c) If the owner or operator determines, pursuant to § 258.53(g) of this part, that there is a statistically significant increase over background for one or more of the constituents listed in appendix I to this part or in the alternative list approved in accordance with paragraph (a)(2) of this section, at any monitoring well at the boundary specified under § 258.51(a)(2), the owner or operator:

(1) Must, within 14 days of this finding, place a notice in the operating record indicating which constituents have shown statistically significant changes from background levels, and notify the State director that this notice was placed in the operating record; and

(2) Must establish an assessment monitoring program meeting the requirements of § 258.55 of this part within 90 days except as provided for in paragraph (c)(3) of this section.

(3) The owner/operator may demonstrate that a source other than a MSWLF unit caused the contamination or that the statistically significant increase resulted from error in sampling, analysis, statistical evaluation, or natural variation in ground-water quality. A report documenting this demonstration must be certified by a qualified ground-water scientist or approved by the Director of an approved State and be placed in the operating record. If a successful demonstration is made and documented, the owner or operator may continue detection monitoring as specified in this section. If, after 90 days, a successful demonstration is not made, the owner or operator must initiate an assessment monitoring program as required in § 258.55.

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.55

§ 258.55 Assessment monitoring program.

Currentness

(a) Assessment monitoring is required whenever a statistically significant increase over background has been detected for one or more of the constituents listed in the appendix I to this part or in the alternative list approved in accordance with § 258.54(a)(2).

(b) Within 90 days of triggering an assessment monitoring program, and annually thereafter, the owner or operator must sample and analyze the ground water for all constituents identified in appendix II to this part. A minimum of one sample from each downgradient well must be collected and analyzed during each sampling event. For any constituent detected in the downgradient wells as a result of the complete appendix II analysis, a minimum of four independent samples from each well (background and downgradient) must be collected and analyzed to establish background for the constituents. The Director of an approved State may specify an appropriate subset of wells to be sampled and analyzed for appendix II constituents during assessment monitoring. The Director of an approved State may delete any of the appendix II monitoring parameters for a MSWLF unit if it can be shown that the removed constituents are not reasonably expected to be in or derived from the waste contained in the unit.

(c) The Director of an approved State may specify an appropriate alternate frequency for repeated sampling and analysis for the full set of appendix II constituents required by § 258.55(b) of this part, during the active life (including closure) and post-closure care of the unit considering the following factors:

(1) Lithology of the aquifer and unsaturated zone;

(2) Hydraulic conductivity of the aquifer and unsaturated zone;

(3) Ground-water flow rates;

(4) Minimum distance between upgradient edge of the MSWLF unit and downgradient monitoring well screen (minimum distance of travel);

(5) Resource value of the aquifer; and

(6) Nature (fate and transport) of any constituents detected in response to this section.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(d) After obtaining the results from the initial or subsequent sampling events required in paragraph (b) of this section, the owner or operator must:

(1) Within 14 days, place a notice in the operating record identifying the appendix II constituents that have been detected and notify the State Director that this notice has been placed in the operating record;

(2) Within 90 days, and on at least a semiannual basis thereafter, resample all wells specified by § 258.51(a), conduct analyses for all constituents in appendix I to this part or in the alternative list approved in accordance with § 258.54(a)(2), and for those constituents in appendix II to this part that are detected in response to paragraph (b) of this section, and record their concentrations in the facility operating record. At least one sample from each well (background and downgradient) must be collected and analyzed during these sampling events. The Director of an approved State may specify an alternative monitoring frequency during the active life (including closure) and the post-closure period for the constituents referred to in this paragraph. The alternative frequency for appendix I constituents, or the alternative list approved in accordance with § 258.54(a)(2), during the active life (including closure) shall be no less than annual. The alternative frequency shall be based on consideration of the factors specified in paragraph (c) of this section;

(3) Establish background concentrations for any constituents detected pursuant to paragraph (b) or (d)(2) of this section; and

(4) Establish ground-water protection standards for all constituents detected pursuant to paragraph (b) or (d) of this section. The ground-water protection standards shall be established in accordance with paragraphs (h) or (i) of this section.

(e) If the concentrations of all appendix II constituents are shown to be at or below background values, using the statistical procedures in § 258.53(g), for two consecutive sampling events, the owner or operator must notify the State Director of this finding and may return to detection monitoring.

(f) If the concentrations of any appendix II constituents are above background values, but all concentrations are below the ground-water protection standard established under paragraphs (h) or (i) of this section, using the statistical procedures in § 258.53(g), the owner or operator must continue assessment monitoring in accordance with this section.

(g) If one or more appendix II constituents are detected at statistically significant levels above the ground-water protection standard established under paragraphs (h) or (i) of this section in any sampling event, the owner or operator must, within 14 days of this finding, place a notice in the operating record identifying the appendix II constituents that have exceeded the ground-water protection standard and notify the State Director and all appropriate local government officials that the notice has been placed in the operating record. The owner or operator also:

(1)(i) Must characterize the nature and extent of the release by installing additional monitoring wells as necessary;

(ii) Must install at least one additional monitoring well at the facility boundary in the direction of contaminant migration and sample this well in accordance with § 258.55(d)(2);

(iii) Must notify all persons who own the land or reside on the land that directly overlies any part of the plume of contamination if contaminants have migrated off-site if indicated by sampling of wells in accordance with § 258.55 (g)(1); and

(iv) Must initiate an assessment of corrective measures as required by § 255.56 of this part within 90 days; or

(2) May demonstrate that a source other than a MSWLF unit caused the contamination, or that the SSI increase resulted from error in sampling, analysis, statistical evaluation, or natural variation in ground-water quality. A report documenting this demonstration must be certified by a qualified ground-water scientist or approved by the Director of an approved State and placed in the operating record. If a successful demonstration is made the owner or operator must continue monitoring in accordance with the assessment monitoring program pursuant to § 258.55, and may return to detection monitoring if the appendix II constituents are at or below background as specified in § 258.55(e). Until a successful demonstration is made, the owner or operator must comply with § 258.55(g) including initiating an assessment of corrective measures.

(h) The owner or operator must establish a ground-water protection standard for each appendix II constituent detected in the ground-water. The ground-water protection standard shall be:

(1) For constituents for which a maximum contaminant level (MCL) has been promulgated under section 1412 of the Safe Drinking Water Act (codified) under 40 CFR part 141, the MCL for that constituent;

(2) For constituents for which MCLs have not been promulgated, the background concentration for the constituent established from wells in accordance with § 258.51(a)(1); or

(3) For constituents for which the background level is higher than the MCL identified under paragraph (h)(1) of this section or health based levels identified under § 258.55(i)(1), the background concentration.

(i) The Director of an approved State may establish an alternative ground-water protection standard for constituents for which MCLs have not been established. These ground-water protection standards shall be appropriate health based levels that satisfy the following criteria:

(1) The level is derived in a manner consistent with Agency guidelines for assessing the health risks of environmental pollutants (51 FR 33992, 34006, 34014, 34028, Sept. 24, 1986);

(2) The level is based on scientifically valid studies conducted in accordance with the Toxic Substances Control Act Good Laboratory Practice Standards (40 CFR part 792) or equivalent;

(3) For carcinogens, the level represents a concentration associated with an excess lifetime cancer risk level (due to continuous lifetime exposure) with the $1x10^{-4}$ to $1x10^{-6}$ range; and

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(4) For systemic toxicants, the level represents a concentration to which the human population (including sensitive subgroups) could be exposed to on a daily basis that is likely to be without appreciable risk of deleterious effects during a lifetime. For purposes of this subpart, systemic toxicants include toxic chemicals that cause effects other than cancer or mutation.

(j) In establishing ground-water protection standards under paragraph (i) of this section, the Director of an approved State may consider the following:

(1) Multiple contaminants in the ground water;

(2) Exposure threats to sensitive environmental receptors; and

(3) Other site-specific exposure or potential exposure to ground water.

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.56

§ 258.56 Assessment of corrective measures.

Currentness

(a) Within 90 days of finding that any of the constituents listed in appendix II to this part have been detected at a statistically significant level exceeding the ground-water protection standards defined under § 258.55 (h) or (i) of this part, the owner or operator must initiate an assessment of corrective measures. Such an assessment must be completed within a reasonable period of time.

(b) The owner or operator must continue to monitor in accordance with the assessment monitoring program as specified in § 258.55.

(c) The assessment shall include an analysis of the effectiveness of potential corrective measures in meeting all of the requirements and objectives of the remedy as described under § 258.57, addressing at least the following:

(1) The performance, reliability, ease of implementation, and potential impacts of appropriate potential remedies, including safety impacts, cross-media impacts, and control of exposure to any residual contamination;

(2) The time required to begin and complete the remedy;

(3) The costs of remedy implementation; and

(4) The institutional requirements such as State or local permit requirements or other environmental or public health requirements that may substantially affect implementation of the remedy(s).

(d) The owner or operator must discuss the results of the corrective measures assessment, prior to the selection of remedy, in a public meeting with interested and affected parties.

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.57

§ 258.57 Selection of remedy.

Currentness

(a) Based on the results of the corrective measures assessment conducted under § 258.56, the owner or operator must select a remedy that, at a minimum, meets the standards listed in paragraph (b) of this section. The owner or operator must notify the State Director, within 14 days of selecting a remedy, a report describing the selected remedy has been placed in the operating record and how it meets the standards in paragraph (b) of this section.

(b) Remedies must:

(1) Be protective of human health and the environment;

(2) Attain the ground-water protection standard as specified pursuant to §§ 258.55 (h) or (i);

(3) Control the source(s) of releases so as to reduce or eliminate, to the maximum extent practicable, further releases of appendix II constituents into the environment that may pose a threat to human health or the environment; and

(4) Comply with standards for management of wastes as specified in § 258.58(d).

(c) In selecting a remedy that meets the standards of § 258.57(b), the owner or operator shall consider the following evaluation factors:

(1) The long- and short-term effectiveness and protectiveness of the potential remedy(s), along with the degree of certainty that the remedy will prove successful based on consideration of the following:

(i) Magnitude of reduction of existing risks;

(ii) Magnitude of residual risks in terms of likelihood of further releases due to waste remaining following implementation of a remedy;


© 2025 Thomson Reuters. No claim to original U.S. Government Works.

(iii) The type and degree of long-term management required, including monitoring, operation, and maintenance;

(iv) Short-term risks that might be posed to the community, workers, or the environment during implementation of such a remedy, including potential threats to human health and the environment associated with excavation, transportation, and redisposal of containment;

(v) Time until full protection is achieved;

(vi) Potential for exposure of humans and environmental receptors to remaining wastes, considering the potential threat to human health and the environment associated with excavation, transportation, redisposal, or containment;

(vii) Long-term reliability of the engineering and institutional controls; and

(viii) Potential need for replacement of the remedy.

(2) The effectiveness of the remedy in controlling the source to reduce further releases based on consideration of the following factors:

(i) The extent to which containment practices will reduce further releases;

(ii) The extent to which treatment technologies may be used.

(3) The ease or difficulty of implementing a potential remedy(s) based on consideration of the following types of factors:

(i) Degree of difficulty associated with constructing the technology;

(ii) Expected operational reliability of the technologies;

(iii) Need to coordinate with and obtain necessary approvals and permits from other agencies;

(iv) Availability of necessary equipment and specialists; and

(v) Available capacity and location of needed treatment, storage, and disposal services.

(4) Practicable capability of the owner or operator, including a consideration of the technical and economic capability.

(5) The degree to which community concerns are addressed by a potential remedy(s).

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(d) The owner or operator shall specify as part of the selected remedy a schedule(s) for initiating and completing remedial activities. Such a schedule must require the initiation of remedial activities within a reasonable period of time taking into consideration the factors set forth in paragraphs (d) (1)–(8) of this section. The owner or operator must consider the following factors in determining the schedule of remedial activities:

(1) Extent and nature of contamination;

(2) Practical capabilities of remedial technologies in achieving compliance with ground-water protection standards established under § 258.55 (g) or (h) and other objectives of the remedy;

(3) Availability of treatment or disposal capacity for wastes managed during implementation of the remedy;

(4) Desirability of utilizing technologies that are not currently available, but which may offer significant advantages over already available technologies in terms of effectiveness, reliability, safety, or ability to achieve remedial objectives;

(5) Potential risks to human health and the environment from exposure to contamination prior to completion of the remedy;

(6) Resource value of the aquifer including:

(i) Current and future uses;

(ii) Proximity and withdrawal rate of users;

(iii) Ground-water quantity and quality;

(iv) The potential damage to wildlife, crops, vegetation, and physical structures caused by exposure to waste constituent;

(v) The hydrogeologic characteristic of the facility and surrounding land;

(vi) Ground-water removal and treatment costs; and

(vii) The cost and availability of alternative water supplies.

(7) Practicable capability of the owner or operator.

(8) Other relevant factors.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(e) The Director of an approved State may determine that remediation of a release of an appendix II constituent from a MSWLF unit is not necessary if the owner or operator demonstrates to the satisfaction of the Director of the approved State that:

(1) The ground-water is additionally contaminated by substances that have originated from a source other than a MSWLF unit and those substances are present in concentrations such that cleanup of the release from the MSWLF unit would provide no significant reduction in risk to actual or potential receptors; or

(2) The constituent(s) is present in ground water that:

(i) Is not currently or reasonably expected to be a source of drinking water; and

(ii) Is not hydraulically connected with waters to which the hazardous constituents are migrating or are likely to migrate in a concentration(s) that would exceed the ground-water protection standards established under § 258.55 (h) or (i); or

(3) Remediation of the release(s) is technically impracticable; or

(4) Remediation results in unacceptable cross-media impacts.

(f) A determination by the Director of an approved State pursuant to paragraph (e) of this section shall not affect the authority of the State to require the owner or operator to undertake source control measures or other measures that may be necessary to eliminate or minimize further releases to the ground-water, to prevent exposure to the ground-water, or to remediate the ground-water to concentrations that are technically practicable and significantly reduce threats to human health or the environment.

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.58

§ 258.58 Implementation of the corrective action program.

Currentness

(a) Based on the schedule established under § 258.57(d) for initiation and completion of remedial activities the owner/operator must:

(1) Establish and implement a corrective action ground-water monitoring program that:

(i) At a minimum, meet the requirements of an assessment monitoring program under § 258.55;

(ii) Indicate the effectiveness of the corrective action remedy; and

(iii) Demonstrate compliance with ground-water protection standard pursuant to paragraph (e) of this section.

(2) Implement the corrective action remedy selected under § 258.57; and

(3) Take any interim measures necessary to ensure the protection of human health and the environment. Interim measures should, to the greatest extent practicable, be consistent with the objectives of and contribute to the performance of any remedy that may be required pursuant to § 258.57. The following factors must be considered by an owner or operator in determining whether interim measures are necessary:

(i) Time required to develop and implement a final remedy;

(ii) Actual or potential exposure of nearby populations or environmental receptors to hazardous constituents;

(iii) Actual or potential contamination of drinking water supplies or sensitive ecosystems;

(iv) Further degradation of the ground-water that may occur if remedial action is not initiated expeditiously;

(v) Weather conditions that may cause hazardous constituents to migrate or be released;

(vi) Risks of fire or explosion, or potential for exposure to hazardous constituents as a result of an accident or failure of a container or handling system; and

(vii) Other situations that may pose threats to human health and the environment.

(b) An owner or operator may determine, based on information developed after implementation of the remedy has begun or other information, that compliance with requirements of § 258.57(b) are not being achieved through the remedy selected. In such cases, the owner or operator must implement other methods or techniques that could practicably achieve compliance with the requirements, unless the owner or operator makes the determination under § 258.58(c).

(c) If the owner or operator determines that compliance with requirements under § 258.57(b) cannot be practically achieved with any currently available methods, the owner or operator must:

(1) Obtain certification of a qualified ground-water scientist or approval by the Director of an approved State that compliance with requirements under § 258.57(b) cannot be practically achieved with any currently available methods;

(2) Implement alternate measures to control exposure of humans or the environment to residual contamination, as necessary to protect human health and the environment; and

(3) Implement alternate measures for control of the sources of contamination, or for removal or decontamination of equipment, units, devices, or structures that are:

(i) Technically practicable; and

(ii) Consistent with the overall objective of the remedy.

(4) Notify the State Director within 14 days that a report justifying the alternative measures prior to implementing the alternative measures has been placed in the operating record.

(d) All solid wastes that are managed pursuant to a remedy required under § 258.57, or an interim measure required under § 258.58(a)(3), shall be managed in a manner:

(1) That is protective of human health and the environment; and

(2) That complies with applicable RCRA requirements.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(e) Remedies selected pursuant to § 258.57 shall be considered complete when:

(1) The owner or operator complies with the ground-water protection standards established under §§ 258.55(h) or (i) at all points within the plume of contamination that lie beyond the ground-water monitoring well system established under § 258.51(a).

(2) Compliance with the ground-water protection standards established under §§ 258.55(h) or (i) has been achieved by demonstrating that concentrations of appendix II constituents have not exceeded the ground-water protection standard(s) for a period of three consecutive years using the statistical procedures and performance standards in § 258.53(g) and (h). The Director of an approved State may specify an alternative length of time during which the owner or operator must demonstrate that concentrations of appendix II constituents have not exceeded the ground-water protection standard(s) taking into consideration:

(i) Extent and concentration of the release(s);

(ii) Behavior characteristics of the hazardous constituents in the ground-water;

(iii) Accuracy of monitoring or modeling techniques, including any seasonal, meteorological, or other environmental variabilities that may affect the accuracy; and

(iv) Characteristics of the ground-water.

(3) All actions required to complete the remedy have been satisfied.

(f) Upon completion of the remedy, the owner or operator must notify the State Director within 14 days that a certification that the remedy has been completed in compliance with the requirements of § 258.58(e) has been placed in the operating record. The certification must be signed by the owner or operator and by a qualified ground-water scientist or approved by the Director of an approved State.

(g) When, upon completion of the certification, the owner or operator determines that the corrective action remedy has been completed in accordance with the requirements under paragraph (e) of this section, the owner or operator shall be released from the requirements for financial assurance for corrective action under § 258.73.

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter I. Solid Wastes
Part 258. Criteria for Municipal Solid Waste Landfills (Refs & Annos)
Subpart E. Ground–Water Monitoring and Corrective Action

40 C.F.R. § 258.59

§ 258.59 [Reserved]

Currentness

SOURCE: 56 FR 51016, Oct. 9, 1991; 58 FR 51546, Oct. 1, 1993; 59 FR 58789, Nov. 15, 1994; 63 FR 17729, April 10, 1998; 69 FR 13255, March 22, 2004, unless otherwise noted.

AUTHORITY: 33 U.S.C. 1345(d) and (e); 42 U.S.C. 6902(a), 6907, 6912(a), 6944, 6945(c) and 6949a(c), 6981(a).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter O. Sewage Sludge
Part 503. Standards for the Use or Disposal of Sewage Sludge (Refs & Annos)
Subpart B. Land Application

40 C.F.R. § 503.13

§ 503.13 Pollutant limits.

Currentness

(a) Sewage sludge.

(1) Bulk sewage sludge or sewage sludge sold or given away in a bag or other container shall not be applied to the land if the concentration of any pollutant in the sewage sludge exceeds the ceiling concentration for the pollutant in Table 1 of § 503.13.

(2) If bulk sewage sludge is applied to agricultural land, forest, a public contact site, or a reclamation site, either:

(i) The cumulative loading rate for each pollutant shall not exceed the cumulative pollutant loading rate for the pollutant in Table 2 of § 503.13; or

(ii) The concentration of each pollutant in the sewage sludge shall not exceed the concentration for the pollutant in Table 3 of § 503.13.

(3) If bulk sewage sludge is applied to a lawn or a home garden, the concentration of each pollutant in the sewage sludge shall not exceed the concentration for the pollutant in Table 3 of § 503.13.

(4) If sewage sludge is sold or given away in a bag or other container for application to the land, either:

(i) The concentration of each pollutant in the sewage sludge shall not exceed the concentration for the pollutant in Table 3 of § 503.13; or

(ii) The product of the concentration of each pollutant in the sewage sludge and the annual whole sludge application rate for the sewage sludge shall not cause the annual pollutant loading rate for the pollutant in Table 4 of § 503.13 to be exceeded. The procedure used to determine the annual whole sludge application rate is presented in appendix A of this part.

(b) Pollutant concentrations and loading rates—sewage sludge.

(1) Ceiling concentrations.

**Table 1 of § 503.13—Ceiling Concentrations**

| Pollutant | Ceiling concentration (milligrams per kilogram) [1] |
|---|---|
| Arsenic | 75 |
| Cadmium | 85 |
| Copper | 4300 |
| Lead | 840 |
| Mercury | 57 |
| Molybdenum | 75 |
| Nickel | 420 |
| Selenium | 100 |
| Zinc | 7500 |

(2) Cumulative pollutant loading rates.

**Table 2 of § 503.13—Cumulative Pollutant Loading Rates**

| Pollutant | Cumulative pollutant loading rate (kilograms per hectare) |
|---|---|
| Arsenic | 41 |
| Cadmium | 39 |
| Copper | 1500 |
| Lead | 300 |
| Mercury | 17 |
| Nickel | 420 |
| Selenium | 100 |
| Zinc | 2800 |

(3) Pollutant concentrations.

**Table 3 of § 503.13—Pollutant Concentrations**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| Pollutant | Monthly average concentration (milligrams per kilogram) [1] |
|---|---|
| Arsenic | 41 |
| Cadmium | 39 |
| Copper | 1500 |
| Lead | 300 |
| Mercury | 17 |
| Nickel | 420 |
| Selenium | 100 |
| Zinc | 2800 |

(4) Annual pollutant loading rates.

**Table 4 of § 503.13—Annual Pollutant Loading Rates**

| Pollutant | Annual pollutant loading rate (kilograms per hectare per 365 day period) |
|---|---|
| Arsenic | 2.0 |
| Cadmium | 1.9 |
| Copper | 75 |
| Lead | 15 |
| Mercury | 0.85 |
| Nickel | 21 |
| Selenium | 5.0 |
| Zinc | 140 |

(c) Domestic septage.

The annual application rate for domestic septage applied to agricultural land, forest, or a reclamation site shall not exceed the annual application rate calculated using equation (1).

$$AAR = \frac{N}{0.0026} \quad \textbf{Eq. (1)}$$

Where:

AAR=Annual application rate in gallons per acre per 365 day period.

N=Amount of nitrogen in pounds per acre per 365 day period needed by the crop or vegetation grown on the land.

**Credits**
[59 FR 9099, Feb. 25, 1994; 60 FR 54769, Oct. 25, 1995]

SOURCE: 58 FR 9387, Feb. 19, 1993, unless otherwise noted.

AUTHORITY: Sections 405 (d) and (e) of the Clean Water Act, as amended by Pub.L. 95–217, Sec. 54(d), 91 Stat. 1591 (33 U.S.C. 1345 (d) and (e)); and Pub.L. 100–4, Title IV, Sec. 406 (a), (b), 101 Stat., 71, 72 (33 U.S.C. 1251 et seq.).

Notes of Decisions (16)

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

## Footnotes

1 Dry weight basis.

1 Dry weight basis.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter O. Sewage Sludge
Part 503. Standards for the Use or Disposal of Sewage Sludge (Refs & Annos)
Subpart B. Land Application

40 C.F.R. § 503.16

§ 503.16 Frequency of monitoring.

Currentness

(a) Sewage sludge.

(1) The frequency of monitoring for the pollutants listed in Table 1, Table 2, Table 3 and Table 4 of § 503.13; the pathogen density requirements in § 503.32(a) and § 503.32(b)(2); and the vector attraction reduction requirements in § 503.33 (b)(1) through (b)(4) and § 503.33 (b)(7) through (b)(8) shall be the frequency in Table 1 of § 503.16.

**Table 1 of § 503.16—Frequency of Monitoring—Land Application**

| **Amount of sewage sludge [1] (metric tons per 365 day period)** | **Frequency** |
|---|---|
| Greater than zero but less than 290 | Once per year........................................................................ |
| Equal to or greater than 290 but less than 1,500 | Once per quarter (four times per year)...................................... |
| Equal to or greater than 1,500 but less than 15,000 | Once per 60 days (six times per year)....................................... |
| Equal to or greater than 15,000 | Once per month (12 times per year)......................................... |

(2) After the sewage sludge has been monitored for two years at the frequency in Table 1 of § 503.16, the permitting authority may reduce the frequency of monitoring for pollutant concentrations and for the pathogen density requirements in § 503.32(a)(5)(ii) and (a)(5)(iii).

(b) Domestic septage. If either the pathogen requirements in § 503.32(c)(2) or the vector attraction reduction requirements in § 503.33(b)(12) are met when domestic septage is applied to agricultural land, forest, or a reclamation site, each container of domestic septage applied to the land shall be monitored for compliance with those requirements.

(Approved by the Office of Management and Budget under control number 2040–0157)

**Credits**
[64 FR 42569, Aug. 4, 1999]

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

SOURCE: 58 FR 9387, Feb. 19, 1993, unless otherwise noted.

AUTHORITY: Sections 405 (d) and (e) of the Clean Water Act, as amended by Pub.L. 95–217, Sec. 54(d), 91 Stat. 1591 (33 U.S.C. 1345 (d) and (e)); and Pub.L. 100–4, Title IV, Sec. 406 (a), (b), 101 Stat., 71, 72 (33 U.S.C. 1251 et seq.).

Current through June 2, 2025, 90 FR 23291. Some sections may be more current. See credits for details.

## Footnotes

1 Either the amount of bulk sewage sludge applied to the land or the amount of sewage sludge prepared for sale or give-away in a bag or other container for application to the land (dry weight basis).

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter R. Toxic Substances Control Act
Part 751. Regulation of Certain Chemical Substances and Mixtures Under Section 6 of the Toxic Substances Control Act (Refs & Annos)
Subpart E. Persistent, Bioaccumulative, and Toxic Chemicals (Refs & Annos)

40 C.F.R. § 751.401

§ 751.401 General.

Currentness

(a) This subpart establishes prohibitions and restrictions on the manufacturing, processing, and distribution in commerce of persistent, bioaccumulative, and toxic chemicals in accordance with TSCA section 6(h), 15 U.S.C 2605(h).

(b) Unless otherwise specified in this subpart, prohibitions and restrictions of this subpart do not apply to the following activities:

(1) Distribution in commerce of any chemical substance, or any product or article that contains the chemical substance, that has previously been sold or supplied to an end user, i.e., any person that purchased or acquired the finished good for purposes other than resale. An example of an end user is a consumer who resells a product they no longer intend to use or who donates an article to charity.

(2) Disposal of any chemical substance, or any product or article that contains the chemical substance, as well as importation, processing and distribution in commerce of any chemical substance or any product or article that contains the chemical substance for purposes of disposal.

(3) Manufacturing, processing, distribution in commerce, and use of any chemical substance, or any product or article that contains the chemical substance, for research and development, as defined in § 751.403.

(c) Owner and operator requirements. Any requirement for an owner or operator or an owner and operator is a requirement for any individual that is either an owner or an operator.

**Credits**
[89 FR 91514, Nov. 19, 2024]

SOURCE: 84 FR 11435, March 27, 2019; 86 FR 879, Jan. 6, 2021, unless otherwise noted.

AUTHORITY: 15 U.S.C. 2605, 15 U.S.C. 2625(l)(4).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Current through May 27, 2025, 90 FR 22213. Some sections may be more current. See credits for details.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter R. Toxic Substances Control Act
Part 751. Regulation of Certain Chemical Substances and Mixtures Under Section 6 of the Toxic Substances Control Act (Refs & Annos)
Subpart E. Persistent, Bioaccumulative, and Toxic Chemicals (Refs & Annos)

40 C.F.R. § 751.403

§ 751.403 Definitions.

Currentness

The definitions in subpart A of this part apply to this subpart unless otherwise specified in this section.

2,4,6–TTBP means the chemical substance 2,4,6–tris(tert-butyl)phenol (CASRN 732–26–3).

2,4,6–TTBP oil and lubricant additives means any 2,4,6–TTBP–containing additive to a product of any viscosity intended to reduce friction between moving parts, whether mineral oil or synthetic base, including engine crankcase and gear oils and bearing greases. 2,4,6–TTBP oil and lubricant additive does not include hydraulic fluid and other oils whose primary purpose is not friction reduction.

Article means a manufactured item:

(1) Which is formed to a specific shape or design during manufacture,

(2) Which has end use function(s) dependent in whole or in part upon its shape or design during end use, and

(3) Which has either no change of chemical composition during its end use or only those changes of composition which have no commercial purpose separate from that of the article, and that result from a chemical reaction that occurs upon end use of other chemical substances, mixtures, or articles; except that fluids and particles are not considered articles regardless of shape or design.

DecaBDE means the chemical substance decabromodiphenyl ether (CASRN 1163–19–5).

HCBD means the chemical substance hexachlorobutadiene (CASRN 87–68–3).

Lubricants and grease mean any product used to reduce friction, heat, or wear between moving or adjacent solid surfaces, or that enhance the lubricity of other substances.

PCTP means the chemical substance pentachlorothiophenol (CASRN 133–49–3).

PIP (3:1) means the chemical substance phenol, isopropylated phosphate (3:1) (CASRN 68937–41–7).

Potentially exposed person means any person who may be exposed to a chemical substance or mixture regulated under this subpart as a result of the use of that chemical or mixture.

Product means the chemical substance, a mixture containing the chemical substance, or any object that contains the chemical substance or mixture containing the chemical substance that is not an article.

Regulated area means an area established by the regulated entity to demarcate areas where airborne concentrations of a specific chemical substance can reasonably be expected.

Research and Development means laboratory and research use only for purposes of scientific experimentation or analysis, or chemical research on, or analysis of, the chemical substance, including methods for disposal, but not for research or analysis for the development of a new product, or refinement of an existing product that contains the chemical substance.

**Credits**

[86 FR 894, Jan. 6, 2021; 86 FR 909, Jan. 6, 2021; 86 FR 922, Jan. 6, 2021; 86 FR 932, Jan. 6, 2021; 89 FR 91514, Nov. 19, 2024]

SOURCE: 84 FR 11435, March 27, 2019; 86 FR 879, Jan. 6, 2021, unless otherwise noted.

AUTHORITY: 15 U.S.C. 2605, 15 U.S.C. 2625(l)(4).

Current through May 29, 2025, 90 FR 22670. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter R. Toxic Substances Control Act
Part 751. Regulation of Certain Chemical Substances and Mixtures Under Section 6 of the Toxic Substances Control Act (Refs & Annos)
Subpart E. Persistent, Bioaccumulative, and Toxic Chemicals (Refs & Annos)

40 C.F.R. § 751.405

§ 751.405 DecaBDE.

Currentness

(a) Prohibition.

(1) General.

(i) Except as provided in paragraphs (a)(2) and (b) of this section, all persons are prohibited from all manufacturing and processing of decaBDE or decaBDE–containing products or articles after March 8, 2021, and all persons are prohibited from all distribution in commerce of decaBDE or decaBDE–containing products or articles after January 6, 2022.

(ii) Unless otherwise specified in this subpart, the prohibitions and restrictions of this subpart do not apply to products or articles containing decaBDE at concentrations less than 0.1% by weight, if the decaBDE was not intentionally added to the product or article.

(2) Phase-in of Prohibitions for Specific Uses of decaBDE and decaBDE–containing Products or Articles.

(i) After July 6, 2022, all persons are prohibited from all manufacturing, processing, and distribution in commerce decaBDE for use in curtains in the hospitality industry, and the curtains to which decaBDE has been added.

(ii) After January 6, 2023, all persons are prohibited from all processing and distribution in commerce of decaBDE for use in wire and cable insulation in nuclear power generation facilities (including test and research reactors).

(iii) After January 8, 2024, all persons are prohibited from all manufacturing, processing, and distribution in commerce of decaBDE for use in parts installed in and distributed as part of new aerospace vehicles, and the parts to which decaBDE has been added for such vehicles. After the end of the aerospace vehicles service lives, all persons are prohibited from all importing, processing, and distribution in commerce of aerospace vehicles manufactured before January 8, 2024 that contain decaBDE in any part. After the end of the aerospace vehicles service lives, all persons are prohibited from all manufacture, processing and distribution in commerce of decaBDE for use in replacement parts for aerospace vehicles, and the replacement parts to which decaBDE has been added for such vehicles.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(iv) After the end of the vehicles service lives or 2036, whichever is earlier, all persons are prohibited from all manufacture, processing and distribution in commerce of decaBDE for use in replacement parts for motor vehicles, and the replacement parts to which decaBDE has been added for such vehicles.

(v) After the end of the pallets' service life, all persons are prohibited from all distribution in commerce of plastic shipping pallets that contain decaBDE and were manufactured prior March 8, 2021.

(vi) After the end of the wire and cables' service life, all persons are prohibited from all processing and distribution in commerce of decaBDE–containing wire and cable insulation for nuclear power generation facilities (including test and research reactors).

(b) Exclusions to the Prohibition. Distribution in commerce and recycling of decaBDE–containing plastic from products or articles, and processing and distribution in commerce of decaBDE–containing products or articles made from such recycled plastic, where no new decaBDE is added during the recycling or production processes is not subject to the prohibition in paragraph (a) of this section.

(c) Recordkeeping.

(1) After March 8, 2021, all persons who manufacture, process, or distribute in commerce decaBDE or decaBDE–containing products or articles must maintain ordinary business records, such as invoices and bills-of-lading related to compliance with the prohibitions, restrictions, and other provisions of this section.

(i) These records must be maintained for a period of five years from the date the record is generated.

(ii) These records must include a statement that the decaBDE or the decaBDE–containing products or articles are in compliance with 40 CFR 751.405(a).

(iii) These records must be made available to EPA upon request.

(2) The recordkeeping requirements in paragraph (c)(1) do not apply to the activities described in paragraphs (a)(2)(v) and (b) of this section.

(d) Signage in Regulated Areas.

(1) After January 21, 2025, all persons who process, including recycle, plastic shipping pallets that contain decaBDE must place signs at every entry point into the regulated area.

(2) Each sign must show clearly, prominently, in multiple languages as appropriate, and in an easily readable font size the following text:

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Decabromodiphenyl ether (decaBDE) (CASRN 1163–19–5), a chemical that has been identified as a persistent, bioaccumulative, and toxic (PBT) chemical by the U.S. Environmental Protection Agency, may be present in this regulated area. All persons in this regulated area who recycle existing plastic shipping pallets that contain decaBDE are required to wear personal protective equipment, including respiratory protection that is at least as protective as a NIOSH–approved N95 respirator with an assigned protection factor (APF) of 10 and dermal protection of gloves that are chemically resistant to decaBDE, per regulations at 40 CFR 751.405(e).

(e) Workplace protection—

(1) Applicability. After January 21, 2025, the provisions of this paragraph (e) apply to any workplaces engaged in manufacturing and processing of decaBDE and decaBDE–containing products and articles, except for those identified in paragraph (e)(6) of this section.

(2) Regulated areas. Owners or operators must establish and maintain regulated areas as defined in 40 CFR 751.403.

(i) The owner or operator must limit access to regulated areas to authorized persons.

(ii) The owner or operator must demarcate regulated areas from the rest of the workplace in a manner that adequately establishes and alerts persons to the boundaries of the regulated area and minimizes the number of authorized persons exposed to decaBDE within the regulated area.

(iii) The owner or operator must ensure that each potentially exposed person is provided with a respirator according to the requirements of paragraph (e) of this section and must ensure that all potentially exposed persons within the regulated area are using the provided respirators whenever exposures to airborne concentrations of decaBDE can reasonably be expected.

(iv) The owner or operator must ensure that while persons are wearing respirators in the regulated area, they do not engage in activities that interfere with respirator seal or performance.

(v) The owner or operator must ensure that, within a regulated area, persons do not engage in non-work activities that may increase exposure to decaBDE.

(3) Respiratory protection. The owner or operator must provide respiratory protection to all potentially exposed persons in the regulated area as demarcated in accordance with paragraph (e)(2) of this section, and according to the provisions outlined in 29 CFR 1910.134(b), (c)(1), (3) and (4), (d)(1)(iv), (f), and (g) through (l) and, as specified in this paragraph (e)(3) for potentially exposed persons to decaBDE during expected time of use.

(i) For purposes of this paragraph (e)(3), cross-referenced provisions in 29 CFR 1910.134 applying to an “employee” apply equally to potentially exposed persons and cross-referenced provisions applying to an “employer” also apply equally to owners or operators. Other terms in cross-referenced provisions in 29 CFR 1910.134 that are defined in 29 CFR 1910.134(b) have the meaning assigned to them in 29 CFR 1910.134(b).

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) Owners and operators must develop and administer a written respiratory protection program consistent with the requirements of 29 CFR 1910.134(c)(1), (3) and (4).

(iii) Owners and operators must select respiratory protection that properly fits each affected person and communicate respirator selections to each affected person consistent with the requirements of 29 CFR 1910.134(f).

(iv) Owners and operators must provide, ensure use of, and maintain (in a sanitary, reliable, and undamaged condition) respiratory protection that is of safe design and construction for the applicable condition of use consistent with the requirements of 29 CFR 1910.134(g) through (j).

(v) Prior to or at the time of initial assignment to a job involving potential exposure to decaBDE, owners and operators must provide training to all persons required to use respiratory protection consistent with 29 CFR 1910.134(k).

(vi) Owners and operators must retrain all persons required to use PPE at least annually, or whenever the owner or operator has reason to believe that a previously trained person does not have the required understanding and skill to properly use PPE, or when changes in the workplace or in PPE to be used render the previous training obsolete.

(vii) The type of respiratory protection that the owners or operator must select and provide to potentially exposed persons must be at least as protective as a NIOSH–approved N95 respirator (APF 10).

(viii) Owners and operators must select and provide respirators as required in paragraph (e)(3) of this section consistent with the requirements of 29 CFR 1910.134(d)(1)(iv), and with consideration of workplace and user factors that affect respirator performance and reliability.

(ix) Owners and operators must ensure that respirators are used in compliance with the terms of the respirator's NIOSH certification.

(x) Owners and operators must conduct regular evaluations of the workplace, including consultations with potentially exposed persons using respiratory protection, consistent with the requirements of 29 CFR 1910.134(l), to ensure that the provisions of the written respiratory protection program required under paragraph (e)(3) of this section are being effectively implemented.

(xi) The respiratory protection requirements in this paragraph (e)(3) represent the minimum respiratory protection requirements, such that any respirator affording a higher degree of protection than the required respirator may be used.

(4) Dermal protection.

(i) Owners or operators must require the donning of gloves that are chemically resistant to decaBDE with activity-specific training where dermal contact with decaBDE is reasonably expected. Owners or operators must minimize and protect potentially exposed persons from dermal exposure in accordance with 29 CFR 1910.132.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(ii) Owners or operators must supply and require the donning of dermal PPE that separates and provides a barrier to prevent direct dermal contact with decaBDE in the specific work area where it is selected for use, selected in accordance with this paragraph (e)(4) and provided in accordance with 29 CFR 1910.132(h), to each person who is reasonably likely to be dermally exposed in the work area through direct dermal contact with decaBDE. For the purposes of this paragraph (e)(4), provisions in 29 CFR 1910.132(h) applying to an "employee" also apply equally to potentially exposed persons, and provisions applying to an "employer" also apply equally to owners or operators.

(iii) Dermal PPE that is of safe design and construction for the work to be performed must be provided, used, and maintained in a sanitary, reliable, and undamaged condition. Owners and operators must select PPE that properly fits each affected person and communicate PPE selections to each affected person.

(iv) Owners or operators must provide training in accordance with 29 CFR 1910.132(f) to all persons required to use dermal protection prior to or at the time of initial assignment to a job involving exposure to decaBDE. For the purposes of this paragraph (e)(4), provisions in 29 CFR 1910.132(f) applying to an "employee" also apply equally to potentially exposed persons, and provisions applying to an "employer" also apply equally to owners or operators.

(v) Owners and operators must retrain each person required to use dermal protection at least annually or whenever the owner or operator has reason to believe that a previously trained person does not have the required understanding and skill to properly use dermal protection, or when changes in the workplace or in dermal protection to be used render the previous training obsolete.

(5) Workplace protection records.

(i) The owner or operator of workplaces engaged in the manufacturing and processing of decaBDE and decaBDE–containing products and articles, except for those identified in paragraph (e)(6) of this section, must retain records of:

(A) The name, workplace address, work shift, job classification, and work area of each person reasonably likely to directly handle decaBDE or handle equipment or materials on which decaBDE may be present;

(B) The basis for the regulated area as defined in § 751.403, including monitoring data and documentation of any controls or combination of controls that have reduced exposure to where airborne concentrations of decaBDE can no longer reasonably be expected resulting in a smaller or no regulated area being established;

(C) The type of PPE selected by the owner or operator for use by each of these persons, the respiratory protection used by each potentially exposed person, and PPE program implementation, including fit-testing and training;

(D) The basis for the PPE selection (e.g., demonstration based on permeation testing or manufacturer specifications that each item of PPE selected provides an impervious barrier to prevent exposure during expected duration and conditions of exposure, including the likely combinations of chemical substances to which the PPE may be exposed in the work area); and

(E) Appropriately sized PPE and training on proper application, wear, and removal of PPE, and proper care/disposal of PPE.

(ii) These records must be maintained for a period of five years from the date the record is generated.

(iii) These records must be made available to EPA upon request.

(iv) The owner or operator must provide potentially exposed persons and their designate representative an opportunity to observe records related to the basis of the PPE or another control measure selection, including potential monitoring results that are representative of the potentially exposed person's exposure.

(6) Exclusions. The following are not subject to the workplace protection requirements of paragraph (e) of this section:

(i) Import of decaBDE and decaBDE–containing products and articles.

(ii) Recycling of decaBDE–containing plastic from products or articles and decaBDE–containing products or articles made from such recycled plastic, where no new decaBDE is added during the recycling or production processes, except for those articles identified in paragraph (a)(2)(v) of this section.

(iii) Processing addressed in paragraph (a)(2)(vi) of this section of decaBDE–containing wire and cable insulation for use in nuclear power generation facilities.

(iv) Processing of new and replacement parts to which decaBDE has been added for motor and aerospace vehicles, and the motor and aerospace vehicles that contain new and replacement parts to which decaBDE has been added.

(f) Export notification for decaBDE–containing products and articles. All persons intending to export decaBDE–containing wire and cable for nuclear power generation facilities (including test and research reactors) are required to notify EPA under TSCA section 12(b) and the provisions of subpart D of 40 CFR part 707. The exemption at 40 CFR 707.60(b) does not apply to decaBDE–containing wire and cable for nuclear power generation facilities.

(g) Prohibition on releases to water. After January 21, 2025, all persons are prohibited from releasing decaBDE to water during manufacturing, processing, and distribution in commerce of decaBDE and decaBDE–containing products, and such persons are required to follow any applicable regulations for preventing the release of decaBDE.

**Credits**
[86 FR 894, Jan. 6, 2021; 89 FR 91514, Nov. 19, 2024]

SOURCE: 84 FR 11435, March 27, 2019; 86 FR 879, Jan. 6, 2021, unless otherwise noted.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

AUTHORITY: 15 U.S.C. 2605, 15 U.S.C. 2625(l)(4).

Current through May 29, 2025, 90 FR 22670. Some sections may be more current. See credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
Title 40. Protection of Environment
Chapter I. Environmental Protection Agency (Refs & Annos)
Subchapter R. Toxic Substances Control Act
Part 761. Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions (Refs & Annos)
Subpart D. Storage and Disposal (Refs & Annos)

40 C.F.R. § 761.50

§ 761.50 Applicability.

Currentness

(a) General PCB disposal requirements. Any person storing or disposing of PCB waste must do so in accordance with subpart D of this part. The following prohibitions and conditions apply to all PCB waste storage and disposal:

(1) No person may open burn PCBs. Combustion of PCBs approved under § 761.60(a) or (e), or otherwise allowed under part 761, is not open burning.

(2) No person may process liquid PCBs into non-liquid forms to circumvent the high temperature incineration requirements of § 761.60(a).

(3) No person may discharge water containing PCBs to a treatment works (as defined § 503.9(aa) of this chapter) or to navigable waters unless the PCB concentration is <3 µg/L (approximately 3 ppb), or unless the discharge is in accordance with a PCB discharge limit included in a permit issued under section 307(b) or 402 of the Clean Water Act.

(4) Spills and other uncontrolled discharges of PCBs at concentrations of ≥50 ppm constitute the disposal of PCBs.

(5) Any person land disposing of non-liquid PCBs may avoid otherwise-applicable sampling requirements by presuming that the PCBs disposed of are ≥500 ppm (or ≥100 µg/100 $cm^2$ if no free-flowing liquids are present).

(6) Any person storing or disposing of PCBs is also responsible for determining and complying with all other applicable Federal, State, and local laws and regulations.

(b) PCB waste—

(1) PCB liquids. Any person removing PCB liquids from use (i.e., not PCB remediation waste) must dispose of them in accordance with § 761.60(a), or decontaminate them in accordance with § 761.79.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(2) PCB Items. Any person removing from use a PCB Item containing an intact and non-leaking PCB Article must dispose of it in accordance with § 761.60(b), or decontaminate it in accordance with § 761.79. PCB Items where the PCB Articles are no longer intact and non-leaking are regulated for disposal as PCB bulk product waste under § 761.62(a) or (c).

(i) Fluorescent light ballasts containing PCBs only in an intact and non-leaking PCB Small Capacitor are regulated for disposal under § 761.60(b)(2)(ii).

(ii) Fluorescent light ballasts containing PCBs in the potting material are regulated for disposal as PCB bulk product waste under § 761.62.

(3) PCB remediation waste. PCB remediation waste, including PCB sewage sludge, is regulated for cleanup and disposal in accordance with § 761.61.

(i) Any person responsible for PCB waste at as-found concentrations ≥50 ppm that was either placed in a land disposal facility, spilled, or otherwise released into the environment prior to April 18, 1978, regardless of the concentration of the spill or release; or placed in a land disposal facility, spilled, or otherwise released into the environment on or after April 18, 1978, but prior to July 2, 1979, where the concentration of the spill or release was ≥50 ppm but < 500 ppm, must dispose of the waste as follows:

(A) Sites containing these wastes are presumed not to present an unreasonable risk of injury to health or the environment from exposure to PCBs at the site. However, the EPA Regional Administrator may inform the owner or operator of the site that there is reason to believe that spills, leaks, or other uncontrolled releases or discharges, such as leaching, from the site constitute ongoing disposal that may present an unreasonable risk of injury to health or the environment from exposure to PCBs at the site, and may require the owner or operator to generate data necessary to characterize the risk. If after reviewing any such data, the EPA Regional Administrator makes a finding, that an unreasonable risk exists, then they may direct the owner or operator of the site to dispose of the PCB remediation waste in accordance with § 761.61 such that an unreasonable risk of injury no longer exists.

(B) Unless directed by the EPA Regional Administrator to dispose of PCB waste in accordance with paragraph (b)(3)(i)(A) of this section, any person responsible for PCB waste at as-found concentrations ≥50 ppm that was either placed in a land disposal facility, spilled, or otherwise released into the environment prior to April 18, 1978, regardless of the concentration of the spill or release; or placed in a land disposal facility, spilled, or otherwise released into the environment on or after April 18, 1978, but prior to July 2, 1979, where the concentration of the spill or release was ≥50 ppm but < 500 ppm, who unilaterally decides to dispose of that waste (for example, to obtain insurance or to sell the property), is not required to clean up in accordance with § 761.61. Disposal of the PCB remediation waste must comply with § 761.61. However, cleanup of those wastes that is not in complete compliance with § 761.61 will not afford the responsible party with relief from the applicable PCB regulations for that waste.

(ii) Any person responsible for PCB waste that was either placed in a land disposal facility, spilled, or otherwise released into the environment on or after April 18, 1978, but prior to July 2, 1979, where the concentration of the spill or release was ≥500 ppm; or placed in a land disposal facility, spilled, or otherwise released into the environment on or after July 2, 1979, where the concentration of the spill or release was ≥50 ppm, must dispose of it in accordance with either of the following:

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(A) In accordance with the PCB Spill Cleanup Policy (Policy) at subpart G of this part, for those PCB remediation wastes that meet the criteria of the Policy. Consult the Policy for a description of the spills it covers and its notification and timing requirements.

(B) In accordance with § 761.61. Complete compliance with § 761.61 does not create a presumption against enforcement action for penalties for any unauthorized PCB disposal.

(iii) The owner or operator of a site containing PCB remediation waste has the burden of proving the date that the waste was placed in a land disposal facility, spilled, or otherwise released into the environment, and the concentration of the original spill.

(4) PCB bulk product waste—

(i) General. Any person disposing of PCB bulk product waste must do so in accordance with § 761.62. PCB bulk product waste, as that term is defined in § 761.3, is waste that was ≥50 ppm when originally removed from service, even if its current PCB concentration is <50 ppm. PCB bulk product waste is regulated for disposal based on the risk from the waste once disposed of. For waste which is land disposed, the waste is regulated based on how readily the waste is released from disposal to the environment, in particular by leaching out from the land disposal unit.

(ii) Metal surfaces in contact with PCBs. Any person disposing of metal surfaces in contact with PCBs (e.g., painted metal) may use thermal decontamination procedures in accordance with § 761.79(c)(6) (see § 761.62(a)(6)).

(5) PCB household waste. Any person storing or disposing of PCB household waste, as that term is defined in § 761.3, must do so in accordance with § 761.63.

(6) PCB research and development waste. Any person disposing of PCB wastes generated during and as a result of research and development for use under § 761.30(j), or for disposal under § 761.60(j), must do so in accordance with § 761.64.

(7) PCB/Radioactive waste.

(i) Any person storing PCB/radioactive waste ≥50 ppm PCBs must do so taking into account both its PCB concentration and its radioactive properties, except as provided in § 761.65(a)(1), (b)(1)(ii), and (c)(6)(i).

(ii) Any person disposing of PCB/radioactive waste must do so taking into account both its PCB concentration and its radioactive properties. If, taking into account only the properties of the PCBs in the waste (and not the radioactive properties of the waste), the waste meets the requirements for disposal in a facility permitted, licensed, or registered by a State as a municipal or non-municipal non-hazardous waste landfill (e.g., PCB bulk product waste under § 761.62(b)(1)), then the person may dispose of the PCB/radioactive waste, without regard to the PCB component of the waste, on the basis of its radioactive properties in accordance with all applicable requirements for the radioactive component of the waste.

(8) Porous surfaces. In most cases a person must dispose of porous surfaces as materials where PCBs have penetrated far beneath the surface, rather than a simple surface contamination. Any person disposing of porous surfaces on which PCBs have been spilled and meeting the definition of PCB remediation waste at § 761.3 must do so in accordance with § 761.61. Any person disposing of porous surfaces which are part of manufactured non-liquid products containing PCBs and meeting the definition of PCB bulk product waste at § 761.3 must do so in accordance with § 761.62. Any person may decontaminate concrete surfaces upon which PCBs have been spilled in accordance with § 761.79(b)(4), if the decontamination procedure is commenced within 72 hours of the initial spill of PCBs to the concrete or portion thereof being decontaminated. Any person may decontaminate porous non-liquid PCBs in contact with non-porous surfaces, such as underground metal fuel tanks coated with fire retardant resin or pitch, for purposes of unrestricted use or disposal in a smelter in accordance with § 761.79(b)(3).

(c) Storage for disposal. Any person who holds PCB waste must store it in accordance with § 761.65.

(d) Performance specifications for disposal technologies—

(1) Incinerators. Any person using an incinerator to dispose of PCBs must use an incinerator that meets the criteria set forth in § 761.70.

(2) High efficiency boilers. Any person using a high efficiency boiler to dispose of PCBs must use a boiler that meets the criteria set forth in § 761.71.

(3) Scrap metal recovery ovens and smelters. Any person using scrap metal recovery ovens and smelters to dispose of PCBs must use a device that meets the criteria set forth in § 761.72.

(4) Chemical waste landfills. Any person using a chemical waste landfill to dispose of PCBs must use a chemical waste landfill that meets the criteria set forth in § 761.75.

(e) TSCA PCB Coordinated Approval. Any person seeking a TSCA PCB Coordinated Approval must follow the procedures set forth in § 761.77.

**Credits**

[63 FR 35444, June 29, 1998; 64 FR 33760, June 24, 1999; 88 FR 59686, Aug. 29, 2023]

SOURCE: 44 FR 31542, May 31, 1979; 50 FR 29199, July 17, 1985; 52 FR 10705, April 2, 1987; 54 FR 52745, Dec. 21, 1989; 63 FR 35444, June 29, 1998; 89 FR 60736, July 26, 2024, unless otherwise noted.

AUTHORITY: 15 U.S.C. 2605, 2607, 2611, 2614, and 2616 and 42 U.S.C. 6939g.

Notes of Decisions (4)

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Current through May 30, 2025, 90 FR 22866. Some sections may be more current. See credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO



114TH CONGRESS } HOUSE OF REPRESENTATIVES { REPORT
*1st Session* 114–176

# TSCA MODERNIZATION ACT OF 2015

JUNE 23, 2015.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. UPTON, from the Committee on Energy and Commerce, submitted the following

# R E P O R T

[To accompany H.R. 2576]

[Including cost estimate of the Congressional Budget Office]

The Committee on Energy and Commerce, to whom was referred the bill (H.R. 2576) to modernize the Toxic Substances Control Act, and for other purposes, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

CONTENTS

| | Page |
|---|---|
| Purpose and Summary | 12 |
| Background and Need for Legislation | 12 |
| Hearings | 13 |
| Committee Consideration | 13 |
| Committee Votes | 14 |
| Committee Oversight Findings | 16 |
| Statement of General Performance Goals and Objectives | 16 |
| New Budget Authority, Entitlement Authority, and Tax Expenditures | 16 |
| Earmark, Limited Tax Benefits, and Limited Tariff Benefits | 16 |
| Committee Cost Estimate | 16 |
| Congressional Budget Office Estimate | 16 |
| Federal Mandates Statement | 21 |
| Duplication of Federal Programs | 21 |
| Disclosure of Directed Rule Makings | 22 |
| Advisory Committee Statement | 22 |
| Applicability to Legislative Branch | 22 |
| Section-by-Section Analysis of the Legislation | 22 |
| Changes in Existing Law Made by the Bill, as Reported | 34 |

The amendment is as follows:

Strike all after the enacting clause and insert the following:

49–006

(II) in clause (i)—

(aa) by inserting “or an order under section 4,” before “the standard for review”;

(bb) by striking “such rule” and inserting “such rule or order”;

(cc) by striking “the rule” and inserting “the rule or order”; and

(dd) by striking the semicolon and inserting “; and”; and

(III) by striking clause (ii) and redesignating clause (iii) as clause (ii); and

(B) in paragraph (2), by striking “any rule” and inserting “any rule or order”.

(k) SECTION 20.—Section 20(a)(1) of the Toxic Substances Control Act (15 U.S.C. 2619(a)(1)) is amended by striking “order issued under section 5” and inserting “order issued under section 4 or 5”.

(l) SECTION 21.—Section 21 of the Toxic Substances Control Act (15 U.S.C. 2620) is amended—

(1) in subsection (a), by striking “order under section 5(e) or (6)(b)(2)” and inserting “order under section 4 or 5(e)”; and

(2) in subsection (b)—

(A) in paragraph (1), by striking “order under section 5(e), 6(b)(1)(A), or 6(b)(1)(B)” and inserting “order under section 4 or 5(e)”; and

(B) in paragraph (4)(B)—

(i) in the matter preceding clause (i), by striking “order under section 5(e) or 6(b)(2)” and inserting “order under section 4 or 5(e)”;

(ii) in clause (i), by striking “order under section 5(e)” and inserting “order under section 4 or 5(e)”; and

(iii) in clause (ii), by striking “or an order under section 6(b)(2)”.

(m) SECTION 24.—Section 24(b)(2)(B) of the Toxic Substances Control Act (15 U.S.C. 2623(b)(2)(B)) is amended—

(1) by inserting “and” at the end of clause (i);

(2) by striking clause (ii); and

(3) by redesignating clause (iii) as clause (ii).

(n) SECTION 27.—Section 27(a) of the Toxic Substances Control Act (15 U.S.C. 2626(a)) is amended by striking “rules promulgated” and inserting “rules, orders, or consent agreements”.

(o) SECTION 30.—Section 30(2) of the Toxic Substances Control Act (15 U.S.C. 2629(2)) is amended by striking “rule” and inserting “rule, order, or consent agreement”.

## PURPOSE AND SUMMARY

To modernize the Toxic Substances Control Act of 1976, to identify and control unreasonable risks of injury to health or the environment from the manufacture, processing, distribution in commerce, use, and disposal of chemical substances, facilitate interstate commerce, and for other purposes.

## BACKGROUND AND NEED FOR LEGISLATION

In 1971, the President’s Council on Environmental Quality proposed comprehensive Federal legislation to identify and control potentially dangerous chemicals in U.S. commerce that were not adequately regulated under other Federal environmental statutes. President Ford signed the Toxic Substances Control Act (TSCA) (15 U.S.C. 2601 *et seq*.) into law on October 11, 1976.

Under TSCA, the Environmental Protection Agency (EPA) is responsible for identifying, testing, and regulating chemical substances in U.S. commerce whose manufacture, processing, distribution in commerce, use, and disposal present or will present an unreasonable risk of injury to health or the environment.

In the nearly four decades since its enactment and particularly during the last decade, there have been persistent concerns about the pace of EPA’s work under TSCA, the ability of the Agency to

use its existing authority, and whether the statute prevents certain regulatory efforts.

A variety of factors, including EPA's slow pace in regulating chemicals already on the market, has led to several new State chemical control statutes—ranging from specific chemical restrictions to general chemical control programs—and retailer-based systems to identify and promote products that were considered safer for consumers. Ultimately, public confusion about chemical-specific claims, a perceived lack of expeditious action by EPA, and a domestic and foreign marketplace that has become increasingly uneven, unpredictable, and incompatible with economic and regulatory realities led Congress to examine TSCA and how it can operate more effectively in the 21st century.

Oversight by the Committee yielded two conclusions about TSCA modernization. First, not every part of TSCA needs to be rewritten—and those that do are places where there is widespread agreement. Second, not every problem with TSCA is a statutory problem. EPA may, if it chooses, use existing authority to remedy these concerns.

In light of these conclusions, the Committee on Energy and Commerce focused on giving the Agency more direct tools to obtain testing information on chemical substances, restructuring the way existing chemicals are evaluated and regulated, clarifying the treatment and availability of trade secrets submitted to EPA, updating the collection of fees needed to support EPA's implementation of TSCA, assuring high quality science is used by the Agency, and organizing the Federal-State regulatory relationship in a way that makes sense for promoting interstate and global commerce, but also recognizes non-conflicting efforts taken by several States.

## Hearings

The Subcommittee on Environment and the Economy held a hearing entitled "H.R. ____, the TSCA Modernization Act" on April 14, 2015. The Subcommittee received testimony from:

- Jim Jones, Assistant Administrator, Office of Chemical Safety and Pollution Prevention, U.S. Environmental Protection Agency;
- Michael P. Walls, Vice President of Regulatory and Technical Affairs, American Chemistry Council;
- Beth Bosley, President, Boron Specialties, LLC, on behalf of the Society of Chemical Manufacturers and Affiliates;
- Jennifer Thomas, Senior Director, Federal Government Affairs, Alliance of Automobile Manufacturers; and
- Andy Igrejas, Director, Safer Chemicals, Healthy Families.

## Committee Consideration

On May 14, 2015, the Subcommittee on Environment and the Economy met in open markup session and forwarded a Committee Print entitled the "TSCA Modernization Act" to the full Committee, as amended, by a record vote of 21 yeas and 0 nays. On June 2 and June 3, 2015, the Committee on Energy and Commerce met in open markup session and ordered H.R. 2576, the "TSCA Modernization Act," reported to the House, as amended, by a recorded vote of 47 yeas and 0 nays, and 1 present.

A huge thank-you to Senators UDALL and VITTER, who cosponsored this bill, lead the way; Senators BOXER and INHOFE, the chair and ranking member of the Environment Committee; and Senators MARKEY, WHITEHOUSE, and BOOKER for their leadership and contributions throughout this entire process.

Also, a special thank-you to the staff who worked day and night. I know I received calls from my staff member Adrian Deveny at a variety of hours on a variety of weekends as he worked with other staff members to work out, iron out the challenges that remained, so a special thank-you to Adrian Deveny.

Just a short time ago, I had the chance to speak to Bonnie Lautenberg, Frank Lautenberg's wife. She would have loved to have been here when we took this vote, but she is going to be down in the Capitol next week with children and grandchildren. I hope to get a chance to really thank her in person for her husband's leadership but also for her leadership, her advocacy that we reached this final moment. She said to me: It appears it takes a village to pass a bill. Well, it does. This village was a bipartisan village. This was a bicameral village. It has reached a successful conclusion.

In the most powerful Nation on Earth, we should not be powerless to protect our citizens from toxic chemicals in everyday products. Today marks a sea shift in which we finally begin to change that. For too long, we have been unable to protect our citizens from toxic chemicals that hurt pregnant women and young children, chemicals that hurt our children's development, chemicals that cause cancer.

The Frank R. Lautenberg Chemical Safety for the 21st Century Act will tremendously improve how we regulate toxic chemicals in the United States—those that are already in products and should no longer be used and those new chemicals that are invented that should be thoroughly examined before they end up in products—and make sure that toxic chemicals don't find their way into our classrooms, into our bedrooms, into our homes, into our workplaces. Now the Environmental Protection Agency will have the tools and resources needed to evaluate the dangerous chemicals and to eliminate any unsafe uses.

My introduction to this issue began with a bill in the Oregon State Legislature about the cancer-causing flame retardants that are in our carpets and our couches and the foam in our furniture that should not be there. This bill gives us the ability to review that and to get rid of those toxic chemicals.

It was enormously disturbing to me to find out that our little babies crawling on the carpet, their noses 1 inch off the ground, were breathing in dust from the carpet that included these cancer-causing flame retardants. It should never have happened, but we did not have the type of review process that protects Americans. Now we will.

So, together, a bipartisan team has run a marathon, and today we cross the finish line. In short order, this bill will be sitting in the Oval Office, on the President's desk, and he will be putting ink to paper and creating this new and powerful tool for protecting the health of American citizens. That is an enormous accomplishment.

Mr. President, on behalf of Senator BOXER, the printing cost of the statement of additional views with respect to H.R. 2576, TSCA, will exceed the two-page rule and cost $2,111.20.

I ask unanimous consent that the Boxer statement of additional views be printed in the RECORD.

There being no objection, the material was ordered to be printed in the RECORD, as follows:

DETAILED ANALYSIS AND ADDITIONAL VIEWS OF DEMOCRATIC MEMBERS ON THE MOTION TO CONCUR IN THE HOUSE AMENDMENT TO THE SENATE AMENDMENT TO THE BILL H.R. 2576 ENTITLED "AN ACT TO MODERNIZE THE TOXIC SUBSTANCES CONTROL ACT, AND FOR OTHER PURPOSES" JUNE 7, 2016

As the lead Senate Democratic negotiators on H.R. 2576, (hereinafter referred to as the Frank R. Lautenberg Chemical Safety for the 21st Century Act), we submit the following additional views that describe the intent of the negotiators on elements of the final bill text.

### 1. "WILL PRESENT"

Existing TSCA as in effect before the date of enactment of Frank R. Lautenberg Chemical Safety for the 21st Century Act includes the authority, contained in several sections (see, for example, section 6(a)), for EPA to take regulatory actions related to chemical substances or mixtures if it determines that the chemical substance or mixture "presents or will present" an unreasonable risk to health or the environment.

The Frank R. Lautenberg Chemical Safety for the 21st Century Act includes language that removes all instances of "will present" from existing TSCA and the amendments thereto. This does not reflect an intent on the part of Congressional negotiators to remove EPA's authority to consider future or reasonably anticipated risks in evaluating whether a chemical substance or mixture presents an unreasonable risk to health or the environment. In fact, a new definition added to TSCA explicitly provides such authority and a mandate for EPA to consider conditions of use that are not currently known or intended but can be anticipated to occur:

'(4) The term 'conditions of use' means the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of";

### 2. MIXTURES

In section 6(b) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, EPA is directed to undertake risk evaluations on chemical substances in order to determine whether they pose an unreasonable risk to health or the environment. Some have questioned whether the failure to explicitly authorize risk evaluations on mixtures calls into question EPA's authority to evaluate the risks from chemical substances in mixtures.

The definition of 'conditions of use' described above plainly covers all uses of a chemical substance, including its incorporation in a mixture, and thus would clearly enable and require, where relevant, EPA to evaluate the risks of the chemical substance as a component of a mixture.

### 3. NEW CHEMICALS

While existing TSCA does not preclude EPA from reviewing new chemicals and significant new uses following notification by the manufacturer or processor, it does not require EPA to do so or to reach conclusions on the potential risks of all such chemicals before they enter the marketplace. EPA has authority to issue orders blocking or limiting production or other activities if it finds that available information is inadequate and the chemical may present an unreasonable risk, but the burden is on EPA to invoke this authority; if it fails to do so within the 90–180 day review period, manufacture of the new chemical can automatically commence. This bill makes significant changes to this passive approach under current law: For the first time, EPA will be required to review all new chemicals and significant new uses and make an affirmative finding regarding the chemical's or significant new use's potential risks as a condition for commencement of manufacture for commercial purposes and, in the absence of a finding that the chemical or significant new use is not likely to present an unreasonable risk, manufacture will not be allowed to occur. If EPA finds that it lacks sufficient information to evaluate the chemical's or significant new use's risks or that the chemical or significant new use does or may present an unreasonable risk, it is obligated to issue an order or rule that precludes market entry or imposes conditions sufficient to prevent an unreasonable risk. EPA can also require additional testing. Only chemicals and significant new uses that EPA finds are not likely to present an unreasonable risk can enter production without restriction. This affirmative approach to better ensuring the safety of new chemicals entering the market is essential to restoring the public's confidence in our chemical safety system.

### 4. UNREASONABLE RISK

TSCA as in effect before the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act authorized EPA to regulate chemical substances if it determined that the chemical substance "presents or will present an unreasonable risk of injury to health or the environment." In its decision in Corrosion Proof Fittings vs EPA, the U.S. Court of Appeals, 5th Circuit overturned EPA's proposed ban on asbestos, in part because it believed that

"In evaluating what is "unreasonable," the EPA is required to consider the costs of any proposed actions and to "carry out this chapter in a reasonable and prudent manner [after considering] the environmental, economic, and social impact of any action." 15 U.S.C. §2601(c).

As the District of Columbia Circuit stated when evaluating similar language governing the Federal Hazardous Substances Act, "[t]he requirement that the risk be 'unreasonable' necessarily involves a balancing test like that familiar in tort law: The regulation may issue if the severity of the injury that may result from the product, factored by the likelihood of the injury, offsets the

harm the regulation itself imposes upon manufacturers and consumers." Forester v. CPSC, 559 F.2d 774 789 (D.C.Cir.1977). We have quoted this language approvingly when evaluating other statutes using similar language. See, e.g., Aqua Slide, 569 F.2d at 839."

The Frank R. Lautenberg Chemical Safety for the 21st Century Act clearly rejects that approach to determining what "unreasonable risk of injury to health or the environment" means, by adding text that directs EPA to determine whether such risks exist "without consideration of costs or other nonrisk factors" and, if they do, to promulgate a rule that ensures "that the chemical substance no longer presents such risk." In this manner, Congress has ensured that when EPA evaluates a chemical to determine whether it poses an unreasonable risk to health or the environment and regulates the chemical if it does, the Agency may not apply the sort of "balancing test" described above.

5. PRIORITIZATION

Section 6(b) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, defines high-priority chemical substances and low-priority chemical substances as follows:

"(i) HIGH-PRIORITY SUBSTANCES.—The Administrator shall designate as a high-priority substance a chemical substance that the Administrator concludes, without consideration of costs or other nonrisk factors, may present an unreasonable risk of injury to health or environment because of a potential hazard and a potential route of exposure under the conditions of use, including an unreasonable risk to a potentially exposed or susceptible subpopulation identified as relevant by the Administrator.

"(ii) LOW-PRIORITY SUBSTANCES.—The Administrator shall designate a chemical substance as a low-priority substance if the Administrator concludes, based on information sufficient to establish, without consideration of costs or other nonrisk factors, that such substance does not meet the standard identified in clause (i) for designating a chemical substance a high-priority substance."

The direction to EPA for the designation of low-priority substances is of note in that it requires such designations to be made only when there is "information sufficient to establish" that the standard for designating a substance as a high-priority substance is not met. Clear authority is provided under section 4(a)(2)(B), as created in the Frank R. Lautenberg Chemical Safety for the 21st Century Act, to enable EPA to obtain the information needed to prioritize chemicals for which information is initially insufficient. The bill text also goes on to state that if "the information available to the Administrator at the end of such an extension [for testing of a chemical substance in order to determine its priority designation] remains insufficient to enable the designation of the chemical substance as a low-priority substance, the Administrator shall designate the chemical substance as a high-priority substance."

These provisions are intended to ensure that the only chemicals to be designated low-priority are those for which EPA both has sufficient information and, based on that information, affirmatively concludes that the substance does not warrant a finding that it may present an unreasonable risk.

6. INDUSTRY REQUESTED CHEMICALS

Sec. 6(b)(4)(E) sets the percentage of risk evaluations that the Administrator shall conduct at industry's request at between 25 percent (if enough requests are submitted) and 50 percent. The Administrator should set up a system to ensure that those percentages are met and not exceeded in each fiscal year. An informal effort that simply takes requests as they come in and hopes that the percentages will work out does not meet the requirement that the Administrator "ensure" that the percentages be met. Also, clause (E)(ii) makes clear that industry requests for risk evaluations "shall be" subject to fees. Therefore, if at any point the fees imposed by the Frank Lautenberg Act (which are subject to a termination in section 26(b)(6)) are allowed to lapse, industry's opportunity to seek risk evaluations will also lapse and the minimum 25 percent requirement will not apply.

7. PACE OF AND LONG-TERM GOAL FOR EPA SAFETY REVIEWS OF EXISTING CHEMICALS

Existing TSCA grandfathered in tens of thousands of chemicals to the inventory without requiring any review of their safety. The Frank R. Lautenberg Chemical Safety for the 21st Century Act sets in motion a process under which EPA will for the first time systematically review the safety of chemicals in active commerce. While this will take many years, the goal of the legislation is to ensure that all chemicals on the market get such a review. The initial targets for numbers of reviews are relatively low, reflecting current EPA capacity and resources. These targets represent floors, not ceilings, and Senate Democratic negotiators expect that as EPA begins to collect fees, gets procedures established and gains experience, these targets can be exceeded in furtherance of the legislation's goals.

8. "MAXIMUM" EXTENT PRACTICABLE

Several sections of the Frank R. Lautenberg Chemical Safety for the 21st Century Act include direction to EPA to take certain actions to "the extent practicable", in contrast to language in S 697 as reported by the Senate that actions be taken to "the maximum extent practicable." During House-Senate negotiations on the bill, Senate negotiators were informed that House Legislative Counsel believed the terms "extent practicable" and "maximum extent practicable" are synonymous, and ultimately Congress agreed to include "extent practicable" in the Frank R. Lautenberg Chemical Safety for the 21st Century Act with the expectation that no change in meaning from S 697 as reported by the Senate be inferred from that agreement.

9. COST CONSIDERATIONS IN RULEMAKING

Section 6(c)(2) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act lists what is required in analysis intended to support an EPA rule for a chemical substance or mixture:

"(2) REQUIREMENTS FOR RULE.—"(A) STATEMENT OF EFFECTS.—In proposing and promulgating a rule under subsection (a) with respect to a chemical substance or mixture, the Administrator shall consider and publish a statement based on reasonably available information with respect to—

"(i) the effects of the chemical substance or mixture on health and the magnitude of the exposure of human beings to the chemical substance or mixture;

"(ii) the effects of the chemical substance or mixture on the environment and the magnitude of the exposure of the environment to such substance or mixture;

"(iii) the benefits of the chemical substance or mixture for various uses; and

"(iv) the reasonably ascertainable economic consequences of the rule, including consideration of—

"(I) the likely effect of the rule on the national economy, small business, technological innovation, the environment, and public health;

"(II) the costs and benefits of the proposed and final regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator; and

"(III) the cost effectiveness of the proposed regulatory action and of the 1 or more primary alternative regulatory actions considered by the Administrator.

The language above specifies the information on effects, exposures and costs that EPA is to consider in determining how to regulate a chemical substance that presents an unreasonable risk as determined in EPA's risk evaluation.

Senate Democratic negotiators clarify that sections 6(c)(2)(A)(i) and (ii) do not require EPA to conduct a second risk evaluation-like analysis to identify the specified information, but rather, can satisfy these requirements on the basis of the conclusions regarding the chemical's health and environmental effects and exposures in the risk evaluation itself.

The scope of the statement EPA is required to prepare under clauses (i)-(iv) is bounded in two important respects. First, it is to be based on information reasonably available to EPA, and hence does not require new information collection or development. Second, EPA's consideration of costs and benefits and cost-effectiveness is limited to the requirements of the rule itself and the 1 or more "primary" alternatives it considered, not every possible alternative. The role of the statement required under subparagraph (c)(2)(A) in selecting the restrictions to include in its rule is delineated in subparagraph (c)(2)(B). Under this provision, EPA must "factor in" the considerations described in the statement "to the extent practicable" and "in accordance with subsection (a)." As revised, subsection (a) deletes the paralyzing "least burdensome" requirement in the existing law and instructs that EPA's rule must ensure that the chemical substance or mixture "no longer presents'" the unreasonable risk identified in the risk evaluation. Thus, it is clear that the considerations in the statement required under subparagraph (c)(2)(A) do not require EPA to demonstrate benefits outweigh costs, to definitively determine or select the least-cost alternative, or to select an option that is demonstrably cost-effective or is the least burdensome adequately protective option. Rather, it requires only that EPA take into account the specified considerations in deciding among restrictions to impose, which must be sufficient to ensure that the subject chemical substance no longer presents the unreasonable risk EPA has identified. The Frank R. Lautenberg Chemical Safety for the 21st Century Act clearly rejects the regulatory approach and framework that led to the failed asbestos ban and phase-out rule of 1989 in Corrosion Proof Fittings v. EPA 947 F.2d 1201 (5th Cir. 1991).

10. "MINIMUM" LABELING REQUIREMENTS

Section 6(a) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, ensures that the requirements EPA can impose to address an unreasonable risk to health or the environment include requiring "clear and adequate minimum" warnings. The addition of the word "minimum" was intended to avoid the sort of litigation that was undertaken in Wyeth v. Levine, 555 U.S. 555 (2009), when a plaintiff won a Supreme Court decision after alleging that the harm she suffered from a

drug that had been labeled in accordance with FDA requirements had nevertheless been inadequately labeled under Vermont law. This ensures that manufacturers or processors of chemical substances and mixtures can always take additional measures, if in the interest of protecting health and the environment, it would be reasonable to do so.

11. CRITICAL USE EXEMPTIONS

Section 6(g) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, authorizes EPA to exempt specific conditions of use from otherwise applicable section 6(a) rule requirements, if EPA makes specified findings. Section 6(g)(4) in turn requires EPA to include in such an exemption conditions that are "necessary to protect health and the environment while achieving the purposes of the exemption." It is Congress' intent that the conditions EPA imposes will protect health and the environment to the extent feasible, recognizing that, by its nature, an exemption will allow for activities that present some degree of unreasonable risk.

12. REGULATORY COMPLIANCE

Several sections of the Frank R. Lautenberg Chemical Safety for the 21st Century Act clarify the Congressional intent that compliance with federal EPA standards, rules or other requirements shall not preclude liability in circumstances where a reasonable manufacturer or processor or distributor of a chemical substance or mixture could or should have taken additional measures or precautions in the interest of protecting public health and the environment.

13. TSCA AS THE PRIMARY STATUTE FOR THE REGULATION OF TOXIC SUBSTANCES

EPA's authorities and duties under section 6 of TSCA have been significantly expanded under the Frank R. Lautenberg Chemical Safety for the 21st Century Act, now including comprehensive deadlines and throughput expectations for chemical prioritization, risk evaluation, and risk management. The interagency referral process and the intra-agency consideration process established under Section 9 of existing TSCA must now be regarded in a different light since TSCA can no longer be construed as a "gap-filler" statutory authority of last resort. The changes in section 9 are consistent with this recognition and do not conflict with the fundamental expectation that, where EPA concludes that a chemical presents an unreasonable risk, the Agency should act in a timely manner to ensure that the chemical substance no longer presents such risk. Thus, once EPA has reached this conclusion, Section 9(a) is not intended to supersede or modify the Agency's obligations under Sections 6(a) or 7 to address risks from activities involving the chemical substance, except as expressly identified in a section 9(a) referral for regulation by another agency which EPA believes has sufficient authority to eliminate the risk and where the agency acts in a timely and effective manner to do so.

Regarding EPA's consideration of whether to use non-TSCA EPA authorities in order to address unreasonable chemical risks identified under TSCA, the new section 9(b)(2) merely consolidates existing language which was previously split between section 6(c) and section 9(b). It only applies where the Administrator has already determined that a risk to health or the environment associated with a chemical substance or mixture could be eliminated or reduced to a sufficient extent by additional actions taken under other EPA authorities. It allows the Administrator substantial discretion to use TSCA nonetheless, and it certainly does not reflect that TSCA is an authority of last resort in such cases. Importantly, the provision adds a new qualification, not in original TSCA, that the required considerations are to be "based on information reasonably available to the Administrator" to ensure that such considerations do not require additional information to be collected or developed. Furthermore, none of these revisions were intended to alter the clear intent of Congress, reflected in the original legislative history of TSCA, that these decisions would be completely discretionary with the Administrator and not subject to judicial review in any manner.

14. DISCLOSURE OF CONFIDENTIAL BUSINESS INFORMATION

S. 697 as passed by the Senate included several requirements as amendments to sections 8 and 14 of existing TSCA that direct EPA to "promptly" make confidential business information public when it determines that protections against disclosure of such information should no longer apply. The Frank R. Lautenberg Chemical Safety for the 21st Century Act instead directs EPA to remove the protections against disclosure when it determines that they should no longer apply. Because EPA informed Senate negotiators that its practice is to promptly make public information that is no longer protected against disclosure, we see no difference or distinction in meaning between the language in S. 697 as passed and the Frank R. Lautenberg Chemical Safety for the 21st Century Act, and expect EPA to continue its current practice of affirmatively making public information that is not or no longer protected from disclosure as expeditiously as possible.

Subsection 14(d)(9) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, further clarifies the Congressional intent that any information required pursuant to discovery, subpoena, court order, or any other judicial process is always allowable and discoverable under State and Federal law, and not protected from disclosure.

15. CHEMICAL IDENTITY

Section 14(b)(2) of the bill retains TSCA's provision making clear that information from health and safety studies is not protected from disclosure. It also retains TSCA's two existing exceptions from disclosure of information from health and safety studies: for information where disclosure would disclose either how a chemical is manufactured or processed or the portion a chemical comprises in a mixture. A clarification has been added to the provision to note explicitly that the specific identity of a chemical is among the types of information that need not be disclosed, when disclosing health and safety information, if doing so would also disclose how a chemical is made or the portion a chemical comprises in a mixture. This clarification does not signal any Congressional intent to alter the meaning of the provision, only to clarify its intent.

16. "REQUIREMENTS"'

Subsection 5(i)(2) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act clarifies the Congressional intent to ensure that state requirements, including legal causes of action arising under statutory or common law, are not preempted or limited in any way by EPA action or inaction on a chemical substance.

Subsection 6(j) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, clarifies the Congressional intent to ensure that state requirements, including legal causes of action arising under statutory or common law, are not preempted or limited in any way by EPA action or inaction on a chemical substance.

17. STATE-FEDERAL RELATIONSHIP

Sections 18(a)(1)(B) and 18(b)(1) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, refer to circumstances under which a state may not establish or continue to enforce a "statute, criminal penalty, or administrative action" on a chemical substance. Section 18(b)(2) states that "this subsection does not restrict the authority of a State or political subdivision of a State to continue to enforce any statute enacted, criminal penalty assessed, or administrative action taken". In an email transmitted by Senate Republican negotiators at 11:45 AM on May 23, 2016, the Senate requested that House Legislative Counsel delete the word "assessed," but this change was not made in advance of the 12 PM deadline to file the bill text with the House Rules Committee. The Senate's clear intent was not to change or in any way limit the meaning of the phrase "criminal penalty" in section 18(b)(2).

Section 18(d)(I) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, references "risk evaluations"' on chemical substances that may be conducted by states or political subdivisions of states with the clear intent to describe the circumstances in which such efforts would not be preempted by federal action. The term "Risk Evaluation" may not be universally utilized in every state or political subdivision of a state, but researching each analogous term used in each state or political subdivision of a state in order to explicitly list it was neither realistic nor possible. The use of this term is not intended to be in any way limiting.

Section 18(d)(1)(A)(ii) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, fully preserves the authority of states or political subdivisions of states to impose "information obligation" requirements on manufacturers or processors with respect to chemicals they produce or use. The provision cites examples of such obligations: reporting and monitoring or "other information obligations." These may include, but are not limited to, state requirements related to information, such as companies' obligations to disclose use information, to provide warnings or to label products or chemicals with certain information regarding risks and recommended actions to reduce exposure or environmental release.

Section 18(d)(2) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, specifies that nothing in this section shall modify the preemptive effect of any prior rule or order by the Administrator prior to the effective date, responding to concerns that prior EPA action on substances such as polychlorinated biphenyls would be potentially immunized from liability for injury or harm.

Section 18(e) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, grandfathers existing and enacted state laws and regulatory actions, and requirements imposed now or in the future under the authority of state laws that were in effect on August 31, 2003.

Section 18(f) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, provides discretionary and mandatory waivers which exempt regulatory action by states and their political subdivisions from any federal preemptive effect. In particular, Subsection 18(f)(2)(B)

specifies that, where requested, EPA shall grant a waiver from preemption under subsection (b) upon the enactment of any statute, or the proposal or completion of a preliminary administrative action, with the intent of prohibiting or otherwise restricting a chemical substance or mixture, provided these actions occur during the 18-month period after EPA initiates the prioritization process and before EPA publishes the scope of the risk evaluation for the chemical substance (which cannot be less than 12 months after EPA initiates the prioritization process).

Section 18(g) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, specifies that no preemption of any common law or statutory causes of action for civil relief or criminal conduct shall occur, and that nothing in this Act shall be interpreted as dispositive or otherwise limiting any civil action or other claim for relief. This section also clarifies the Congressional intent to ensure that state requirements, including legal causes of action arising under statutory or common law, are not preempted or limited in any way by EPA action or inaction on a chemical substance. This section further clarifies Congress' intent that no express, implied, or actual conflict exists between any federal regulatory action and any state, federal, or maritime tort action, responding to the perceived conflict contemplated in Geier v. American Honda Motor Co., 529 U.S. 861 (2000) and its progeny.

18. FEES

Fees under section 26(b), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, are authorized to be collected so that 25% of EPA's overall costs to carry out section 4, 5, and 6, and to collect, process, review, provide access to and protect from disclosure information, are defrayed, subject to a $25,000,000 cap (that itself can be adjusted for inflation or if it no longer provides 25% of EPA's costs listed above). While the collection of fees is tied to the submission of particular information under sections 4 and 5 or the manufacturing or processing of a particular chemical substance undergoing a risk evaluation under section 6, in general the use of these fees is not limited to defraying the cost of the action that was the basis for payment of the fee. The exception to this general principle is for fees to defray the cost of conducting manufacturer requested risk evaluations, which are independent of the $25 million cap or 25% limit. These must be spent on the particular risk evaluation that was the basis for payment of the fee. This limitation applies only to the fee collected for the purpose of conducting the risk evaluation and does not prevent EPA from collecting further fees from such persons for other purposes for which payment of fees are authorized under the section. For example, if a manufacturer-requested risk evaluation later leads to risk management action, EPA may assign further fees to manufacturers and processors of that substance, subject to the $25,000,000 cap and the requirement to not exceed 25% of overall program costs for carrying out sections 4, 5, and 6, and to collect, process, review, provide access to and protect from disclosure information.

We also note that some have raised the possibility that section 26(b)(4)(B)(i)(I), as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, could be read to exclude the cost of risk evaluations, other than industry-requested risk evaluations, from the costs that can be covered by fees. This was not the intent and is not consistent with the statutory language. As clearly indicated in section 26(b)(1), the amended law provides that manufacturers and processors of chemicals subject to risk evaluations be subject to fees, and that fees be collected to defray the cost of administering sections 4, 5, and 6, and of collecting, processing, reviewing and providing access to and protecting from disclosure information. Risk evaluations are a central element of section 6. And as demonstrated by section 6(b)(4)(F)(i), the intent of the bill is that the EPA-initiated risk evaluations be defrayed at the 25% level (subject to the $25,000,000 cap), in contrast to the industry-initiated evaluations, which are funded at the 50% or 100% level. The final citation in section 26(b)(4)(B)(i) should be read as section 6(b)(4)(C)(ii), as it is in section 6(b)(4)(F)(i), not to section 6(b) generally.

19. SCIENTIFIC STANDARDS

The term "weight of evidence" refers to a systematic review method that uses a pre-established protocol to comprehensively, objectively, transparently, and consistently, identify and evaluate each stream of evidence, including strengths, limitations, and relevance of each study and to integrate evidence as necessary and appropriate based upon strengths, limitations, and relevance.

This requirement is not intended to prevent the Agency from considering academic studies, or any other category of study. We expect that when EPA makes a weight of the evidence decision it will fully describe its use and methods.

20. PARTIAL RISK EVALUATIONS

Section 26(1)(4) of TSCA, as amended by the Frank R. Lautenberg Chemical Safety for the 21st Century Act, states

"(4) CHEMICAL SUBSTANCES WITH COMPLETED RISK ASSESSMENTS.—With respect to a chemical substance listed in the 2014 update to the TSCA Work Plan for Chemical Assessments for which the Administrator has published a completed risk assessment prior to the date of enactment of the Frank R. Lautenberg Chemical Safety for the 21st Century Act, the Administrator may publish proposed and final rules under section 6(a) that are consistent with the scope of the completed risk assessment for the chemical substance and consistent with other applicable requirements of section 6."

EPA has completed risk assessments on TCE, NMP, and MC, but has not yet proposed or finalized section 6(a) rules to address the risks that were identified. The risk assessments for these chemicals were not conducted across all conditions of use. During the bi-cameral negotiations, EPA expressed the view that, rather than reexamine and perhaps broaden the scope of these assessments, it is better to proceed with proposed and final rules on the covered chemicals to avoid any delay in the imposition of important public health protections that are known to be needed. Congress shared these concerns. The language House-Senate negotiators included above is intended to allow EPA to proceed with the regulation of these substances if the scope of the proposed and final rules is consistent with the scope of the risk assessments conducted on these substances.

21. SNURS FOR ARTICLES

Section 5(a)(5) addresses the application of significant new use rules (SNURs) to articles or categories of articles containing substances of concern. It provides that in promulgating such SNURs, EPA must make "an affirmative finding . . . . that the reasonable potential for exposure to the chemical substance through the article or category of articles subject to the rule justifies notification." This language clarifies that potential exposure is a relevant factor in applying SNURs to articles. Exposure is a relevant factor in identifying other significant new uses of a chemical substance as well. It is not intended to require EPA to conduct an exposure assessment or provide evidence that exposure to the substance through the article or category of articles will in fact occur. Rather, since the goal of SNURs is to bring to EPA's attention and enable it to evaluate uses of chemicals that could present unreasonable risks, a reasonable expectation of possible exposure based on the nature of the substance or the potential uses of the article or category of articles will be sufficient to "warrant notification." EPA has successfully used the SNUR authority in the existing law to provide for scrutiny of imported articles (many of which are widely used consumer products) that contain unsafe chemicals that have been restricted or discontinued in the U.S. and it's critical that SNURs continue to perform this important public health function under the amended law.

22. COMPLIANCE DEADLINES

The amended law expands on existing section 6(d) by providing that rules under section 6 must include "mandatory compliance dates." These dates can vary somewhat with the type of restriction being imposed but, in general, call for compliance deadlines that "shall be as soon as practicable, but not later than 5 years after the promulgation of the rule." While EPA could in unusual circumstances delay compliance for as long as five years, this should be the exception and not the norm. To realize the risk reduction benefits of the rule, it is expected that compliance deadlines will be as soon as practicable after the rule's effective date as directed in new paragraph 6(d)(1).

Senator Barbara Boxer, Ranking Member, Environment and Public Works Committee.

Senator Edward J. Markey, Ranking Member, Subcommittee on Superfund, Waste Management and Regulatory Oversight, Environment and Public Works Committee, and cosponsor, Frank R. Lautenberg Chemical Safety for the 21st Century Act.

Senator Tom Udall, lead Democratic author and sponsor, Frank R. Lautenberg Chemical Safety for the 21st Century Act.

Senator Jeffrey A. Merkley, cosponsor, Frank R. Lautenberg Chemical Safety for the 21st Century Act.

Mr. MERKLEY. I yield the floor.

Mrs. GILLIBRAND. Mr. President, I know that everyone here shares a desire to fix our chemical safety law, the Toxic Substances Control Act, and I appreciate the years of hard work that my colleagues, starting with the late Senator from New Jersey, Frank Lautenberg, put in to try to make this bill the best bipartisan compromise it could be.

So many parts of this bill strengthen the standards and review process for chemicals, and I am pleased that we will finally be able to effectively regulate chemicals on a Federal level.

However, there is one part of the bill that still concerns me: the preemption of State laws.